**ORIGINAL**

*E-filing*

1   Mark Lapham, Esq. (SBN 146352)
    Law Offices of Mark Lapham, Esq.
2   751 Diablo Rd.
    Danville, CA 94526
3   Tel:  (925) 837-9007
    Fax: (650) 738-0325
4

5   Attorney for Plaintiff,
    OBED M. APOSTOL, JR.

*FILED*

APR 30 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

*Fed
Pod
iss.
(2)
ADR
KAW*

**BY FAX**

6

7

8                   **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10

11   OBED M. APOSTOL, JR., an individual.     )   Case No.: **C13-1983**
                                              )
12              Plaintiff,                    )   **PLAINTIFF'S COMPLAINT FOR**
                                              )
13         v.                                 )   **(1) WRONGFUL FORECLOSURE**
                                              )   **(2) FRAUD;**
14   CITIMORTGAGE, INC., a New York           )   **(3) TO UNWIND TRUSTEE'S SALE;**
     Corporation; CITI RESIDENTIAL            )   **(4) TO VOID OR CANCEL TRUSTEE'S**
15   LENDING, INC., a national banking        )   **DEED UPON SALE;**
     association; CR TITLE SERVICES, INC., a  )   **(5) TO VOID OR CANCEL ASSIGNMENT**
16   Delaware Corporation; CRYSTAL MOORE,     )   **OF DEED OF TRUST;**
     an individual; BRYAN BLY, an individual; )   **(6) CANCELLATION OF WRITTEN**
17   MORTGAGE ELECTRONIC                      )   **INSTRUMENTS;**
     REGISTRATION SYSTEMS, INC., a            )   **(7) VIOLATION OF CALIFORNIA CIVIL**
18   Delaware Corporation; and DOES 1 through )   **CODE SECTION 2934(a)(1)(A);**
     100, inclusive,                          )   **(8) UNJUST ENRICHMENT;**
19                                            )   **(9) VIOLATION OF THE TRUTH-IN-**
                                              )   **LENDING ACT 15 U.S.C 1601** *et seq.;*
20              Defendants.                   )   **(10) VIOLATION OF CALIFORNIA**
                                              )   **BUSINESS AND PROFESSIONS CODE**
21                                            )   **SECTIONS 17200, et seq. (Fraud Claims);**
                                              )   **and**
22                                            )   **(11) DECLARATORY RELIEF**
                                              )
23                                            )   **DEMAND FOR JURY TRIAL**
                                              )
24                                            )
                                              )
25   _____)

26         Pursuant to the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), COMES NOW, the

27   Plaintiff herein, OBED M. APOSTOL, JR., (hereinafter "Plaintiff" and/or "Homeowner"), brings

28

                                            1

APOSTOL v. CITIMORTGAGE, INC., et al.                          Verified Complaint

1   suit against CITIMORTGAGE, INC., a New York Corporation (hereinafter "CITIMORTGAGE");

2   CITI RESIDENTIAL LENDING, INC., a national banking association (hereinafter "CITI

3   RESIDENTIAL"); CR TITLE SERVICES, INC., a Delaware Corporation; (hereinafter "CRTS");

4   CRYSTAL MOORE, an individual; BRYAN BLY, an individual; MORTGAGE ELECTRONIC

5   REGISTRATION SYSTEMS, INC., a Delaware Corporation (hereinafter "MERS"); and DOES 1

6   through 100, inclusive, collectively referred to as "Defendants," for wrongful foreclosure, for Fraud,

7   for violation of California Civil Code Section 2932.5, for violation of the California Business &

8   Professions Code, Section 17200 *et seq* and for Unjust Enrichment.  Plaintiff also seeks to

9   invalidate and unwind the illegal foreclosure sale of the Subject Property by Defendants to a third

10  party purchaser, TURN KEY ASSET, INC., and restitution for mortgage payments and fees and

11  costs improperly collected by Defendants from Plaintiff.

12       The crux of Plaintiff's case is that, as a result of fraudulent mortgage assignment(s),

13  foreclosure documents and egregious breaches of agreements governing the mortgage-backed

14  securities (MBS) trust to which Plaintiff's loan was sold in March 2007, none of the defendants

15  named to this action is a beneficiary or real party in interest under Plaintiff's Deed of Trust

16  ("DOT") having the power to enforce the accompanying note.  Plaintiff contends that his mortgage

17  loan has become unsecured and that, consequently, no real party in interest exists with the power to

18  collect Plaintiff's mortgage payments or to exercise the power of sale under the Deed of Trust.

19       This situation arises from the verified fact that Plaintiff's mortgage loan was irrevocably sold

20  by the original lender, ARGENT MORTGAGE COMPANY, LLC (hereinafter "ARGENT

21  MORTGAGE"), in a securitization transaction on or before March 1, 2007 and ARGENT

22  MORTGAGE was paid for the full balance of the Plaintiff's loan. The subject mortgage loan

23  (consisting of the deed of trust and mortgage note) was bundled with other mortgages in a pool by

24  the intermediary loan purchaser, CITIGROUP GLOBAL MARKETS REALTY CORP. (hereinafter

25  "CGMRS"), the "Sponsor" and "Seller" in the securitization transaction. CGMRS is a nonbank

26  subsidiary of CITIGROUP, INC. (hereinafter "CITIGROUP"). This was the first sale of the

27  Plaintiff's mortgage loan.

28

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

Thereafter, securitization Sponsor and Seller CGMRS irrevocably sold the Plaintiff's mortgage loan (pooled with other mortgages) to CITIGROUP MORTGAGE LOAN TRUST, INC. (hereinafter "CMLTI"), the securitization "Depositor" and "Registrant" who formed the Mortgage-Backed Securities Trust ("MBS Trust"): CITIGROUP MORTGAGE LOAN TRUST 2007-AMC2, ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-AMC2 (hereinafter the "CMLTI 2007-AMC2"). This MBS Trust is a Special Purpose Vehicle ("SPV") with an election and continuing qualification of a *Real Estate Mortgage Investment Conduit* ("REMIC") pursuant to the Internal Revenue Tax Code of 1986, as amended (the "Tax Code"). CMLTI, a single-purpose entity, is another nonbank subsidiary of CITIGROUP. This was the second sale of the Plaintiff's mortgage loan.

In exchange for the securities Certificates (the "Certificates") issued by the MBS Trust, CMLTI sold the pooled Mortgage Loans (including Plaintiff's mortgage loan) to the CMLTI 2007-AMC2. U.S. BANK NATIONAL ASSOCIATION (hereinafter "U.S. BANK") serves as Trustee and fiduciary owner of the pooled Mortgage Loans in the Trust Fund for the benefit of the Certificateholders (investors) of the CMLTI 2007-AMC2. This was the third sale of the Plaintiff's mortgage loan.

The MBS Trust was created and formed with the execution of the Pooling and Servicing Agreement (the "PSA") dated as of March 1, 2007 (also herein referred to as the "Securitization Agreement.") The PSA is construed in accordance with and governed by the substantive laws of the State of New York.[1] The contractual terms, control, and ownership of the securitized Mortgage Loans are governed by the binding PSA. This governing Securitization Agreement provides for the valid and legal procedure for selling of the Mortgage Loans to the MBS Trust (with the precise

---

[1] When assets are transferred to a New York trust (as in the case of CMLTI 2007-AMC2), which was formed and governed in accordance with laws of the State of New York] there has to be actual delivery in as perfect a manner as possible; a "mere recital" is not sufficient (and, endorsements in blank does not suffice either because there is nothing that indicates that something endorsed in blank is trust property, rather than the trustee's or someone else's). **Adherence to the Securitization Agreement determines whether there was a transfer effected or not because under NY trust law (which governs most PSAs), a transfer not in compliance with a trust's documents is void**.

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

1  order of transfer) on or before the trust's specified "Closing Date" to create a clear "Purchaser-

2  Seller" position whereby certain REMIC provisions under the Tax Code were observed, and

3  whereby the original lender (the "Originator") selling its mortgage loans to the securitization trust

4  entity (issuer of trust's securities certificates) would be protected from issues regarding either

5  entity going into bankruptcy.

6        According to Section 860 of the Internal Revenue Code, in order for an investment entity to

7  qualify as a REMIC (as in the CMLTI 2007-AMC2), all steps in the contribution and transfer

8  process (of the notes and mortgages/deed of trusts) must be <u>true and complete sales</u> between the

9  parties and <u>must be accomplished within the three month time limit from the date of REMIC</u>

10  <u>"startup" of the entity.</u> Therefore, every transfer of the note(s) and assignment of mortgage(s) must

11  be a true purchase and sale, and, consequently the note must be endorsed and the mortgage (deed of

12  trust) assigned from one entity to another.  Any asset (mortgage loan) identified for inclusion in an

13  entity seeking REMIC status must be sold into the entity within the three-month time period from

14  the official startup day of the REMIC which in this instant case was on March 30, 2007, the

15  "Closing Date" and REMIC "Startup Day" for the MBS Trust: CMLTI 2007-AMC2. Any

16  procedural defect relating to endorsement, notarization, assignment of rights, and recordation

17  renders foreclosure action on the loan asset on behalf of the REMIC vulnerable to stay of

18  foreclosure, and possible dismissal through absence of proper standing to proceed.

19        When ARGENT MORTGAGE, CGMRC and CMLTI each got paid in full on or before the

20  MBS Trust's Closing Date on March 30, 2007 for selling the Plaintiff's mortgage loan in the

21  securitization transaction, ARGENT MORTGAGE, CGMRC and CMLTI's ownership title and

22  beneficial interest in and to the mortgage loan, respectively, were each extinguished.

23        However, despite CGMRC and CMLTI's representations, warranties and covenants in the

24  binding PSA regarding the transfer and assignment of the securitized Mortgage Loans (including

25  Plaintiff's), the official records of Plaintiff's mortgage in the Santa Clara County Recorder <u>do not</u>

26  show any assignment of Plaintiff's security interest (DOT) from original lender ARGENT

27  MORTGAGE to any entity on or before May 30, 2007. There was no record whatsoever of the

28

4

required intervening assignment of the Plaintiff's DOT from ARGENT MORTGAGE-to-CGMRC
> from CGMRC-to-CMLTI > and from CMLTI-to-U.S. BANK as Trustee of the CMLTI 2007-
AMC2. The prescribed rules and provisions of the governing the trust were violated and the
securitization of Plaintiff's loan failed, thereby leaving U.S. BANK, as Trustee for the REMIC
MBS Trust: CMLTI 2007-AMC2, without any legal or equitable interest in Plaintiff's mortgage.
This is an incontrovertible fact.

Such failure to assign the Plaintiff's DOT (more so without intervening indorsement of the
underlying original mortgage Note), which was a material breach of the binding PSA, resulted to an
irreversible break in the chain of title of the Plaintiff's mortgaged property. It should also be noted
that any mortgage assignment (DOT) without the indorsement of the underlying original mortgage
Note is nullity; it is not only voidable, but it is void.

From that point forward, up to and including the present time, through a series of
manipulations and actions by those who purchased Plaintiff's loan from original lender ARGENT
MORTGAGE, a maze of confusion has been created so that now it is uncertain who, if anyone,
aside from Plaintiff, can make any legitimate claim to an interest in Plaintiff's real property. Such
failure to validly transfer and assign the Plaintiff's mortgage loan on or before the Closing Date
(also called the REMIC "Startup Date") on March 30, 2007 effectively and irreversibly broke the
chain of title of the property, consequently clouding the title to the detriment of the mortgagor.

**COVERING UP THE FAILED SECURITIZATION OF PLAINTIFF'S MORTGAGE LOAN**

The fraud on Plaintiff's mortgage loan was initiated on January 13, 2009 when Defendants
conspired to cover up the botched securitization by willfully directing Defendant CITI
RESIDENTIAL LENDING, INC. ("CITI RESIDENTIAL LENDING"), acting as purported
Attorney-in-fact for ARGENT MORTGAGE COMPANY, LLC ("ARGENT MORTGAGE"), to
assign the Plaintiff's DOT (without the underlying original mortgage Note) to MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), ITS SUCCESSORS AND
ASSIGNS, AS NOMINEE FOR CITIMORTGAGE, INC. ("CITIMORTGAGE"). This was done
despite the fact that Defendants knew fully well that original lender ARGENT MORTGAGE had

5

1  already sold the Plaintiff's DOT and Note in March 2007, and ARGENT MORTGAGE no longer

2  has any ownership title and beneficial interest in the Plaintiff's mortgage loan. CITI

3  RESIDENTIAL LENDING has no right, power and authority acting as Attorney-in-Fact for

4  ARGENT MORTGAGE to assign Plaintiff's mortgage (DOT) that ARGENT MORTGAGE no

5  longer owns since March 30, 2007.

6       In furtherance of the fraud, the above-cited Assignment of DOT (the "1st mortgage

7  assignment") was signed and notarized by very well known and publicized "robo-signers-for-hire,"

8  CRYSTAL MOORE and BRYAN BLY, respectively. Ms. Moore is not a Vice President or

9  employee of CITI RESIDENTIAL LENDING as was falsely represented in this assignment of

10  mortgage instrument; she is in fact an employee of NATIONWIDE TITLE CLEARING

11  (hereinafter "NTC") when CRYSTAL MOORE purportedly signed the first assignment of

12  Plaintiff's DOT on January 13, 2009. Notary Public BRYAN BLY is also an employee NTC. Like

13  Ms. Moore, Mr. Bly is a "robo-signer for hire," known to falsely represent himself as officer and

14  employee of various lenders and mortgage servicing companies. The St. Petersburg Times reported

15  on the mass signings by Ms. Moore and Bly, earning the duo the reputation of the two best-known

16  "robo-signers" in the country. In a deposition in November 2010 regarding a foreclosure case in

17  Florida, both Ms. Moore and Mr. Bly admitted signing thousands of mortgage assignments per day

18  (i.e., between 3,000 to 5,000 assignments per day) for different lenders, securitization trusts and

19  mortgage servicing companies and described the "Assembly Line" work they do at NTC. Ms.

20  Moore admitted under oath that she never read any documents she signed and spends "a few

21  seconds" with each one of them. When asked whether she is/was a Vice President of any of the

22  companies she represented when signing the documents, Ms. Moore said, "NO." In the deposition,

23  Ms. Moore also acknowledged she neither verifies the information in the documents nor take steps

24  to verify information she signed. Here is the web link of Ms. Moore and Mr. Bly's video-

25  depositions: http://www.tampabay.com/news/on-video-alleged-robo-signers-describe-assembly-

26  line-work/1133687.

27       Also in furtherance of the fraud, another assignment of the Plaintiff's DOT was made on

28

APOSTOL v. CITIMORTGAGE, INC., et al.           Verified Complaint

1    March 14, 2011 and recorded on March 17, 2011 (the "2nd mortgage assignment"). Here, Defendant

2    MERS, its successors and assigns, as Nominee for CITIMORTGAGE, fraudulently assigned

3    Plaintiff's DOT to CITIMORTGAGE, who then simultaneously substituted Defendant CR TITLE

4    SERVICES, INC. ("CRTS") in the DOT in place of original Trustee TOWN AND COUNTRY

5    TITLE SERVICES, INC. under a Substitution of Trustee ("SOT") instrument recorded on March

6    17, 2011. The 2nd mortgage assignment (as well as the previous 1st assignment) was made a number

7    of years after original lender ARGENT MORTGAGE had already sold Plaintiff's mortgage loan in

8    the securitization transaction, but not legally and validly transferred to the MBS Trust on or before

9    its "Closing Date" on March 30, 2007. Because the purported authority of MERS in the 2nd

10   mortgage assignment was derived from and flows directly from the invalid and fraudulent 1st

11   mortgage assignment, it follows that such 2nd Assignment of Plaintiff's DOT by MERS to

12   CITIMORTGAGE is also void, not just voidable.

13        The cloud on Plaintiff's title to his home property rendered it unalienable. Further, Plaintiff

14   has been fraudulently induced to pay mortgage payments to Defendant CITIMORTGAGE, a party

15   without authority to collect them because of egregious breaches of the governing securitization

16   agreement.  Consequently, Plaintiff seeks the Court's intervention to invalidate the Trustee's Deed

17   Upon Sale issued by CRTS and unwind the wrongful foreclosure, which are the subject of this

18   action, and to quiet title to Plaintiff's real property in his name and to disgorge the ill-gotten gains

19   obtained by Defendants at Plaintiff's expense.

20                                **PARTIES AND JURISDICTION**

21

22   1.        Plaintiff, OBED M. APOSTOL, JR., is informed and believes and thereupon alleges

23   that Defendants, and each of them, claim an interest in Plaintiff's property adverse to Plaintiff's

24   herein. Defendants' claims are without any basis in law or in equity, and said Defendants have no

25   legal or equitable right, claim, or interest in said property.  Plaintiff therefore seeks a declaration

26   that the title to the subject property is vested in Plaintiff's alone and that the defendants herein, and

27   each of them, be declared to have no estate, right, title or interest in the subject property and that

28

APOSTOL v. CITIMORTGAGE, INC., et al.                                      Verified Complaint

1   said defendants, and each of them, be forever enjoined from asserting any estate, right, title or

2   interest in the subject property adverse to Plaintiff herein.   This suit also seeks to declare the

3   foreclosure sale illegal and unwound the foreclosure action on Plaintiff's unique real property,

4   located at 1330 Cedar Court, Gilroy, CA 95020 with Parcel ID No. 808-03-035 (hereinafter the

5   "Property").   Defendants have initiated a non-judicial foreclosure proceeding against Plaintiff's

6   property that is not in compliance with laws of California. The subject property was sold in a

7   wrongful foreclosure on May 15, 2012 by Defendant CR TITLE SERVICES, INC. ("CRTS"), an

8   invalid trustee in Plaintiff's mortgage without legal authority. And CRTS subsequently transferred

9   the title of the property by issuing a Trustee's Deed Upon Sale ("TDUS") in favor of TURN KEY

10  ASSET, INC.

11      2.      Defendant CITIMORTGAGE, INC. ("CITIMORTGAGE") is a corporation organized

12  and existing under the laws of the State of New York, with principal place of business at 1000

13  Technology Drive, O'Fallon, Missouri 63368 and doing business in California. CITIMORTGAGE

14  is a subsidiary company of CITIGROUP, INC. ("CITIGROUP"), a financial holding company and

15  the third largest U.S. mortgage lender in the United States. CITIGROUP's prime mortgage lending

16  and servicing of those loans is provided through CITIMORTGAGE.

17      3.      Defendant CITI RESIDENTIAL LENDING, INC. ("CITI RESIDENTIAL

18  LENDING"), a national banking association organized under the laws of the State of Delaware and

19  with its principal place of business in Orange, California, is another controlled company and

20  subsidiary of CITIGROUP. Thus CITIGROUP is liable for any and all of CITI RESIDENTIAL

21  LENDING's conduct alleged herein. CITI RESIDENTIAL LENDING is one of the largest

22  privately held retail subprime mortgage lenders in the United States. CITIMORTGAGE or CITI

23  RESIDENTIAL LENDING is neither the original lender nor a party to the Original Loan

24  Transaction on October 31, 2006 between the Plaintiff and ARGENT MORTGAGE COMPANY,

25  LLC ("ARGENT MORTGAGE"), the original lender in the Plaintiff's mortgage loan (consisting of

26  a Promissory Note and a Deed of Trust). CITI RESIDENTIAL LENDING acquired ARGENT

27  MORTGAGE on September 7, 2007. Shortly thereafter, CITIGROUP rebranded ARGENT

28

8

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

1    MORTGAGE COMPANY, LLC to CITI RESIDENTIAL LENDING, INC. Then on April 30,

2    2008, CITIGROUP transitioned CITI RESIDENTIAL LENDING's loan origination and related

3    assets to CITIMORTGAGE and CITY RESIDENTIAL LENDING's operation was shut down.

4        4.      Defendant CR TITLE SERVICES, INC. ("CRTS") is a Delaware corporation with its

5    principal place of business in O'Fallon, Missouri and doing business in California.  CRTS is another

6    subsidiary and controlled company of CITIGROUP. CRTS schedules and conducts trustee's

7    (foreclosure) sales of real property. CRTS is neither the original trustee nor a party to the Original

8    Loan Transaction. CRTS' role and involvement here was an essential part in Defendants'

9    conspiracy to defraud (and to commit the other acts alleged herein) in that it was through CRTS, the

10   foreclosing trustee, Defendants were able to force wrongful foreclosure against Plaintiff's property,

11   which sale resulted in substantial profit to Defendants. CRTS also violated numerous other laws and

12   statutes in furtherance of such conspiracy, acted intentionally and with malice in doing these acts,

13   for which CRTS services was paid handsomely by Defendants.

14       5.      Defendant CRYSTAL MOORE, as an individual, employed by NATIONWIDE TITLE

15   CLEARING ("NTC"), with a business address listed at 2100 Alt 19 North, Palm Harbor, Florida

16   34683 and Tel. No. 727-771-4000. Defendant CRYSTAL MOORE purportedly signed the 1st

17   Assignment of Plaintiff's DOT in Pinellas County, Florida on January 13, 2009, falsely represented

18   herself as Vice President of CITI RESIDENTIAL LENDING, INC. On information and belief,

19   CITI RESIDENTIAL does not even have any office or branch in Pinellas County, Florida.

20       6.      Defendant BRYAN BLY, as an individual, employed by NATIONWIDE TITLE

21   CLEARING ("NTC"), with a business address listed at 2100 Alt 19 North, Palm Harbor, Florida

22   34683 and Tel. No. 727-771-4000. Defendant BRYAN BLY purportedly notarized the 1st

23   Assignment of DOT instrument on January 13, 2009 in Pinellas County, Florida.

24       7.      Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

25   ("MERS") is organized and existing under the laws of the State of Delaware with corporate

26   headquarters located at 1818 Library Street, Reston, VA 20190. MERS tracks the ownership

27   interests and servicing rights in mortgage loans and holds title to mortgages solely as a nominee for

28

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

1  MERS' member lenders which subscribe to its services.  MERS is neither the original lender nor a

2  party to the Original Loan Transaction. Plaintiff is informed and believes and thereon alleges that

3  MERS is not a financial lending entity.

4      8.      CITIGROUP GLOBAL MARKETS REALTY CORP. ("CGMRS") was the "Sponsor"

5  and mortgage "Seller" in the securitization transaction. CGMRS, a corporation organized under the

6  laws of the State of New York, is a nonbank subsidiary of CITIGROUP. CGMRS is neither the

7  original lender nor a party to the Original Loan Transaction.

8      9.      CITIGROUP MORTGAGE LOAN TRUST, INC. ("CMLTI") was the securitization

9  "Depositor" and "Registrant" who formed the Mortgage-Backed Securities Trust ("MBS Trust"):

10 CITIGROUP MORTGAGE LOAN TRUST 2007-AMC2, ASSET-BACKED PASS-THROUGH

11 CERTIFICATES, SERIES 2007-AMC2 (the "CMLTI 2007-AMC2"), a special purpose vehicle

12 ("SPV") with an election and continuing qualification of a *Real Estate Mortgage Investment*

13 *Conduit* ("REMIC") pursuant to the Internal Revenue Tax Code of 1986, as amended (the "Tax

14 Code"). CMLTI, a single-purpose entity and a corporation organized under the laws of the State of

15 Delaware, is another nonbank subsidiary of CITIGROUP. CMLTI is neither the original lender nor

16 a party to the Original Loan Transaction.

17     10.    Plaintiff is ignorant of the true names and capacities of Defendants sued under fictitious

18 names Does 100, inclusive, and Plaintiff will amend this Complaint to allege such true names and

19 capacities as soon as they are ascertained.  Plaintiff is informed and believes and thereon alleges

20 that each of said fictitiously named Defendants is responsible in some manner for the acts

21 complained of herein.

22     11.    Venue of this action is proper in this District as the residential real property, which is

23 the subject of this action, is situated in Santa Clara County, California, and the acts complained of

24 herein occurred in Santa Clara County, California.

25     12.    Plaintiff is informed and believes, and thereon alleges that each of the fictitiously

26 named Defendants, Defendants DOES 1 through DOES 100, inclusive, is legally responsible in

27 some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were

28

10

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

1   legally caused by those Defendants, and/or that each of the fictitiously named Defendants is

2   responsible in some manner for the occurrences herein alleged, and the Plaintiff's injuries as herein

3   alleged were legally caused by such conduct.

4               **MATERIAL FACTS COMMON TO ALL CAUSES OF ACTION**

5        13.    On or about October 31, 2006, Homeowner (Plaintiff) entered into a residential

6   mortgage loan transaction (the "Original Loan Transaction") with ARGENT MORTGAGE

7   COMPANY, LLC ("ARGENT MORTGAGE"). ARGENT MORTGAGE is the Lender on record

8   in Plaintiff's Promissory Note (hereinafter "Note") and Deed of Trust (hereinafter "DOT"). The

9   Original Loan Transaction consisted of a Note and DOT securing the Plaintiff's home property that

10  is subject to this action. ARGENT MORTGAGE is the initial beneficiary and TOWN AND

11  COUNTRY TITLE SERVICES, INC. as original Trustee in the DOT. CITIMORTGAGE, INC.

12  ("CITIMORTGAGE") is the purported loan servicer.  A true and correct copy of the **Plaintiff's**

13  **DOT** dated as of October 31, 2006 is attached hereto as **Exhibit "A"** and incorporated by reference

14  as though fully set forth herein. The DOT (also dated as of October 31, 2006) was recorded in the

15  official records of the Santa Clara County Recorder on November 6, 2006 as Document No.

16  19171994.

17  **I – PLAINTIFF'S MORTGAGE LOAN WAS SOLD IN A VERIFIED SECURITIZATION**

18  **TRANSACTION ON OR BEFORE MARCH 30, 2007**

19       14.    Plaintiff is informed and believes and thereon alleges that shortly after funding the

20  Plaintiff's loan on or about October 31, 2006 as an "off-the-book" transaction, original lender

21  ARGENT MORTGAGE, as the loan "Originator" in a verified securitization transaction, in fact

22  irrevocably sold the Plaintiff's mortgage loan to CITIGROUP GLOBAL MARKETS REALTY

23  CORPORATION ("CGMRC"). As noted hereinbefore, this was the first sale of the Plaintiff's

24  mortgage loan.

25       16.    Acting as "Sponsor" and "Seller" in the securitization transaction, CGMRC bundled the

26  Plaintiff's loan with other mortgages in a pool and sold the pooled Mortgage Loans, without

27  recourse, to securitization "Depositor" CITIGROUP MORTGAGE LOAN TRUST, INC.

28

                                        11

1   ("CMLTI"), an affiliate company of CGMRC. <u>This was the second sale of the Plaintiff's mortgage</u>

2   <u>loan.</u>

3       17.     The securitization process involves pooling mortgage loans, transferring those

4   obligations to a trust thereby converting them into securities and then selling fractional interests in

5   the trust's pool of mortgages to investors. The relationship of the parties to the securitization is

6   governed by a binding Pooling and Servicing Agreement (the "PSA"). The PSA determines when a

7   party to the agreement has the right to foreclose.  The loans are purchased from an "Originator,"

8   collected and packaged by a securitization "Sponsor" and then sold to a "Depositor" who in turn

9   sells and transfers these loans into a tax-advantaged trust entity. The trust is organized as Special

10  Purpose Vehicle ("SPV") to be a Qualified Special Purpose Entity ("QSPE"), which receives

11  special tax treatment. To avoid double taxation of both the trust and the certificate holders

12  (investors), mortgages are held in *Real Estate Mortgage Investment Conduits* ("REMICs"), a

13  category of QSPE, pursuant to Section 860 of the Internal Revenue Code (the "Tax Code"). The

14  QSPE with an election to continuously qualify as a REMIC trust holds the mortgage loans as

15  collateral on the securities traded and sold by Wall Street and other financial firms to multiple

16  investors. REMICs, in general, are not taxable entities; the pro-rata "pass-through" distributions

17  (cash flows) to certificate holders are taxable. To qualify and receive such favorable "pass-through"

18  or single tax treatment based on strict Internal Revenue Service REMIC rules, all interest in the

19  mortgage is supposed to be transferred forward to the certificate holders ("Investors").

20      18.     In this instant case, Plaintiff's loan was sold through a series of securitization

21  transactions into the MBS Trust: CITIGROUP MORTGAGE LOAN TRUST 2007-AMC2,

22  ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-AMC2 (the "CMLTI 2007-

23  AMC2") on or before the trust's "Closing Date" on March 30, 2007.  The MBS Trust was created

24  and formed with the execution of the PSA dated as of March 1, 2007 (also herein referred to as the

25  "Securitization Agreement"). The Securitization Agreement is construed in accordance with and

26  governed by the substantive laws of the State of New York. The PSA governing the CMLTI 2007-

27  AMC2 consists of 296 pages when downloaded as a PDF file and printed. This PSA, which was

28

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

1    filed on April 17, 2007 with the Securities and Exchange Commission (SEC) as Form 8-K for

2    2/15/2007 EX-4.1 (SEC File 333-138237-08), is not attached but it can be found at the SEC website

3    and incorporated by reference as though fully set forth herein:

4    http://www.secinfo.com/dqTm6.u12c.c.htm.

5        19.    The contractual terms, control, and ownership of the securitized Mortgage Loans are

6    governed by the binding PSA. This governing Securitization Agreement provides for the legal

7    procedure for selling of the Mortgage Loans to the MBS Trust (with the precise order of transfer)

8    on or before the trust's specified "Closing Date" to create a clear "Purchaser-Seller" position

9    whereby certain REMIC provisions under the Tax Code were observed, and whereby the original

10   lender (the "Originator") selling its mortgage loans to the securitization trust entity (issuer of

11   trust's securities certificates) would be protected from issues regarding either entity going into

12   bankruptcy.

13       20.    For the MBS Trust to acquire this protection from Lender and Issuer from bankruptcy

14   (referred to as "*Bankruptcy Remote*"), at least two "*True Sales*" of the loans had to occur, when

15   loans were transferred to different entities.  A "*True Sale*" of the loan would be a circumstance

16   whereby one party owned the Note, and then sold it to another party.  An offer would be made, and

17   then accepted, with financial consideration given to the "seller" in return for the Note.  The Notes

18   would be transferred, and the security instruments (mortgages or deeds of trust) "assigned to the

19   buyers" of the Note, with an assignment and recording thereof made every step of the way, and

20   each Note indorsed to the next party. Such legal process was necessary to maintain a valid lien,

21   one that would permit a loan servicer to foreclose on a borrower in purported default on behalf of

22   the Trustee of the MBS Trust (i.e., the holder of the note and mortgagee on record in the deed of

23   trust.)

24       21.    CMLTI is the securitization "Registrant" and "Depositor" who formed the CMLTI

25   2007-AMC2 with an election and continuing qualification of a REMIC in accordance with the Tax

26   Code. Pursuant to the binding PSA, CGMRC as the "Sponsor" and "Seller" in the securitization

27   represented, warranted and covenanted that it irrevocably sold, transferred, assigned and conveyed

28

13

the Plaintiff's mortgage loan, together with other mortgages in a pool, to CMLTI, the securitization Depositor. As noted hereinbefore, this was the second sale of the Plaintiff's mortgage loan.

22.    Thereafter, Depositor CMLTI represented, warranted and covenanted in the binding and governing PSA that it in exchange for the securities certificates (multiclass bonds) issued by the MBS Trust, CMLTI irrevocably sold the pooled Mortgage Loans (including the Plaintiff's loan), without recourse, to U.S. BANK as Trustee for the benefit of the Certificateholders of the CMLTI 2007-AMC2 on or before the trust's "Closing Date" (also concurrently the REMIC "Startup Day") on March 30, 2007. This was the third sale of the Plaintiff's mortgage loan.

23.    Pursuant to the terms and REMIC provisions of the PSA, only the Depositor (in this case CMLTI), and no other, may transfer qualified assets (in this case the Mortgage Loans) to the securitization trust. [Emphasis added] This was necessary and in accordance with the Tax Code to preserve and maintain the separation and *"bankruptcy remoteness"* of the loan originator, ARGENT MORTGAGE, and the MBS Trust: CMLTI 2007-AMC2. (So if the originator went bust, the investors [certificateholders] would not be exposed to the risk of lenders to the originator trying to get the notes back out of the trust.)

24.    The Depositor exists for the sole purpose of enabling the transaction to have the key elements that make it a securitization in the first place: a *"true sale"* of the Mortgage Loans to a "bankruptcy-remote" and "FDIC-remote" purchaser. The Depositor purchases the loans from the Sponsor, then immediately sells the loans to the Trustee of the securitization trust, and uses the proceeds received from the trust to pay the Sponsor for the Depositor's own purchase of the loans. It all happens simultaneously, or as nearly so as theoretically possible. The length of time that the Depositor owns the loans has been described as "one nanosecond."

25.    The Depositor, a single-purpose entity, has no other functions, so it needs no more than a handful of employees and officers. Nevertheless, it is essential for the *"true sale"* and *"bankruptcy-remote"*/*"FDIC-remote"* analysis that the Depositor maintains its own corporate existence separate from the Sponsor and the Trust and observes the formalities of this separate corporate identity at all times. The *"Elephant in the Room"* in all structured financial transactions is

14

the mandatory requirement to create at least <u>two</u> "*true sales*" of the notes and mortgages between the Originator and the Trustee for the Trust so as to make the assets of the Trust both "bankruptcy" and "FDIC" remote from the originator. And, these "*true sales*" must be documented by representations and attestations signed by the parties; by attorney opinion letters; by asset purchase and sale agreements (i.e., contained in the PSA); by proof of adequate and reasonably equivalent consideration for each purchase; by "*true sale*" reports from the three major "ratings agencies" (Standard & Poor's, Moody's, and Fitch) and by transfer, complete intervening endorsements and delivery receipts for mortgage notes.

26.     CITIGROUP GLOBAL MARKETS, INC., the designated "Underwriter" of the securitization (and an affiliate company of securitization Sponsor CGMRC and Depositor CMLTI), sold the securities certificates or multiclass bonds backed by the Mortgage Loans in the Trust Fund on behalf of Depositor CMLTI to multiple investors. The <u>irrevocable</u> sale of the Mortgage Loans between securitization Depositor CMLTI and U.S. BANK, as Trustee for the CMLTI 2007-AMC2 (for the benefit of the Certificateholders) was not only <u>acknowledged</u>, but also <u>certified</u> by U.S. BANK, as Trustee and the fiduciary owner of the securitized Mortgage Loans in the Trust Fund for the benefit of the Certificateholders of the MBS Trust.

27.     In order to comply with MBS Trust's election and continuing qualification as a REMIC trust within the meaning of Section 860 of the Tax Code, the strict terms of the governing PSA specified a "Cut-off Date" on March 1, 2007 and a "Closing Date" (also the REMIC "Startup Day") on March 30, 2007. The Closing Date is an <u>absolute deadline</u> after which the Trustee of the CMLTI 2007-AMC2 is <u>strictly prohibited</u> from accepting any contribution of an asset (in this case any mortgage loan). The PSA refers to any late or out-of-date mortgage loan transfer as a "*Prohibited Transaction.*"

28.     The mortgage files for each mortgage loan (i.e., primarily consisting of the complete intervening assignment of the DOT and endorsement of the underlying mortgage note from the loan originator-to-seller/sponsor > seller/sponsor -to-depositor > then from depositor-to-trustee of the MBS Trust) <u>must be received by the Trustee of the MBS Trust no later than the 90 days from the</u>

15

1    Closing Date – and to be acknowledged and certified by the Trustee (or the appointed Trust's

2    Custodian). Also, each mortgage loan to be contributed to the Trust Fund must also be a qualified

3    loan (i.e., performing loan, not in default).

4        29.    Pursuant to the terms and REMIC provisions of the binding PSA, original lender

5    ARGENT MORTGAGE, as loan "Originator," irrevocably sold the Plaintiff's mortgage loan to

6    Sponsor and Seller CGMRC on or before the securitization trust's "Cut-off Date" on March 1,

7    2007. Thereafter, CGMRC bundled the Plaintiff's loan with other mortgages in a pool and sold the

8    Mortgage Loans, without recourse, to Depositor CMLTI, who in turn securitized and sold these

9    Mortgage Loans to the MBS Trust: CMLTI 2007-AMC2 on or before the trust's "Closing Date" on

10   March 30, 2007.  Loan Originator ARGENT MORTGAGE, Sponsor and Seller CGMRC and

11   Depositor CMLTI, respectively, were each paid for the full balance of the Plaintiff's loan that was

12   pooled with others mortgages and securitized into the CMLTI 2007-AMC2. In the binding and

13   governing Securitization Agreement (the "PSA") that was executed under oath, securitization Seller

14   and Sponsor CGMRC and Depositor CMLTI each represented, warranted and covenanted that each

15   of the Mortgage Loans (i.e., with the complete intervening assignment of the deed of trust and

16   indorsement of the underlying original note from loan originator-to-seller/sponsor > seller/sponsor -

17   to-depositor > then from depositor-to-trustee of the MBS Trust) was properly and validly assigned,

18   transferred and conveyed to U.S. BANK as Trustee for the benefit of the Certificateholders of the

19   CMLTI 2007-AMC2 on or before the trust's "Closing Date" on March 30, 2007.

20       30.    In order for one of these investment trusts to qualify for the "pass through" tax benefit

21   of a REMIC, ALL LEGAL AND EQUITABLE INTEREST IN THE MORTGAGES HELD IN

22   THE NAME OF THE TRUST ARE VESTED IN THE INVESTORS (CERTIFICATEHOLDERS),

23   not in anyone else AT ANY TIME. If legal and/or equitable interest in the mortgages held in the

24   name of the trust is claimed by anyone other than the investors, those that are making those

25   misrepresentations are either defrauding the investors, or the homeowners & courts, or both. So if

26   the trust, or a servicer, or a trustee, acting on behalf of the trust, is found to have violated the very

27

28

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

1  strict REMIC guidelines (put in place in order to qualify as a REMIC), the "pass through" tax status

2  of the REMIC is subject to permanent revocation.

3      31.     According to Section 860 of the Internal Revenue Code, in order for an investment

4  entity to qualify as a REMIC, all steps in the "contribution" and transfer process (of the notes) must

5  be true and complete sales between the parties and must be accomplished within the three month

6  time limit from the date of REMIC "startup" of the entity. Therefore, every transfer of the note(s)

7  must be a true purchase and sale, and, consequently the note must be endorsed from one entity to

8  another.  Any mortgage note/asset identified for inclusion in an entity seeking REMIC status must

9  be sold into the entity within the three-month time period from the official startup day of the

10  REMIC. Any procedural defect relating to endorsement, notarization, assignment of rights, and

11  recordation renders foreclosure action on the loan asset on behalf of the REMIC vulnerable to stay

12  of foreclosure, and possible dismissal through absence of proper standing to proceed.

13  **II - FAILED SECURITIZATION: DESPITE PAYMENT OF THE FULL BALANCE OF**

14  **THE PLAINTIFF'S LOAN, ORIGINAL LENDER ARGENT MORTGAGE FAILED TO**

15  **VALIDLY ASSIGN THE MORTGAGE LOAN PURSUANT TO THE BINDING AND**

16  **GOVERNING PSA.**

17  / / /

18      32.     When ARGENT MORTGAGE, CGMRC and CMLTI each got paid in full for selling

19  the Plaintiff's mortgage loan in the securitization transaction on or before March 30, 2007,

20  ARGENT MORTGAGE, CGMRC and CMLTI's beneficial interest and ownership title in the loan,

21  respectively, were each extinguished.

22      33.     However, despite CGMRC and CMLTI's representations, warranties and covenants of

23  in the binding PSA, the official records of the Santa Clara County Recorder regarding the Plaintiff's

24  mortgage do not show any assignment of Plaintiff's security interest (DOT) from original lender

25  ARGENT MORTGAGE to any entity on or before May 30, 2007. To date, there is no record

26  whatsoever of the required intervening assignment of the Plaintiff's DOT from ARGENT

27

28
                                        17

1   MORTGAGE-to-CGMRC > from CGMRC-to-CMLTI > and from CMLTI-to-U.S. BANK as

2   Trustee of the CMLTI 2007-AMC2. That is an incontrovertible fact.

3       34.     Because it has been verified (and it cannot be disputed) that original lender ARGENT

4   MORTGAGE failed to assign the Plaintiff's mortgage to CGMRC, securitization Sponsor CGMRC

5   could not and did not assign the mortgage to CMLTI; and thus, securitization Depositor CMLTI

6   could not and did not assign said mortgage to U.S. BANK, as Trustee for the Certificateholders of

7   the CMLTI 2007-AMC2 on or before the trust's "Closing Date" of on March 30, 2007.

8   **III - BROKEN CHAIN OF TITLE WITH THE REAL PARTY IN INTEREST,**

9   **BENEFICIARY AND NOTEHOLDER UNKNOWN**

10      35.     Such failure to assign the Plaintiff's DOT (more so without intervening indorsement of

11  the underlying original mortgage Note), a material breach of the binding PSA, resulted to an

12  irreversible break in the chain of title of the mortgaged property. It should also be noted that any

13  mortgage assignment (DOT) without the indorsement of the underlying original mortgage Note is

14  nullity; it is not only voidable, but it is void.

15      36.      From that point forward, up to and including the present time, through a series of

16  manipulations and actions by those who purchased Plaintiff's loan from original lender ARGENT

17  MORTGAGE, a maze of confusion has been created so that now it is uncertain who, if anyone,

18  aside from Plaintiff, can make any legitimate claim to an interest in Plaintiff's real property. Such

19  failure to validly transfer and assign the Plaintiff's mortgage loan on or before the Closing Date

20  (also called the REMIC "Startup Date") on March 30, 2007 effectively and irreversibly broke the

21  chain of title of the property, consequently clouding the title to the detriment of the mortgagor.

22      37.     The mortgagor (borrower) herein relied on loan servicer CITIMORTGAGE's

23  misrepresentations, and has been damaged in the following ways: 1) while the illegal foreclosure of

24  the property proceeded, multiple parties may still seek to enforce the debt obligation against the

25  mortgagor – i.e., civil double jeopardy; 2) the title to the real estate property has been clouded,

26  fatally defective and rendered unmarketable, as any REO would-be buyer of subject property will

27  find themselves in legal limbo, unable to know with any certainty whether they can safely buy the

28

APOSTOL v. CITIMORTGAGE, INC., et al.                                      Verified Complaint

1   property or get title insurance; 3) mortgagor never had an opportunity to refinance the loan or sell

2   the property with a clouded title or negotiate modification of the loan with the true party in interest

3   in the mortgage loan; 4) mortgagor had been paying the wrong party for an undetermined amount of

4   time and overpaid in interest that was over calculated; 5) mortgagor is unable to determine whether

5   the monthly mortgage payments was paid to the right party; and 6) mortgagor may have to expend

6   significant funds to cover the cost of attorney's fees and related cost to regain title to the property.

7       38.     As cited, there was NO RECORD whatsoever in the official records of the Santa Clara

8   County Recorder of the intervening assignment of DOT and chain of valid indorsement of the

9   original Note from ARGENT MORTGAGE-to-CGMRC, CGMRC-to-U.S. BANK as trustee for

10  the CMLTI 2007-AMC2. An irreversible broken chain of title now exists - with the true

11  beneficiary, mortgagee and noteholder UNDOCUMENTED and UNKNOWN.

12  **IV – FRAUDULENT AND INVALID ASSIGNMENTS OF PLAINTIFF'S DOT AND**

13  **INVALID SUBSTITUTION OF TRUSTEE IN THE DOT**

14      39.     To cover up the failed securitization and have an "appearance of standing" in the

15  Plaintiff's mortgage loan, Defendants willfully caused CITI RESIDENTIAL LENDING, as

16  purported Attorney-in-fact for ARGENT MORTGAGE, to assign the Plaintiff's DOT (without the

17  underlying original mortgage Note) to Defendant MORTGAGE ELECTRONIC REGISTRATION

18  SYSTEMS, INC. ("MERS"), its Successors and Assigns, as Nominee for CITIMORTGAGE, INC.

19  A true and correct copy of the **1st Assignment of Plaintiff's DOT** dated as of January 13, 2009 is

20  attached hereto as **Exhibit "B"** and incorporated by reference as though fully set forth herein. This

21  first mortgage assignment was recorded in the official records of the Santa Clara County Recorder

22  on March 2, 2009 as Document No. 20151291.

23      40.     This 1st mortgage assignment of Plaintiff's DOT to MERS as nominee for

24  CITIMORTGAGE was fraudulently and willfully issued despite the fact that Defendants knew fully

25  well that original lender ARGENT MORTGAGE had already sold the Plaintiff's DOT and Note in

26  March 2007 and that ARGENT MORTGAGE no longer has any ownership title and beneficial

27  interest in the Plaintiff's mortgage loan. For this reason, CITI RESIDENTIAL LENDING's

28

19

APOSTOL v. CITIMORTGAGE, INC., et al.                                Verified Complaint

1  purported authority acting as Attorney-in-fact for ARGENT MORTGAGE who no longer has any

2  standing in the Plaintiff's mortgage loan cannot be valid. Therefore, MERS' purported right and

3  authority as nominee for CITIMORTGAGE, its successors and assigns, and as the nominal

4  beneficiary in the DOT is also invalid and void in the first place, not just voidable.

5  41.    On March 14, 2011, MERS, as nominee of CITIMORTGAGE, an invalid beneficiary,

6  willfully and fraudulently assigned the Plaintiff's DOT (without the endorsement of the underlying

7  original mortgage Note) to CITIMORTGAGE, its purported principal in the invalid 1st assignment

8  of Plaintiff's DOT. A true and correct copy of the **2nd Assignment of Plaintiff's DOT** by MERS to

9  CITIMORTGAGE, which was recorded in the official records of the Santa Clara County Recorder

10  on March 17, 2011 as Document No. 21113836, is attached hereto as **Exhibit "C"** and incorporated

11  by reference as though fully set forth herein.

12  42.    Simultaneously on March 14, 2011, CITIMORTGAGE, not a valid beneficiary,

13  substituted Defendant CR TITLE SERVICES, INC. ("CRTS") in the DOT in place of original

14  Trustee TOWN AND COUNTRY TITLE SERVICES, INC. under a Substitution of Trustee

15  ("SOT") instrument that was also recorded in the public records of the county recorder on March

16  17, 2011 as Document No. 21113837. A true and correct copy of this **SOT** is attached hereto as

17  **Exhibit "D"** and incorporated by reference as though fully set forth herein.

18  43.    Because the SOT instrument flows directly from the illegal and invalid Assignments of

19  DOT, it is likewise void, not just voidable.  It is void for the additional reason that, under Section

20  2934(a)(1)(A) of California's non-judicial foreclosure statute, all beneficiaries must acknowledge

21  and record the SOT.  Here, neither MERS nor CITIMORTGAGE is the valid beneficiary,

22  mortgagee or lender; not one of these entities is an authorized agent for the UNKNOWN and

23  UNDOCUMENTED true beneficiary in the Plaintiff's mortgage loan.

24  44.    Pursuant to Covenant No. 24 of the Deed of Trust, <u>only the lender (in this case the</u>

25  <u>"unknown" new Beneficiary in the DOT or its duly authorized agent) has the power and authority to</u>

26  <u>substitute the Trustee under the DOT.</u> [Emphasis added] Covenant No. 24 in the DOT states,

27          "**Substitute Trustee**. Lender, at its option, may from time to time appoint a
        successor trustee to any Trustee appointed hereunder by an instrument acknowledged

28

20

by Lender and recorded in the office of the Recorder of the county in which the property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution."

45.     There is no record of perfected title making CITI RESIDENTIAL LENDING, MERS or CITIMORTGAGE the beneficiary in the deed of trust and/or the successor lender in the mortgage note. Therefore, the SOT is void under Section 2934(a)(1)(A) and tender of the outstanding loan amount is not required to challenge wrongful foreclosure sale of the property.  Dimrock v. Emerald Properties (2000) 81 Cal.App. 4th 686, 678.

46.     By the assignment(s) of mortgage (more so without the underlying original mortgage note) and trustee substitution, Defendants CITI RESIDENTIAL LENDING, MERS and CITIMORTGAGE have each violated the California Government Code Sections 12650-12656, and may be liable for violations of the False Claims Act. Furthermore, the fraudulent and invalid Assignment(s) of DOT and SOT instrument affected the interest in real estate and were, therefore, recorded pursuant to CA Government Code Section 27280 and CA Civil Code Section 880.350 in order to proceed falsely under the provisions of California Civil Code 2924 and other provisions of the foreclosure law of California.

47.     Defendants knew fully well that none of them has the authority to enforce Plaintiff's mortgage loan and, so, attempted to paper over and hide their violation of the governing securitization agreement and applicable California law by knowingly executing fraudulent documents preparatory to the illegal foreclosure action on Plaintiff's mortgage loan.

**V - NON-JUDICIAL FORECLOSURE ACTION INITIATED AGAINST PLAINTIFF'S ALLEGED MORTGAGE LOAN DEFAULT**

48.     Simultaneous to Defendants MERS and CITIMORTGAGE's issuance and recording of the 2nd Assignment of Plaintiff's DOT and the SOT instrument, respectively, CR TITLE SERVICES, INC. ("CRTS") representing itself as "either the original trustee, the duly appointed trustee, or acting as agent for the trustee or beneficiary" issued a Notice of Default and Election to

21

1   Sell Under Deed of Trust (hereinafter "NOD") on March 14, 2011 and recorded this NOD on March

2   17, 2011 in the public records of the county recorder as Instrument No. 21113838. Attached to the

3   NOD was a Declaration dated as of March 4, 2011 re Borrower Contact and Due Diligence

4   Pursuant to Cal. Civ. Code 2923.5 and instructions to Trustee re Notice of Default. A person named

5   "Pam January" signed this Declaration without specifically naming who is the "present beneficiary"

6   in the Plaintiff's mortgage loan. A true and correct copy the **NOD** is included as **Exhibit "E"** hereto

7   and incorporated by reference as though fully set forth herein.

8       49.     While the NOD recites as a matter of historical record only that ARGENT

9   MORTGAGE is the Beneficiary in the DOT when such security instrument was recorded on

10   November 6, 2006, CRTS did not state whether it was in fact acting as Agent for ARGENT

11   MORTGAGE, CITIMORTGAGE, U.S. BANK or any entity when it issued the NOD on March 14,

12   2011. (CRTS could not state so because not one of said entities is the present beneficiary in the

13   DOT after original lender ARGENT MORTGAGE irrevocably sold the Plaintiff's mortgage loan in

14   March 2007.) CRTS did not specifically named the "present Beneficiary" in the NOD.

15       50.     Under Section 2924(a)(1) of California's non-judicial foreclosure statute, only a

16   "trustee, mortgagee or beneficiary or any of their authorized agents" may record a NOD. CRTS is

17   neither the original trustee nor the validly substituted as Trustee, nor an authorized agent of the

18   trustee, mortgagee or beneficiary in the DOT. CITIMORTGAGE is not a valid beneficiary in the

19   DOT and U.S. BANK, as Trustee for the CMLTI 2007-AMC2, is without any valid beneficial

20   interest in the subject mortgage loan so it too cannot legally authorize CRTS to initiate the

21   foreclosure action against Plaintiff's mortgage loan. Likewise, CITIMORTGAGE was neither the

22   previous nor present beneficiary in the loan; instead it is merely the sub-servicer to WELLS

23   FARGO, the named "Master Servicer" of the CMLTI 2007-AMC2. CITIMORTGAGE or WELLS

24   FARGO here cannot be the valid servicer in the Plaintiff's mortgage loan on behalf of the CMLTI

25   2007-AMC2 because said trust entity never received a valid assignment and transfer of the

26   Plaintiff's mortgage loan as a consequence of the failed securitization.

27

28

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

51.     Any attempt of CITIMORTGAGE (or even WELLS FARGO) to assert alternatively that it has legal standing to foreclose on Plaintiff's mortgage loan as servicer for the CMLTI 2007-AMC2 utterly fails. Because of the failed securitization of the mortgage loan and the resulting broken chain of title, U.S. BANK as Trustee for the MBS Trust never received the intervening assignment of the Plaintiff's DOT and cannot produce a valid intervening chain of endorsement of the underlying original mortgage note. Therefore, U.S. BANK as Trustee for the CMLTI 2007-AMC2, not the valid successor lender, present beneficiary or secured creditor, cannot legally authorize CITIMORTGAGE (or WELLS FARGO) to act as servicer in the Plaintiff's loan on behalf of the MBS Trust. That is incontrovertible fact.

52.     Therefore, CRTS had no power, right or authority to issue the NOD; and such NOD is void and of no legal force and effect. Section 2924(a)(1)(C) of the non-judicial foreclosure statute requires a statement in the NOD setting forth the nature of each breach actually known to the beneficiary. Here, CRTS did not provide the information required in the NOD.  Any information was provided by CITIMORTGAGE, the loan servicer for the MBS Trust (but not on Plaintiff's mortgage loan), and not the present Beneficiary in the DOT. This is yet another violation of the non-judicial foreclosure statute. Due to the draconian consequences of a non-judicial foreclosure, strict compliance with the statute's provisions is required.  Miller v. Cote (1982) 127 Cal. App. 3d 888, 894 (a trustee sale based on a statutorily deficient notice of default is invalid).

53.     Therefore, the NOD is invalid because it was not issued by TOWN AND COUNTRY TITLE SERVICES, INC., the mortgage Trustee on record, or by any authorized agent of the "undocumented" and "unknown" new Beneficiary in the DOT. The NOD is defective and fraudulent; it is a nullity, and not in compliance with the foreclosure laws of the State of California.

54.     On July 19, 2011, CRTS, representing itself as Trustee in the DOT without any valid appointment and authority, issued a Notice of Trustee's Sale (hereinafter "1st NOTS") and recorded this 1st NOTS in the public records of the county recorder on the same day as Document No. 21247992. The foreclosure sale of the property securing the DOT was scheduled on August 15,

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

1    2011, but it did not take place on that date. A true and correct copy the **1st NOTS** is included as

2    **Exhibit "F"** hereto and incorporated by reference as though fully set forth herein.

3        55.     On April 20, 2012, CRTS, again representing itself as Trustee in the DOT without any

4    valid appointment and authority, issued another Notice of Trustee's Sale (hereinafter "2nd NOTS")

5    and recorded this 2nd NOTS in the public records of the county recorder on April 24, 2012 as

6    Document No. 21636023. The foreclosure sale of the property securing the DOT was set on May

7    15, 2012. A true and correct copy the **2nd NOTS** is included as **Exhibit "G"** hereto and

8    incorporated by reference as though fully set forth herein.

9        56.     On May 15, 2012, CRTS, representing itself as Trustee in the DOT without valid any

10   appointment and authority, sold the Plaintiff's subject Property in a foreclosure sale. CRTS issued a

11   Trustee's Deed Upon Sale (hereinafter "TDUS") on May 22, 2012 and recorded this TDUS as

12   Document No. 21681978 in the official records of the county recorded on May 23, 2012. In the

13   TDUS, CRTS stated that "Grantee" TURN KEY ASSET, INC. was the highest bidder at said public

14   auction sale, paying the amount of $287,100.01 for the Plaintiff's Property with alleged unpaid debt

15   (together with cost) of $562,530.04.  A true and correct copy the **TDUS** is included as **Exhibit "H"**

16   hereto and incorporated by reference as though fully set forth herein.

17       57.     The recorded 1st NOTS, 2nd NOTS and TDUS each states that CRTS is duly appointed

18   trustee under the DOT. However, as cited, there is no valid Substitution of Trustee ("SOT")

19   instrument to support such representation. Therefore the NOD, 1st and 2nd NOTS and TDUS issued

20   by CRTS were each invalid without legal force and effect. The foreclosure notices and TDUS were

21   each VOID, not just voidable.

22       58.     The fraudulent filing and recording of the abovementioned mortgage instruments (i.e.,

23   Assignment(s) of DOT, SOT, NOD, NOTS and TDUS) constitute a felony under California penal

24   law.[2]

25   _____

26   [2] Defendants to this action have not recorded any valid, legally effective assignment of Plaintiff's mortgage and trustee
     substitution. Defendants' fraudulent attempts to record mortgage assignments constitute a felony under Cal. Penal Code
27   §115(a) which provides:
             Any person who knowingly procures or offers any false or forged instrument to be filed,
28           registered or recorded in any public office within this state, which instrument, if genuine,
                                                                                    (continued . . .)

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

59.     A review of the chain of title of the property from the public records of the county recorder clearly illustrated an orchestrated attempt by the defendants to paper over the mortgage securitization violations and show an appearance of "compliance of the non-judicial foreclosure laws of California."

60.     Upon information and belief and the aforementioned facts herein, Plaintiff's home property was foreclosed by strangers to the Original Loan Transaction who have no equitable or legal claim to an interest in Plaintiff's real property. Because the DOT was rendered void as alleged hereinabove, the assignments of the DOT as alleged hereinbefore are also void as a result of fraud and the lack of capacity on the part of Defendants CITI RESIDENTIAL LENDING, MERS and CITIMORTGAGE to execute a valid mortgage assignment(s) and trustee substitution. It also follows in this instant case that the Foreclosure Notices and TDUS instrument issued by a party (CRTS) without authority from the unknown beneficiary (or its authorized agent) is not in compliance with the foreclosure laws of California; each of these documents is void, without any force and legal effect.  Plaintiff is further informed and believes and thereon alleges that none of the defendants here has ownership of the Note concurrently with being the beneficiary of the deed of trust, thereby rendering the illegal foreclosure proceedings on the mortgage loan and any claim in Plaintiff's real property null and void.  Without this court's assistance, Defendants' wrongful foreclosure would be permitted even though Defendants lack the requisite ability and right to foreclose without substantive and incontrovertible evidence supporting Defendants' authority to act by virtue of being the simultaneous holder of the Note and DOT or by being the agent for the unknown holder of the Note and DOT.

---

( . . . continued)
            might be filed, registered, or recorded under any law of this state or of the United States, is
            guilty of a felony.

The filing and recording of the Assignments of DOT, Substitution of Trustee, Notices of Default and Trustee's Sale, and the Trustee's Deed Upon Sale are all deliberate intent and each an act to perpetuate mortgage fraud. Cal. Penal Code §532(f)(a) provides that "a person commits mortgage fraud if, with the intent to defraud, the person does any of the following ... (4) files or causes to be filed with the recorder of any county in connection with a mortgage loan transaction any document the person knows to contain deliberate misstatement, misrepresentation, or omissions."

APOSTOL v. CITIMORTGAGE, INC., et al.                              Verified Complaint

61.     The true owner(s) and holder(s) of the Plaintiff's Note and DOT are unknown in this specific case because of the fact that there is no evidence of any legal interest on the part of Defendants CITI RESIDENTIAL LENDING, MERS, CITIMORTGAGE and CRTS as either the owner or holder of the Plaintiff's Note or assignee in the DOT, and in view of the lack of the intervening indorsement of the original Note and the invalid assignments of the DOT on January 13, 2009 and March 14, 2011, which were several years passed the "true sale" of the Plaintiff's mortgage loan by original lender ARGENT MORTGAGE's in the securitization transaction in March 2007. Defendants CITI RESIDENTIAL, MERS, CITIMORTGAGE and CRTS are strangers and not party to the Original Loan Transaction.  Not one of these entities appears in the original Note and DOT.  Plaintiff is informed and believes and thereon alleges that CITIMORTGAGE and its agent CRTS, (or even U.S. BANK, as Trustee for the CMLTI 2007-AMC2) do not have any right, power or authority to commence the foreclosure action against Plaintiff's real property.

62.     As hereinbefore alleged, Plaintiff's mortgage loan was the subject of a securitized mortgage transaction where the bundle of rights incident to the Note and DOT was sold, in parsed fashion, to one or more third parties for the purpose of same serving as collateral for one or more of the Special Purpose Vehicles (SPVs) in the form of securitized trusts, Collateral Debt Obligations (CDOs), Collateralized Mortgage Obligations (CMOs) or other form of mortgage-backed security (MBS) and/or in connection with one or more credit default swaps (CDS.)

63.     Like the Defendants, the U.S. BANK or the MBS Trust here has no authority to claim a beneficial interest or any interest in the deed of trust and the note unless there has been a complete and unbroken chain of assignments to the trust on or before the trust's closing date pursuant to the strict terms and REMIC provisions of the PSA.  Furthermore, none of the Defendants (and U.S. BANK as Trustee of the MBS Trust) in this case will be able to establish an unbroken chain of title to any party, or substantiate a beneficial interest, real party in interest or standing to any party.

64.     This creates a triable issue of fact as to who the lawful owner and holder of the Note truly is. U.S. BANK as Trustee of the MBS Trust (or any of its agents, i.e., MERS,

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

CITIMORTGAGE, and CRTS, who are each without any valid authority as agent of the unknown true beneficiary under the DOT) does not have standing to pursue the foreclosure action; and not one of the Defendants here legally acquire the Plaintiff's mortgage loan (consisting of the Note and DOT.) Moreover, U.S. BANK, as Trustee for the CMLTI 2007-AMC2, has no requisite authority conferred upon it by the operative and governing PSA, to accept any conveyance of a mortgage loan after the closing date of the MBS Trust on March 30, 2007. U.S. BANK has no power or authority to act outside of the scope of the powers conferred upon the Trustee under the PSA. U.S. BANK cannot take ANY action which conflicts with the strict terms and REMIC provisions of the PSA for conveyance of mortgage loans to the MBS Trust. That is an incontrovertible fact.

65.     It remains to be discovered whether "True Sales" took place with regard to the transfer of the Note through the securitization chain. Such True Sale must be evidenced by (i) legal opinions from each party that require fulfillment of the conditions for sale for sale and purchase; (ii) an arms' length relationship between the parties; and (iii) evidence of the capacity of the securitization parties to buy and sell, which is questionable when the so called lender's/seller's loan funds may have been pre-funded from inception by the buyer/certificate holders (investors) of the MBS Trust. Conclusion of a True Sale would deny rights as holder in due course for the current party (or parties) attempting to foreclose on the mortgaged property, making unsupported and unproven claim to be the secured creditor and beneficiary in the subject mortgage loan.

66.     For the MBS Trust to exercise rights of foreclosure, it will be undertaking actions inconsistent with its status as a REMIC, a "pass-through" entity under Federal law. For other parties to undertake such action may not be permitted to do so given either absence of (i) standing as a holder of interest or (ii) conveyance of authority to act through proper assignment under the securitization agreement. In order for one of these investment trusts to qualify for the "pass through" tax benefit of a REMIC, all legal and equitable interest in the mortgages held in the name of the trust are vested in the investors, not in anyone else at any time. If legal and/or equitable interest in the mortgages held in the name of the trust is claimed by anyone other than the investors,

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

those that are making those claims are making misrepresentations, thus defrauding the investors, the homeowners and the courts.

67.     Any further "fix" by MERS, or CITIMORTGAGE (or securitization Master Servicer WELLS FARGO), or any entity without legal standing at this late date to assign the Plaintiff's mortgage loan to the MBS Trust, is not permissible for factual three reasons: (i) it would be far too late [i.e., now almost seven (7) years passed the "Closing Date" of the MBS Trust on March 30, 2007; (ii) the assignment/conveyance of mortgage would not follow the chain of title ["broken chain of title"] and it goes directly to the trust [thereby destroying its "bankruptcy remote" shield required as a REMIC trust and violating the requirement that it go through Depositor CMLTI.; and (iii) it would only occur after the subject mortgage loan was allegedly in default (this would be contrary to the term in securitization agreements that the loan must be performing.)

68.     Because the Plaintiff's original Note and DOT were not transferred and assigned to MBS Trust within the specified time frame mandated by terms and REMIC provisions of the PSA, another entity may be found to be the true and actual owner and holder of the Note and mortgagee in the DOT. Discovery must be sought to determine if the Note and DOT to make a final determination of exactly who does own the Plaintiff's Note and DOT; to determine if the such Note and DOT have been bifurcated or split; and to discover the custody chain of physical possession and ownership of the Plaintiff's mortgage loan.

69.     In a clumsy attempt to cover up the botched securitization of Plaintiff's loan that occurred years earlier, Defendants CITI RESIDENTIAL LENDING, MERS and CITI MORTGAGE engaged in a series of fraudulent transactions, with CRTS falsely claiming it was duly appointed as "Trustee" under Plaintiff's DOT, then initiating and completing the foreclosure proceedings against the Plaintiff's mortgage loan at the behest of CITIMORTGAGE.

70.     Finally, it should also be noted that when the Plaintiff's mortgage loan was securitized in March 2007, from a mortgage loan it became an investment contract wherein the borrower is an undisclosed third party who has the right to rescind the securitization negotiation/transaction but was never informed by the lender selling the mortgage loan into a REMIC MBS trust. The

securitized Mortgage Loans (including the Plaintiff's loan) were already been converted into investment grade securities, and the investors have already paid for it. The Uniform Commercial Code under Article 3 (Negotiable Instruments) no longer governs these securities. As securities they are now governed by UCC Article 8 (Securities), which carry a whole different set of rules and regulations that must be followed to make the transaction valid, including but not limited to informing the property owner that the same is entering into a third party transaction with multiple investors. That has never been done in this instant case.

71.     Based on the Statute of Frauds called out in California Civil Code 1624, a Promissory Note issued by a lender, is converted into a Wall Street security, which entitles the certificate or bondholder to cash flow from the REMIC pool. In this transaction, two things did not happen pursuant to Article 8 of the UCC: 1) the Borrower was not a subscriber to said transaction and has no knowledge of it; and 2) the transaction is not memorialized by the Borrower. Under the Statute of Frauds, the Borrower can now request full rescission of the contract, H-8, and Recoupment H-9, including doing a margin call on the REMIC pool, and demanding the Securitization Trust to cease and desist and halt trading in the above securities, which in turn would disqualify the pool and make it liable for double taxation, and further substantial tax penalties and sanctions.

72.     Plaintiff is informed, believes and thereon alleges that the alleged Assignments of the DOT are null and void because of fraud and the ultra vires act on the part of Defendants CITI RESIDENTIAL LENDING, MERS and CITIMORTGAGE.  Further, on information and belief, the alleged mortgage assignments had been "robo-signed" on behalf Defendants.  Plaintiff disputes the legality of the DOT assignments. Defendant CRTS issued and recorded the NOD and NOTS against the Plaintiff's mortgage loan without any valid authority. CRTS does not also name the entity in the NOD and NOTS for which it is instituting the foreclosure. Plaintiff is further informed and believes and thereon alleges that prior to demanding payments from the Plaintiff and even after recording the NOD and NOTS, none of the Defendants or Doe Defendants had or have a secured or unsecured legal, equitable, or pecuniary interest in the Plaintiff's Note and DOT as required under California law − irrespective of who is actually in physical possession of Plaintiff's Note.  Defendant

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

1    CITIMORTGAGE assumes the position as an encumbrancer of Plaintiff's real property under

2    California law in violation of California's statutory law.

3        73.    Plaintiff is informed, believes and thereon alleges that there was no effective

4    assignment or other documentation that would confirm that U.S. BANK, as Trustee for the CMLTI

5    2007-AMC2, or any other entity validly acquired the full and unencumbered interest in the

6    mortgage loan from original lender ARGENT MORTGAGE or its undocumented successor(s); or

7    that the original lender ARGENT MORTGAGE validly assigned the DOT and transferred the

8    original mortgage Note to any of these defendants; or that any of the defendants actually took

9    possession and ownership of the mortgage loan from any other entity.

10       74.    The complexity of the securitization schemes of many lenders, which may or may not

11   involve intentional obfuscation, and the very real possibility that they simply do not have or will not

12   be able to find the paperwork (i.e., original "wet-ink" promissory note, properly completed allonge

13   or endorsement, assignment and filing/recordation at the county recorder to perfect and maintain a

14   valid lien) to back up their claims, makes it virtually impossible for the borrowers such as Plaintiff

15   to eliminate the cloud on the title to Plaintiff's real estate without assistance of this court.  Plaintiff

16   is informed and believes and thereon alleges that Plaintiff's Note was sold and resold multiple

17   times.

18       75.    ARGENT MORTGAGE never intended Plaintiff to pay back the loan to it because

19   ARGENT MORTGAGE would be and was IN FACT PAID IN FULL upon funding of the loan to

20   Plaintiff immediately upon closing or shortly thereafter. Original lender and initial loan seller

21   ARGENT MORTGAGE and intermediary loan purchasers CGMRC and CMLTI have each been

22   paid in full and has no further interest in the either Note or Deed of Trust, equitable or otherwise.

23       76.    Defendants and each of their predecessors in interest, whoever or whatever they might

24   be, are required to comply with California's conveyance law, which mandates publicly recording

25   the assignment(s) of the DOT and indorsement of the original note if one is a mortgagee or other

26   encumbrancer.  The Statute of Frauds applies to assignment(s) of Plaintiff's DOT in this instant

27   case since this is real property instrument.  If the mortgage assignment is not valid, more so without

28

APOSTOL v. CITIMORTGAGE, INC., et al.                                   Verified Complaint

the indorsement of the underlying original note, the purported assignee in the DOT has no standing to assert an interest in the real property that stands as security for the DOT.

77.     Plaintiff is informed, believes and thereon alleges that all of the Defendants knew or through the exercise of reasonable diligence should have known of the falsity of the contents of these void, fraudulent and invalid documents (i.e., Assignments of DOT, SOT, NOD, NOTS and TDUS.) At the time of these material misrepresentations, Defendants intended (and continue to do so) to defraud Plaintiff, and Plaintiff justifiably relied upon said misrepresentations by making payments to the alleged loan servicer CITIMORTGAGE, thereby suffering resulting damage because Plaintiff's title to his real estate was clouded, and since it is now not known who, if anyone, besides Plaintiff can claim a legal or equitable interest in Plaintiff's real property.

78.     Accordingly, Plaintiff disputes the authenticity and validity of the Assignments of the DOT and SOT; and the NOD, NOTS and TDUS that were subsequently issued by CRTS.  Plaintiff also disputes the authority of each entity or individual who executed said mortgage instruments on behalf of the Defendants, which are fraudulent, invalid and void. Because the Foreclosure Law in California must be strictly followed or the foreclosure sale is VOID, Plaintiff is informed and believes and thereon alleges that since neither the Assignment of DOT, SOT, NOD, NOTS nor the TDUS is valid, the illegal foreclosure action conducted by the Defendants was unlawful, so that there is no requirement under California law to "tender" the loan balance to a fraudulent beneficiary or alleged agent(s) for the beneficiary who are in fact strangers to the transaction in order to invalidate the foreclosure sale of Plaintiff's property.

79.     Plaintiff has never been provided with any valid and legal assignment or other documentation which demonstrates and verifies that any of the Defendants acquired the full and unencumbered interest in the mortgage loan (Note and DOT) from the original lender ARGENT MORTGAGE or its undocumented and unknown successor(s) in interest.

### FIRST CAUSE OF ACTION: WRONGFUL FORECLOSURE
### (Against All Defendants)

80.     Plaintiff refers to and incorporates herein as though fully set forth herein the allegations contained hereinabove in paragraphs 1 through 79, inclusive.

31

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

81.     Defendants had both common law and statutory duties to Plaintiff. Defendants had a statutory duty to conduct themselves in strict compliance with all statutory provisions regulating their conduct. Defendants also had common law duties to treat Plaintiff fairly and to not injure either Plaintiff or his Property and to not infringe on any of Plaintiff's rights.

82.     Defendants negligently breached the duties specified herein by, among other things, negligently failing to follow statutory requirements in initiating foreclosure, and ultimately foreclosing on Plaintiff's Property. The acts and omissions include the fact that Defendants executed and recorded the Assignment(s) of DOT, SOT, NOD, NOTS and TDUS, all without having authority to do so, as the true unknown beneficiary did not authorize and/or execute said documents, nor did the true unknown beneficiary directed any of the Defendants to take any action on behalf of itself. Additionally, the Assignment(s) of DOT and SOT instrument were executed based on fraud, as more specifically pleaded in the Second Cause of Action, and thus rendering the Assignment(s) of DOT, SOT, NOD, NOTS and TDUS instruments void as a matter of law. Defendants foreclosed on Plaintiff's home property wrongfully, through the use of both fraudulent, as well as invalid, documents, thus causing irregularities in the foreclosure sale, which effectively void the Assignment(s) of Deed of Trust and SOT, and hold ineffective the other aforementioned documents valid. These fraudulent and invalid documents prejudicially harmed the Plaintiff, as Defendants that were neither the true beneficiary, nor agents of the true beneficiary, foreclosed on and subsequently sold Plaintiff's home.

83.     Defendants' acts are also in violation of California's non-judicial foreclosure scheme as codified under §2924 et seq. Specifically:

a. The Assignment(s) of the Deed of Trust executed by Defendants CITI RESIDENTIAL LENDING, MERS and CITIMORTGAGE, where not one of these defendants has legal standing, purportedly appointing CRTS as substitute trustee in the Plaintiff's DOT.

b. The NOD issued by invalid mortgage Trustee, CRTS, initiating the foreclosure was recorded in the name of an unknown party or not the true "beneficiary" at the time.

c. Under California law the NOD which initiated the foreclosure on behalf of a party who is

32

1    not a *true beneficiary at the time of filing the NOD* is void *ab initio*, rendering any subsequent

2    foreclosure based on that NOD void as well. That is exactly the case here.

3         d.    As a separate ground for invalidation of the foreclosure - the entire chain of recorded

4    documents is predicated on the basis that Defendants CITI RESIDENTIAL LENDING, MERS and

5    CITIMORTGAGE had a recognizable legal interest in the Plaintiff's DOT, which was not the case

6    here. As detailed hereinbefore, Plaintiff believes and alleges that each of these Defendants acted on

7    its own, without any authority and agency relationship with the "unknown" and "undocumented"

8    true beneficiary and real party in interest, when it assigned the Plaintiff's mortgage on January 13,

9    2009 and again on March 14, 2011, more so without the intervening indorsement of the underlying

10   original mortgage Note. Following the broken chain through to conclusion, this means the NOD,

11   NOTS and TDUS that were issued by CRTS, who is not a valid trustee, mortgagee, beneficiary or

12   authorized agent of the unknown and undocumented true beneficiary, are each VOID. It is well

13   established that where a purported trustee without authority conducts a trustee's sale, that sale is

14   *void* as a matter of law and must be rescinded.

15       84.    Defendants, collectively, refused to stop the foreclosure process despite the challenge

16   and requests from Plaintiff, and subsequently wrongfully foreclosed and sold Plaintiff's home on

17   May 15, 2012 to TURN KEY ASSET, INC. without the legal authority to do so.

18       85.    Defendant CRTS, not the trustee or authorized agent of the unknown and

19   undocumented true beneficiary in the DOT, initiated and completed the foreclosure proceedings on

20   Plaintiff's mortgage loan based on illegal and fraudulent assignment(s) of Plaintiff's DOT and SOT

21   instrument. CRTS knowingly filed fraudulent and invalid foreclosure documents at the behest of

22   Defendant CITIMORTGAGE and thereby willfully violated the requirements of California's non-

23   judicial foreclosure statutes.

24       86.    In initiating the aforementioned illegal and fraudulent foreclosure proceedings, all and

25   each of the Defendants here acted with willful oppressiveness and malice toward the Plaintiff.

26   **TENDER RULE NOT APPLICABLE HERE**

27

28

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

87.     Where a trustee's sale can be shown as unlawfully conducted and therefore void, a showing of tender of amount due is rendered unnecessary. (Bank of America v. La Jolla Group II, (2005) 129 Cal.App.4th 706, 712, 28 Cal.Rptr.3d 825).

88.     Here, as set forth above, Plaintiff alleges that the foreclosure sale is VOID, not just voidable, and that it would be inequitable to require tender.

89.     Even assuming arguendo that Defendants could muster the sentiment of this Court to side with their contentious ideology, foreclosing here would nonetheless be highly inequitable and injurious beyond repair.

90.     Denying the Defendants' the ability to enforce these clouded and questionable instruments would also find support in deferring to public policy considerations of fairness and in the interests of justice.

91.     Plaintiff suffered, and continue to suffer damages, proximately caused by Defendants illegal and fraudulent foreclosure activities against him, including but not limited to the loss of his real property, severe emotional distress, mortgage payments wrongfully paid to Defendant CITIMORTGAGE which had no valid authority to collect such payments, increased costs and fees assessed against Plaintiff associated with the foreclosure activities, legal fees to regain title of the property, and inter alia, damage to his credit. Plaintiff has been prejudicially damaged by the actions of Defendants in an amount not presently ascertained and will be proven at trial. Plaintiff is also entitled and seeks punitive damages against the Defendants as a result of the illegal, fraudulent and willfully oppressive foreclosure activities against Plaintiff that Defendants have engaged in.

### SECOND CAUSE OF ACTION: FRAUD
### (Against All Defendants)

92.     Plaintiff refers to and incorporates herein as though fully set forth herein the allegations contained hereinabove in paragraphs 1 through 91, inclusive.

93.     Plaintiff is informed and believes and thereon alleges that the Defendants, and each of them, in doing the things as hereinbefore alleged acted as to Plaintiff with malice and ill will, knowing that their actions would cause Plaintiff great trauma, financial and emotional suffering while subjecting Plaintiff fraudulently to the loss of his home. The conduct of the defendants was

34

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

1   done knowingly without legal justification. Plaintiff is further informed and believes and thereon

2   alleges that unless the callous, intentional and unlawful conduct of the Defendants, and each of

3   them, is not punished severely with an appropriate award of exemplary and punitive damages,

4   Defendants and each of them will continue to plague the citizens of this country with their illegal

5   actions.

6   94.     On information and belief, Plaintiff alleges that CITI RESIDENTIAL LENDING,

7   MERS or CITIMORTGAGE is not the Beneficiary in the DOT after the Plaintiff's mortgage loan

8   was irrevocably sold on March 30, 2007 by original lender ARGENT MORTGAGE. Even though

9   Defendants knew or should have known that original lender ARGENT MORTGAGE had already

10  long sold the Plaintiff's mortgage loan several years earlier in the securitization transaction and

11  ARGENT MORTGAGE's right, power and authority in the DOT had already been effectively

12  TERMINATED at that point of mortgage loan sale, Defendants have willfully and fraudulently

13  assigned the Plaintiff's DOT on January 13, 2009 and again on March 14, 2011. Defendants further

14  knew they did not have Plaintiff's Note to transfer (along with the Deed of Trust).

15  95.     In fact, Defendant CITI RESIDENTIAL LENDING no longer an existing operating

16  entity when it allegedly acted as Attorney-in-Fact of ARGENT MORTGAGE in the first

17  assignment of Plaintiff's DOT on January 13, 2009 (see Exhibit "B"); its parent company

18  CITIGROUP shut down CITI RESIDENTIAL LENDING's operations on April 30, 2008.

19  Regarding the second assignment of Plaintiff's DOT (see Exhibit "C"), MERS' principal

20  CITIMORTGAGE was not a valid beneficiary in the Plaintiff's DOT for reasons hereinbefore cited.

21  Therefore, MERS acted on its own without any authority and agency relationship with the true

22  unknown beneficiary in the DOT when MERS executed the 2nd assignment of Plaintiff's mortgage

23  on March 14, 2011. MERS knew very well that it does not have any standing and authority to

24  assign a mortgage loan that it does not own, or as in this instant case, when MERS was in fact not a

25  nominal beneficiary and/or nominee of the "undocumented" and "unknown" successor lender in the

26  DOT. Therefore, MERS' mortgage assignment to CITIMORTGAGE is a fraudulent and felonious

27  act as the beneficial interest of original lender ARGENT MORTGAGE had been extinguished on or

28

35

1  before March 30, 2007, and that CITI RESIDENTIAL LENDING was an invalid assignee in the

2  first assignment Plaintiff's mortgage, the instrument by which MERS' alleged right and authority as

3  Nominee for CITIMORTGAGE in the 2nd mortgage assignment was derived from.

4      96.     Both mortgage assignments were also in violation of the governing Securitization

5  Agreement and thus contractually null and void. Despite knowingly it would be a "prohibited

6  transaction" based on the precise terms and REMIC provisions of the governing PSA, MERS

7  willfully and fraudulently assigned the Plaintiff's mortgage to CITIMORTGAGE to cover up the

8  irreversible broken of chain of title in the Plaintiff's mortgage loan which was the consequence of

9  the its failed securitization.

10      97.     The binding terms and REMIC provisions of the governing PSA strictly prohibit U.S.

11  BANK to purchase or accept any non-qualified (non-performing) mortgage loan on behalf of the

12  CMLTI 2007-AMC2 after the trust's "Closing Date" on March 30, 2007. As Trustee for the MBS

13  Trust, U.S. BANK has no requisite authority conferred upon it by the operative PSA to accept the

14  conveyance of Plaintiff's DOT passed the MBS Trust's closing date, more so when the mortgage

15  loan was allegedly a non-qualified asset (i.e., a non-performing loan on default) at the time of its

16  assignment and transfer. U.S. BANK has no power or authority to act outside of the scope of the

17  powers conferred upon the Trustee under the PSA. U.S. BANK could not take any action which

18  conflicts with the strict terms and REMIC provisions of the PSA for conveyance of mortgage loans

19  to the MBS Trust. Defendants' mortgage assignments are sham documents that constitute a clumsy

20  attempt to obscure a botched securitization.

21      98.     Defendant CITIMORTGAGE, as alleged loan servicer, held itself out as the authorized

22  agent entitled to collect mortgage payments from Plaintiff even after ARGENT MORTGAGE had

23  already sold Plaintiff's DOT and Note, and was paid for the full balance of the debt, but failed to

24  properly transfer the mortgage loan pursuant to the precise terms and REMIC provisions of the

25  governing securitization agreement. From that point forward, CITIMORTGAGE continued to act as

26  the purported servicer in the Plaintiff's loan – making false representations, with intent of inducing

27  Plaintiff into accepting that it also the valid beneficiary in the mortgage loan so Plaintiff would

28

36

continue to make monthly payments to CITIMORTGAGE. Plaintiff reasonably relied on such false assertions to be true and made multiple and continued mortgage payments to CITIMORTGAGE, believing CITIMORTGAGE to be the servicer and actual beneficiary in the mortgage. Based on reliance of CITIMORTGAGE's false claims, Plaintiff was harmed by each and every mortgage payment that was paid to CITIMORTGAGE. These amounts begin from the day the mortgage loan was irrevocably sold by ARGENT MORTGAGE in March 2007 up to the time Plaintiff stopped making monthly mortgage payments.

99.     Defendants knowingly caused to be filed a fraudulent NOD and NOTS against the Plaintiff as neither CITIMORTGAGE as servicer nor any of the Defendants herein had a valid beneficial interest in Plaintiff's loan at the time the NOD and NOTS were issued and therefore, CRTS in violation of the non-judicial foreclosure statute, was without power to initiate foreclosure proceedings and conduct the foreclosure sale of the Plaintiff's home property on May 15, 2012.

100.     Each of the Defendants herein had knowledge of the falsity of the Assignment(s) of DOT, SOT instrument and intended to defraud Plaintiff. Similarly, each of the Defendants had knowledge of the falsity of the NOD, NOTS and TDUS, and caused these documents to be filed with the intent to defraud Plaintiff.  Likewise, Defendant CITIMORTGAGE knew that it had no authority to collect mortgage payments from Plaintiff because CITIMORTGAGE was not a valid loan servicer and not the valid principal/beneficiary in the Plaintiff's mortgage loan, but nevertheless demanded and took payment from Plaintiff with intent to defraud.

101.     Plaintiff justifiably relied on Defendants' false representations and suffered harm as a direct and proximate result of these deliberately false representations.  Specifically, the issuance of the fraudulent mortgage assignment(s) and SOT instrument were necessary for the initiation and completion of their illegal foreclosure proceedings. Thus, Defendants' fraudulent acts proximately and actually allowed CRTS to conduct the foreclosure sale of the Plaintiff's home property through the use of the aforementioned fraudulent and invalid documents. The ensuing NOD, NOTS and TDUS have negatively impaired Plaintiff's creditworthiness and leading to the loss of his property

APOSTOL v. CITIMORTGAGE, INC., et al.                                        Verified Complaint

title. In addition, Plaintiff suffered, and continues to suffer severe emotional distress as a result of the fraud perpetrated upon him by the Defendants.

102.    Defendants, and each of them, have acted intentionally and with malice and oppression against Plaintiff, proximately and actually causing Plaintiff harm. The aforementioned Defendants' conduct was egregious and encompassed a scheme and pattern of behavior, entitling Plaintiff to an award of exemplary and punitive damages.

### THIRD CAUSE OF ACTION: TO SET ASIDE TRUSTEE'S SALE
### (Against All Defendants)

103.    Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 102, inclusive, as though fully set forth herein.

104.    The Foreclosing Defendants never had the legal authority to foreclose, i.e., the authority to exercise the power of sale as an assignee of the Note and Deed of Trust, because the Foreclosing Defendants' interest was never acknowledged and recorded in violation of Civil Code § 2932.5, resulting in the non-judicial foreclosure sale being void ab initio.

105.    Moreover, the Foreclosing Defendants never had the legal authority to foreclose because the instrument (Deed of Trust), which permitted foreclosure if the borrower was in default, is void as it was unlawfully assigned and/or transferred to the Foreclosing Defendants.  Therefore, the Deed of Trust could not provide a basis for a foreclosure, and the non-judicial foreclosure is void ab initio.

106.    Accordingly, Plaintiff hereby requests an order of this Court that the Trustee's Sale was irregular in that it was legally void and conducted without any right or privilege by the Foreclosing Defendants.

### FOURTH CAUSE OF ACTION:
### TO VOID OR CANCEL TRUSTEE'S DEED UPON SALE
### (Against All Defendants)

107.    Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 106, inclusive, as though fully set forth herein.

38

APOSTOL v. CITIMORTGAGE, INC., et al.                                   Verified Complaint

108.     Although the trustee's deed upon sale appears valid on its face, it is invalid, and of no legal force and effect, for the reasons set forth above including, inter alia, the fact the Deed of Trust which purportedly secured the Note, which served as the basis for a claim to have the right to conduct a non-judicial foreclosure was at all times void due to the wrongful and improper assignment to the Foreclosing Defendants.

109.     Plaintiff is therefore entitled to an order that the Trustee's Deed Upon Sale is void ab initio and cancelling such Trustee's Deed.

### FIFTH CAUSE OF ACTION:
### TO VOID OR CANCEL ASSIGNMENT(s) OF DEED OF TRUST
### (Against All Defendants)

110.     Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 109, inclusive, as though fully set forth herein.

111.     The assignment(s) of the deed of trust is invalid, and of no force and effect, for the reasons set forth above including, inter alia, the fact the Defendants did not have standing or the legal authority to assign the deed of trust which purportedly secured the Note, and which served as the basis for a claim to have the right to conduct a non-judicial foreclosure.  Thus, the assignment(s) of the deed of trust was at all times void.  Plaintiff is therefore entitled to an order that the Assignment(s) of the Deed of Trust is void ab initio and cancelling such Assignment.

### SIXTH CAUSE OF ACTION:
### CANCELLATION OF WRITTEN INSTRUMENTS
### (Against All Defendants)

112.     Plaintiff refers to and incorporates herein as though fully set forth herein the allegations contained hereinabove in paragraphs 1 through 111, inclusive.

113.     Cal. Civ. Code §3412 provides in part: "[a] written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, on that person's application, be so adjudged and ordered to be delivered up or canceled." Plaintiff is informed and believes and thereon alleges that the written instruments affecting Plaintiff's real property have become a nullity and that if left outstanding they could cause injury to Plaintiff, or may be used vexatiously against him.  Plaintiff is further informed

39

APOSTOL v. CITIMORTGAGE, INC., et al.                                                   Verified Complaint

1   and believes that he is entitled to equitable relief from this court in the form of having the aforesaid

2   written instruments delivered up and canceled when the evidence to impeach or invalidate the

3   aforesaid written instruments is lost or may throw a cloud or suspicion over Plaintiff's title.

4       114.    Under Civ. Code §3413, for a Deed of Trust to be subject to a cause of action for

5   cancellation, the instrument must appear to be valid. At the time Plaintiff executed the DOT and

6   Note, said documents appeared to be valid as uniform instruments related to real property

7   transactions. Plaintiff herein seeks to cancel the DOT and Note resulting from the fraudulent

8   activity of Defendants herein, activity that has caused an irreparable cloud on the title to Plaintiff's

9   real property. Plaintiff alleges that Defendants are unable to show clean, properly recorded and

10   uninterrupted assignments and DOT and endorsements of the Note to them, entitling Defendants to

11   make any claim against Plaintiff's real property.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA CIVIL CODE SECTION 2934(a)(1)(A)**
**(Against All Defendants)**

14       115.    Plaintiff refers to and incorporates herein as though fully set forth herein the allegations

15   contained hereinabove in paragraphs 1 through 114, inclusive.

16       116.    California Civil Code §2934(a)(1)(A) provides that all beneficiaries must execute the

17   Substitution of Trustee and such document must be recorded to be effective, and if not, the resulting

18   sale is void. Section 2934(a)(1) further provides that the trustee under a trust deed upon real

19   property or an estate for years therein given to secure an obligation to pay money and conferring no

20   other duties upon the trustee than those which are incidental to the exercise of the power of sale

21   therein conferred, may be substituted by the recording in the county in which the property is located

22   of a substitution executed and acknowledged by: (A) all of the beneficiaries under the trust deed, or

23   their successors in interest...." [Emphasis added].

24       117.    Plaintiff is informed and believes and thereon alleges that it is clear, specifically in this

25   case, that there can be no valid non-judicial foreclosure where the trustee under the original deed of

26   trust allegedly acting on behalf of the encumbrancer of Plaintiff's real property is not properly

40

APOSTOL v. CITIMORTGAGE, INC., et al.                    Verified Complaint

substituted with a "recorded" document.  Furthermore, all beneficiaries, known and unknown, did not effectively execute the Substitution of Trustee.  Therefore, any trustee's sale is void.

## EIGHTH CAUSE OF ACTION: UNJUST ENRICHMENT
### (Against All Defendants)

118.     Plaintiff refers to and incorporates herein as though fully set forth herein the allegations contained hereinabove in paragraphs 1 through 117, inclusive.

119.     Defendants have claimed rights to payments on Plaintiff's Note.  Plaintiff in fact made payments to Defendant CITIMORTGAGE pursuant to and in reliance upon CITIMORTGAGE's claim to rights to such payments.  As alleged hereinabove, Defendant CITIMORTGAGE does not have rights to such payments.  Each of the Defendants herein had knowledge of such circumstances giving rise to unjust enrichment at the time of claiming rights to payment from Plaintiff on the Note. Defendants knowingly acquired a benefit at the expense of Plaintiff without Plaintiff's knowledge. Defendants, and each of them, received a benefit from Plaintiff of money had and received.  It is unjust for Defendants to retain the benefit at the expense of Plaintiff.  The true amount to the extent to which the Defendants, and each of them, have been unjustly enriched is unknown to Plaintiff at this time but the amount is believed to be within the jurisdictional limits of this court.  When the true amount is known Plaintiff will either seek leave of court to amend this complaint or else present proof of same at the time of trial.

120.     Plaintiff is informed and believes and thereon alleges that the Defendants, and each of them, have no rights to the payments that Plaintiff made on the Note and that the same, with interest at the legal rate, should be refunded to Plaintiff.

## NINTH CAUSE OF ACTION:
## VIOLATION OF THE TRUTH-IN-LENDING ACT 15 U.S.C 1601 *et seq.*
### (Against All Defendants)

121.     Plaintiff refers to and incorporates herein as though fully set forth herein the allegations contained hereinabove in paragraphs 1 through 120, inclusive.

122.     Defendant violated the Federal Truth-in-Lending Act 15 U.S.C 1601 et seq. (hereinafter "TILA").

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

123.    No documents are recorded reflecting any defendant as the lawful lender in due courts. The Notices of Default and Foreclosure are each fraudulent and defective.  As such, the foreclosure is fraudulent and void.

124.    Defendants are not entitled to foreclosure procedures, which Defendants are not entitled to initiate, participate in, benefit or conduct.

125.    See, United States v. Detroit Timber & Lumber Co., 200 U. S. 321, 337.  The Fair Debt Collection Practices Act (FDCPA), 15 U. S. C. §1692 et seq., imposes civil liability on "debt collector[s]" for certain prohibited debt collection practices. A debt collector who "fails to comply with any [FDCPA] provision . . . with respect to any person is liable to such person" for "actual damage[s]," costs, "a reasonable attorney's fee as determined by the court," and statutory "additional damages." §1692k(a). In addition, violations of the FDCPA are deemed unfair or deceptive acts or practices under the Federal Trade Commission Act(FTC Act), §41 et seq., which is enforced by the Federal Trade Com-mission (FTC). See §1692l. A debt collector who acts with "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is [prohibited under the FDCPA]" is subject to civil penalties enforced by the FTC.

126.    Defendants, and each of them, have filed documents Defendants knew or reasonably should have known to contained fraudulent information with the court and/or with the Santa Clara County Recorder's Office.  Defendants appear at bar with unclean hands and documents they know or reasonably should have known to be fraudulent.

**TENTH CAUSE OF ACTION:**
**VIOLATION OF BUSINESS AND PROFESSIONS**
**CODE SECTION 17200,** *et seq.*
**(Against All Defendants)**

127.    Plaintiff refers to and incorporates herein as though fully set forth herein the allegations contained hereinabove in paragraphs 1 through 126, inclusive.

128.    California Business & Professions Code Section 17200, et seq., prohibits acts of unfair competition, which means and includes any "fraudulent business act or practice . . ." and conduct which is "likely to deceive" and is "fraudulent" within the meaning of Section 17200.

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

129.     As more fully described above, the Foreclosing Defendants' acts and practices are likely to deceive, constituting a fraudulent business act or practice.  This conduct is ongoing and continues to this date.

130.     Specifically, the Foreclosing Defendants engage in deceptive business practices with respect to mortgage loan servicing, transfer and assignment of notes and deeds of trust, foreclosure of residential properties and related matters by

(a)  Assessing improper or excessive late fees;

(b)  Improperly characterizing customer's account as being in default or delinquent status to generate unwarranted fees;

(c)  Instituting improper or premature foreclosure proceedings to generate unwarranted fees;

(d)  Misapplying or failing to apply customer payments;

(e)  Failing to provide adequate monthly statement information to customer regarding the status of his accounts, payments owed, and/or basis for fees assessed;

(f)  Seeking to collect, and collecting, various improper fees, costs and charges, that are either not legally due under the mortgage contract or California law, or that are in excess of amounts legally due;

(g)  Mishandling borrower's mortgage payments and failing to timely or properly credit payments received, resulting in late charges, delinquencies or default;

(h)  Treating borrower as in default on his loans even though the borrower has tendered timely and sufficient payments or has otherwise complied with mortgage requirements or California law;

(i)  Failing to disclose the fees, costs and charges allowable under the mortgage contract;

(j)  Ignoring grace periods;

(k)  Executing and recording false and misleading documents; and

(l)  Acting as beneficiaries and trustees without the legal authority to do so.

43

131.   The Defendants fail to act in good faith as they claim fees for services but do not render same services competently and in compliance with applicable law.

132.   Moreover, the Defendants engage in a uniform pattern and practice of unfair and overly-aggressive servicing that result in the assessment of unwarranted and unfair fees against California consumers, and premature default often resulting in unfair and illegal foreclosure proceedings.  The scheme implemented by the Defendants is designed to defraud California consumers and enrich the Defendants.

133.   The foregoing acts and practices have caused substantial harm to California consumers. As a direct and proximate cause of the unlawful, unfair and fraudulent acts and practices of the Defendants, Plaintiffs and California consumers have suffered and will continue to suffer damages in the form of unfair and unwarranted late fees and other improper fees and charges.

134.   By reason of the foregoing, the Defendants have been unjustly enriched and should be required to disgorge their illicit profits and/or make restitution to Plaintiff and other California consumers who have been harmed, and/or be enjoined from continuing in such practices pursuant to California Business & Professions Code Sections 17203 and 17204.  Additionally, Plaintiff is therefore entitled to injunctive relief and attorney's fees as available under California Business and Professions Code Sec. 17200 and related sections.

135.   Plaintiff alleges that Defendants' conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiff and requires this Court to weigh the utility of the Defendants' conduct against the gravity of the harm to Plaintiff.

136.   Plaintiff suffered and is suffering and will continue to suffer injury and financial ruin as a direct and proximate result of Defendants deceptive acts as alleged above.  Plaintiff is entitled under the Business and Professions Code Section 17200 to equitable remedy of restitution (i.e. disgorgement) of all money, property and benefits wrongfully obtained by Defendants (Plaintiff's Deed of Trust, etc.).

137.   The foregoing acts and omissions of Defendants affect trade and commerce as that term is defined under the Unfair Practices Act ("UPA").

APOSTOL v. CITIMORTGAGE, INC., et al.                                    Verified Complaint

138.     The UPA defines unfair competition to include any unlawful, unfair, or fraudulent business act or practice and provides that a court may order injunctive relief and restitution to affected parties as a remedy for any violations of the UPA.

139.     Beginning on the dates indicated and at all times relevant herein, Defendants and the DOE Defendants have committed acts of unfair competition proscribed by the UPA including the acts and practices against Plaintiff alleged herein.

140.     Plaintiff continues to suffer manifest injustice in these matters.  Defendants continue in their acts in clear violation of both state and federal law.

## ELEVENTH CAUSE OF ACTION: DECLARATORY RELIEF
### (Against All Defendants)

141.     Plaintiff refers to and incorporates herein as though fully set forth herein the allegations contained hereinabove in paragraphs 1 through 140, inclusive.

142.     This is also an action for declaratory relief which is brought pursuant to C.C.P. §1060, and which provides that any persons interested under a written instrument or a contract who desires a declaration of their rights or duties with respect to another or in respect to property may, in the case of an actual controversy relating to the legal rights and duties of the parties, bring an original action in the court for a declaration of their rights or duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract, with the declaration having the force and effect of a final judgment and which may be had before there has been any breach of the obligation in respect to which the declaration is sought.

143.     Plaintiff is a "person" within the meaning and intent of C.C.P. §1060.  There is an actual controversy, as Defendants commenced an illegal foreclosure action on Plaintiff's real property. Plaintiff was not provided with any evidence that any of the Defendants has full and unencumbered legal title to both the Note and DOT and there is no evidence of any effective assignment of either the Note or the DOT by the original lender to any entity.

144.     C.C.P. §1062 provides that the remedies provided by the chapter are cumulative and shall not be construed as restricting any remedy, and further this chapter shall not preclude any

45

APOSTOL v. CITIMORTGAGE, INC., et al.                                Verified Complaint

1    party from obtaining additional relief based on the same facts.  C.C.P. §1062.3 provides that actions

2    brought under this chapter shall be set for trial at the earliest possible date and shall take the

3    precedence over all other cases except older matters of the same character and matters to which

4    special precedence may be given by law.

5        145.    In that the Defendants completed an illegal Trustee's Sale of the Plaintiff's Property,

6    and CRTS thereafter recording a Trustee's Deed Upon Sale ("TDUS") transferred the Property title

7    to TURN KEY ASSET, INC. and dispossessed Plaintiff of his real property and evicted him and his

8    family from their home.

9        146.    Due to the dispute as to the rights and interests of the parties to the Subject Property,

10   Plaintiff requests that the Court declare the rights of the parties in this matter.  Plaintiff requests that

11   the Court enforce these rights with the issuance of injunctions or restraining orders as may be

12   necessary to place the parties in their proper position with respect to their interests, if any, in the

13   Subject Property.

14                                   **PRAYER**

15       **WHEREFORE**, Plaintiff prays for judgment against the Defendants and each of them as

16   hereinafter set forth:

17       1.     For an order to unwound the foreclosure sale of Property and voiding the Trustee's

18   Deed Upon Sale;

19       2.     For judgment that Plaintiff is the rightful holder of title to the property and that

20   Defendants, each of them, have no estate, right, title or interest in the Subject Property;

21       3.     For a judgment forever enjoining Defendants, and each of them, from claiming any

22   estate, right, title or interest in the subject property.

23       4.     For an order that there was never any proper legal assignment of the full and

24   unencumbered legal interest in both the Notes and Deeds of Trust from the original lender to any

25   Defendant herein or any entity;

26       5.     For an order or judgment that no Defendant herein has any legal rights in either the

27   Note or DOT, deeming said instruments as VOID and cancelling said instruments;

28

APOSTOL v. CITIMORTGAGE, INC., et al.                        Verified Complaint

6.      For an order compelling said Defendants, and each of them, to unwound the illegal foreclosure and transfer legal title and possession of the subject property back to Plaintiff herein;

7.      For an order or judgment that the Assignment(s) of the Deed of Trust, Substitution of Trustee instrument, Default and Foreclosure Notices, and Trustee's Deed Upon Sale are each defective fraudulent documents and must be cancelled and removed from the public records in the Santa Clara County Recorder's Office as VOID documents and that necessary steps are taken to execute a full deed of reconveyance of the Deed of Trust in favor of Plaintiff;

8.      For an Order that the Defendants have no standing and legal right to re-institute any foreclosure proceedings against Plaintiff's real property;

9.      For a declaration that the foreclosure by Defendants against Plaintiff's real property is illegal and said wrongful foreclosure be unwound by Defendants.

10.     For a Temporary Restraining Order and Preliminary and Permanent Injunction enjoining any post non-judicial foreclosure activity of the Defendants, pending the full disposition of the action on the merits. Plaintiff requesting such relief for the reasons set forth and with request for any other and further relief which is just and proper.

11.     Plaintiff further requests the court to issue an Order for Defendants, and each of them, to remove and cure all reports based upon fraudulent documents Defendants made to all Credit Reporting Agencies which are derogatory to Plaintiff's credit standing.

12.     For a finding that Defendants, and each of them, have been unjustly enriched in an amount according to proof and that the same, with interest at the legal rate, shall be reimbursed to Plaintiff.

13.     For general, compensatory and special damages, including attorney's fees and costs according to proof; and

14.     For and all further relief as this court deems fair, just and proper.

DATED: April 25, 2013

_____
Mark W. Lapham
Attorney for Plaintiff,
OBED APOSTOL, JR.

47

# EXHIBIT A

EXHIBIT "A"

DOCUMENT: 19171994

Pages: 19

Recording Requested By:
Argent Mortgage Company, LLC

Return To:
Argent Mortgage Company, LLC
C/O Nationwide Title Clearing, Inc.
2100 Alt 19 North
Palm Harbor, FL 34683

Fees. 63.00
Taxes
Copies
AMT PAID 63.00

BRENDA DAVIS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Bank

RDE # 014
11/06/2006
8:24 AM

Prepared By: Argent Mortgage Company, LLC
Joseph Gleason
One City Blvd West
Orange, CA 92868

————————————— [Space Above This Line For Recording Data] —————————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated October 31, 2006
together with all Riders to this document.
(B) "Borrower" is OBED M. APOSTOL, Jr., A Single Man

Borrower is the trustor under this Security Instrument.
(C) "Lender" is Argent Mortgage Company, LLC

Lender is a Limited Liability Company
organized and existing under the laws of Delaware

0097470074 - 9502

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005 1/01

(VMP) -6(CA) (0005)
Page 1 of 15                                    Initials: _____

VMP MORTGAGE FORMS - (800)521-7291

10/31/2006 11:58:37 AM

d06-01ca (05/2005)Rev.01

Lender's address is 3 Park Plaza - 10th Floor  Irvine, CA 92614

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is Town and Country Title Services, Inc.

(E) "Note" means the promissory note signed by Borrower and dated October 31, 2006
The Note states that Borrower owes Lender four hundred sixty thousand and 00/100
                                                                        Dollars
(U.S. $460,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than December 1, 2036                  .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

0097470074 - 9502
Initials: _____

(VMP) -6(CA) (0005)
   ®

Page 2 of 15   10/31/2006 11:58:37   Form 3005  1/01

D06-02CA (05/2005)Rev.01

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

<table>
<tr><td style="text-align:center">County</td><td style="text-align:center">of</td><td style="text-align:center">SANTA CLARA</td><td>:</td></tr>
<tr><td style="text-align:center">[Type of Recording Jurisdiction]</td><td></td><td style="text-align:center">[Name of Recording Jurisdiction]</td><td></td></tr>
</table>

EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF:

Parcel ID Number: 808-03-035                                    which currently has the address of
1330 CEDAR COURT                                                                                  [Street]
GILROY                                          [City], California 95020            [Zip Code]
("Property Address"):

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

   THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

   UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

   **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

0097470074 - 9502
Initials. _____

-6(CA) (0005)                          Page 3 of 15     10/31/2006 11:58:37  Form 3005  1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with



the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

0097470074 - 9502
Initials: _____

 -6(CA) (0005)          Page 8 of 15   10/31/2006  11:58:37   Form 3005   1/01

D06-08CA (05/2005)Rev.01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

0097470074 - 9502

Initials: _____

@ -6(CA) (0005)     Page 9 of 15     10/31/2006 11:58:37     Form 3005   1/01

D06-09CA (05/2005)Rev.01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

0097470074 - 9502
Initials: ___

-6(CA) (0005)    Page 13 of 15   10/31/2006 11:58:37    Form 3005  1/01

D06-13CA (05/2005)Rev.01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
OBED M. APOSTOL, Jr.                    -Borrower

_____

_____ (Seal)
                                                        -Borrower

_____ (Seal)        _____ (Seal)
                                    -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                    -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                    -Borrower                                        -Borrower

0097470074 - 9502

 -6(CA) (0005)                    Page 14 of 15        10/31/2006 11:58:37 Form 3005   1/01

(05/2005)Rev.01

**State of California**

County of SANTA CLARA } ss:

On 1ST NOV. 2006 before me, Dena Kim Levey NOTARY PUBLIC.
____Day/Month/Year____          _____Notary Public_____

personally appeared OBED M. APOSTOL, JR.

_____

_____

~~personally known to me~~ (or proven to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument

Witness my hand and official seal.



_____  (Seal)
Notary Public

DENA KIM LEVEY
Commission # 1438882
Notary Public - California
Santa Cruz County
My Comm. Expires Oct 8, 2007

0097470074 - 9502

10/31/2006 11:58:37 AM

400-15CA (05/2005)Rev.01

"EXHIBIT A"
Legal Description

ALL THAT PARCEL OF LAND IN COUNTY OF SANTA CLARA, STATE OF CALIFORNIA AS MORE FULLY DESCRIBED IN DOCUMENT 18242347 AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

LOT 133, AS SHOWN ON THAT CERTAIN MAP ENTITLED, "TRACT NO. 3960 WESTWOOD ACRES UNIT NO. 2", WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA ON MARCH 29, 1965 IN BOOK 192 OF MAPS, AT PAGES 54 AND 55.

APN: 808-03-035

# EXHIBIT B

EXHIBIT "B"

[RECORDING REQUESTED BY]
NATIONWIDE TITLE CLEARING
[AND WHEN RECORDED MAIL TO]
CITI RESIDENTIAL LENDING INC.
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

CRL L#: 9000129958
CMI L#: 9000129958
Investor L#: 0221941039
Custodian: 304
Effective Date: 02/11/2009

DOCUMENT: 20151291

Pages:     1
Fees .         12.00
Taxes ..
Copies..
AMT PAID       12.00

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Recording Service

RDE # 006
3/02/2009
11:22 AM

## CORPORATE ASSIGNMENT OF DEED OF TRUST

**FOR GOOD AND VALUABLE CONSIDERATION,**
the sufficiency of which is hereby acknowledged, the undersigned, CITI RESIDENTIAL LENDING INC., AS
ATTORNEY-IN-FACT FOR ARGENT MORTGAGE COMPANY, LLC, WHOSE ADDRESS IS 10801 E. 6TH
STREET , RANCHO CUCAMONGA, CA 91730, (ASSIGNOR), by these presents does convey, grant, sell, assign,
transfer and set over the described Deed of Trust together with the certain note(s) described therein, without recourse,
representation or warranty, together with all right, title and interest secured thereby, all liens, and any rights due or to become
due thereon to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") A DELAWARE
CORPORATION, ITS SUCCESSORS OR ASSIGNS, AS NOMINEE FOR CITIMORTGAGE INC. PO BOX 2026,
FLINT, MI 48501, (ASSIGNEE).
Said Deed made by OBED M. APOSTOL JR. and recorded on 11/06/2006 as Inst# 19171994 in Book Page  in the office of
the SANTA CLARA County Recorder, CA.
Property more commonly known as: 1330 CEDAR CT, GILROY, CA 95020

Dated:01/13/2009
CITI RESIDENTIAL LENDING INC., AS ATTORNEY-IN-FACT FOR ARGENT MORTGAGE COMPANY, LLC

By:_____
  CRYSTAL MOORE  VICE PRESIDENT

STATE OF FLORIDA          COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me THIS 13TH DAY OF JANUARY IN THE YEAR 2009 by
CRYSTAL MOORE, well known to me to be the VICE PRESIDENT of CITI RESIDENTIAL LENDING INC., AS
ATTORNEY-IN-FACT FOR ARGENT MORTGAGE COMPANY, LLC a corporation, on behalf of the corporation.

BRYAN J. BLY DD 691065  Notary Public

My Commission expires: 07/01/2011
Prep by: Jessica Fretwell NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

Bryan J. Bly
Notary Public, State of Florida
Commission # DD 691065
Expires July 01, 2011
Bonded Through National Notary Assn.

CRLAS 9212056  12/31 CRL CJ2020850  MIN 100011590001299580 MERS PHONE 1-888-679-MERS

*9212056*

form5/FRMCA1

# EXHIBIT C

**EXHIBIT "C"**

**Stewart Title**

Requested and Prepared by:
CR Title Services, Inc.

**DOCUMENT: 21113836**

Pages:  2

Fees....    21 00
Taxes...
Copies..
AMT PAID    21 00

REGINA ALCOMENDRAS          RDE # 010
SANTA CLARA COUNTY RECORDER  3/17/2011
Recorded at the request of   8:59 AM
Recording Service

When Recorded Mail To:
**CR Title Services, Inc.**
**1000 TECHNOLOGY DRIVE MS 314**
**O'FALLON, MO 63368**

APN: 808-03-035

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No: **T11-75146-CA**          Order No: **7742-368837**

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:

CitiMortgage, Inc.

all beneficial interest under that certain Deed of Trust dated: **10-31-2006** executed by
**OBED M. APOSTOL, JR., A SINGLE MAN**, as Trustor(s), to **TOWN AND COUNTRY TITLE SERVICES, INC.**, as Trustee, recorded 11-06-2006, as Instrument No. 19171994, in Book , Page , , of Official Records, in the office of the County Recorder of **SANTA CLARA** County, **CALIFORNIA** together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

Date: March 14, 2011

**TS: T11-75146-CA**

MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.
('MERS') A DELAWARE
CORPORATION, ITS SUCCESSORS
OR ASSIGNS, AS NOMINEE FOR
CITIMORTGAGE INC.

Lisa Markham
Assistant Secretary

State of AZ }ss
County of PIMA}ss

On March 14, 2011 before me, Xochitl Pizarro Notary Public, personally
appeared Lisa Markham who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Arizona that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (seal)
Xochitl Pizarro Notary Public

XOCHITL PIZARRO
Notary Public - Arizona
PIMA COUNTY
My Commission Expires
4-4-2014

# EXHIBIT D

S

EXHIBIT "D"

RECORDING REQUESTED BY:

STEWART TITLE OF CA

AND WHEN RECORDED MAIL TO:

**CR TITLE SERVICES INC.**
**1000 TECHNOLOGY DRIVE MS 314**
**O'FALLON, MO 63368**

| DOCUMENT: 21113837 | Pages: 2 |
| --- | --- |
| | Fees. . 21 00 |
| | Taxes.. |
| | Copies. |
| | AMT PAID 21 00 |

REGINA ALCOMENDRAS          RDE H  010
SANTA CLARA COUNTY RECORDER  3/17/2011
Recorded at the request of   8:59 AM
Recording Service

TS No.: T11-75146-CA          Order No.: 7742-368837          SPACE ABOVE THIS LINE FOR RECORDER'S USE

# SUBSTITUTION OF TRUSTEE

   **WHEREAS, OBED M. APOSTOL, JR., A SINGLE MAN** was the original Trustor, **TOWN AND COUNTRY TITLE SERVICES, INC.** was the original Trustee, and **ARGENT MOTGAGE COMPANY, LLC** was the original Beneficiary under that certain Deed of Trust dated **10-31-2006** and recorded on **11-06-2006** as Instrument No. 19171994, in book , page , of Official Records of **SANTA CLARA** County, **CALIFORNIA;** and

   **WHEREAS,** the undersigned is the present Beneficiary under said Deed of Trust, and

   **WHEREAS,** the undersigned desires to substitute a new Trustee under said Deed of Trust in place and instead of said original Trustee, or Successor Trustee, thereunder, in the manner in said Deed of Trust provided,

   **NOW, THEREFORE,** the undersigned hereby substitutes **CR Title Services, Inc.,** as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Dated: March 14, 2011

T11-75146-CA

## Substitution of Trustee

CitiMortgage, Inc.

By: _____
      Lisa Markham
      Assistant Vice President

State of AZ }
County of PIMA }

On March 14, 2011 before me, Xochitl Pizarro Notary Public, personally
appeared Lisa Markham, who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (seal)

      Xochitl Pizarro Notary Public

XOCHITL PIZARRO
Notary Public · Arizona
PIMA COUNTY
My Commission Expires
4-5-2014

# EXHIBIT E

**EXHIBIT "E"**

**Stewart Title**

RECORDING REQUESTED BY:

| DOCUMENT: 21113838 | | Pages: 3 |

Fees.                24 00
Taxes .
Copies .
AMT PAID             24 00

WHEN RECORDED MAIL TO:
**CR TITLE SERVICES INC.**
**1000 TECHNOLOGY DRIVE MS 314**
**O'FALLON, MO 63368**
368837

REGINA ALCOMENDRAS              RDE # 010
SANTA CLARA COUNTY RECORDER     3/17/2011
Recorded at the request of     8:59 AM
Recording Service

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No.: T11-75146-CA/ APN: 808-03-035

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.  No sale date may be set until approximately 90 days from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **$50,151.95** as of **03-14-2011**, and will increase until your account becomes current.  While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than three months after this notice of default is recorded) to, among other things. (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor. To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

CitiMortgage, Inc.
**C/O CitiMortgage Inc.**
**ATTN: FORECLOSURE DEPARTMENT**

TS No.: **T11-75146-CA**

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**1000 TECHNOLOGY DRIVE MS 314**
**O'FALLON, MO 63368**
**Phone: 877-576-0472**

**If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.**

## Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN: That **CR Title Services, Inc.** is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated **10-31-2006**, executed by **OBED M. APOSTOL, JR., A SINGLE MAN**, as Trustor, to secure certain obligations in favor of **ARGENT MOTGAGE COMPANY, LLC**, as beneficiary, recorded **11-06-2006**, as Instrument No. 19171994, in Book , Page , , of Official Records in the Office of the Recorder of **SANTA CLARA** County, California describing land therein as: AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

including **1 NOTE(S) FOR THE ORIGINAL** sum of **$460,000.00**, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

**INSTALLMENT OF PRINCIPAL AND INTEREST PLUS IMPOUNDS AND / OR ADVANCES WHICH BECAME DUE ON 10/01/2009 PLUS LATE CHARGES, AND ALL SUBSEQUENT INSTALLMENTS OF PRINCIPAL, INTEREST, BALLOON PAYMENTS, PLUS IMPOUNDS AND/OR ADVANCES AND LATE CHARGES THAT BECOME PAYABLE.**

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

**Dated: 03-14-2011**              CR Title Services, Inc.

BY: _____
       MELISSA STULL,

Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes only and is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.

*TII- 75146-CA*

Declaration Re: Borrower Contact and Due Diligence Pursuant to CC §2923.5 and instructions to Trustee
Re: Notice of Default

Re:     **OBED M APOSTOL JR**
        **1330 CEDAR CT**
        **GILROY, CA 95020**
        CitiMortgage

The undersigned beneficiary or their authorized agent for the beneficiary hereby represents and declares
as follows:

1. x On 01/31/2011 the beneficiary or their authorized agent contacted the borrower(s) to assess their
financial situation and to explore options to avoid foreclosure. During this contact the borrower(s) was
advised he or she has the right to schedule a follow-up meeting to occur within 14 days. Further,
the borrower(s) was provided the toll-free telephone number to find a HUD-certified housing
counseling agency.

2. n/a n/a No contact was made with the borrower despite the due diligence of beneficiary or their
authorized agent's pursuant to California Civil Code §2923.5(g), including (a) Mailing a first-class letter
to the borrower(s) which included a toll free number to contact a HUD-certified housing counseling
agency; (b) Attempting to contact the borrower(s) by telephone at the primary telephone number on file at
least three times at different hours and on different days or determined that the primary and secondary
phone numbers on file were disconnected; and (c) Having received no response from the borrower(s) for
14 days after the telephone contact efforts were complete, an additional letter was sent to the borrower(s)
via certified mail, with return receipt requested.

3. n/a  The borrower has surrendered the secured property as evidenced by a letter confirming the
surrender or by delivery of the keys to the secured property to the beneficiary, their authorized agent or
the trustee.

4. n/a  The Beneficiary or their authorized agent has evidence and reasonably believes that the borrower
has contracted with an organization, person, or entity whose primary business is advising people who
have decided to leave their homes on how to extend the foreclosure process and to avoid their contractual
obligations to beneficiaries.

5. n/a  The beneficiary or their authorized agent has confirmed that the borrower(s) filed for bankruptcy
and the proceedings have not been finalized to wit, there is no order on the court's docket closing or
dismissing the bankruptcy case.

6. n/a  The provisions of California Civil Code §2923.5 do not apply because the loan is not a residential
mortgage loans originated between January 1, 2003 and December 31, 2007 secured by the borrower's
principal residence.

The undersigned instructs the trustee to proceed with non-judicial foreclosure proceedings and expressly
authorizes the trustee or their authorized agent to sign the notice of default containing the declaration re:
contact required pursuant to California Civil Code §2923.5.

Dated:  03/04/2011

By:     Pam January

# EXHIBIT F

EXHIBIT "F"


STEWART TITLE OF CALIFORNIA, INC.

RECORDING REQUESTED BY
CR TITLE SERVICES INC.

AND WHEN RECORDED MAIL TO:
CR TITLE SERVICES INC.
1000 TECHNOLOGY DRIVE MS 314
O'FALLON, MO 63368

7741-368837

| | |
|---|---|
| DOCUMENT: 21247919 | Pages: 2 |
| | Fees        21.00 |
| | Taxes. |
| | Copies.. |
| | AMT PAID    21.00 |

REGINA ALCOMENDRAS           RDE # 008
SANTA CLARA COUNTY RECORDER   7/19/2011
Recorded at the request of   8:22 AM
Recording Service

SPACE ABOVE THIS LINE FOR RECORDER'S USE

T.S. No. T11-75146-CA / APN: 808-03-035

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 10-31-2006. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to a Deed of Trust described below. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Pursuant to California Civil Code Section 2923.54 the undersigned, on behalf of the beneficiary, loan servicer, or authorized agent, declares as follows:

[ X ] The mortgage loan servicer has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.53 that is current and valid on the date the notice of sale is filed and
[ X ] The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or 2923.55

Trustor: **OBED M. APOSTOL, JR., A SINGLE MAN**
Duly Appointed Trustee: **CR Title Services, Inc.**
      **C/O PITE DUNCAN, 4375 JUTLAND DRIVE, SUITE 200, SAN DIEGO, CA 92117 877-576-0472**
Recorded 11-06-2006 as Instrument No. 19171994 in book , page  of Official Records in the office of the Recorder of SANTA CLARA County, California,
Date of Sale:**08-15-2011 at 10:00 AM**
Place of Sale:    **AT THE ENTRANCE TO THE SUPERIOR COURTHOUSE, 190 N. MARKET STREET, SAN JOSE, CALIFORNIA**
Amount of unpaid balance and other charges: **$529,529.57**
Street Address or other common designation of real property:    **1330 CEDAR COURT**
                                          **GILROY, CA 95020**

A.P.N.: **808-03-035**
Legal Description: **EXHIBIT A**

**ALL THAT PARCEL OF LAND IN THE CITY OF GILROY, COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, AS MORE FULLY DESCRIBED IN DOCUMENT 18242347 AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:**

LOT 133, AS SHOWN ON THAT CERTAIN MAP ENTITLED, "TRACT NO. 3960 WESTWOOD ACRES
UNIT NO. 2" WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE
COUNTY OF SANTA CLARA, STATE OF CALIFORNIA ON MARCH 29, 1965 IN BOOK 192 OF MAPS,
AT PAGES 54 AND 55.

The undersigned Trustee disclaims any liability for any incorrectness of the street address or other common designation, if any, shown
above.  If no street address or other common designation is shown, directions to the location of the property may be obtained by
sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale. The Trustee shall incur
no liability for any good faith error in stating the proper amount of unpaid balances and charges.

For Sales Information please contact PRIORITY POSTING AND PUBLISHING at WWW.PRIORITYPOSTING.COM or (714) 573-
1965

REINSTATEMENT LINE: 877-576-0472

Date: 07-19-2011

CR Title Services, Inc.
1000 TECHNOLOGY DRIVE MS 314
O'FALLON, MO 63368

_____
SHELLEY BOEK, TRUSTEE SPECIALIST

Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have
received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes only and
is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.

# EXHIBIT G

**EXHIBIT "G"**

**Stewart Title**

RECORDING REQUESTED BY
CR TITLE SERVICES INC.

AND WHEN RECORDED MAIL TO:
CR TITLE SERVICES INC.
P.O. BOX 16128
TUCSON, AZ 85732-6128

DOCUMENT: 21636023          Pages: 2

| Fees | 21 00 |
| Taxes | . |
| Copies | . |
| AMT PAID | 21 00 |

REGINA ALCOMENDRAS          RDE # 008
SANTA CLARA COUNTY RECORDER    4/24/2012
Recorded at the request of      8:49 AM
Recording Service

# 3608831

SPACE ABOVE THIS LINE FOR RECORDER'S USE

T.S. No. T11-75146-CA / APN: 808-03-035

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 10-31-2006. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to a Deed of Trust described below. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Pursuant to California Civil Code Section 2923.54 the undersigned, on behalf of the beneficiary, loan servicer, or authorized agent, declares as follows:

[ X ] The mortgage loan servicer has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.53 that is current and valid on the date the notice of sale is filed and
[ X ] The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or 2923.55

Notice to Potential Bidders
If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

Notice to Property Owner
The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call (714) 573-1965 or visit this Internet Web WWW.PRIORITYPOSTING.COM, using the file number assigned to this case T11-75146-CA. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

Trustor: **OBED M. APOSTOL, JR., A SINGLE MAN**
Duly Appointed Trustee: **CR Title Services, Inc.**
   **P.O. BOX 16128, TUCSON, AZ 85732-6128 866-702-9658**
Recorded 11-06-2006 as Instrument No. 19171994 in book , page  of Official Records in the office of the Recorder of SANTA CLARA County, California,
Date of Sale:**05-15-2012** at 10:00 AM
Place of Sale:       at the gated North Market Street Entrance Superior Courthouse, 190 N. Market Street San Jose, CA 95113
Amount of unpaid balance and other charges: **$558,493.87**
Street Address or other common designation of real property:       **1330 CEDAR COURT**
                                                                    **GILROY, CA 95020**

A.P.N.: **808-03-035**
Legal Description:

**ALL THAT PARCEL OF LAND IN THE CITY OF GILROY, COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, AS MORE FULLY DESCRIBED IN DOCUMENT 18242347 AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:**

**LOT 133, AS SHOWN ON THAT CERTAIN MAP ENTITLED, "TRACT NO. 3960 WESTWOOD ACRES UNIT NO. 2" WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA ON MARCH 29, 1965 IN BOOK 192 OF MAPS, AT PAGES 54 AND 55.**

The underlined Trustee disclaims any liability for any incorrectness of the street address or other common designation, if any, shown above. If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale. The Trustee shall incur no liability for any good faith error in stating the proper amount of unpaid balances and charges.

For Sales Information please contact PRIORITY POSTING AND PUBLISHING at WWW.PRIORITYPOSTING.COM or (714) 573-1965.

**REINSTATEMENT LINE: 866-702-9658**

Date: 04-20-2012

                     CR Title Services, Inc.
                     **P.O. BOX 16128**
                     **TUCSON, AZ 85732-6128**


                     CHANTELLE ROBLES, TRUSTEE SPECIALIST


**Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes only and is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.**

# EXHIBIT H

EXHIBIT "H"

DOCUMENT: 21681978          Pages: 3

Fees        26 00
Taxes .    316 25
Copies .
AMT PAID   342.25

RECORDING REQUESTED BY:
CR Title Services, Inc.

REGINA ALCOMENDRAS          RDE #  007
SANTA CLARA COUNTY RECORDER  5/23/2012
Recorded at the request of    4:10 PM
Recording Service

AND WHEN RECORDED TO:
Turn Key Asset  Inc
1694 TULLY RD SUITE # A
SAN JOSE ,CA 95122

Forward Tax Statements to
the address given above

SPACE ABOVE LINE FOR RECORDER'S USE

TS #: T11-75146-CA                    Order #: 7742-368837
APN: 808-03-035                       Investor #: 221941039

*1st position*
*Turn Key Asset Inc.*

## TRUSTEE'S DEED UPON SALE

A.P.N.: 808-03-035                          Transfer Tax: 316.25
The Grantee Herein was not The Foreclosing Beneficiary.
The Amount of The Unpaid Debt was $562,530.04
The Amount Paid By The Grantee Was $287,100.01
Said Property Is In The City of GILROY, County of SANTA CLARA

**CR Title Services, Inc.**, as Trustee, (whereas so designated in the Deed of Trust hereunder more
particularly described or as duly appointed Trustee) does hereby GRANT and CONVEY to

**Turn Key Asset  Inc**

(herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest
conveyed to and now held by it as Trustee under the Deed of Trust in and to the property situated in the
county of **SANTA CLARA**, State of California, described as follows:

See Attached Legal Description.

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by
**OBED M. APOSTOL, JR., A SINGLE MAN** as Trustor, dated **10-31-2006** of the Official Records in the
office of the Recorder of SANTA CLARA, California under the authority and powers vested in the Trustee
designated in the Deed of Trust or as the duly appointed Trustee, default having occurred under the Deed of
Trust pursuant to the Notice of Default and Election to Sell under the Deed of Trust recorded on 11-06-
2006, instrument number 19171994, Book , Page  of Official records.  Trustee having complied with all
applicable statutory requirements of the State of California and performed all duties required by the Deed
of Trust including sending a Notice of Default and Election to Sell within ten days after its recording and a
Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to each person
entitled to notice in compliance with California Civil Code 2924b.

*1330 Cedar G Gilroy CA 95020*

# TRUSTEE'S DEED UPON SALE

TS #: **T11-75146-CA**
Order #: **7742-368837**

All requirements per California Statutes regarding the mailing, personal delivery and publication of copies of Notice of Default and Election to Sell under Deed of Trust and Notice of Trustee's Sale, and the posting of copies of Notice of Trustee's Sale have been complied with. Trustee, in compliance with said Notice of Trustee's sale and in exercise of its powers under said Deed of Trust sold said real property at public auction on **05-15-2012**. Grantee, being the highest bidder at said sale became the purchaser of said property for the amount bid, being **$287,100.01**, in lawful money of the United States, in pro per, receipt thereof is hereby acknowledged in full/partial satisfaction of the debt secured by said Deed of Trust.

In witness thereof, **CR Title Services, Inc.**, as Trustee, has this day, caused its name to be hereunto affixed by its officer thereunto duly authorized by its corporation by-laws.

Date: **May 22, 2012**

                                   **CR Title Services, Inc.**

                              By: _____
                                   Alfred G. Santasiere, Assistant Vice President

State of AZ        }ss
County of PIMA}

On May 22, 2012 before me, Anna Benedict, Notary Public, personally appear Alfred G. Santasiere, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of AZ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____ (seal)

        Anna Benedict, Notary Public

Anna Benedict
Notary Public - Arizona
Pima County
My Commission Expires
April 8, 2016

TS #: T11-75146-CA
Order #: 7742-368837

## Legal Description

**EXHIBIT A**

ALL THAT PARCEL OF LAND IN THE CITY OF GILROY, COUNTY OF SANTA CLARA, STATE OF
CALIFORNIA, AS MORE FULLY DESCRIBED IN DOCUMENT 18242347 AND BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

LOT 133, AS SHOWN ON THAT CERTAIN MAP ENTITLED, "TRACT NO. 3960 WESTWOOD ACRES
UNIT NO. 2" WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE
COUNTY OF SANTA CLARA, STATE OF CALIFORNIA ON MARCH 29, 1965 IN BOOK 192 OF MAPS,
AT PAGES 54 AND 55.