DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

for the account of _____

account number _____ or, if mailed by check, to

Applicable statements should be mailed to _____

This information is provided by assignee named above, or its agent.

EXHIBIT A-12

FORM OF CLASS M-7 CERTIFICATE

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE TRUST ADMINISTRATOR OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THIS CERTIFICATE IS SUBORDINATE TO THE CLASS A CERTIFICATES, THE CLASS M-1 CERTIFICATES, THE CLASS M-2 CERTIFICATES, THE CLASS M-3 CERTIFICATES, THE CLASS M-4 CERTIFICATES, THE CLASS M-5 CERTIFICATES AND THE CLASS M-6 CERTIFICATES TO THE EXTENT DESCRIBED IN THE POOLING AND SERVICING AGREEMENT REFERRED TO HEREIN.

EACH TRANSFEREE OF THIS CERTIFICATE WHO IS AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR SECTION 4975 OF THE CODE WILL BE DEEMED TO HAVE MADE THE REPRESENTATIONS DESCRIBED HEREIN.

| | |
|---|---|
| Series 2007-AMC2 | Aggregate Certificate Principal Balance of the Class M-7 Certificates as of the Issue Date: $28,658,000.00 |
| Pass-Through Rate: Variable | Denomination: $28,658,000.00 |
| Cut-off Date and date of Pooling and Servicing Agreement: March 1, 2007 | Servicers: Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP |
| First Distribution Date: April 25, 2007 | Master Servicer: Wells Fargo Bank, N.A. |

210

Trust Administrator: Wells Fargo Bank, N.A.

No. 1                                   Trustee: U.S. Bank National Association

Issue Date: March 30, 2007

CUSIP: 17311X AK 1

DISTRIBUTIONS IN REDUCTION OF THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE MAY BE MADE MONTHLY AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING CERTIFICATE PRINCIPAL BALANCE HEREOF AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ABOVE AS THE DENOMINATION OF THIS CERTIFICATE.

211

ASSET-BACKED PASS-THROUGH CERTIFICATE

evidencing a beneficial ownership interest in a Trust Fund (the "Trust Fund") consisting primarily of a pool of conventional one- to four-family, fixed-rate and adjustable-rate, first and second lien mortgage loans (the "Mortgage Loans") formed and sold by

CITIGROUP MORTGAGE LOAN TRUST INC.

THIS CERTIFICATE DOES NOT REPRESENT AN OBLIGATION OF OR INTEREST IN CITIGROUP MORTGAGE LOAN TRUST INC., THE MASTER SERVICER, THE TRUST ADMINISTRATOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES. NEITHER THIS CERTIFICATE NOR THE UNDERLYING MORTGAGE LOANS ARE GUARANTEED BY ANY AGENCY OR INSTRUMENTALITY OF THE UNITED STATES.

This certifies that Cede & Co. is the registered owner of a Percentage Interest (obtained by dividing the denomination of this Certificate by the aggregate Certificate Principal Balance of the Class M-7 Certificates as of the Issue Date) in that certain beneficial ownership interest evidenced by all the Class M-7 Certificates in the REMIC created pursuant to a Pooling and Servicing Agreement, dated as specified above (the "Agreement"), among Citigroup Mortgage Loan Trust Inc. (hereinafter called the "Depositor," which term includes any successor entity under the Agreement), the Master Servicer, the Servicers, the Trust Administrator and the Trustee, a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, distributions will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered on the Record Date, in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to the Holders of Class M-7 Certificates on such Distribution Date pursuant to the Agreement.

All distributions to the Holder of this Certificate under the Agreement will be made or caused to be made by the Trust Administrator by wire transfer in immediately available funds to the account of the Person entitled thereto if such Person shall have so notified the Trust Administrator in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date or otherwise by check mailed by first class mail to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Trust Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trust Administrator for that purpose as provided in the Agreement.

This Certificate is one of a duly authorized issue of Certificates designated as Asset-Backed Pass-Through Certificates of the Series specified on the face hereof (herein called the "Certificates") and representing the Percentage Interest specified above in the Class of Certificates to which the Certificate belongs.

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. As provided in the Agreement, withdrawals from the Collection Account and the Distribution Account may be made from time to time for purposes other than distributions to Certificateholders, such purposes including reimbursement of advances made, or certain expenses incurred, with respect to the Mortgage Loans.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee and the rights of the Certificateholders, under the Agreement at any time by the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is

212

registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trust Administrator as provided in the Agreement, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trust Administrator duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest will be issued to the designated transferee or transferees.

Each transferee of this Certificate who is a Plan subject to ERISA or Section 4975 of the Code, a Person acting, directly or indirectly, on behalf of any such Plan or a Person using "Plan Assets" to acquire this Certificate shall be deemed to have made the representations in Section 5.02(b) of the Agreement.

The Certificates are issuable in fully registered form only without coupons in Classes and denominations representing Percentage Interests specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, the Certificates are exchangeable for new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same. No service charge will be made for any such registration of transfer or exchange of Certificates, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

The Depositor, the Master Servicer, the Trust Administrator, the Trustee and any agent of the Depositor, the Master Servicer, the Trust Administrator or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Trust Administrator, the Trustee nor any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby shall terminate upon payment to the Certificateholders of all amounts held by the Trust Administrator and required to be paid to them pursuant to the Agreement following the earlier of (i) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan and REO Property remaining in the REMIC and (ii) the purchase by the party designated in the Agreement at a price determined as provided in the Agreement from the REMIC of all the Mortgage Loans and all property acquired in respect of such Mortgage Loans. The Agreement permits, but does not require, the party designated in the Agreement to purchase from the REMIC all the Mortgage Loans and all property acquired in respect of any Mortgage Loan at a price determined as provided in the Agreement. The exercise of such right will effect early retirement of the Certificates; however, such right to purchase is subject to the aggregate Stated Principal Balance of the Mortgage Loans at the time of purchase being less than 10% of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

The recitals contained herein shall be taken as statements of the Depositor, and the Trust Administrator assumes no responsibility for their correctness.

Unless the certificate of authentication hereon has been executed by the Trust Administrator, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

213

IN WITNESS WHEREOF, the Trust Administrator has caused this Certificate to be duly executed.

Dated: March ___, 2007

Wells Fargo Bank, N.A., as Trust Administrator

By: _____
       Authorized Officer

CERTIFICATE OF AUTHENTICATION

This is one of the Certificates referred to in the within-mentioned Agreement.

Wells Fargo Bank, N.A., as Trust Administrator

By: _____
       Authorized Signatory

<u>ABBREVIATIONS</u>

The following abbreviations, when used in the inscription on the face of this instrument, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common                    UNIF GIFT MIN ACT - <u>Custodian</u>

TEN ENT - as tenants by the entireties            (Cust) (Minor) under
                                                   Uniform Gifts to Minors Act

JT TEN - as joint tenants with right              _____
if survivorship and not as                        (State)
tenants in common

        Additional abbreviations may also be used though not in the above list.

<u>ASSIGNMENT</u>

        FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto

_____

(Please print or typewrite name, address including postal zip code, and Taxpayer Identification Number of assignee) a Percentage Interest equal to _____% evidenced by the within Asset-Backed Pass-Through Certificates and hereby authorize(s) the registration of transfer of such interest to assignee on the Certificate Register of the Trust Fund.

        I (we) further direct the Trust Administrator to issue a new Certificate of a like Percentage Interest and Class to the above named assignee and deliver such Certificate to the following address:

_____
_____ .

Dated: _____            _____
                                  Signature by or on behalf of assignor


                                  _____
                                  Signature Guaranteed


215

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

for the account of _____

account number _____ or, if mailed by check, to

Applicable statements should be mailed to _____

_____

This information is provided by assignee named above, or its agent.  _____


EXHIBIT A-13

FORM OF CLASS M-8 CERTIFICATE

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE TRUST ADMINISTRATOR OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THIS CERTIFICATE IS SUBORDINATE TO THE CLASS A CERTIFICATES, THE CLASS M-1 CERTIFICATES, THE CLASS M-2 CERTIFICATES, THE CLASS M-3 CERTIFICATES, THE CLASS M-4 CERTIFICATES, THE CLASS M-5 CERTIFICATES, THE CLASS M-6 CERTIFICATES AND THE CLASS M-7 CERTIFICATES TO THE EXTENT DESCRIBED IN THE POOLING AND SERVICING AGREEMENT REFERRED TO HEREIN.

EACH TRANSFEREE OF THIS CERTIFICATE WHO IS AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR SECTION 4975 OF THE CODE WILL BE DEEMED TO HAVE MADE THE REPRESENTATIONS DESCRIBED HEREIN.

Series 2007-AMC2

Pass-Through Rate: Variable

Cut-off Date and date of Pooling and Servicing Agreement: March 1, 2007

First Distribution Date: April 25, 2007

Aggregate Certificate Principal Balance of the Class M-8 Certificates as of the Issue Date: $25,350,000.00

Denomination: $25,350,000.00

Servicers: Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP

Master Servicer: Wells Fargo Bank, N.A.

216

Trust Administrator: Wells Fargo Bank, N.A.

No. 1                                       Trustee: U.S. Bank National Association

Issue Date: March 30, 2007

CUSIP: 17311X AL 9

DISTRIBUTIONS IN REDUCTION OF THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE MAY BE MADE MONTHLY AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING CERTIFICATE PRINCIPAL BALANCE HEREOF AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ABOVE AS THE DENOMINATION OF THIS CERTIFICATE.

217

ASSET-BACKED PASS-THROUGH CERTIFICATE

evidencing a beneficial ownership interest in a Trust Fund (the "Trust Fund") consisting primarily of a pool of conventional one- to four-family, fixed-rate and adjustable-rate, first and second lien mortgage loans (the "Mortgage Loans") formed and sold by

CITIGROUP MORTGAGE LOAN TRUST INC.

THIS CERTIFICATE DOES NOT REPRESENT AN OBLIGATION OF OR INTEREST IN CITIGROUP MORTGAGE LOAN TRUST INC., THE MASTER SERVICER, THE TRUST ADMINISTRATOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES. NEITHER THIS CERTIFICATE NOR THE UNDERLYING MORTGAGE LOANS ARE GUARANTEED BY ANY AGENCY OR INSTRUMENTALITY OF THE UNITED STATES.

This certifies that Cede & Co. is the registered owner of a Percentage Interest (obtained by dividing the denomination of this Certificate by the aggregate Certificate Principal Balance of the Class M-8 Certificates as of the Issue Date) in that certain beneficial ownership interest evidenced by all the Class M-8 Certificates in the REMIC created pursuant to a Pooling and Servicing Agreement, dated as specified above (the "Agreement"), among Citigroup Mortgage Loan Trust Inc. (hereinafter called the "Depositor," which term includes any successor entity under the Agreement), the Master Servicer, the Servicers, the Trust Administrator and the Trustee, a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, distributions will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered on the Record Date, in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to the Holders of Class M-8 Certificates on such Distribution Date pursuant to the Agreement.

All distributions to the Holder of this Certificate under the Agreement will be made or caused to be made by the Trust Administrator by wire transfer in immediately available funds to the account of the Person entitled thereto if such Person shall have so notified the Trust Administrator in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date or otherwise by check mailed by first class mail to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Trust Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trust Administrator for that purpose as provided in the Agreement.

This Certificate is one of a duly authorized issue of Certificates designated as Asset-Backed Pass-Through Certificates of the Series specified on the face hereof (herein called the "Certificates") and representing the Percentage Interest specified above in the Class of Certificates to which the Certificate belongs.

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. As provided in the Agreement, withdrawals from the Collection Account and the Distribution Account may be made from time to time for purposes other than distributions to Certificateholders, such purposes including reimbursement of advances made, or certain expenses incurred, with respect to the Mortgage Loans.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee and the rights of the Certificateholders, under the Agreement at any time by the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is

218

registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trust Administrator as provided in the Agreement, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trust Administrator duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest will be issued to the designated transferee or transferees.

Each transferee of this Certificate who is a Plan subject to ERISA or Section 4975 of the Code, a Person acting, directly or indirectly, on behalf of any such Plan or a Person using "Plan Assets" to acquire this Certificate shall be deemed to have made the representations in Section 5.02(b) of the Agreement.

The Certificates are issuable in fully registered form only without coupons in Classes and denominations representing Percentage Interests specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, the Certificates are exchangeable for new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same. No service charge will be made for any such registration of transfer or exchange of Certificates, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

The Depositor, the Master Servicer, the Trust Administrator, the Trustee and any agent of the Depositor, the Master Servicer, the Trust Administrator or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Trust Administrator, the Trustee nor any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby shall terminate upon payment to the Certificateholders of all amounts held by the Trust Administrator and required to be paid to them pursuant to the Agreement following the earlier of (i) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan and REO Property remaining in the REMIC and (ii) the purchase by the party designated in the Agreement at a price determined as provided in the Agreement from the REMIC of all the Mortgage Loans and all property acquired in respect of such Mortgage Loans. The Agreement permits, but does not require, the party designated in the Agreement to purchase from the REMIC all the Mortgage Loans and all property acquired in respect of any Mortgage Loan at a price determined as provided in the Agreement. The exercise of such right will effect early retirement of the Certificates; however, such right to purchase is subject to the aggregate Stated Principal Balance of the Mortgage Loans at the time of purchase being less than 10% of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

The recitals contained herein shall be taken as statements of the Depositor, and the Trust Administrator assumes no responsibility for their correctness.

Unless the certificate of authentication hereon has been executed by the Trust Administrator, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

219

IN WITNESS WHEREOF, the Trust Administrator has caused this Certificate to be duly executed.

Dated: March ____, 2007

Wells Fargo Bank, N.A., as Trust Administrator

By: _____
        Authorized Officer

CERTIFICATE OF AUTHENTICATION

This is one of the Certificates referred to in the within-mentioned Agreement.

Wells Fargo Bank, N.A., as Trust Administrator

By: _____
        Authorized Signatory

220

ABBREVIATIONS

The following abbreviations, when used in the inscription on the face of this instrument, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common                    UNIF GIFT MIN ACT - Custodian

TEN ENT - as tenants by the entireties            (Cust) (Minor) under
                                                   Uniform Gifts to Minors Act

JT TEN - as joint tenants with right              _____
if survivorship and not as
tenants in common                                 (State)

     Additional abbreviations may also be used though not in the above list.

ASSIGNMENT

     FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto

_____

_____
(Please print or typewrite name, address including postal zip code, and Taxpayer Identification Number of assignee) a Percentage Interest equal to ____% evidenced by the within Asset-Backed Pass-Through Certificates and hereby authorize(s) the registration of transfer of such interest to assignee on the Certificate Register of the Trust Fund.

     I (we) further direct the Trust Administrator to issue a new Certificate of a like Percentage Interest and Class to the above named assignee and deliver such Certificate to the following address:

_____

_____.

Dated:                                            _____
                                                  Signature by or on behalf of assignor


                                                  _____
                                                  Signature Guaranteed

221

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

_____

for the account of _____

account number _____ or, if mailed by check, to

Applicable statements should be mailed to _____

_____

This information is provided by assignee named above, or its agent. _____

_____

EXHIBIT A-19

FORM OF CLASS M-9 CERTIFICATE

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE TRUST ADMINISTRATOR OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THIS CERTIFICATE IS SUBORDINATE TO THE CLASS A CERTIFICATES, THE CLASS M-1 CERTIFICATES, THE CLASS M-2 CERTIFICATES, THE CLASS M-3 CERTIFICATES, THE CLASS M-4 CERTIFICATES, THE CLASS M-5 CERTIFICATES, THE CLASS M-6 CERTIFICATES, THE CLASS M-7 CERTIFICATES AND THE CLASS M-8 CERTIFICATES TO THE EXTENT DESCRIBED IN THE POOLING AND SERVICING AGREEMENT REFERRED TO HEREIN.

EACH TRANSFEREE OF THIS CERTIFICATE WHO IS AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR SECTION 4975 OF THE CODE WILL BE DEEMED TO HAVE MADE THE REPRESENTATIONS DESCRIBED HEREIN.

Series 2007-AMC2                          Aggregate Certificate Principal Balance of the Class M-9
                                          Certificates as of the Issue Date: $20,942,000.00

Pass-Through Rate: Variable               Denomination: $20,942,000.00

Cut-off Date and date of Pooling and Servicing Agreement:   Servicers: Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC
March 1, 2007                             and Countrywide Home Loans Servicing LP

222

First Distribution Date: April 25, 2007                    Master Servicer: Wells Fargo Bank, N.A.

                                                           Trust Administrator: Wells Fargo Bank, N.A.

No. 1                                                      Trustee: U.S. Bank National Association

                                                           Issue Date: March 30, 2007

                                                           CUSIP: 17311X AM 7

DISTRIBUTIONS IN REDUCTION OF THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE MAY BE MADE MONTHLY AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING CERTIFICATE PRINCIPAL BALANCE HEREOF AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ABOVE AS THE DENOMINATION OF THIS CERTIFICATE.

---

223

ASSET-BACKED PASS-THROUGH CERTIFICATE

evidencing a beneficial ownership interest in a Trust Fund (the "Trust Fund") consisting primarily of a pool of conventional one- to four-family, fixed-rate and adjustable-rate, first and second lien mortgage loans (the "Mortgage Loans") formed and sold by

CITIGROUP MORTGAGE LOAN TRUST INC.

THIS CERTIFICATE DOES NOT REPRESENT AN OBLIGATION OF OR INTEREST IN CITIGROUP MORTGAGE LOAN TRUST INC., THE MASTER SERVICER, THE TRUST ADMINISTRATOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES. NEITHER THIS CERTIFICATE NOR THE UNDERLYING MORTGAGE LOANS ARE GUARANTEED BY ANY AGENCY OR INSTRUMENTALITY OF THE UNITED STATES.

This certifies that Cede & Co. is the registered owner of a Percentage Interest (obtained by dividing the denomination of this Certificate by the aggregate Certificate Principal Balance of the Class M-9 Certificates as of the Issue Date) in that certain beneficial ownership interest evidenced by all the Class M-9 Certificates in the REMIC created pursuant to a Pooling and Servicing Agreement, dated as specified above (the "Agreement"), among Citigroup Mortgage Loan Trust Inc. (hereinafter called the "Depositor," which term includes any successor entity under the Agreement), the Master Servicer, the Servicers, the Trust Administrator and the Trustee, a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, distributions will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (a "Distribution Date") commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered on the Record Date, in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to the Holders of Class M-9 Certificates on such Distribution Date pursuant to the Agreement.

All distributions to the Holder of this Certificate under the Agreement will be made or caused to be made by the Trust Administrator by wire transfer in immediately available funds to the account of the Person entitled thereto if such Person shall have so notified the Trust Administrator in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date or otherwise by check mailed by first class mail to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Trust Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trust Administrator for that purpose as provided in the Agreement.

This Certificate is one of a duly authorized issue of Certificates designated as Asset-Backed Pass-Through Certificates of the Series specified on the face hereof (herein called the "Certificates") and representing the Percentage Interest specified above in the Class of Certificates to which the Certificate belongs.

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. As provided in the Agreement, withdrawals from the Collection Account and the Distribution Account may be made from time to time for purposes other than distributions to Certificateholders, such purposes including reimbursement of advances made, or certain expenses incurred, with respect to the Mortgage Loans.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee and the rights of the Certificateholders, under the Agreement at any time by the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is

224

registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trust Administrator as provided in the Agreement, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trust Administrator duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest will be issued to the designated transferee or transferees.

Each transferee of this Certificate who is a Plan subject to ERISA or Section 4975 of the Code, a Person acting, directly or indirectly, on behalf of any such Plan or a Person using "Plan Assets" to acquire this Certificate shall be deemed to have made the representations in Section 5.02(b) of the Agreement.

The Certificates are issuable in fully registered form only without coupons in Classes and denominations representing Percentage Interests specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, the Certificates are exchangeable for new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same. No service charge will be made for any such registration of transfer or exchange of Certificates, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

The Depositor, the Master Servicer, the Trust Administrator, the Trustee and any agent of the Depositor, the Master Servicer, the Trust Administrator or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Trust Administrator, the Trustee nor any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby shall terminate upon payment to the Certificateholders of all amounts held by the Trust Administrator and required to be paid to them pursuant to the Agreement following the earlier of (i) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan and REO Property remaining in the REMIC and (ii) the purchase by the party designated in the Agreement at a price determined as provided in the Agreement from the REMIC of all the Mortgage Loans and all property acquired in respect of such Mortgage Loans. The Agreement permits, but does not require, the party designated in the Agreement to purchase from the REMIC all the Mortgage Loans and all property acquired in respect of any Mortgage Loan at a price determined as provided in the Agreement. The exercise of such right will effect early retirement of the Certificates; however, such right to purchase is subject to the aggregate Stated Principal Balance of the Mortgage Loans at the time of purchase being less than 10% of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

The recitals contained herein shall be taken as statements of the Depositor, and the Trust Administrator assumes no responsibility for their correctness.

Unless the certificate of authentication hereon has been executed by the Trust Administrator, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

225

IN WITNESS WHEREOF, the Trust Administrator has caused this Certificate to be duly executed.

Dated: March ___, 2007

                                                    Wells Fargo Bank, N.A., as Trust Administrator

                                        By: _____
                                                    Authorized Officer

<u>CERTIFICATE OF AUTHENTICATION</u>

This is one of the Certificates referred to in the within-mentioned Agreement.

                                                    Wells Fargo Bank, N.A., as Trust Administrator

                                        By: _____
                                                    Authorized Signatory

226

ABBREVIATIONS

The following abbreviations, when used in the inscription on the face of this instrument, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common               UNIF GIFT MIN ACT - <u>Custodian</u>

TEN ENT - as tenants by the entireties        (Cust) (Minor) under
                                              Uniform Gifts to Minors Act

JT TEN - as joint tenants with right          _____
if survivorship and not as                    (State)
tenants in common

    Additional abbreviations may also be used though not in the above list.

ASSIGNMENT

    FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto

_____

_____

(Please print or typewrite name, address including postal zip code, and Taxpayer Identification Number of assignee) a Percentage Interest equal to _____% evidenced by the within Asset-Backed Pass-Through Certificates and hereby authorize(s) the registration of transfer of such interest to assignee on the Certificate Register of the Trust Fund.

    I (we) further direct the Trust Administrator to issue a new Certificate of a like Percentage Interest and Class to the above named assignee and deliver such Certificate to the following address:

_____

_____.

Dated:                          _____
                                Signature by or on behalf of assignor


                                _____
                                Signature Guaranteed

227

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

for the account of _____

account number _____ or, if mailed by check, to

Applicable statements should be mailed to _____

This information is provided by assignee named above, or its agent. _____

EXHIBIT A-15

FORM OF CLASS M-10 CERTIFICATE

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE TRUST ADMINISTRATOR OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS THAT ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE AGREEMENT.

THIS CERTIFICATE IS SUBORDINATE TO THE CLASS A CERTIFICATES, THE CLASS M-1 CERTIFICATES, THE CLASS M-2 CERTIFICATES, THE CLASS M-3 CERTIFICATES, THE CLASS M-4 CERTIFICATES, THE CLASS M-5 CERTIFICATES, THE CLASS M-6 CERTIFICATES, THE CLASS M-7 CERTIFICATES, THE CLASS M-8 CERTIFICATES AND THE CLASS M-9 CERTIFICATES TO THE EXTENT DESCRIBED IN THE POOLING AND SERVICING AGREEMENT REFERRED TO HEREIN.

EACH TRANSFEREE OF THIS CERTIFICATE WHO IS AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR SECTION 4975 OF THE CODE WILL BE DEEMED TO HAVE MADE THE REPRESENTATIONS DESCRIBED HEREIN.

228

Series 2007-AMC2

Aggregate Certificate Principal Balance of the Class M-10 Certificates as of the Issue Date: $25,351,000.00

Pass-Through Rate: Variable

Denomination: $25,351,000.00

Cut-off Date and date of Pooling and Servicing Agreement: March 1, 2007

Servicers: Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP

First Distribution Date: April 25, 2007

Master Servicer: Wells Fargo Bank, N.A.

Trust Administrator: Wells Fargo Bank, N.A.

No. 1

Trustee: U.S. Bank National Association

Issue Date: March 30, 2007

CUSIP: 17311X AU 9

DISTRIBUTIONS IN REDUCTION OF THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE MAY BE MADE MONTHLY AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING CERTIFICATE PRINCIPAL BALANCE HEREOF AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ABOVE AS THE DENOMINATION OF THIS CERTIFICATE.

229

ASSET-BACKED PASS-THROUGH CERTIFICATE

evidencing a beneficial ownership interest in a Trust Fund (the "Trust Fund") consisting primarily of a pool of conventional one- to four-family, fixed-rate and adjustable-rate, first and second lien mortgage loans (the "Mortgage Loans") formed and sold by

CITIGROUP MORTGAGE LOAN TRUST INC.

THIS CERTIFICATE DOES NOT REPRESENT AN OBLIGATION OF OR INTEREST IN CITIGROUP MORTGAGE LOAN TRUST INC., THE MASTER SERVICER, THE TRUST ADMINISTRATOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES. NEITHER THIS CERTIFICATE NOR THE UNDERLYING MORTGAGE LOANS ARE GUARANTEED BY ANY AGENCY OR INSTRUMENTALITY OF THE UNITED STATES.

This certifies that Cede & Co. is the registered owner of a Percentage Interest (obtained by dividing the denomination of this Certificate by the aggregate Certificate Principal Balance of the Class M-10 Certificates as of the Issue Date) in that certain beneficial ownership interest evidenced by all the Class M-10 Certificates in the REMIC created pursuant to a Pooling and Servicing Agreement, dated as specified above (the "Agreement"), among Citigroup Mortgage Loan Trust Inc. (hereinafter called the "Depositor," which term includes any successor entity under the Agreement), the Master Servicer, the Servicers, the Trust Administrator and the Trustee, a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, distributions will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered on the Record Date, in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to the Holders of Class M-10 Certificates on such Distribution Date pursuant to the Agreement.

All distributions to the Holder of this Certificate under the Agreement will be made or caused to be made by the Trust Administrator by wire transfer in immediately available funds to the account of the Person entitled thereto if such Person shall have so notified the Trust Administrator in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date or otherwise by check mailed by first class mail to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Trust Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trust Administrator for that purpose as provided in the Agreement.

This Certificate is one of a duly authorized issue of Certificates designated as Asset-Backed Pass-Through Certificates of the Series specified on the face hereof (herein called the "Certificates") and representing the Percentage Interest specified above in the Class of Certificates to which the Certificate belongs.

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. As provided in the Agreement, withdrawals from the Collection Account and the Distribution Account may be made from time to time for purposes other than distributions to Certificateholders, such purposes including reimbursement of advances made, or certain expenses incurred, with respect to the Mortgage Loans.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee and the rights of the Certificateholders, under the Agreement at any time by the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is

230

registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trust Administrator as provided in the Agreement, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trust Administrator duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest will be issued to the designated transferee or transferees.

Each transferee of this Certificate who is a Plan subject to ERISA or Section 4975 of the Code, a Person acting, directly or indirectly, on behalf of any such Plan or a Person using "Plan Assets" to acquire this Certificate shall be deemed to have made the representations in Section 5.02(b) of the Agreement.

No transfer of this Certificate shall be made unless the transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "1933 Act"), and an effective registration or qualification under applicable state securities laws, or is made in a transaction that does not require such registration or qualification. In the event that such a transfer of this Certificate is to be made without registration or qualification, the Trust Administrator shall require receipt of written certifications from the Holder of the Certificate desiring to effect the transfer, and from such Holder's prospective transferee, substantially in the forms attached to the Agreement as Exhibit F-1. None of the Depositor or the Trust Administrator is obligated to register or qualify the Class of Certificates specified on the face hereof under the 1933 Act or any other securities law or to take any action not otherwise required under the Agreement to permit the transfer of such Certificates without registration or qualification. Any Holder desiring to effect a transfer of this Certificate shall be required to indemnify the Trustee, the Trust Administrator, the Master Servicer, the Depositor, the Servicers and any Sub-Servicer against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

The Certificates are issuable in fully registered form only without coupons in Classes and denominations representing Percentage Interests specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, the Certificates are exchangeable for new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same. No service charge will be made for any such registration of transfer or exchange of Certificates, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

The Depositor, the Master Servicer, the Trust Administrator, the Trustee and any agent of the Depositor, the Master Servicer, the Trust Administrator or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Trust Administrator, the Trustee nor any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby shall terminate upon payment to the Certificateholders of all amounts held by the Trust Administrator and required to be paid to them pursuant to the Agreement following the earlier of (i) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan and REO Property remaining in the REMIC and (ii) the purchase by the party designated in the Agreement at a price determined as provided in the Agreement from the REMIC of all the Mortgage Loans and all property acquired in respect of such Mortgage Loans. The Agreement permits, but does not require, the party designated in the Agreement to purchase from the REMIC all the Mortgage Loans and all property acquired in respect of any Mortgage Loan at a price determined as provided in the Agreement. The exercise of such right will effect early retirement of the Certificates; however, such right to purchase is subject to the aggregate Stated Principal Balance of the Mortgage Loans at the time of purchase being less than 10% of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

The recitals contained herein shall be taken as statements of the Depositor, and the Trust Administrator assumes no responsibility for their correctness.

Unless the certificate of authentication hereon has been executed by the Trust Administrator, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

231

Case 3:13-cv-01983-WHO   Document 32-4   Filed 09/27/13   Page 23 of 178

IN WITNESS WHEREOF, the Trust Administrator has caused this Certificate to be duly executed.

Dated: March ___, 2007

Wells Fargo Bank, N.A., as Trust Administrator

By: _____

Authorized Officer

CERTIFICATE OF AUTHENTICATION

This is one of the Certificates referred to in the within-mentioned Agreement.

Wells Fargo Bank, N.A., as Trust Administrator

By: _____

Authorized Signatory

232

<u>ABBREVIATIONS</u>

The following abbreviations, when used in the inscription on the face of this instrument, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common                    UNIF GIFT MIN ACT - <u>Custodian</u>

TEN ENT - as tenants by the entireties            (Cust) (Minor) under
                                                  Uniform Gifts to Minors Act

JT TEN - as joint tenants with right              _____
if survivorship and not as                        (State)
tenants in common

        Additional abbreviations may also be used though not in the above list.

<u>ASSIGNMENT</u>

        FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto

_____

_____

(Please print or typewrite name, address including postal zip code, and Taxpayer Identification Number of assignee) a Percentage Interest equal to _____% evidenced by the within Asset-Backed Pass-Through Certificates and hereby authorize(s) the registration of transfer of such interest to assignee on the Certificate Register of the Trust Fund.

        I (we) further direct the Trust Administrator to issue a new Certificate of a like Percentage Interest and Class to the above named assignee and deliver such Certificate to the following address:

_____

_____.

Dated: _____                    _____
                                      Signature by or on behalf of assignor


                                      _____
                                      Signature Guaranteed

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

_____

for the account of _____

account number _____ or, if mailed by check, to

_____

Applicable statements should be mailed to _____

_____

This information is provided by assignee named above, or its agent. _____

EXHIBIT A-16

FORM OF CLASS CE-1 CERTIFICATE

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THIS CERTIFICATE IS SUBORDINATE TO THE CLASS A CERTIFICATES AND THE MEZZANINE CERTIFICATES TO THE EXTENT DESCRIBED IN THE POOLING AND SERVICING AGREEMENT REFERRED TO HEREIN.

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS THAT ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE AGREEMENT.

NO TRANSFER OF THIS CERTIFICATE TO AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR SECTION 4975 OF THE CODE WILL BE REGISTERED EXCEPT IN COMPLIANCE WITH THE PROCEDURES DESCRIBED HEREIN.

| | |
|---|---|
| Series: 2007-AMC2 | Aggregate Certificate Principal Balance of the Class CE-1 Certificates as of the Issue Date: $69,438,570.36 |
| Pass-Through Rate: Variable | Denomination: $69,438,570.36 |
| Cut-off Date and date of Pooling and Servicing Agreement: March 1, 2007 | Servicers: Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP |
| First Distribution Date: April 25, 2007 | Master Servicer: Wells Fargo Bank, N.A. |
| | Trust Administrator: Wells Fargo Bank, N.A. |
| No. 1 | Trustee: U.S. Bank National Association |
| Aggregate Notional Amount of the Class CE-1 Certificates as of the Issue Date: $2,204,397,570.36 | Issue Date: March 30, 2007 |

234

THE OUTSTANDING CERTIFICATE PRINCIPAL BALANCE OR NOTIONAL AMOUNT HEREOF AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ABOVE AS THE INITIAL CERTIFICATE PRINCIPAL BALANCE OR NOTIONAL AMOUNT, AS THE CASE MAY BE, OF THIS CERTIFICATE.

235

ASSET BACKED PASS-THROUGH CERTIFICATE

evidencing a beneficial ownership interest in a portion of a Trust Fund (the "Trust Fund") consisting primarily of a pool of conventional one- to four-family, fixed-rate and adjustable-rate, first and second lien mortgage loans (the "Mortgage Loans") formed and sold by

CITIGROUP MORTGAGE LOAN TRUST INC.

THIS CERTIFICATE DOES NOT REPRESENT AN OBLIGATION OF OR INTEREST IN CITIGROUP MORTGAGE LOAN TRUST INC., THE MASTER SERVICER, THE TRUST ADMINISTRATOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES. NEITHER THIS CERTIFICATE NOR THE UNDERLYING MORTGAGE LOANS ARE GUARANTEED BY ANY AGENCY OR INSTRUMENTALITY OF THE UNITED STATES.

This certifies that Citigroup Global Markets Realty Corp. is the registered owner of a Percentage Interest (obtained by dividing the denomination of this Certificate by the aggregate Certificate Principal Balance of the Class CE-1 Certificates as of the Issue Date) in that certain beneficial ownership interest evidenced by all the Class CE-1 Certificates in REMIC III created pursuant to a Pooling and Servicing Agreement, dated as specified above (the "Agreement"), among Citigroup Mortgage Loan Trust Inc. (hereinafter called the "Depositor," which term includes any successor entity under the Agreement), the Master Servicer, the Servicers, the Trust Administrator and the Trustee, a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, distributions will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered on the Record Date, in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to the Holders of Class CE-1 Certificates on such Distribution Date pursuant to the Agreement.

All distributions to the Holder of this Certificate under the Agreement will be made or caused to be made by the Trust Administrator by wire transfer in immediately available funds to the account of the Person entitled thereto if such Person shall have so notified the Trust Administrator in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date or otherwise by check mailed by first class mail to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Trust Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trust Administrator for that purpose as provided in the Agreement.

This Certificate is one of a duly authorized issue of Certificates designated as Asset Backed Pass-Through Certificates of the Series specified on the face hereof (herein called the "Certificates") and representing the Percentage Interest specified above in the Class of Certificates to which the Certificate belongs.

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. As provided in the Agreement, withdrawals from the Collection Account and the Distribution Account may be made from time to time for purposes other than distributions to Certificateholders, such purposes including reimbursement of advances made, or certain expenses incurred, with respect to the Mortgage Loans.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee and the rights of the Certificateholders under the Agreement at any time by the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is

236

registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trust Administrator as provided in the Agreement, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trust Administrator duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest will be issued to the designated transferee or transferees.

No transfer of this Certificate shall be made unless the transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "1933 Act"), and an effective registration or qualification under applicable state securities laws, or is made in a transaction that does not require such registration or qualification. In the event that such a transfer of this Certificate is to be made without registration or qualification, the Trust Administrator shall require receipt of (i) if such transfer is purportedly being made in reliance upon Rule 144A under the 1933 Act, written certifications from the Holder of the Certificate desiring to effect the transfer, and from such Holder's prospective transferee, substantially in the forms attached to the Agreement as Exhibit F-1, and (ii) in all other cases, an Opinion of Counsel satisfactory to it that such transfer may be made without such registration or qualification (which Opinion of Counsel shall not be an expense of the Trust Fund or of the Depositor, the Trustee or the Master Servicer, the Trust Administrator or the Servicer in their respective capacities as such), together with copies of the written certification(s) of the Holder of the Certificate desiring to effect the transfer and/or such Holder's prospective transferee upon which such Opinion of Counsel is based. None of the Depositor or the Trust Administrator is obligated to register or qualify the Class of Certificates specified on the face hereof under the 1933 Act or any other securities law or to take any action not otherwise required under the Agreement to permit the transfer of such Certificates without registration or qualification. Any Holder desiring to effect a transfer of this Certificate shall be required to indemnify the Trustee, the Trust Administrator, the Depositor, the Master Servicer, the Servicers and any Sub-Servicer against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of this Certificate to a Plan subject to ERISA or Section 4975 of the Code, any Person acting, directly or indirectly, on behalf of any such Plan or any Person using "Plan Assets" to acquire this Certificate shall be made except in accordance with Section 5.02(b) of the Agreement.

The Certificates are issuable in fully registered form only without coupons in Classes and denominations representing Percentage Interests specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, the Certificates are exchangeable for new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same. No service charge will be made for any such registration of transfer or exchange of Certificates, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

The Depositor, the Master Servicer, the Trust Administrator, the Trustee and any agent of the Depositor, the Master Servicer, the Trust Administrator or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Trust Administrator, the Trustee nor any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby shall terminate upon payment to the Certificateholders of all amounts held by the Trust Administrator and required to be paid to them pursuant to the Agreement following the earlier of (i) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan and REO Property remaining in REMIC I and (ii) the purchase by the party designated in the Agreement at a price determined as provided in the Agreement from REMIC I of all the Mortgage Loans and all property acquired in respect of such Mortgage Loans. The Agreement permits, but does not require, the party designated in the Agreement to purchase from REMIC I all the Mortgage Loans and all property acquired in respect of any Mortgage Loan at a price determined as provided in the Agreement. The exercise of such right will effect early retirement of the Certificates; however, such right to purchase is subject to the aggregate Stated Principal Balance of the Mortgage Loans at the time of purchase being less than 10% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date.

The recitals contained herein shall be taken as statements of the Depositor and the Trust Administrator assumes no responsibility for their correctness.

Unless the certificate of authentication hereon has been executed by the Trust Administrator, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Trust Administrator has caused this Certificate to be duly executed.

Dated: March ____, 2007

                                    Wells Fargo Bank, N.A., as Trust Administrator


                          By: _____
                                    Authorized Officer



                          CERTIFICATE OF AUTHENTICATION

    This is one of the Certificates referred to in the within-mentioned Agreement.


                                    Wells Fargo Bank, N.A., as Trust Administrator


                          By: _____
                                    Authorized Signatory

238

<u>ABBREVIATIONS</u>

The following abbreviations, when used in the inscription on the face of this instrument, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common                    UNIF GIFT MIN ACT - <u>Custodian</u>

TEN ENT - as tenants by the entireties            (Cust) (Minor) under
                                                  Uniform Gifts to Minors Act

JT TEN - as joint tenants with right              _____
if survivorship and not as
tenants in common                                 (State)

     Additional abbreviations may also be used though not in the above list.

<u>ASSIGNMENT</u>

     FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto

_____

(Please print or typewrite name, address including postal zip code, and Taxpayer Identification Number of assignee) a Percentage Interest equal to _____% evidenced by the within Asset Backed Pass-Through Certificates and hereby authorize(s) the registration of transfer of such interest to assignee on the Certificate Register of the Trust Fund.

     I (we) further direct the Trust Administrator to issue a new Certificate of a like Percentage Interest and Class to the above named assignee and deliver such Certificate to the following address:

_____
_____ .

Dated: _____                    _____
                                    Signature by or on behalf of assignor


                                    _____
                                    Signature Guaranteed

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available
funds to _____

for the account of _____

account number _____ or, if mailed by check, to
_____

Applicable statements should be mailed to _____
_____

This information is provided by _____
assignee named above, or _____
its agent.

FORM OF CLASS CE-2 CERTIFICATE

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS THAT ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE AGREEMENT.

NO TRANSFER OF THIS CERTIFICATE TO AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR SECTION 4975 OF THE CODE WILL BE REGISTERED EXCEPT IN COMPLIANCE WITH THE PROCEDURES DESCRIBED HEREIN.

Series: 2007-AMC2

Pass-Through Rate: Variable

Cut-off Date and date of Pooling and Servicing Agreement: March 1, 2007

First Distribution Date: April 25, 2007

No. 1

Aggregate Notional Amount of the Class CE-2 Certificates as of the Issue Date: $1,126,710,877.98

Aggregate Certificate Principal Balance of the Class CE-2 Certificates as of the Issue Date: $0.00

Denomination: $0.00

Servicers: Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP

Master Servicer: Wells Fargo Bank, N.A.

Trust Administrator: Wells Fargo Bank, N.A.

Trustee: U.S. Bank National Association

Issue Date: March 30, 2007

THE OUTSTANDING CERTIFICATE PRINCIPAL BALANCE OR NOTIONAL AMOUNT HEREOF AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ABOVE AS THE INITIAL CERTIFICATE PRINCIPAL BALANCE OR NOTIONAL AMOUNT, AS THE CASE MAY BE, OF THIS CERTIFICATE.

241

ASSET BACKED PASS-THROUGH CERTIFICATE

evidencing a beneficial ownership interest in a portion of a Trust Fund (the "Trust Fund") consisting primarily of a pool of conventional one- to four-family, fixed-rate and adjustable-rate, first and second lien mortgage loans (the "Mortgage Loans") formed and sold by

CITIGROUP MORTGAGE LOAN TRUST INC.

THIS CERTIFICATE DOES NOT REPRESENT AN OBLIGATION OF OR INTEREST IN CITIGROUP MORTGAGE LOAN TRUST INC., THE MASTER SERVICER, THE TRUST ADMINISTRATOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES. NEITHER THIS CERTIFICATE NOR THE UNDERLYING MORTGAGE LOANS ARE GUARANTEED BY ANY AGENCY OR INSTRUMENTALITY OF THE UNITED STATES.

This certifies that Citigroup Global Markets Realty Corp. is the registered owner of a Percentage Interest (obtained by dividing the denomination of this Certificate by the aggregate Certificate Principal Balance of the Class CE-2 Certificates as of the Issue Date) in that certain beneficial ownership interest evidenced by all the Class CE-2 Certificates in REMIC IV created pursuant to a Pooling and Servicing Agreement, dated as specified above (the "Agreement"), among Citigroup Mortgage Loan Trust Inc. (hereinafter called the "Depositor," which term includes any successor entity under the Agreement), the Master Servicer, the Servicers, the Trust Administrator and the Trustee, a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, distributions will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered on the Record Date, in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to the Holders of Class CE-2 Certificates on such Distribution Date pursuant to the Agreement.

All distributions to the Holder of this Certificate under the Agreement will be made or caused to be made by the Trust Administrator by wire transfer in immediately available funds to the account of the Person entitled thereto if such Person shall have so notified the Trust Administrator in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date or otherwise by check mailed by first class mail to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Trust Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trust Administrator for that purpose as provided in the Agreement.

This Certificate is one of a duly authorized issue of Certificates designated as Asset Backed Pass-Through Certificates of the Series specified on the face hereof (herein called the "Certificates") and representing the Percentage Interest specified above in the Class of Certificates to which the Certificate belongs.

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. As provided in the Agreement, withdrawals from the Collection Account and the Distribution Account may be made from time to time for purposes other than distributions to Certificateholders, such purposes including reimbursement of advances made, or certain expenses incurred, with respect to the Mortgage Loans.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee and the rights of the Certificateholders under the Agreement at any time by the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is

242

registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trust Administrator as provided in the Agreement, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trust Administrator duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest will be issued to the designated transferee or transferees.

No transfer of this Certificate shall be made unless the transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "1933 Act"), and an effective registration or qualification under applicable state securities laws, or is made in a transaction that does not require such registration or qualification. In the event that such a transfer of this Certificate is to be made without registration or qualification, the Trust Administrator shall require receipt of (i) if such transfer is purportedly being made in reliance upon Rule 144A under the 1933 Act, written certifications from the Holder of the Certificate desiring to effect the transfer, and from such Holder's prospective transferee, substantially in the forms attached to the Agreement as Exhibit F-1, and (ii) in all other cases, an Opinion of Counsel satisfactory to it that such transfer may be made without such registration or qualification (which Opinion of Counsel shall not be an expense of the Trust Fund or of the Depositor, the Trustee or the Master Servicer, the Trust Administrator or the Servicer in their respective capacities as such), together with copies of the written certification(s) of the Holder of the Certificate desiring to effect the transfer and/or such Holder's prospective transferee upon which such Opinion of Counsel is based. None of the Depositor or the Trust Administrator is obligated to register or qualify the Class of Certificates specified on the face hereof under the 1933 Act or any other securities law or to take any action not otherwise required under the Agreement to permit the transfer of such Certificates without registration or qualification. Any Holder desiring to effect a transfer of this Certificate shall be required to indemnify the Trustee, the Trust Administrator, the Depositor, the Master Servicer, the Servicers and any Sub-Servicer against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of this Certificate to a Plan subject to ERISA or Section 4975 of the Code, any Person acting, directly or indirectly, on behalf of any such Plan or any Person using "Plan Assets" to acquire this Certificate shall be made except in accordance with Section 5.02(b) of the Agreement.

The Certificates are issuable in fully registered form only without coupons in Classes and denominations representing Percentage Interests specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, the Certificates are exchangeable for new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same. No service charge will be made for any such registration of transfer or exchange of Certificates, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

The Depositor, the Master Servicer, the Trust Administrator, the Trustee and any agent of the Depositor, the Master Servicer, the Trust Administrator or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Trust Administrator, the Trustee nor any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby shall terminate upon payment to the Certificateholders of all amounts held by the Trust Administrator and required to be paid to them pursuant to the Agreement following the earlier of (i) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan and REO Property remaining in REMIC I and (ii) the purchase by the party designated in the Agreement at a price determined as provided in the Agreement from REMIC I of all the Mortgage Loans and all property acquired in respect of such Mortgage Loans. The Agreement permits, but does not require, the party designated in the Agreement to purchase from REMIC I all the Mortgage Loans and all property acquired in respect of any Mortgage Loan at a price determined as provided in the Agreement. The exercise of such right will effect early retirement of the Certificates; however, such right to purchase is subject to the aggregate Stated Principal Balance of the Mortgage Loans at the time of purchase being less than 10% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date.

The recitals contained herein shall be taken as statements of the Depositor and the Trust Administrator assumes no responsibility for their correctness.

Unless the certificate of authentication hereon has been executed by the Trust Administrator, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

Case 3:13-cv-01983-WHO   Document 32-4   Filed 09/27/13   Page 35 of 178

IN WITNESS WHEREOF, the Trust Administrator has caused this Certificate to be duly executed.

Dated: March ___, 2007

Wells Fargo Bank, N.A., as Trust Administrator

By: _____
     Authorized Officer

CERTIFICATE OF AUTHENTICATION

This is one of the Certificates referred to in the within-mentioned Agreement.

Wells Fargo Bank, N.A., as Trust Administrator

By: _____
     Authorized Signatory

244

<u>ABBREVIATIONS</u>

The following abbreviations, when used in the inscription on the face of this instrument, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common                    UNIF GIFT MIN ACT - <u>Custodian</u>

TEN ENT - as tenants by the entireties            (Cust) (Minor) under
                                                  Uniform Gifts to Minors Act

JT TEN - as joint tenants with right              _____
if survivorship and not as                        (State)
tenants in common

    Additional abbreviations may also be used though not in the above list.

<u>ASSIGNMENT</u>

    FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto

_____

(Please print or typewrite name, address including postal zip code, and Taxpayer Identification Number of assignee) a Percentage Interest equal to _____% evidenced by the within Asset Backed Pass-Through Certificates and hereby authorize(s) the registration of transfer of such interest to assignee on the Certificate Register of the Trust Fund.

    I (we) further direct the Trust Administrator to issue a new Certificate of a like Percentage Interest and Class to the above named assignee and deliver such Certificate to the following address:

_____

_____.

Dated:                                  _____
                                        Signature by or on behalf of assignor


                                        _____
                                        Signature Guaranteed

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

for the account of _____

account number _____ or, if mailed by check, to

Applicable statements should be mailed to _____

This information is provided by assignee named above, or its agent. _____

EXHIBIT A-17

FORM OF CLASS P CERTIFICATE

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS THAT ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE AGREEMENT.

NO TRANSFER OF THIS CERTIFICATE TO AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR SECTION 4975 OF THE CODE WILL BE REGISTERED EXCEPT IN COMPLIANCE WITH THE PROCEDURES DESCRIBED HEREIN.

Series: 2007-AMC2

Cut-off Date and date of Pooling and Servicing Agreement: March 1, 2007

First Distribution Date: April 25, 2007

No. 1

Aggregate Certificate Principal Balance of the Class P Certificates as of the Issue Date: $100.00

Denomination: $100.00

Servicers: Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP

Master Servicer: Wells Fargo Bank, N.A.

Trust Administrator: Wells Fargo Bank, N.A.

Trustee: U.S. Bank National Association

Issue Date: March 30, 2007

DISTRIBUTIONS IN REDUCTION OF THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE MAY BE MADE MONTHLY AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING CERTIFICATE PRINCIPAL BALANCE HEREOF AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ABOVE AS THE DENOMINATION OF THIS CERTIFICATE.

247

ASSET BACKED PASS-THROUGH CERTIFICATE

evidencing a beneficial ownership interest in a Trust Fund (the "Trust Fund") consisting primarily of a pool of conventional one- to four-family, fixed-rate and adjustable-rate, first and second lien mortgage loans (the "Mortgage Loans") formed and sold by

CITIGROUP MORTGAGE LOAN TRUST INC.

THIS CERTIFICATE DOES NOT REPRESENT AN OBLIGATION OF OR INTEREST IN CITIGROUP MORTGAGE LOAN TRUST INC., THE MASTER SERVICER, THE TRUST ADMINISTRATOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES. NEITHER THIS CERTIFICATE NOR THE UNDERLYING MORTGAGE LOANS ARE GUARANTEED BY ANY AGENCY OR INSTRUMENTALITY OF THE UNITED STATES.

This certifies that Citigroup Global Markets Realty Corp. is the registered owner of a Percentage Interest (obtained by dividing the denomination of this Certificate by the aggregate Certificate Principal Balance of the Class P Certificates as of the Issue Date) in that certain beneficial ownership interest evidenced by all the Class P Certificates in REMIC V created pursuant to a Pooling and Servicing Agreement, dated as specified above (the "Agreement"), among Citigroup Mortgage Loan Trust Inc. (hereinafter called the "Depositor," which term includes any successor entity under the Agreement), the Master Servicer, the Trust Administrator, the Servicer and the Trustee, a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, distributions will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered on the Record Date, in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to the Holders of Class P Certificates on such Distribution Date pursuant to the Agreement.

All distributions to the Holder of this Certificate under the Agreement will be made or caused to be made by the Trust Administrator by wire transfer in immediately available funds to the account of the Person entitled thereto if such Person shall have so notified the Trust Administrator in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date or otherwise by check mailed by first class mail to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Trust Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trust Administrator for that purpose as provided in the Agreement.

This Certificate is one of a duly authorized issue of Certificates designated as Asset Backed Pass-Through Certificates of the Series specified on the face hereof (herein called the "Certificates") and representing the Percentage Interest specified above in the Class of Certificates to which the Certificate belongs.

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. As provided in the Agreement, withdrawals from the Collection Account and the Distribution Account may be made from time to time for purposes other than distributions to Certificateholders, such purposes including reimbursement of advances made, or certain expenses incurred, with respect to the Mortgage Loans.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee and the rights of the Certificateholders under the Agreement at any time by the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is

248

registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trust Administrator as provided in the Agreement, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trust Administrator duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest will be issued to the designated transferee or transferees.

No transfer of this Certificate shall be made unless the transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "1933 Act"), and an effective registration or qualification under applicable state securities laws, or is made in a transaction that does not require such registration or qualification. In the event that such a transfer of this Certificate is to be made without registration or qualification, the Trust Administrator shall require receipt of (i) if such transfer is purportedly being made in reliance upon Rule 144A under the 1933 Act, written certifications from the Holder of the Certificate desiring to effect the transfer, and from such Holder's prospective transferee, substantially in the forms attached to the Agreement as Exhibit F-1, and (ii) in all other cases, an Opinion of Counsel satisfactory to it that such transfer may be made without such registration or qualification (which Opinion of Counsel shall not be an expense of the Trust Fund or of the Depositor, the Trustee or the Master Servicer, the Trust Administrator or the Servicer in their respective capacities as such), together with copies of the written certification(s) of the Holder of the Certificate desiring to effect the transfer and/or such Holder's prospective transferee upon which such Opinion of Counsel is based. None of the Depositor or the Trust Administrator is obligated to register or qualify the Class of Certificates specified on the face hereof under the 1933 Act or any other securities law or to take any action not otherwise required under the Agreement to permit the transfer of such Certificates without registration or qualification. Any Holder desiring to effect a transfer of this Certificate shall be required to indemnify the Trustee, the Trust Administrator, the Depositor, the Master Servicer, the Servicers and any Sub-Servicer against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of this Certificate to a Plan subject to ERISA or Section 4975 of the Code, any Person acting, directly or indirectly, on behalf of any such Plan or any Person using "Plan Assets" to acquire this Certificate shall be made except in accordance with Section 5.02(b) of the Agreement.

The Certificates are issuable in fully registered form only without coupons in Classes and denominations representing Percentage Interests specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, the Certificates are exchangeable for new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same. No service charge will be made for any such registration of transfer or exchange of Certificates, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

The Depositor, the Master Servicer, the Trust Administrator, the Trustee and any agent of the Depositor, the Master Servicer, the Trust Administrator or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Trust Administrator, the Trustee nor any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby shall terminate upon payment to the Certificateholders of all amounts held by the Trust Administrator and required to be paid to them pursuant to the Agreement following the earlier of (i) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan and REO Property remaining in REMIC I and (ii) the purchase by the party designated in the Agreement at a price determined as provided in the Agreement from REMIC I of all the Mortgage Loans and all property acquired in respect of such Mortgage Loans. The Agreement permits, but does not require, the party designated in the Agreement to purchase from REMIC I all the Mortgage Loans and all property acquired in respect of any Mortgage Loan at a price determined as provided in the Agreement. The exercise of such right will effect early retirement of the Certificates; however, such right to purchase is subject to the aggregate Stated Principal Balance of the Mortgage Loans at the time of purchase being less than 10% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date.

The recitals contained herein shall be taken as statements of the Depositor and the Trust Administrator assumes no responsibility for their correctness.

Unless the certificate of authentication hereon has been executed by the Trust Administrator, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

Case 3:13-cv-01983-WHO   Document 32-4   Filed 09/27/13   Page 41 of 178

IN WITNESS WHEREOF, the Trust Administrator has caused this Certificate to be duly executed.

Dated: March ____, 2007

Wells Fargo Bank, N.A., as Trust Administrator

By: _____
       Authorized Officer

CERTIFICATE OF AUTHENTICATION

This is one of the Certificates referred to in the within-mentioned Agreement.

Wells Fargo Bank, N.A., as Trust Administrator

By: _____
       Authorized Signatory

ABBREVIATIONS

The following abbreviations, when used in the inscription on the face of this instrument, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common                    UNIF GIFT MIN ACT - <u>Custodian</u>

TEN ENT - as tenants by the entireties            (Cust) (Minor) under
                                                  Uniform Gifts to Minors Act

JT TEN - as joint tenants with right              _____
if survivorship and not as                        (State)
tenants in common

    Additional abbreviations may also be used though not in the above list.

<u>ASSIGNMENT</u>

    FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto

_____

_____

(Please print or typewrite name, address including postal zip code, and Taxpayer Identification Number of assignee) a Percentage Interest equal to _____% evidenced by the within Asset Backed Pass-Through Certificates and hereby authorize(s) the registration of transfer of such interest to assignee on the Certificate Register of the Trust Fund.

    I (we) further direct the Trust Administrator to issue a new Certificate of a like Percentage Interest and Class to the above named assignee and deliver such Certificate to the following address:

_____

_____.

Dated: _____                            _____
                                                  Signature by or on behalf of assignor


                                                  _____
                                                  Signature Guaranteed


251

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available
funds to _____

_____
for the account of _____
account number _____ or, if mailed by check, to

_____
Applicable statements should be mailed to _____

_____

This information is provided by
assignee named above, or _____
its agent.

EXHIBIT A-18

FORM OF CLASS R CERTIFICATE

THIS CERTIFICATE MAY NOT BE TRANSFERRED TO A NON-UNITED STATES PERSON.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "RESIDUAL INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT" ("REMIC"), AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE").

ANY RESALE, TRANSFER OR OTHER DISPOSITION OF THIS CERTIFICATE MAY BE MADE ONLY IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE AGREEMENT REFERRED TO HEREIN.

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS THAT ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE AGREEMENT REFERRED TO HEREIN.

NO TRANSFER OF THIS CERTIFICATE TO AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT (EACH A "PLAN") SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE CODE WILL BE REGISTERED EXCEPT IN COMPLIANCE WITH THE PROCEDURES DESCRIBED HEREIN.

ANY RESALE, TRANSFER OR OTHER DISPOSITION OF THIS CERTIFICATE MAY BE MADE ONLY IF THE PROPOSED TRANSFEREE PROVIDES (I) AN AFFIDAVIT TO THE TRUST ADMINISTRATOR THAT (A) SUCH TRANSFEREE IS NOT (1) THE UNITED STATES OR ANY POSSESSION THEREOF, ANY STATE OR POLITICAL SUBDIVISION THEREOF, ANY FOREIGN GOVERNMENT, ANY INTERNATIONAL ORGANIZATION, OR ANY AGENCY OR INSTRUMENTALITY OF ANY OF THE FOREGOING, (2) ANY ORGANIZATION (OTHER THAN A COOPERATIVE DESCRIBED IN SECTION 521 OF THE CODE) THAT IS EXEMPT FROM THE TAX IMPOSED BY CHAPTER 1 OF THE CODE UNLESS SUCH ORGANIZATION IS SUBJECT TO THE TAX IMPOSED BY SECTION 511 OF THE CODE, (3) ANY ORGANIZATION DESCRIBED IN SECTION 1381(A)(2)(C) OF THE CODE (ANY SUCH PERSON DESCRIBED IN THE FOREGOING CLAUSES (1), (2) OR (3) SHALL HEREINAFTER BE REFERRED TO AS A "DISQUALIFIED ORGANIZATION") OR (4) AN AGENT OF A DISQUALIFIED ORGANIZATION AND (B) NO PURPOSE

OF SUCH TRANSFER IS TO IMPEDE THE ASSESSMENT OR COLLECTION OF TAX, AND (II) SUCH TRANSFEREE SATISFIES CERTAIN ADDITIONAL CONDITIONS RELATING TO THE FINANCIAL CONDITION OF THE PROPOSED TRANSFEREE. NOTWITHSTANDING THE REGISTRATION IN THE CERTIFICATE REGISTER OF ANY TRANSFER, SALE OR OTHER DISPOSITION OF THIS CERTIFICATE TO A DISQUALIFIED ORGANIZATION OR AN AGENT OF A DISQUALIFIED ORGANIZATION, SUCH REGISTRATION SHALL BE DEEMED TO BE OF NO LEGAL FORCE OR EFFECT WHATSOEVER AND SUCH PERSON SHALL NOT BE DEEMED TO BE A CERTIFICATEHOLDER FOR ANY PURPOSE HEREUNDER, INCLUDING, BUT NOT LIMITED TO, THE RECEIPT OF DISTRIBUTIONS ON THIS CERTIFICATE. EACH HOLDER OF THIS CERTIFICATE BY ACCEPTANCE HEREOF SHALL BE DEEMED TO HAVE CONSENTED TO THE PROVISIONS OF THIS PARAGRAPH AND THE PROVISIONS OF SECTION 5.02(D) OF THE AGREEMENT REFERRED TO HEREIN. ANY PERSON THAT IS A DISQUALIFIED ORGANIZATION IS PROHIBITED FROM ACQUIRING BENEFICIAL OWNERSHIP OF THIS CERTIFICATE.

Series 2007-AMC2

Aggregate Percentage Interest of the Class R Certificates as of the Issue Date: 100%

Cut-off Date and date of Pooling and Servicing Agreement: March 1, 2007

First Distribution Date: April 25, 2007

Servicers: Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP

Master Servicer: Wells Fargo Bank, N.A.

No. 1

Trust Administrator: Wells Fargo Bank, N.A.

Trustee: U.S. Bank National Association

Issue Date: March 30, 2007

DISTRIBUTIONS IN REDUCTION OF THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE MAY BE MADE MONTHLY AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING CERTIFICATE PRINCIPAL BALANCE HEREOF AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ABOVE AS THE DENOMINATION OF THIS CERTIFICATE.

ASSET-BACKED PASS-THROUGH CERTIFICATE

evidencing a beneficial ownership interest in a portion of a Trust Fund (the "Trust Fund") consisting primarily of a pool of conventional one- to four-family, fixed-rate and adjustable-rate, first and second lien mortgage loans (the "Mortgage Loans") formed and sold by

CITIGROUP MORTGAGE LOAN TRUST INC.

THIS CERTIFICATE DOES NOT REPRESENT AN OBLIGATION OF OR INTEREST IN CITIGROUP MORTGAGE LOAN TRUST INC., THE MASTER SERVICER, THE TRUST ADMINISTRATOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES. NEITHER THIS CERTIFICATE NOR THE UNDERLYING MORTGAGE LOANS ARE GUARANTEED BY ANY AGENCY OR INSTRUMENTALITY OF THE UNITED STATES.

This certifies that Citigroup Global Markets Inc. is the registered owner of a Percentage Interest (obtained by dividing the denomination of this Certificate by the aggregate Certificate Principal Balance of the Class R Certificates as of the Issue Date) in that certain beneficial ownership interest evidenced by all the Class R Certificates created pursuant to a Pooling and Servicing Agreement, dated as specified above (the "Agreement"), among Citigroup Mortgage Loan Trust Inc. (hereinafter called the "Depositor," which term includes any successor entity under the Agreement), the Master Servicer, the Servicers, the Trust Administrator and the Trustee, a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, distributions will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered on the Record Date, in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to the Holders of Class R Certificates on such Distribution Date pursuant to the Agreement.

All distributions to the Holder of this Certificate under the Agreement will be made or caused to be made by the Trust Administrator by wire transfer in immediately available funds to the account of the Person entitled thereto if such Person shall have so notified the Trust Administrator in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date or otherwise by check mailed by first class mail to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Trust Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trust Administrator for that purpose as provided in the Agreement.

This Certificate is one of a duly authorized issue of Certificates designated as Asset-Backed Pass-Through Certificates of the Series specified on the face hereof (herein called the "Certificates") and representing a Percentage Interest in the Class of Certificates equal to the denomination specified on the face hereof divided by the aggregate Certificate Principal Balance of the Class of Certificates specified on the face hereof.

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. As provided in the Agreement, withdrawals from the Collection Account and the Distribution Account may be made from time to time for purposes other than distributions to Certificateholders, such purposes including reimbursement of advances made, or certain expenses incurred, with respect to the Mortgage Loans.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor, the Master Servicer, the Servicers, the Trust Administrator, the Trustee, and the rights of the Certificateholders under the Agreement at any time by the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

254

Any resale, transfer or other disposition of this certificate may be made only in accordance with the provisions of section 5.02 of the agreement referred to herein.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trust Administrator as provided in the Agreement, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trust Administrator duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable in fully registered form only without coupons in Classes and denominations representing Percentage Interests specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, the Certificates are exchangeable for new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same. No service charge will be made for any such registration of transfer or exchange of Certificates, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

No transfer of this Certificate shall be made unless the transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "1933 Act"), and an effective registration or qualification under applicable state securities laws, or is made in a transaction that does not require such registration or qualification. In the event that such a transfer of this Certificate is to be made without registration or qualification, the Trust Administrator shall require receipt of (i) if such transfer is purportedly being made in reliance upon Rule 144A under the 1933 Act, written certifications from the Holder of the Certificate desiring to effect the transfer, and from such Holder's prospective transferee, substantially in the forms attached to the Agreement as Exhibit F-1, and (ii) in all other cases, an Opinion of Counsel satisfactory to it that such transfer may be made without such registration or qualification (which Opinion of Counsel shall not be an expense of the Trust Fund or of the Depositor, the Trustee, the Trust Administrator, the Master Servicer or the Servicer in their respective capacities as such), together with copies of the written certification(s) of the Holder of the Certificate desiring to effect the transfer and/or such Holder's prospective transferee upon which such Opinion of Counsel is based. None of the Depositor or the Trust Administrator is obligated to register or qualify the Class of Certificates specified on the face hereof under the 1933 Act or any other securities law or to take any action not otherwise required under the Agreement to permit the transfer of such Certificates without registration or qualification. Any Holder desiring to effect a transfer of this Certificate shall be required to indemnify the Trustee, the Trust Administrator, the Depositor, the Master Servicer, the Servicers and any Sub-Servicer against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of this Certificate to a Plan subject to ERISA or Section 4975 of the Code, any Person acting, directly or indirectly, on behalf of any such Plan or any person using Plan Assets to acquire this Certificate shall be made except in accordance with Section 5.02(b) of the Agreement.

Prior to registration of any transfer, sale or other disposition of this Certificate, the proposed transferee shall provide to the Trust Administrator (i) an affidavit to the effect that such transferee is any Person other than a Disqualified Organization or the agent (including a broker, nominee or middleman) of a Disqualified Organization, and (ii) a certificate that acknowledges that (A) the Class R Certificates have been designated as a residual interest in REMIC I and REMIC II, (B) it will include in its income a pro rata share of the net income of the Trust Fund and that such income may be an "excess inclusion," as defined in the Code, that, with certain exceptions, cannot be offset by other losses or benefits from any tax exemption, and (C) it expects to have the financial means to satisfy all of its tax obligations including those relating to holding the Class R Certificates. Notwithstanding the registration in the Certificate Register of any transfer, sale or other disposition of this Certificate to a Disqualified Organization or an agent (including a broker, nominee or middleman) of a Disqualified Organization, such registration shall be deemed to be of no legal force or effect whatsoever and such Person shall not be deemed to be a Certificateholder for any purpose, including, but not limited to, the receipt of distributions in respect of this Certificate.

The Holder of this Certificate, by its acceptance hereof, shall be deemed to have consented to the provisions of Section 5.02 of the Agreement and to any amendment of the Agreement deemed necessary by counsel of the Depositor to ensure that the transfer of this Certificate to any Person other than a Permitted Transferee or any other Person will not cause the Trust Fund to cease to qualify as a REMIC or cause the imposition of a tax upon REMIC I or REMIC II.

No service charge will be made for any such registration of transfer or exchange of Certificates, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

The Depositor, the Master Servicer, the Trust Administrator, the Trustee and any agent of the Depositor, the Master Servicer, the Trust Administrator or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all

255

purposes, and none of the Depositor, the Master Servicer, the Trust Administrator, the Trustee nor any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby shall terminate upon payment to the Certificateholders of all amounts held by the Trust Administrator and required to be paid to them pursuant to the Agreement following the earlier of (i) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan and REO Property remaining in the REMIC and (ii) the purchase by the party designated in the Agreement at a price determined as provided in the Agreement from the REMIC of all the Mortgage Loans and all property acquired in respect of such Mortgage Loans. The Agreement permits, but does not require, the party designated in the Agreement to purchase from REMIC I all the Mortgage Loans and all property acquired in respect of any Mortgage Loan at a price determined as provided in the Agreement. The exercise of such right will effect early retirement of the Certificates; however, such right to purchase is subject to the aggregate Stated Principal Balance of the Mortgage Loans at the time of purchase being less than 10% of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

The recitals contained herein shall be taken as statements of the Depositor, and the Trust Administrator assumes no responsibility for their correctness.

Unless the certificate of authentication hereon has been executed by the Trust Administrator, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

256

IN WITNESS WHEREOF, the Trust Administrator has caused this Certificate to be duly executed.

Dated: March ___, 2007

Wells Fargo Bank, N.A., as Trust Administrator

By: _____
       Authorized Officer

CERTIFICATE OF AUTHENTICATION

This is one of the Certificates referred to in the within-mentioned Agreement.

Wells Fargo Bank, N.A., as Trust Administrator

By: _____
       Authorized Signatory

257

ABBREVIATIONS

The following abbreviations, when used in the inscription on the face of this instrument, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common                UNIF GIFT MIN ACT - <u>Custodian</u>

TEN ENT - as tenants by the entireties        (Cust) (Minor) under
                                              Uniform Gifts to Minors Act

JT TEN - as joint tenants with right          _____
if survivorship and not as                    (State)
tenants in common

    Additional abbreviations may also be used though not in the above list.


<u>ASSIGNMENT</u>

    FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto

_____

_____

(Please print or typewrite name, address including postal zip code, and Taxpayer Identification Number of assignee) a Percentage Interest equal to _____% evidenced by the within Asset-Backed Pass-Through Certificates and hereby authorize(s) the registration of transfer of such interest to assignee on the Certificate Register of the Trust Fund.

    I (we) further direct the Trust Administrator to issue a new Certificate of a like Percentage Interest and Class to the above named assignee and deliver such Certificate to the following address:

_____

_____ .


Dated: _____          _____
                                   Signature by or on behalf of assignor


                                   _____
                                   Signature Guaranteed

258

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

_____

for the account of _____

account number _____ or, if mailed by check, to

_____

Applicable statements should be mailed to _____

_____

This information is provided by _____
assignee named above, or
its agent. _____

EXHIBIT A-19

FORM OF CLASS R-X CERTIFICATE

THIS CERTIFICATE MAY NOT BE TRANSFERRED TO A NON-UNITED STATES PERSON.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "RESIDUAL INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT" ("REMIC"), AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE").

ANY RESALE, TRANSFER OR OTHER DISPOSITION OF THIS CERTIFICATE MAY BE MADE ONLY IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE AGREEMENT REFERRED TO HEREIN.

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS THAT ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE AGREEMENT REFERRED TO HEREIN.

NO TRANSFER OF THIS CERTIFICATE TO AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT (EACH A "PLAN") SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE CODE WILL BE REGISTERED EXCEPT IN COMPLIANCE WITH THE PROCEDURES DESCRIBED HEREIN.

ANY RESALE, TRANSFER OR OTHER DISPOSITION OF THIS CERTIFICATE MAY BE MADE ONLY IF THE PROPOSED TRANSFEREE PROVIDES (I) AN AFFIDAVIT TO THE TRUST ADMINISTRATOR THAT (A) SUCH TRANSFEREE IS NOT (1) THE UNITED STATES OR ANY POSSESSION THEREOF, ANY STATE OR POLITICAL SUBDIVISION THEREOF, ANY FOREIGN GOVERNMENT, ANY INTERNATIONAL ORGANIZATION, OR ANY AGENCY OR INSTRUMENTALITY OF ANY OF THE FOREGOING, (2) ANY ORGANIZATION (OTHER THAN A COOPERATIVE DESCRIBED IN SECTION 521 OF THE CODE) THAT IS EXEMPT FROM THE TAX IMPOSED BY CHAPTER 1 OF THE CODE UNLESS SUCH ORGANIZATION IS SUBJECT TO THE TAX IMPOSED BY SECTION 511 OF THE CODE, (3) ANY ORGANIZATION DESCRIBED IN SECTION 1381(A)(2)(C) OF THE CODE (ANY SUCH PERSON DESCRIBED IN THE FOREGOING CLAUSES (1), (2) OR (3) SHALL HEREINAFTER BE REFERRED TO AS A

"DISQUALIFIED ORGANIZATION") OR (4) AN AGENT OF A DISQUALIFIED ORGANIZATION AND (B) NO PURPOSE OF SUCH TRANSFER IS TO IMPEDE THE ASSESSMENT OR COLLECTION OF TAX, AND (II) SUCH TRANSFEREE SATISFIES CERTAIN ADDITIONAL CONDITIONS RELATING TO THE FINANCIAL CONDITION OF THE PROPOSED TRANSFEREE. NOTWITHSTANDING THE REGISTRATION IN THE CERTIFICATE REGISTER OF ANY TRANSFER, SALE OR OTHER DISPOSITION OF THIS CERTIFICATE TO A DISQUALIFIED ORGANIZATION OR AN AGENT OF A DISQUALIFIED ORGANIZATION, SUCH REGISTRATION SHALL BE DEEMED TO BE OF NO LEGAL FORCE OR EFFECT WHATSOEVER AND SUCH PERSON SHALL NOT BE DEEMED TO BE A CERTIFICATEHOLDER FOR ANY PURPOSE HEREUNDER, INCLUDING, BUT NOT LIMITED TO, THE RECEIPT OF DISTRIBUTIONS ON THIS CERTIFICATE. EACH HOLDER OF THIS CERTIFICATE BY ACCEPTANCE HEREOF SHALL BE DEEMED TO HAVE CONSENTED TO THE PROVISIONS OF THIS PARAGRAPH AND THE PROVISIONS OF SECTION 5.02(D) OF THE AGREEMENT REFERRED TO HEREIN. ANY PERSON THAT IS A DISQUALIFIED ORGANIZATION IS PROHIBITED FROM ACQUIRING BENEFICIAL OWNERSHIP OF THIS CERTIFICATE.

Series 2007-AMC2

Cut-off Date and date of Pooling and Servicing Agreement: March 1, 2007

First Distribution Date: April 25, 2007

No. 1

Aggregate Percentage Interest of the Class R-X Certificates as of the Issue Date: 100%

Servicers: Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP

Master Servicer: Wells Fargo Bank, N.A.

Trust Administrator: Wells Fargo Bank, N.A.

Trustee: U.S. Bank National Association

Issue Date: March 30, 2007

DISTRIBUTIONS IN REDUCTION OF THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE MAY BE MADE MONTHLY AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING CERTIFICATE PRINCIPAL BALANCE HEREOF AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ABOVE AS THE DENOMINATION OF THIS CERTIFICATE.

ASSET-BACKED PASS-THROUGH CERTIFICATE

evidencing a beneficial ownership interest in a portion of a Trust Fund (the "Trust Fund") consisting primarily of a pool of conventional one- to four-family, fixed-rate and adjustable-rate, first and second lien mortgage loans (the "Mortgage Loans") formed and sold by

CITIGROUP MORTGAGE LOAN TRUST INC.

THIS CERTIFICATE DOES NOT REPRESENT AN OBLIGATION OF OR INTEREST IN CITIGROUP MORTGAGE LOAN TRUST INC., THE MASTER SERVICER, THE TRUST ADMINISTRATOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES. NEITHER THIS CERTIFICATE NOR THE UNDERLYING MORTGAGE LOANS ARE GUARANTEED BY ANY AGENCY OR INSTRUMENTALITY OF THE UNITED STATES.

This certifies that Citigroup Global Markets Inc. is the registered owner of a Percentage Interest (obtained by dividing the denomination of this Certificate by the aggregate Certificate Principal Balance of the Class R-X Certificates as of the Issue Date) in that certain beneficial ownership interest evidenced by all the Class R-X Certificates created pursuant to a Pooling and Servicing Agreement, dated as specified above (the "Agreement"), among Citigroup Mortgage Loan Trust Inc. (hereinafter called the "Depositor," which term includes any successor entity under the Agreement), the Master Servicer, the Servicers, the Trust Administrator and the Trustee, a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, distributions will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (a "Distribution Date"), commencing on the First Distribution Date specified above, to the Person in whose name this Certificate is registered on the Record Date, in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to the Holders of Class R-X Certificates on such Distribution Date pursuant to the Agreement.

All distributions to the Holder of this Certificate under the Agreement will be made or caused to be made by the Trust Administrator by wire transfer in immediately available funds to the account of the Person entitled thereto if such Person shall have so notified the Trust Administrator in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date or otherwise by check mailed by first class mail to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Trust Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trust Administrator for that purpose as provided in the Agreement.

This Certificate is one of a duly authorized issue of Certificates designated as Asset-Backed Pass-Through Certificates of the Series specified on the face hereof (herein called the "Certificates") and representing a Percentage Interest in the Class of Certificates equal to the denomination specified on the face hereof divided by the aggregate Certificate Principal Balance of the Class of Certificates specified on the face hereof.

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. As provided in the Agreement, withdrawals from the Collection Account and the Distribution Account may be made from time to time for purposes other than distributions to Certificateholders, such purposes including reimbursement of advances made, or certain expenses incurred, with respect to the Mortgage Loans.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor, the Master Servicer, the Servicers, the Trust Administrator, the Trustee, and the rights of the Certificateholders under the Agreement at any time by the Depositor, the Master Servicer, the Servicers, the Trust Administrator and the Trustee with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

261

Any resale, transfer or other disposition of this certificate may be made only in accordance with the provisions of section 5.02 of the agreement referred to herein.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trust Administrator as provided in the Agreement, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trust Administrator duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable in fully registered form only without coupons in Classes and denominations representing Percentage Interests specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, the Certificates are exchangeable for new Certificates of the same Class in authorized denominations evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same. No service charge will be made for any such registration of transfer or exchange of Certificates, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

No transfer of this Certificate shall be made unless the transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "1933 Act"), and an effective registration or qualification under applicable state securities laws, or is made in a transaction that does not require such registration or qualification. In the event that such a transfer of this Certificate is to be made without registration or qualification, the Trust Administrator shall require receipt of (i) if such transfer is purportedly being made in reliance upon Rule 144A under the 1933 Act, written certifications from the Holder of the Certificate desiring to effect the transfer, and from such Holder's prospective transferee, substantially in the forms attached to the Agreement as Exhibit F-1, and (ii) in all other cases, an Opinion of Counsel satisfactory to it that such transfer may be made without such registration or qualification (which Opinion of Counsel shall not be an expense of the Trust Fund or of the Depositor, the Trustee, the Trust Administrator, the Master Servicer or the Servicer in their respective capacities as such), together with copies of the written certification(s) of the Holder of the Certificate desiring to effect the transfer and/or such Holder's prospective transferee upon which such Opinion of Counsel is based. None of the Depositor or the Trust Administrator is obligated to register or qualify the Class of Certificates specified on the face hereof under the 1933 Act or any other securities law or to take any action not otherwise required under the Agreement to permit the transfer of such Certificates without registration or qualification. Any Holder desiring to effect a transfer of this Certificate shall be required to indemnify the Trustee, the Trust Administrator, the Depositor, the Master Servicer, the Servicers and any Sub-Servicer against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of this Certificate to a Plan subject to ERISA or Section 4975 of the Code, any Person acting, directly or indirectly, on behalf of any such Plan or any person using Plan Assets to acquire this Certificate shall be made except in accordance with Section 5.02(b) of the Agreement.

Prior to registration of any transfer, sale or other disposition of this Certificate, the proposed transferee shall provide to the Trust Administrator (i) an affidavit to the effect that such transferee is any Person other than a Disqualified Organization or the agent (including a broker, nominee or middleman) of a Disqualified Organization, and (ii) a certificate that acknowledges that (A) the Class R-X Certificates have been designated as a residual interest in REMIC III, REMIC IV and REMIC V, (B) it will include in its income a pro rata share of the net income of the Trust Fund and that such income may be an "excess inclusion," as defined in the Code, that, with certain exceptions, cannot be offset by other losses or benefits from any tax exemption, and (C) it expects to have the financial means to satisfy all of its tax obligations including those relating to holding the Class R-X Certificates. Notwithstanding the registration in the Certificate Register of any transfer, sale or other disposition of this Certificate to a Disqualified Organization or an agent (including a broker, nominee or middleman) of a Disqualified Organization, such registration shall be deemed to be of no legal force or effect whatsoever and such Person shall not be deemed to be a Certificateholder for any purpose, including, but not limited to, the receipt of distributions in respect of this Certificate.

The Holder of this Certificate, by its acceptance hereof, shall be deemed to have consented to the provisions of Section 5.02 of the Agreement and to any amendment of the Agreement deemed necessary by counsel of the Depositor to ensure that the transfer of this Certificate to any Person other than a Permitted Transferee or any other Person will not cause the Trust Fund to cease to qualify as a REMIC or cause the imposition of a tax upon REMIC III or REMIC IV.

No service charge will be made for any such registration of transfer or exchange of Certificates, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

The Depositor, the Master Servicer, the Trust Administrator, the Trustee and any agent of the Depositor, the Master

262

Servicer, the Trust Administrator or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Trust Administrator, the Trustee nor any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby shall terminate upon payment to the Certificateholders of all amounts held by the Trust Administrator and required to be paid to them pursuant to the Agreement following the earlier of (i) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan and REO Property remaining in the REMIC and (ii) the purchase by the party designated in the Agreement at a price determined as provided in the Agreement from the REMIC of all the Mortgage Loans and all property acquired in respect of such Mortgage Loans. The Agreement permits, but does not require, the party designated in the Agreement to purchase from REMIC I all the Mortgage Loans and all property acquired in respect of any Mortgage Loan at a price determined as provided in the Agreement. The exercise of such right will effect early retirement of the Certificates; however, such right to purchase is subject to the aggregate Stated Principal Balance of the Mortgage Loans at the time of purchase being less than 10% of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

The recitals contained herein shall be taken as statements of the Depositor, and the Trust Administrator assumes no responsibility for their correctness.

Unless the certificate of authentication hereon has been executed by the Trust Administrator, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

263

IN WITNESS WHEREOF, the Trust Administrator has caused this Certificate to be duly executed.

Dated: March ____, 2007

Wells Fargo Bank, N.A., as Trust Administrator

By: _____

Authorized Officer

CERTIFICATE OF AUTHENTICATION

This is one of the Certificates referred to in the within-mentioned Agreement.

Wells Fargo Bank, N.A., as Trust Administrator

By: _____

Authorized Signatory

264

ABBREVIATIONS

The following abbreviations, when used in the inscription on the face of this instrument, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common                    UNIF GIFT MIN ACT - <u>Custodian</u>

TEN ENT - as tenants by the entireties            (Cust) (Minor) under
                                                  Uniform Gifts to Minors Act

JT TEN - as joint tenants with right              _____
if survorship and not as                          (State)
tenants in common

        Additional abbreviations may also be used though not in the above list.


<u>ASSIGNMENT</u>

        FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto

_____

_____

(Please print or typewrite name, address including postal zip code, and Taxpayer Identification Number of assignee) a Percentage Interest equal to _____% evidenced by the within Asset-Backed Pass-Through Certificates and hereby authorize(s) the registration of transfer of such interest to assignee on the Certificate Register of the Trust Fund.

        I (we) further direct the Trust Administrator to issue a new Certificate of a like Percentage Interest and Class to the above named assignee and deliver such Certificate to the following address:

_____

_____ .


Dated: _____        _____
                              Signature by or on behalf of assignor


                              _____
                              Signature Guaranteed

265

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available
funds to _____

_____

for the account of _____

account number _____ or, if mailed by check, to

_____

Applicable statements should be mailed to _____

_____

This information is provided by _____
assignee named above, or
its agent. _____

EXHIBIT B

FORM 10-D, FORM 8-K AND FORM 10-K
REPORTING RESPONSIBILITY

As to each item described below, the entity indicated as the Responsible Party shall be primarily responsible for reporting the information to the Trust Administrator pursuant to Section 4.07(a). If the Trust Administrator is indicated below as to any item, then the Trust Administrator is primarily responsible for obtaining that information.

Under Item 1 of Form 10-D: a) items marked "4.02 statement" are required to be included in the Monthly Statement under Section 4.02, provided by the Trust Administrator based on information received from the Servicer; and b) items marked "Form 10-D report" are required to be in the Form 10-D report but not the 4.02 statement, provided by the party indicated. Information under all other Items of Form 10-D is to be included in the Form 10-D report.

| Form | Item | Description | Responsible Party |
|---|---|---|---|
| 10-D | Must be filed within 15 days of the Distribution Date. | | |
| | 1 **Distribution and Pool Performance Information** | | |
| | *Item 1121(a) - Distribution and Pool Performance Information* | | |
| | (1) Any applicable record dates, accrual dates, determination dates for calculating distributions and actual distribution dates for the distribution period. | | 4.02 statement |
| | (2) Cash flows received and the sources thereof for distributions, fees and expenses. | | 4.02 statement |
| | (3) Calculated amounts and distribution of the flow of funds for the period itemized by type and priority of payment, including: | | 4.02 statement |
| | (i) Fees or expenses accrued and paid, with an identification of the general purpose of such fees and the party receiving such fees or expenses. | | 4.02 statement |
| | (ii) Payments accrued or paid with respect to enhancement or other support identified in Item 1114 of Regulation AB (such as insurance premiums or other enhancement maintenance fees), with an identification of the general purpose of such payments and the party receiving such payments. | | 4.02 statement |

266

| | |
|---|---|
| (iii) Principal, interest and other distributions accrued and paid on the asset-backed securities by type and by class or series and any principal or interest shortfalls or carryovers. | 4.02 statement |
| (iv) The amount of excess cash flow or excess spread and the disposition of excess cash flow. | 4.02 statement |
| (4) Beginning and ending principal balances of the asset-backed securities. | 4.02 statement |
| (5) Interest rates applicable to the pool assets and the asset-backed securities, as applicable. Consider providing interest rate information for pool assets in appropriate distributional groups or incremental ranges. | 4.02 statement |
| (6) Beginning and ending balances of transaction accounts, such as reserve accounts, and material account activity during the period. | 4.02 statement |
| (7) Any amounts drawn on any credit enhancement or other support identified in Item 1114 of Regulation AB, as applicable, and the amount of coverage remaining under any such enhancement, if known and applicable. | 4.02 statement |
| (8) Number and amount of pool assets at the beginning and ending of each period, and updated pool composition information, such as weighted average coupon, weighted average remaining term, pool factors and prepayment amounts. | 4.02 statement<br><br>Updated pool composition information fields to be as specified by Depositor from time to time |
| (9) Delinquency and loss information for the period.<br><br>In addition, describe any material changes to the information specified in Item 1100(b)(5) of Regulation AB regarding the pool assets. | 4.02 statement.<br><br>Form 10-D report: Depositor |
| (10) Information on the amount, terms and general purpose of any advances made or reimbursed during the period, including the general use of funds advanced and the general source of funds for reimbursements. | 4.02 statement |
| (11) Any material modifications, extensions or waivers to pool asset terms, fees, penalties or payments during the distribution period or that have cumulatively become material over time. | 4.02 statement |
| (12) Material breaches of pool asset representations or warranties or transaction covenants. | Form 10-D report: Trust Administrator, Depositor |
| (13) Information on ratio, coverage or other tests used for determining any early amortization, liquidation or other performance trigger and whether the trigger was met. | 4.02 statement |
| (14) Information regarding any new issuance of asset-backed securities backed by the same asset pool,<br>[information regarding] any pool asset changes (other than in connection with a pool asset converting into cash in accordance with its terms), such as additions or removals in connection with a prefunding or revolving period and pool asset substitutions and repurchases (and purchase rates, if applicable), and cash flows available for future purchases, such as the balances of any prefunding or revolving accounts, if applicable.<br>Disclose any material changes in the solicitation, credit-granting, underwriting, origination, acquisition or pool selection criteria or procedures, as applicable, used to originate, acquire or select the new pool assets. | Form 10-D report: Depositor<br><br>Form 10-D report: Depositor<br><br><br><br><br><br>Form 10-D report: Depositor |
| *Item 1121(b) - Pre-Funding or Revolving Period Information*<br>Updated pool information as required under Item 1121(b). | Depositor |

| 2 | **Legal Proceedings** | |
|---|---|---|

| | | |
|---|---|---|
| | Item 1117 - Legal proceedings pending against the following entities, or their respective property, that is material to Certificateholders, including proceedings known to be contemplated by governmental authorities:<br>Seller<br>Depositor<br>Trustee<br>Issuing entity<br>Master Servicer<br>Originator<br>Custodian<br>Servicer | (i) All parties to the Pooling and Servicing Agreement (as to themselves), (ii) the Trustee, Master Servicer and Depositor as to the Issuing entity and (iii) the Depositor as to the Sponsor, any 1110(b) originator and any 1100(d)(i) party |
| 3 | **Sales of Securities and Use of Proceeds** | |
| | *Information from Item 2(a) of Part II of Form 10-Q:*<br><br>With respect to any sale of securities by the sponsor, depositor or issuing entity, that are backed by the same asset pool or are otherwise issued by the issuing entity, whether or not registered, provide the sales and use of proceeds information in Item 701 of Regulation S-K. Pricing information can be omitted if securities were not registered. | Depositor |
| 4 | **Defaults Upon Senior Securities** | |
| | *Information from Item 3 of Part II of Form 10-Q:*<br><br>Report the occurrence of any Event of Default (after expiration of any grace period and provision of any required notice) | Trust Administrator |
| 5 | **Submission of Matters to a Vote of Security Holders** | |
| | *Information from Item 4 of Part II of Form 10-Q* | Trustee, Trust Administrator |
| 6 | **Significant Obligors of Pool Assets** | |
| | *Item 1112(b) - Significant Obligor Financial Information*\* | Depositor |
| | \*This information need only be reported on the Form 10-D for the distribution period in which updated information is required pursuant to the Item. | |
| 7 | **Significant Enhancement Provider Information** | |
| | *Item 1114(b)(2) - Credit Enhancement Provider Financial Information*\*<br>Determining applicable disclosure threshold<br>Requesting required financial information or effecting incorporation by reference | Trust Administrator Depositor |
| | *Item 1115(b) - Derivative Counterparty Financial Information*\*<br>Determining current maximum probable exposure<br>Determining current significance percentage<br>Requesting required financial information or effecting incorporation by reference | Depositor Trust Administrator Depositor |
| | \*This information need only be reported on the Form 10-D for the distribution period in which updated information is required pursuant to the Items. | |
| 8 | **Other Information** | |
| | *Disclose any information required to be reported on Form 8-K during the period covered by the Form 10-D but not reported* | The Responsible Party for the applicable Form 8-K item as indicated |

| | | | below |
|---|---|---|---|
| 9 | **Exhibits** | | |
| | Distribution report | | Trust Administrator |
| | *Exhibits required by Item 601 of Regulation S-K, such as material agreements* | | Depositor |
| **8-K** | Must be filed within four business days of an event reportable on Form 8-K. | | |
| | 1.01 | **Entry into a Material Definitive Agreement** | |
| | | Disclosure is required regarding entry into or amendment of any definitive agreement that is material to the securitization, even if depositor is not a party. Examples: servicing agreement, custodial agreement. Note: disclosure not required as to definitive agreements that are fully disclosed in the prospectus | Depositor, Servicer, Master Servicer, Custodian, Trust Administrator |
| | 1.02 | **Termination of a Material Definitive Agreement** | |
| | | Disclosure is required regarding termination of any definitive agreement that is material to the securitization (other than expiration in accordance with its terms), even if depositor is not a party. Examples: servicing agreement, custodial agreement. | Depositor, Servicer, Master Servicer, Custodian, Trust Administrator |
| | 1.03 | **Bankruptcy or Receivership** | |
| | | Disclosure is required regarding the bankruptcy or receivership, if known to the Master Servicer, with respect to any of the following: Sponsor (Seller), Depositor, Master Servicer, Trustee, Cap Provider, Custodian | Depositor, Servicer, Master Servicer, Custodian, Trust Administrator, Trustee (as to itself) |
| | 2.04 | **Triggering Events that Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement** | |
| | | Includes an early amortization, performance trigger or other event, including event of default, that would materially alter the payment priority/distribution of cash flows/amortization schedule. Disclosure will be made of events other than waterfall triggers which are disclosed in the 4.02 statement | Depositor/ Trust Administrator |
| | 3.03 | **Material Modification to Rights of Security Holders** | |
| | | Disclosure is required of any material modification to documents defining the rights of Certificateholders, including the Pooling and Servicing Agreement | Trust Administrator |
| | 5.03 | **Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year** | |
| | | Disclosure is required of any amendment "to the governing documents of the issuing entity" | Depositor |
| | 5.06 | **Change in Shell Company Status** | |
| | | [Not applicable to ABS issuers] | Depositor |
| | 6.01 | **ABS Informational and Computational Material** | |
| | | [Not included in reports to be filed under Section 4.07] | Depositor |
| | 6.02 | **Change of Master Servicer or Trustee** | |
| | | Requires disclosure of any removal, replacement, substitution or addition of any master servicer, affiliated servicer, other servicer servicing 10% or more of pool assets at time of report, other material servicers, certificate administrator or trustee. Reg AB disclosure about any new servicer or trustee is also required. | Depositor |
| | 6.03 | **Change in Credit Enhancement or Other External Support** | |

269

|  |  |  |  |
|---|---|---|---|
|  |  | Covers termination of any enhancement in manner other than by its terms, the addition of an enhancement, or a material change in the enhancement provided. Applies to external credit enhancements as well as derivatives. <br> Requesting Regulation AB disclosure about any new enhancement or effecting incorporation by reference | Trust Administrator <br><br><br><br> Depositor |
|  | 6.04 | **Failure to Make a Required Distribution** | Trust Administrator |
|  | 6.05 | **Securities Act Updating Disclosure** |  |
|  |  | If any material pool characteristic differs by 5% or more at the time of issuance of the securities from the description in the final prospectus, provide updated Regulation AB disclosure about the actual asset pool. | Depositor |
|  |  | If there are any new servicers or originators required to be disclosed under Regulation AB as a result of the foregoing, provide the information called for in Items 1108 and 1110 respectively. | Depositor |
|  | 7.01 | **Regulation FD Disclosure** | Depositor |
|  | 8.01 | **Other Events** | Depositor |
|  |  | Any event, with respect to which information is not otherwise called for in Form 8-K, that the registrant deems of importance to security holders. | Depositor |
|  | 9.01 | **Financial Statements and Exhibits** | The Responsible Party applicable to reportable event, other than the Trustee |
| **10-K** | Must be filed within 90 days of the fiscal year end for the registrant. | | |
|  | 9B | **Other Information** |  |
|  |  | Disclose any information required to be reported on Form 8-K during the fourth quarter covered by the Form 10-K but not reported | The Responsible Party for the applicable Form 8-K item as indicated above |
|  | 15 | **Exhibits and Financial Statement Schedules** |  |
|  |  | *Item 1112(b) - Significant Obligor Financial Information* | N/A |
|  |  | *Item 1114(b)(2) - Credit Enhancement Provider Financial Information* <br> Determining applicable disclosure threshold <br> Requesting required financial information or effecting incorporation by reference | Trust Administrator Depositor |
|  |  | *Item 1115(b) - Derivative Counterparty Financial Information* <br> Determining current maximum probable exposure <br> Determining current significance percentage <br> Requesting required financial information or effecting incorporation by reference | Depositor Trust Administrator |
|  |  | Item 1117 - Legal proceedings pending against the following entities, or their respective property, that is material to Certificateholders, including proceedings known to be contemplated by governmental authorities: <br> Seller <br> Depositor <br> Trustee <br> Issuing entity <br> Master Servicer <br> Originator | Seller Depositor Trustee Master Servicer Custodian Servicer |

270

| | | | |
|---|---|---|---|
| | | Custodian<br>Servicer | |
| | | Item 1119 - Affiliations and relationships between the following entities, or their respective affiliates, that are material to Certificateholders:<br>Seller<br>Depositor<br>Trustee<br>Issuing entity<br>Master Servicer<br>Servicer<br>Originator<br>Custodian<br>Credit Enhancer/Support Provider, if any<br>Significant Obligor, if any | (i) All parties to the Pooling and Servicing Agreement (as to themselves), (ii) the Depositor as to the Sponsor, Originator, Significant Obligor, Credit Enhancer/Support Provider and (iii) the Depositor as to the Issuing entity |
| | | *Item 1122 - Assessment of Compliance with Servicing Criteria* | Master Servicer<br>Trust Administrator<br>Custodian<br>Servicer |
| | | *Item 1123 -Servicer Compliance Statement* | Master Servicer<br>Trust Administrator<br>Servicer |

EXHIBIT C

SERVICING CRITERIA TO BE ADDRESSED
IN ASSESSMENT OF COMPLIANCE

Definitions
Primary Servicer - transaction party having borrower contact
Master Servicer - aggregator of pool assets
Trust Administrator - waterfall calculator (may be the Trustee, or may be the Master Servicer)
Back-up Servicer - named in the transaction (in the event a Back up Servicer becomes the Primary Servicer, follow Primary Servicer obligations)
Custodian - safe keeper of pool assets
Paying Agent - distributor of funds to ultimate investor (Trust Administrator performs this function)
Trustee - fiduciary of the transaction

Note: The definitions above describe the essential function that the party performs, rather than the party's title. So, for example, in a particular transaction, the trustee may perform the "paying agent" and "trust administrator" functions, while in another transaction, the trust administrator may perform these functions.

Where there are multiple checks for criteria the attesting party will identify in their management assertion that they are attesting only to the portion of the distribution chain they are responsible for in the related transaction agreements.

**Key:**
**X** - obligation

271

| Reg AB Reference | Servicing Criteria | Primary Servicer | Wells Fargo Bank, N.A. as Master Servicer and Trust Administrator |
|---|---|---|---|
| | **General Servicing Considerations** | | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | X | X |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | X | X |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up Servicer for the Pool Assets are maintained. | | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | X | X |
| | **Cash Collection and Administration** | | |
| 1122(d)(2)(i) | Payments on pool assets are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | X | X |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | X | X |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | X | X |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of over collateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | X | X |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. * | | |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | X | X |
| | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts.  These reconciliations are  (A) | X | X |

272

| | | | |
|---|---|---|---|
| 1122(d)(2)(vii) | mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | | |
| | **Investor Remittances and Reporting** | | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of Pool Assets serviced by the Servicer. | X | X |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | X | X |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the Servicer's investor records, or such other number of days specified in the transaction agreements. | X | X |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | X | X |
| | **Pool Asset Administration** | | |
| 1122(d)(4)(i) | Collateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents. | X | |
| 1122(d)(4)(ii) | Pool assets and related documents are safeguarded as required by the transaction agreements | X | |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | X | |
| 1122(d)(4)(iv) | Payments on pool assets, including any payoffs, made in accordance with the related pool asset documents are posted to the Servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related pool asset documents. | X | |
| | The Servicer's records regarding the pool assets agree | X | |

273

| | | | |
|---|---|---|---|
| 1122(d)(4)(v) | with the Servicer's records with respect to an obligor's unpaid principal balance. | | |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's pool assets (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | X | |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | X | |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | X | |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for pool assets with variable rates are computed based on the related pool asset documents. | X | |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such accounts are analyzed, in accordance with the obligor's pool asset documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable pool asset documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related pool assets, or such other number of days specified in the transaction agreements. | X | |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the Servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | X | |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the Servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | X | |
| | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the Servicer, or such other number of days specified in the transaction | X | |

| 1122(d)(4)(xiii) | agreements. | | |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | X | X |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | | X |

---

\* Subject to clarification from the SEC.

EXHIBIT D

FORM OF MORTGAGE LOAN PURCHASE AGREEMENT

**MORTGAGE LOAN PURCHASE AGREEMENT**

This is a Mortgage Loan Purchase Agreement (the "Agreement"), dated February 15, 2007, between Citigroup Mortgage Loan Trust Inc., a Delaware corporation (the "Purchaser"), and Citigroup Global Markets Realty Corp., a New York corporation (the "Seller").

Preliminary Statement

The Seller intends to sell the Mortgage Loans (as hereinafter defined) to the Purchaser on the terms and subject to the conditions set forth in this Agreement. The Purchaser intends to deposit the Mortgage Loans into a mortgage pool comprising the trust fund. The trust fund will be evidenced by a single series of mortgage pass-through certificates designated as Series 2007-AMC2 (the "Certificates"). The Certificates will consist of eighteen classes of certificates. The Certificates will be issued pursuant to a Pooling and Servicing Agreement, dated as of March 1, 2007 (the "Pooling and Servicing Agreement"), among the Purchaser as depositor (the "Depositor"), Ocwen Loan Servicing, LLC as a servicer ("Ocwen"), GMAC Mortgage, LLC as a servicer and Countrywide Home Loans Servicing LP as a servicer (collectively, the "Servicers"), Wells Fargo Bank, N.A. as master servicer and trust administrator (the "Master Servicer" and the "Trust Administrator") and U.S. Bank National Association as trustee (the "Trustee"). Capitalized terms used but not defined herein shall have the meanings set forth in the Pooling and Servicing Agreement.

The parties hereto agree as follows:

SECTION 1.      Agreement to Purchase. The Seller agrees to sell, and the Purchaser agrees to purchase, on or before March 30, 2007 (the "Closing Date"), certain conventional residential mortgage loans (the "Mortgage Loans") originated by Argent Mortgage Company, L.L.C. ("Argent") and Ameriquest Mortgage Company ("Ameriquest"; together with Argent, the "Originators"), having an aggregate principal balance as of the close of business on March 1, 2007 (the "Cut-off Date") of $2,204,397,670.36 (the "Closing Balance"), after giving effect to all payments due on the Mortgage Loans on or before the Cut-off Date, whether or not received.

SECTION 2.      Mortgage Loan Schedule. The Purchaser and the Seller have agreed upon which of the mortgage loans owned by the Seller are to be purchased by the Purchaser pursuant to this Agreement and the Seller will prepare or cause to be prepared on or prior to the Closing Date a final schedule (the "Closing Schedule") that together shall describe such Mortgage Loans and set forth all of the Mortgage Loans to be purchased under this Agreement. The Closing Schedule will conform to the requirements set forth in this Agreement and to the definition of "Mortgage Loan Schedule" under the Pooling and Servicing Agreement. The Closing Schedule shall be used as the Mortgage Loan Schedule under the Pooling and Servicing Agreement and shall be prepared by the Seller based on information provided by the Originators.

SECTION 3.    Consideration.

(a)    In consideration for the Mortgage Loans to be purchased hereunder, the Purchaser shall, as described in Section 7, pay to or upon the order of the Seller in immediately available funds a certain amount (the "Mortgage Loan Purchase Price").

(b)    The Purchaser or any assignee, transferee or designee of the Purchaser shall be entitled to all scheduled payments of principal due after the Cut-off Date, all other payments of principal due and collected after the Cut-off Date, and all payments of interest on the Mortgage Loans allocable to the period after the Cut-off Date. All scheduled payments of principal and interest due on or before the Cut-off Date and collected after the Cut-off Date shall belong to the Seller.

(c)    Pursuant to the Pooling and Servicing Agreement, the Purchaser will assign all of its right, title and interest in and to the Mortgage Loans, together with its rights under this Agreement, to the Trustee for the benefit of the related Certificateholders.

SECTION 4.    Transfer of the Mortgage Loans.

(a)    Possession of Mortgage Files. The Seller does hereby sell, transfer, assign, set over and convey to the Purchaser, without recourse but subject to the terms of this Agreement, all of its right, title and interest in, to and under the Mortgage Loans; provided that such assignment shall not include any of the Servicing Rights with respect to the Mortgage Loans serviced by Ocwen. The contents of each Mortgage File not delivered to the Purchaser or to any assignee, transferee or designee of the Purchaser on or prior to the Closing Date are and shall be held in trust by the Seller for the benefit of the Purchaser or any assignee, transferee or designee of the Purchaser. Upon the sale of the Mortgage Loans, the ownership of each Mortgage Note, the related Mortgage and the other contents of the related Mortgage File is vested in the Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or that come into the possession of the Seller on or after the Closing Date shall immediately vest in the Purchaser and shall be delivered immediately to the Purchaser or as otherwise directed by the Purchaser.

(b)    Delivery of Mortgage Loan Documents. The Seller will, on or prior to the Closing Date, deliver or cause to be delivered to the Purchaser or any assignee, transferee or designee of the Purchaser each of the following documents for each Mortgage Loan:

(i)    The Mortgage Note, endorsed by manual or facsimile signature without recourse by the related Originator or an Affiliate of the related Originator in blank or to the Trustee showing a complete chain of endorsements from the named payee to the Trustee or from the named payee to the Affiliate of the related Originator and from such Affiliate to the Trustee;

(ii)    The original recorded Mortgage, noting the presence of the MIN of the Mortgage Loan, if applicable, and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording thereon or a copy of the Mortgage certified by the public recording office in those jurisdictions where the public recording office retains the original;

(iii)    Unless the Mortgage Loan is registered on the MERS® System, an assignment from the related Originator or an Affiliate of the related Originator to the Trustee in blank or in recordable form of the Mortgage which may be included, where permitted by local law, in a blanket assignment or assignments of the Mortgage to the Trustee, including any intervening assignments and showing a complete chain of title from the original mortgagee named under the Mortgage to the Person assigning the Mortgage Loan to the Trustee (or to MERS, noting the presence of the MIN, if the Mortgage Loan is registered on the MERS® System);

(iv)    Any original assumption, modification, buydown or conversion-to- fixed-interest-rate agreement applicable to the Mortgage Loan; and

(v)    The original or a copy of the title insurance policy (which may be a certificate or a short form policy relating to a master policy of title insurance) pertaining to the Mortgaged Property, or in the event such original title policy is unavailable, a copy of the preliminary title report and the lender's recording instructions, with the original to be delivered within 180 days of the Closing Date or an attorney's opinion of title in jurisdictions where such is the customary evidence of title; or in the event such original or copy of the title insurance policy is unavailable, a written commitment or uniform binder or preliminary report of title issued by the title insurance or escrow company.

276

In instances where an original recorded Mortgage cannot be delivered by the Seller to the Purchaser prior to or concurrently with the execution and delivery of this Agreement, due to a delay in connection with the recording of such Mortgage, the Seller may, (a) in lieu of delivering such original recorded Mortgage referred to in clause (b)(ii) above, deliver to the Purchaser a copy thereof, provided that the Seller certifies that the original Mortgage has been delivered to a title insurance company for recordation after receipt of its policy of title insurance or binder therefor (which may be a certificate relating to a master policy of title insurance), and (b) in lieu of delivering the completed assignment in recordable form referred to in clause (b)(iii) above to the Purchaser, deliver such assignment to the Purchaser completed except for recording information. In all such instances, the Seller will deliver the original recorded Mortgage and completed assignment (if applicable) to the Purchaser promptly upon receipt of such Mortgage. In instances where an original recorded Mortgage has been lost or misplaced, the Seller or the related title insurance company may deliver, in lieu of such Mortgage, a copy of such Mortgage bearing recordation information and certified as true and correct by the office in which recordation thereof was made. In instances where the original or a copy of the title insurance policy referred to in clause (b)(v) above (which may be a certificate relating to a master policy of title insurance) pertaining to the Mortgaged Property relating to a Mortgage Loan cannot be delivered by the Seller to the Purchaser prior to or concurrently with the execution and delivery of this Agreement because such policy is not yet available, the Seller may, in lieu of delivering the original or a copy of such title insurance referred to in clause (b)(v) above, deliver to the Purchaser a binder with respect to such policy (which may be a certificate relating to a master policy of title insurance) and deliver the original or a copy of such policy (which may be a certificate relating to a master policy of title insurance) to the Purchaser within 180 days of the Closing Date. In instances where an original assumption, modification, buydown or conversion-to-fixed- interest-rate agreement cannot be delivered by the Seller to the Purchaser prior to or concurrently with the execution and delivery of this Agreement, the Seller may, in lieu of delivering the original of such agreement referred to in clause (b)(iv) above, deliver a certified copy thereof.

To the extent not already recorded, except with respect to any Mortgage Loan for which MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage as the mortgagee of record, the related Servicer, at the expense of the Seller shall promptly (and in no event later than five Business Days following the later of the Closing Date and the date of receipt by the related Servicer of the recording information for a Mortgage) submit or cause to be submitted for recording, at no expense to any Trust REMIC, in the appropriate public office for real property records, each Assignment delivered to it pursuant to (b)(iii) above. In the event that any such Assignment is lost or returned unrecorded because of a defect therein, the related Servicer, at the expense of the Seller, shall promptly prepare or cause to be prepared a substitute Assignment or cure or cause to be cured such defect, as the case may be, and thereafter cause each such Assignment to be duly recorded. Notwithstanding the foregoing, but without limiting the requirement that such Assignments be in recordable form, neither the related Servicer nor the Trustee shall be required to submit or cause to be submitted for recording any Assignment delivered to it or a Custodian pursuant to (b)(iii) above if such recordation shall not, as of the Closing Date, be required by the Rating Agencies, as a condition to their assignment on the Closing Date of their initial ratings to the Certificates, as evidenced by the delivery by the Rating Agencies of their ratings letters on the Closing Date; provided, however, notwithstanding the foregoing, the related Servicer shall submit each Assignment for recording, at no expense to the Trust Fund or the related Servicer, upon the earliest to occur of: (A) reasonable direction by Holders of Certificates entitled to at least 25% of the Voting Rights, (B) the occurrence of a Servicer Event of Default, (C) the occurrence of a bankruptcy, insolvency or foreclosure relating to the Seller, (D) the occurrence of a servicing transfer as described in Section 7.02 of the Pooling and Servicing Agreement and (E) with respect to any one Assignment the occurrence of a foreclosure relating to the Mortgagor under the related Mortgage. Notwithstanding the foregoing, if the Seller fails to pay the cost of recording the Assignments, such expense will be paid by the related Servicer and such Servicer shall be reimbursed for such expenses by the Trust as Servicing Advances.

With respect to a maximum of approximately 5.00% of the Original Mortgage Loans, by outstanding principal balance of the Original Mortgage Loans as of the Cut-off Date, if any original Mortgage Note referred to in (b)(i) above cannot be located, the obligations of the Seller to deliver such documents shall be deemed to be satisfied upon delivery to the Purchaser of a photocopy of such Mortgage Note, if available, with a lost note affidavit. If any of the original Mortgage Notes for which a lost note affidavit was delivered to the Purchaser is subsequently located, such original Mortgage Note shall be delivered to the Purchaser within three Business Days.

The Seller shall deliver or cause to be delivered to the Purchaser promptly upon receipt thereof any other original documents constituting a part of a Mortgage File received with respect to any Mortgage Loan, including, but not limited to, any original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan.

All original documents relating to the Mortgage Loans that are not delivered to the Purchaser are and shall be held by or on behalf of the Seller, the Purchaser or the related Servicer, as the case may be, in trust for the benefit of the Trustee on behalf of the Certificateholders. In the event that any such original document is required pursuant to the terms of this Section to be a part of a Mortgage File, such document shall be delivered promptly to the Trustee or the Custodian on behalf of the Trustee. Any such original document delivered to or held by the Seller that is not required pursuant to the terms of this Section to be a part of a Mortgage File, shall be delivered promptly to the related Servicer.

(c)     Acceptance of Mortgage Loans. The documents delivered pursuant to Section 4(b) hereof shall be reviewed by the Purchaser or any assignee, transferee or designee of the Purchaser at any time before or after the Closing Date (and with respect to each

277

document permitted to be delivered after the Closing Date within seven days of its delivery) to ascertain that all required documents have been executed and received and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule.

(d)     Transfer of Interest in Agreements. The Purchaser has the right to assign its interest under this Agreement, in whole or in part, to the Trustee, as may be required to effect the purposes of the Pooling and Servicing Agreement, without the consent of the Seller, and the assignee shall succeed to the rights and obligations hereunder of the Purchaser. Any expense reasonably incurred by or on behalf of the Purchaser or the Trustee in connection with enforcing any obligations of the Seller under this Agreement will be promptly reimbursed by the Seller.

(e)     Examination of Mortgage Files. Prior to the Closing Date, the Seller shall either (i) deliver in escrow to the Purchaser or to any assignee, transferee or designee of the Purchaser, for examination, the Mortgage File pertaining to each Mortgage Loan, or (ii) make such Mortgage Files available to the Purchaser or to any assignee, transferee or designee of the Purchaser for examination. Such examination may be made by the Purchaser or the Trustee, and their respective designees, upon reasonable notice to the Seller during normal business hours before the Closing Date and within 60 days after the Closing Date. If any such person makes such examination prior to the Closing Date and identifies any Mortgage Loans that do not conform to the requirements of the Purchaser as described in this Agreement, such Mortgage Loans shall be deleted from the Closing Schedule. The Purchaser may, at its option and without notice to the Seller, purchase all or part of the Mortgage Loans without conducting any partial or complete examination. The fact that the Purchaser or any person has conducted or has failed to conduct any partial or complete examination of the Mortgage Files shall not affect the rights of the Purchaser or any assignee, transferee or designee of the Purchaser to demand repurchase or other relief as provided herein or under the Pooling and Servicing Agreement.

SECTION 5.     Representations, Warranties and Covenants of the Seller.

(a)     The Seller hereby represents and warrants, for the benefit of the Purchaser, that the representations and warranties set forth on Exhibit A hereto are true and correct as of the date hereof and as of the Closing Date.

(b)     The Seller hereby represents and warrants to the Purchaser, as of the date hereof and as of the Closing Date, and covenants, that with respect to each Group I Mortgage Loan and Group II Mortgage Loan:

(i)     The original principal balance of each Mortgage Loan is within Freddie Mac's dollar amount limits for conforming one- to four-family mortgage loans;

(ii)     The original principal balance of any first-lien Mortgage Loan does not exceed the applicable Freddie Mac loan limit;

(iii)     Each Mortgage Loan that is secured by a subordinate lien on the related Mortgaged Property is on a one- to four-family residence that is the principal residence of the borrower;

(iv)     The original loan amount of any subordinate-lien Mortgage Loan does not exceed one-half of the one-unit limitation for first lien mortgage loans, or $208,500 (in Alaska, Guam, Hawaii or Virgin Islands: $312,750), without regard to the number of units;

(v)     The aggregate original principal balance of the first and subordinate lien Mortgage Loans relating to the same Mortgaged Property with respect to any Mortgage Loan does not exceed Freddie Mac's applicable loan limits for first-lien mortgage loans for that property type;

(vi)     No borrower obtained a prepaid single-premium credit-life, credit disability, credit unemployment or credit property insurance policy in connection with the origination of any Mortgage Loan;

(vii)     With respect to any Mortgage Loan, no borrower was charged "point and fees" in an amount greater than (a) $1,000 or (b) 5% of the principal amount of such Mortgage Loan, whichever is greater. For purposes of this representation, "points and fees" (x) include origination, underwriting, broker and finder's fees and charges that the lender imposed as a condition of making the Mortgage Loan, whether they are paid to the lender or a third party; and (y) exclude bona fide discount points, fees paid for actual services rendered in connection with the origination of the Mortgage (such as attorneys' fees, notaries fees and fees paid for property appraisals, credit reports, surveys, title

278

examinations and extracts, flood and tax certifications, and home inspections); the cost of mortgage insurance or credit-risk price adjustments; the costs of title, hazard, and flood insurance policies; state and local transfer taxes or fees; escrow deposits for the future payment of taxes and insurance premiums; and other miscellaneous fees and charges that, in total, do not exceed 0.25 percent of the loan amount;

(viii)     No Mortgage Loan exceeds the "annual percentage rate" or "points and fees payable by the borrower" threshold as described in HOEPA;

(ix)     No Mortgagor with respect to a Mortgage Loan was encouraged or required to select a mortgage loan product offered by the related Originator which is a higher cost product designed for a less creditworthy mortgagor, unless at the time of the Mortgage Loan's origination, such Mortgagor did not qualify taking into account credit history and debt-to income ratios for a lower-cost credit product then offered by the Originator. A borrower who is able to qualify for one of the Originator's standard products should be directed towards or offered the Originator's standard mortgage line;

(x)     With respect to any Mortgage Loan that contains a provision permitting imposition of a premium upon a prepayment prior to maturity: (a) prior to the Mortgage Loan's origination, the borrower agreed to such premium in exchange for a monetary benefit, including but not limited to a rate or fee reduction; (b) the related Originator had a written policy of offering the borrower the option of obtaining a mortgage loan that did not require payment of such a premium unless the mortgage loan that did not require payment of such a premium would be a mortgage loan that is a HOEPA loan or a high-cost home loan under any applicable state or local law and prohibited by the related Originator's underwriting guidelines, and the Mortgage Loan was made available to the borrower with and without a prepayment premium; (c) the prepayment premium is adequately disclosed to the borrower pursuant to applicable state and federal law; (d) no Mortgage Loan originated on or after October 1, 2002 will impose a prepayment premium for a term in excess of three years, and any Mortgage Loan originated prior to such date will not impose prepayment penalties in excess of five years; in each case unless the loan was modified to reduce the prepayment period to no more than three years from the date of the note and the borrower was notified in writing of such reduction in prepayment period; and (e) notwithstanding any state or federal law to the contrary, the related Servicer shall not impose such prepayment premium in any instance when the Mortgage Loan is accelerated or paid off in connection with the workout of a delinquent mortgage or due to the borrower's default;

(xi)     The methodology used in underwriting the extension of credit for each Mortgage Loan did not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such extension of credit. The methodology employed objective criteria that related such facts as, without limitation, the borrower's credit history, income, assets or liabilities, to the proposed mortgage payment and, based on such methodology, the related Originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the Mortgage Loan;

(xii)     No Mortgage Loan is secured by a manufactured housing unit; and

(xiii)     No Mortgage Loan is "seasoned."

(c)     The Seller hereby represents and warrants to the Purchaser, as of the date hereof and as of the Closing Date, and covenants, that:

(i)     The Seller is duly organized, validly existing and in good standing as a corporation under the laws of the State of New York with full corporate power and authority to conduct its business as presently conducted by it to the extent material to the consummation of the transactions contemplated herein. The Seller has the full corporate power and authority to own the Mortgage Loans and to transfer and convey the Mortgage Loans to the Purchaser and has the full corporate power and authority to execute and deliver, engage in the transactions contemplated by, and perform and observe the terms and conditions of this Agreement.

(ii)     The Seller has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery hereof by the Purchaser, constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization or by general principles of equity.

279

(iii)     The execution, delivery and performance of this Agreement by the Seller (x) does not conflict and will not conflict with, does not breach and will not result in a breach of and does not constitute and will not constitute a default (or an event, which with notice or lapse of time or both, would constitute a default) under (A) any terms or provisions of the articles of incorporation or by-laws of the Seller, (B) any term or provision of any material agreement, contract, instrument or indenture, to which the Seller is a party or by which the Seller or any of its property is bound or (C) any law, rule, regulation, order, judgment, writ, injunction or decree of any court or governmental authority having jurisdiction over the Seller or any of its property and (y) does not create or impose and will not result in the creation or imposition of any lien, charge or encumbrance which would have a material adverse effect upon the Mortgage Loans or any documents or instruments evidencing or securing the Mortgage Loans.

(iv)     No consent, approval, authorization or order of, registration or filing with, or notice on behalf of the Seller to any governmental authority or court is required, under federal laws or the laws of the State of New York, for the execution, delivery and performance by the Seller of, or compliance by the Seller with, this Agreement or the consummation by the Seller of any other transaction contemplated hereby and by the Pooling and Servicing Agreement; provided, however, that the Seller makes no representation or warranty regarding federal or state securities laws in connection with the sale or distribution of the Certificates.

(v)     This Agreement does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained herein not misleading. The written statements, reports and other documents prepared and furnished or to be prepared and furnished by the Seller pursuant to this Agreement or in connection with the transactions contemplated hereby taken in the aggregate do not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained therein not misleading.

(vi)     The Seller is not in violation of, and the execution and delivery of this Agreement by the Seller and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Seller or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder.

(vii)     The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement.

(viii)     Immediately prior to the sale of the Mortgage Loans to the Purchaser as herein contemplated, the Seller will be the owner of the related Mortgage and the indebtedness evidenced by the related Mortgage Note, and, upon the payment to the Seller of the Purchase Price, in the event that the Seller retains or has retained record title, the Seller shall retain such record title to each Mortgage, each related Mortgage Note and the related Mortgage Files with respect thereto in trust for the Purchaser as the owner thereof from and after the date hereof.

(ix)     There are no actions or proceedings against, or investigations known to it of, the Seller before any court, administrative or other tribunal (A) that might prohibit its entering into this Agreement, (B) seeking to prevent the sale of the Mortgage Loans by the Seller or the consummation of the transactions contemplated by this Agreement or (C) that might prohibit or materially and adversely affect the performance by the Seller of its obligations under, or validity or enforceability of, this Agreement.

(x)     The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Seller are not subject to the bulk transfer or any similar statutory provisions.

(xi)     The Seller has not dealt with any broker, investment banker, agent or other person, except for the Purchaser or any of its affiliates, that may be entitled to any commission or compensation in connection with the sale of the Mortgage Loans.

(xii)     There is no litigation currently pending or, to the best of the Seller's knowledge without independent investigation, threatened against the Seller that would reasonably be expected to adversely affect the transfer of the

Mortgage Loans, the issuance of the Certificates or the execution, delivery, performance or enforceability of this Agreement, or that would result in a material adverse change in the financial condition of the Seller.

(xiii)     The Seller is solvent and will not be rendered insolvent by the consummation of the transactions contemplated hereby. The Seller is not transferring any Mortgage loan with any intent to hinder, delay or defraud any of its creditors.

SECTION 6.     Repurchase Obligation for Defective Documentation and for Breach of Representation and Warranty.

It is understood and agreed that the representations and warranties set forth in Section 5 shall survive the sale of the Mortgage Loans to the Purchaser and shall inure to the benefit of the Purchaser and any assignee, transferee or designee of the Purchaser, including the Trustee for the benefit of holders of the Mortgage Pass-Through Certificates evidencing an interest in all or a portion of the Mortgage Loans, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment or the examination or lack of examination of any Mortgage File. With respect to the representations and warranties contained herein that are made to the knowledge or the best knowledge of the Seller, or as to which the Seller has no knowledge, if it is discovered that the substance of any such representation and warranty is inaccurate and the inaccuracy materially and adversely affects the value of the related Mortgage Loan, or the interest therein of the Purchaser or the Purchaser's assignee, designee or transferee, then notwithstanding the Seller's lack of knowledge with respect to the substance of such representation and warranty being inaccurate at the time the representation and warranty was made, such inaccuracy shall be deemed a breach of the applicable representation and warranty and the Seller shall take such action described in the following paragraphs of this Section 6 in respect of such Mortgage Loan. Upon discovery by either the Seller or the Purchaser of a breach of any of the foregoing representations and warranties made by the Seller that materially and adversely affects the value of the Mortgage Loans or the interest of the Purchaser (or which materially and adversely affects the interests of the Purchaser in the related Mortgage Loan in the case of a representation and warranty relating to a particular Mortgage Loan), the party discovering such breach shall give prompt written notice to the other. In addition, the Seller hereby acknowledges and agrees that any breach of the representations set forth in Section 5(b) hereof shall be deemed to materially and adversely affect the value of the related mortgage loans or the interests of the Trust in the related mortgage loans.

Within 90 days of the earlier of either discovery by or notice to the Seller of any breach of a representation or warranty made by the Seller that materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans or the interest therein of the Purchaser, the Seller shall use its best efforts promptly to cure such breach in all material respects and, if such breach cannot be cured, the Seller shall, at the Purchaser's option, repurchase such Mortgage Loan at the Purchase Price. The Seller may, at the request of the Purchaser and assuming the Seller has a Qualified Substitute Mortgage Loan, rather than repurchase a deficient Mortgage Loan as provided above, remove such Mortgage Loan and substitute in its place a Qualified Substitute Mortgage Loan or Loans. If the Seller does not provide a Qualified Substitute Mortgage Loan or Loans, it shall repurchase the deficient Mortgage Loan. Any repurchase of a Mortgage Loan(s) pursuant to the foregoing provisions of this Section 6 shall occur on a date designated by the Purchaser and shall be accomplished by deposit in accordance with Section 2.03 of the Pooling and Servicing Agreement. Any repurchase or substitution required by this Section shall be made in a manner consistent with Section 2.03 of the Pooling and Servicing Agreement.

At the time of substitution or repurchase by the Seller of any deficient Mortgage Loan, the Purchaser and the Seller shall arrange for the reassignment of the repurchased or substituted Mortgage Loan to the Seller and the delivery to the Seller of any documents held by the Trustee relating to the deficient or repurchased Mortgage Loan. In the event the Purchase Price is deposited in the Collection Account, the Seller shall, simultaneously with such deposit, give written notice to the Purchaser that such deposit has taken place. Upon such repurchase, the Mortgage Loan Schedule shall be amended to reflect the withdrawal of the repurchased Mortgage Loan from this Agreement.

As to any Deleted Mortgage Loan for which the Seller substitutes a Qualified Substitute Mortgage Loan or Loans, the Seller shall effect such substitution by delivering to the Purchaser or its designee for such Qualified Substitute Mortgage Loan or Loans the Mortgage Note, the Mortgage, the Assignment and such other documents and agreements as are required by the Pooling and Servicing Agreement, with the Mortgage Note endorsed as required therein. The Seller shall remit for deposit in the Collection Account the Monthly Payment due on such Qualified Substitute Mortgage Loan or Loans in the month following the date of such substitution. Monthly payments due with respect to Qualified Substitute Mortgage Loans in the month of substitution will be retained by the Seller. For the month of substitution, distributions to the Purchaser will include the Monthly Payment due on such Deleted Mortgage Loan in the month of substitution, and the Seller shall thereafter be entitled to retain all amounts subsequently received by the Seller in respect of such Deleted Mortgage Loan. Upon such substitution, the Qualified Substitute Mortgage Loans shall be subject to the terms of this Agreement in all respects, and the Seller shall be deemed to have made with respect to such Qualified Substitute Mortgage Loan or Loans as of the date of substitution, the covenants, representations and warranties set forth in Section 5.

It is understood and agreed that the representations and warranties set forth in Section 5 shall survive delivery of the respective Mortgage Files to the Trustee on behalf of the Purchaser.

281

It is understood and agreed that (i) the obligations of the Seller set forth in this Section 6 to cure, repurchase and substitute for a defective Mortgage Loan and (ii) the obligations of the Seller as provided in the next sentence constitute the sole remedies of the Purchaser respecting a missing or defective document or a breach of the representations and warranties contained in Section 5. The Seller shall indemnify the Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of the representations and warranties contained in Section 5 of this Agreement.

SECTION 7.    Closing; Payment for the Mortgage Loans. The closing of the purchase and sale of the Mortgage Loans shall be held at the New York City office of Thacher Proffitt & Wood llp at 10:00 AM New York City time on the Closing Date.

The closing shall be subject to each of the following conditions:

(a)    All of the representations and warranties of the Seller under this Agreement shall be true and correct in all material respects as of the date as of which they are made and no event shall have occurred which, with notice or the passage of time, would constitute a default under this Agreement;

(b)    The Purchaser shall have received, or the attorneys of the Purchaser shall have received in escrow (to be released from escrow at the time of closing), all Closing Documents as specified in Section 8 of this Agreement, in such forms as are agreed upon and acceptable to the Purchaser, duly executed by all signatories other than the Purchaser as required pursuant to the respective terms thereof;

(c)    The Seller shall have delivered or caused to be delivered and released to the Purchaser or to its designee, all documents (including without limitation, the Mortgage Loans) required to be so delivered by the Purchaser; and

(d)    All other terms and conditions of this Agreement shall have been complied with.

Subject to the foregoing conditions, the Purchaser shall deliver or cause to be delivered to the Seller on the Closing Date, against delivery and release by the Seller to the Trustee of all documents required pursuant to the Pooling and Servicing Agreement, the consideration for the Mortgage Loans as specified in Section 3 of this Agreement, by delivery to the Seller of the Mortgage Loan Purchase Price.

SECTION 8.    Closing Documents. Without limiting the generality of Section 7 hereof, the closing shall be subject to delivery of each of the following documents:

(a)    An Officers' Certificate of the Seller, dated the Closing Date, upon which the Purchaser and Citigroup Global Markets Inc. (the "Underwriter") may rely, in a form acceptable to the Purchaser;

(b)    A Secretary's Certificate of the Seller, dated the Closing Date, upon which the Purchaser and the Underwriter may rely, in a form acceptable to the Purchaser, and attached thereto copies of the certificate of incorporation, by-laws and certificate of good standing of the Seller;

(c)    An Opinion of Counsel of the Seller, dated the Closing Date and addressed to the Purchaser and the Underwriter, in a form acceptable to the Purchaser;

(d)    Such opinions of counsel as the Rating Agencies or the Trustee may request in connection with the sale of the Mortgage Loans by the Seller to the Purchaser or the Seller's execution and delivery of, or performance under, this Agreement;

(e)    A letter from Deloitte & Touche L.L.P., certified public accountants, dated the date hereof and to the effect that they have performed certain specified procedures as a result of which they determined that certain information of an accounting, financial or statistical nature set forth in the Purchaser's Prospectus Supplement, dated February 15, 2007, agrees with the records of the Seller;

(f)    [Reserved]; and

(g)    Such further information, certificates, opinions and documents as the Purchaser or the Underwriter may reasonably

282

request.

SECTION 9.     Costs. The Seller shall pay (or shall reimburse the Purchaser or any other Person to the extent that the Purchaser or such other Person shall pay) all necessary and reasonable costs and expenses incurred directly in delivering this Agreement, the Pooling and Servicing Agreement, the Certificates, the prospectus, prospectus supplement and any private placement memorandum relating to the Certificates and other related documents, the fees and expenses of the Purchaser's counsel in connection with the preparation of all documents relating to the securitization of the Mortgage Loans, the filing fee charged by the Securities and Exchange Commission for registration of the Certificates, the fees charged by any rating agency to rate the Certificates and the ongoing expenses of the Rating Agencies. All other costs and expenses in connection with the transactions contemplated hereunder shall be borne by the party incurring such expense.

SECTION 10.     [Reserved].

SECTION 11.     Mandatory Delivery; Grant of Security Interest. The sale and delivery on the Closing Date of the Mortgage Loans described on the Mortgage Loan Schedule in accordance with the terms and conditions of this Agreement is mandatory. It is specifically understood and agreed that each Mortgage Loan is unique and identifiable on the date hereof and that an award of money damages would be insufficient to compensate the Purchaser for the losses and damages incurred by the Purchaser in the event of the Seller's failure to deliver the Mortgage Loans on or before the Closing Date. The Seller hereby grants to the Purchaser a lien on and a continuing security interest in the Seller's interest in each Mortgage Loan and each document and instrument evidencing each such Mortgage Loan to secure the performance by the Seller of its obligation hereunder, and the Seller agrees that it holds such Mortgage Loans in custody for the Purchaser, subject to the Purchaser's (i) right, prior to the Closing Date, to reject any Mortgage Loan to the extent permitted by this Agreement and (ii) obligation to deliver or cause to be delivered the consideration for the Mortgage Loans pursuant to Section 7 hereof. Any Mortgage Loans rejected by the Purchaser shall concurrently therewith be released from the security interest created hereby. The Seller agrees that, upon acceptance of the Mortgage Loans by the Purchaser or its designee and delivery of payment to the Seller, that its security interest in the Mortgage Loans shall be released. All rights and remedies of the Purchaser under this Agreement are distinct from, and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity and all such rights and remedies may be exercised concurrently, independently or successively.

Notwithstanding the foregoing, if on the Closing Date, each of the conditions set forth in Section 7 hereof shall have been satisfied and the Purchaser shall not have paid or caused to be paid the Mortgage Loan Purchase Price, or any such condition shall not have been waived or satisfied and the Purchaser determines not to pay or cause to be paid the Mortgage Loan Purchase Price, the Purchaser shall immediately effect the redelivery of the Mortgage Loans, if delivery to the Purchaser has occurred and the security interest created by this Section 11 shall be deemed to have been released.

SECTION 12.     Notices. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered to or mailed by registered mail, postage prepaid, or transmitted by telex or telegraph and confirmed by a similar mailed writing, if to the Purchaser, addressed to the Purchaser at 390 Greenwich Street, 4th Floor, New York, New York 10013, Attention: Mortgage Finance Group, or such other address as may hereafter be furnished to the Seller in writing by the Purchaser, and if to the Seller, addressed to the Seller at 390 Greenwich Street, 4th Floor, New York, New York 10013, Attention: Mortgage Finance Group, or such other address as may hereafter be furnished to the Seller in writing by the Seller.

SECTION 13.     Severability of Provisions. Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

SECTION 14.     Agreement of Parties. The Seller and the Purchaser each agree to execute and deliver such instruments and take such actions as either of the others may, from time to time, reasonably request in order to effectuate the purpose and to carry out the terms of this Agreement and the Pooling and Servicing Agreement.

SECTION 15.     Survival. The Seller agrees that the representations, warranties and agreements made by it herein and in any certificate or other instrument delivered pursuant hereto shall be deemed to be relied upon by the Purchaser, notwithstanding any investigation heretofore or hereafter made by the Purchaser or on its behalf, and that the representations, warranties and agreements made

283

by the Seller herein or in any such certificate or other instrument shall survive the delivery of and payment for the Mortgage Loans and shall continue in full force and effect, notwithstanding any restrictive or qualified endorsement on the Mortgage Notes and notwithstanding subsequent termination of this Agreement, the Pooling and Servicing Agreement or the Trust Fund.

SECTION 16.    GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS, DUTIES, OBLIGATIONS AND RESPONSIBILITIES OF THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS (INCLUDING THE CHOICE OF LAW PROVISIONS) AND DECISIONS OF THE STATE OF NEW YORK. THE PARTIES HERETO INTEND THAT THE PROVISIONS OF SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW SHALL APPLY TO THIS AGREEMENT.

SECTION 17.    Miscellaneous. This Agreement may be executed in two or more counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. This Agreement supersedes all prior agreements and understandings relating to the subject matter hereof. Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought. The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

It is the express intent of the parties hereto that the conveyance of the Mortgage Loans by the Seller to the Purchaser as provided in Section 4 hereof be, and be construed as, a sale of the Mortgage Loans by the Seller to the Purchaser and not as a pledge of the Mortgage Loans by the Seller to the Purchaser to secure a debt or other obligation of the Seller. However, in the event that, notwithstanding the aforementioned intent of the parties, the Mortgage Loans are held to be property of the Seller, then, (a) it is the express intent of the parties that such conveyance be deemed a pledge of the Mortgage Loans by the Seller to the Purchaser to secure a debt or other obligation of the Seller and (b) (1) this Agreement shall also be deemed to be a security agreement within the meaning of Articles 8 and 9 of the New York Uniform Commercial Code; (2) the conveyance provided for in Section 4 hereof shall be deemed to be a grant by the Seller to the Purchaser of a security interest in all of the Seller's right, title and interest in and to the Mortgage Loans and all amounts payable to the holders of the Mortgage Loans in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts, other than investment earnings, from time to time held or invested in the Collection Account whether in the form of cash, instruments, securities or other property; (3) the possession by the Purchaser or its agent of Mortgage Notes, the related Mortgages and such other items of property that constitute instruments, money, negotiable documents or chattel paper shall be deemed to be "possession by the secured party" for purposes of perfecting the security interest pursuant to Section 9-305 of the New York Uniform Commercial Code; and (4) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Purchaser for the purpose of perfecting such security interest under applicable law. Any assignment of the interest of the Purchaser pursuant to Section 4(d) hereof shall also be deemed to be an assignment of any security interest created hereby. The Seller and the Purchaser shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Mortgage Loans, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement and the Pooling and Servicing Agreement.

SECTION 18.    Indemnification. The Seller shall indemnify and hold harmless each of (i) the Purchaser, (ii) Citigroup Global Markets Inc. and (iii) each person, if any, who controls the Purchaser within the meaning of Section 15 of the Securities Act of 1933, as amended (the "1933 Act") ((i) through (iii) collectively, the "Indemnified Party") against any and all losses, claims, expenses, damages or liabilities to which the Indemnified Party may become subject, under the 1933 Act or otherwise, insofar as such losses, claims, expenses, damages or liabilities (or actions in respect thereof) arise out of, are based upon, or result from, a breach by the Seller of any of the representations and warranties made by the Seller herein, it being understood that the Purchaser has relied upon such representations and warranties.

IN WITNESS WHEREOF, the Purchaser and the Seller have caused their names to be signed by their respective officers thereunto duly authorized as of the date first above written.

CITIGROUP MORTGAGE LOAN
TRUST INC.

By: _____

Name:

284

Title:

CITIGROUP GLOBAL MARKETS REALTY
CORP.

By: _____

Name:
Title:

EXHIBIT A

**Representation and Warranties with respect to the Mortgage Loans**

All capitalized terms in this Exhibit A shall have the meanings ascribed to them in the Mortgage Loan Purchase and Interim Servicing Agreement, dated December 28, 2004, between Citigroup Global Markets Realty Corp. ("CGMRC") and Ameriquest Mortgage Company ("Ameriquest"), as amended; provided, however, that the terms "Mortgage Loan Schedule" and "Originators" shall have the meanings ascribed to them in the Pooling and Servicing Agreement and the terms "Seller" and "Purchaser" shall have the meanings ascribed to them herein.

1. The information set forth in the Mortgage Loan Schedule is complete, true and correct as of the Cut-off Date;

2. [Reserved];

3. As of the Closing Date, the Company has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the related Mortgaged Property, directly, for the payment of any amount required by the Mortgage Note or Mortgage, and no Mortgage Loan has been delinquent for more than thirty (30) days in the prior twelve (12) months;

4. As of the Closing Date, there are no delinquent taxes or insurance premiums affecting the related Mortgaged Property;

5. As of the Closing Date, the terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments, recorded in the applicable public recording office if necessary to maintain the lien priority of the Mortgage, and which have been delivered to the Trustee; the substance of any such waiver, alteration or modification has been approved by the title insurer, to the extent required by the related policy, and is reflected on the Mortgage Loan Schedule. No instrument of waiver, alteration or modification has been executed, and no Mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the title insurer, to the extent required by the policy, and which assumption agreement has been delivered to the Trustee and the terms of which are reflected in the Mortgage Loan Schedule;

6. The Mortgage Note and the Mortgage are not subject to any valid right of rescission, set-off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note and the Mortgage, or the exercise of any right thereunder, render the Mortgage unenforceable, in whole or in part, or subject to any such valid right of rescission, set-off, counterclaim or defense, including the defense of usury and no such valid right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

7. As of the Closing Date, all buildings upon the Mortgaged Property are insured by a generally acceptable insurer against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located, pursuant to insurance policies conforming to the requirements of the Servicing Addendum. All such insurance policies contain a standard mortgagee clause naming the related Originator, its successors and assigns as mortgagee and all premiums thereon are paid current. If upon origination of the Mortgage Loan, the Mortgaged Property was in an area identified on a Flood Hazard Map or Flood Insurance Rate Map issued by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available) a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect which policy conforms to the requirements of Fannie Mae and Freddie Mac. Except as may otherwise be limited by applicable law, the Mortgage obligates the Mortgagor thereunder to maintain all such insurance at the Mortgagor's cost and expense, and on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor;

8. Any and all requirements of any federal, state or local law including, without limitation, usury, truth in lending, real

estate settlement procedures, consumer credit protection, equal credit opportunity, disclosure laws and/or all predatory and abusive lending laws applicable to the origination and servicing of the Mortgage Loan have been complied with. Any and all disclosure statements required to be made by the Mortgagor relating to such requirements are and will remain in the Mortgage File;

9. As of the Closing Date, the Mortgage has not been satisfied, canceled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such satisfaction, cancellation, subordination, rescission or release;

10. The Mortgage creates a valid first or second lien, as applicable, in the related Mortgaged Property as reflected on the Mortgage Loan Schedule;

11. The related Mortgage is a valid, existing and enforceable first or second lien, as applicable, on the related Mortgaged Property, including all improvements on the related Mortgaged Property subject only to (i) the lien of current real property taxes and assessments not yet due and payable, (ii) covenants, conditions and restrictions, rights of way, easements, mineral right reservations and other matters of the public record as of the date of recording of such Mortgage being acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the related Originator of the related Mortgage Loan and which do not adversely affect the Appraised Value of the related Mortgaged Property and (iii) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the related Mortgage or the use, enjoyment, value (as determined by Appraised Value) or marketability of the related Mortgaged Property. Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, subsisting, enforceable and perfected first lien and first priority security interest on the property described therein;

12. The Mortgage Note and the related Mortgage are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms;

13. All parties to the Mortgage Note and the Mortgage had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage, and the Mortgage Note and the Mortgage have been duly and properly executed by such parties. The Mortgagor is a natural person, at least one Mortgagor is a party to the Mortgage Note, and the Mortgage is in an individual capacity;

14. Excluding any Mortgage Loan subject to an escrow holdback, the proceeds of the Mortgage Loan have been fully disbursed to or for the account of the Mortgagor and there is no obligation for the Mortgagee to advance additional funds thereunder and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage have been paid, and the Mortgagor is not currently entitled to any refund of any amounts paid or due to the Mortgagee pursuant to the Mortgage Note or Mortgage;

15. [Reserved];

16. As of the Closing Date, all parties which have had any interest in the Mortgage Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance with any and all applicable "doing business" and licensing requirements of the laws of the state wherein the Mortgaged Property is located;

17. The Mortgage Loan is covered by an ALTA lender's title insurance policy and, in the case of an Adjustable Rate Mortgage Loan, with an adjustable rate mortgage endorsement, such endorsement substantially in the form of ALTA Form 6.0 or 6.1, issued by a title insurer and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring the Interim Servicer, its successors and assigns as to the first priority lien of the Mortgage in the original principal amount of the Mortgage Loan and, with respect to an Adjustable Rate Mortgage Loan, against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment in the Mortgage Interest Rate and Monthly Payment. Additionally, such lender's title insurance policy affirmatively insures ingress and egress to and from the Mortgaged Property, and against encroachments by or upon the Mortgaged Property or any interest therein. The related Originator and its successors and assigns is the sole insured of such lender's title insurance policy, and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement. Such lender's title insurance policy does not require the consent of or notification to the related insurer for assignment to the Purchaser.

18. As of the Closing Date, no claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage, including the Company, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy;

286

19. As of the Closing Date, there is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration; and as of the Closing Date, the Company or the Interim Servicer has not waived any default, breach, violation or event of acceleration. For purposes of the foregoing, a delinquent payment of less than thirty (30) days on a Mortgage Loan in and of itself does not constitute a default, breach, violation or event of acceleration with respect to such Mortgage Loan.

20. As of the Closing Date, there are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) affecting the related Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage;

21. All improvements which were considered in determining the Appraised Value of the related Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property. Each appraisal has been performed in accordance with the provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989;

22. The Mortgage Loan was (i) originated by or in conjunction with a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act, a savings and loan association, a savings bank, a commercial bank, mortgage banker, credit union, insurance company or similar banking institution which is supervised and examined by a federal or state authority or (ii) acquired by the Company or its affiliates directly through loan brokers or correspondents such that (a) the Mortgage Loan was originated in conformity with the Underwriting Guidelines and (b) the Company or its affiliates approved the Mortgage Loan prior to funding;

23. Principal payments on the Mortgage Loan are scheduled to commence no more than sixty days after the proceeds of the Mortgage Loan are disbursed. The Mortgage Loan bears interest at the Mortgage Interest Rate. The Mortgage Note is payable on the first day of each month in Monthly Payments. Interest on the Mortgage Loan is calculated on the basis of a 360-day year consisting of twelve 30-day months. The Mortgage Note does not permit negative amortization;

24. The origination and collection practices used by the Company and the Interim Servicer, as applicable, with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, reasonable and customary in the mortgage origination and servicing industry. The Mortgage Loan has been serviced by the Servicer, the Interim Servicer and any predecessor servicer in accordance with the terms of the Mortgage Note and applicable law. With respect to escrow deposits and Escrow Payments, if any, all such payments are in the possession of, or under the control with, the Servicer or the Interim Servicer, and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. No escrow deposits or Escrow Payments or other charges or payments due the Servicer or the Interim Servicer have been capitalized under any Mortgage or the related Mortgage Note;

25. As of the Closing Date, the Mortgaged Property is free of material damage and waste and there is no proceeding pending for the total or partial condemnation thereof;

26. The Mortgage and related Mortgage Note contain customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure. As of the Closing Date, since the date of origination of the Mortgage Loan, the Mortgaged Property has not been subject to any bankruptcy proceeding or foreclosure proceeding and the Mortgagor has not filed for protection under applicable bankruptcy laws. There is no homestead or other exemption available to the Mortgagor, which would materially interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage. As of the Closing Date, the Mortgagor has not notified the Servicer, the Interim Servicer or the Company and the Company, the Servicer or the Interim Servicer has no knowledge of any relief requested or allowed to the Mortgagor under the Servicemembers Civil Relief Act formerly known as the Soldiers and Sailors Civil Relief Act of 1940;

27. The related Mortgaged Property is not a leasehold estate or, if such Mortgaged Property is a leasehold estate, the remaining term of such lease is at least five (5) years greater than the remaining term of the related Mortgage Note;

28. The Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage on the Mortgaged Property and the security interest of any applicable security agreement or chattel mortgage referred to above;

29. The Mortgage File contains an appraisal or insured AVM of the related Mortgaged Property made prior to the approval of the Mortgage Loan. In the case of an appraisal it was made by a staff or third party qualified appraiser who had no interest,

direct or indirect in the Mortgaged Property or in any loan made on the security thereof, whose compensation is not affected by the approval or disapproval of the Mortgage Loan, for whom no conflict of interest is present and who met the minimum qualifications of USPAP;

30. In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

31. No Mortgage Loan contains provisions pursuant to which Monthly Payments are (i) paid or partially paid with funds deposited in any separate account established by the Company, the Mortgagor, or anyone on behalf of the Mortgagor, (ii) paid by any source other than the Mortgagor or (iii) contains any other similar provisions which may constitute a "buydown" provision. The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature;

32. The Mortgagor has received all disclosure materials required by applicable law with respect to the making of a Refinanced Mortgage Loan, and evidence of such receipt is and will remain in the Mortgage File;

33. The Mortgage Note, the Mortgage, the Assignment of Mortgage and any other documents required to be delivered with respect to each Mortgage Loan pursuant to the Pooling and Servicing Agreement, have been delivered to the Trustee all in compliance with the specific requirements of the Pooling and Servicing Agreement;

34. As of the Closing Date, the Mortgaged Property is lawfully occupied under applicable law and if it is the borrower's primary residence is not vacant within ninety (90) days of the Closing Date (with notice from and proof of such vacancy by the Purchaser); all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities;

35. The Assignment of Mortgage, is in recordable form and (other than with respect to the blank assignee and the lack of mortgage recordation information) is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located. When endorsed as provided for in this Agreement, the Mortgage Notes will be duly endorsed under applicable law;

36. Any principal advances made to the Mortgagor prior to the Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term;

37. No Mortgage Loan has a balloon payment feature;

38. If the Residential Dwelling on the Mortgaged Property is a condominium unit or a unit in a planned unit development (other than a de minimis planned unit development) such condominium or planned unit development project is not ineligible under Fannie Mae's eligibility requirements;

39. [Reserved];

40. Each Mortgage Loan constitutes a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code;

41. As of the Closing Date, no Mortgage Loan has an LTV of more than 100%;

42. No Mortgage Loan is a "high cost" mortgage loan, as defined under any applicable state, local or federal predatory and abusive lending laws, including, but not limited to, the Georgia Fair Lending Act and Section 6 L of the New York State Banking Law;

43. [Reserved];

44. [Reserved];

45. [Reserved];

46. The Mortgage Loans are not subject to the requirement of the Home Ownership and Equity Protection Act of 1994

288

("HOEPA") and no Mortgage Loan is subject to, or in violation of, any applicable state or local law, ordinance or regulation similar to HOEPA and (2) (i) no Mortgage Loan is a "high cost" loan as defined by HOEPA or any other applicable predatory or abusive lending laws and (ii) no Mortgage Loan is a "high cost home", "covered" (excluding home loans defined as "covered home loans" pursuant to clause (1) of the definition of that term in the New Jersey Home Ownership Security Act of 2002), "high risk home" or "predatory" loan under any other applicable state, federal or local law (or similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for resident mortgage loans having high interest rates, points and/or fees);

47. [Reserved];

48. With respect to each Mortgage Loan subject to a Prepayment Charge, such Prepayment Charge, at the time of the origination of the related Mortgage Loan, is enforceable and in compliance with all applicable local, state and federal law (except to the extent that the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally or the collectability thereof may be limited due to acceleration in connection with a foreclosure);

49. [Reserved];

50. As of the Closing Date, the Mortgaged Property is being primarily used as a Residential Dwelling for residential purposes;

51. The Company has obtained a life of loan, transferable real estate tax service contract on each Mortgage Loan and such contract is assignable without penalty, premium or cost to the Purchaser;

52. The Company has obtained a life of loan, transferable flood certification contract for each Mortgage Loan and such contract is assignable without penalty, premium or cost to the Purchaser;

53. The Mortgage Loans conform in all material respects to the Underwriting Guidelines;

54. No Mortgage Loan originated on or after October 1, 2002 and before March 7, 2003 is secured by a Mortgaged Property located in the State of Georgia; No Mortgage Loan that was originated on or after March 7, 2003, is a "high-cost home loan" as defined under the Georgia Fair Lending Act;

55. No proceeds from any Mortgage Loan were used to finance single-premium credit insurance policies;

56. No subprime Mortgage Loan originated on or after October 1, 2002 will impose a Prepayment Charge for a term in excess of three years; No Mortgage Loan originated prior to such date nor any non-subprime Mortgage Loan will impose prepayment charges in excess of five years;

57. In connection with any Mortgage Loan, the Interim Servicer has fully furnished, and will fully furnish in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files to Equifax, Experian and Trans Union Credit Information Company, on a monthly basis;

58. No Mortgage Loan is a "high cost", "covered" or similarly classified loans as defined by the applicable federal, state or local predatory and abusive lending laws nor is any loan a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the then current Standard & Poor's LEVELS Glossary Revised, Appendix E);

59. No fraud was committed in connection with the origination of any Mortgage Loan; provided, however, the Seller does not represent or warrant the accuracy of the qualifying income stated (provided that such stated income is not grossly unreasonable when considering all relevant factors relating to such Mortgagor, including without limitation, geographic area, unique expertise, years in the field of employment, etc) by the related Mortgagor(s) in connection with a Mortgage Loan that does not require income verification as defined in the Underwriting Guidelines;

60. [Reserved];

61. The Mortgage Loan was not prepaid in full prior to the Closing Date and the Seller has not received written notification from the Mortgagor that a prepayment in full will be made following the Closing Date;

62. [Reserved];

63. With respect to any Mortgage Loan or the underlying security related thereto, neither the related Mortgage nor the related Mortgage Note requires the Mortgagor to submit to arbitration to resolve any dispute arising out of or relating in any way thereto; and

64. [Reserved].

---

290

<u>EXHIBIT E</u>

REQUEST FOR RELEASE

TO:    Citibank, N.A.
        5280 Corporate Drive
        MS 0052
        Frederick, MD 21703

Re:    Pooling and Servicing Agreement dated as of March 1, 2007, among Citigroup Mortgage Loan Trust Inc., as Depositor, Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP as Servicers, Wells Fargo Bank, N.A. as Master Servicer and as Trust Administrator and U.S. Bank National Association as Trustee

        In connection with the administration of the Mortgage Loans held by you as Custodian for the Owner pursuant to the above-captioned Agreement, we request the release, and hereby acknowledge receipt, of the Trustee's Mortgage File for the Mortgage Loan described below, for the reason indicated.

Mortgage Loan Number:
Mortgagor Name, Address & Zip Code:

Reason for Requesting Documents (check one):

_____1.    Mortgage Paid in Full

_____2.    Foreclosure

_____3.    Substitution

_____4.    Other Liquidation (Repurchases, etc.)

_____5.    Nonliquidation

Reason:_____

Address to which [Custodian][Trustee] should
Deliver the [Custodian's][Trustee's] Mortgage File:

        [_____]
        [_____]

By:   _____
     Name:
     Title:

Issuer:  _____

Address:  _____

291

Date: _____          _____

     Trustee


U.S. BANK NATIONAL ASSOCIATION


Please acknowledge the execution of the above request by your signature and date below:

_____
Signature                                              Date

Documents returned to Trustee:

_____
Trustee                                                Date

<u>EXHIBIT F-1</u>

FORM OF TRANSFEROR REPRESENTATION LETTER

[Date]

Wells Fargo Bank, N.A.
Sixth Street and Marquette Avenue
Minneapolis, Minnesota 55479
Attn: Transfer Unit: CMLTI 2007-AMC2

Re:  Citigroup Mortgage Loan Trust Inc., Asset-Backed
Pass-Through Certificates, Series 2007-AMC2,
<u>Class , representing a % Class Percentage Interest</u>

Ladies and Gentlemen:

In connection with the transfer by _____ (the "Transferor") to _____ (the "Transferee") of the captioned mortgage pass-through certificates (the "Certificates"), the Transferor hereby certifies as follows:

Neither the Transferor nor anyone acting on its behalf has (a) offered, pledged, sold, disposed of or otherwise transferred any Certificate, any interest in any Certificate or any other similar security to any person in any manner, (b) has solicited any offer to buy or to accept a pledge, disposition or other transfer of any Certificate, any interest in any Certificate or any other similar security from any person in any manner, (c) has otherwise approached or negotiated with respect to any Certificate, any interest in any Certificate or any other similar security with any person in any manner, (d) has made any general solicitation by means of general advertising or in any other manner, (e) has taken any other action, that (in the case of each of subclauses (a) through (e) above) would constitute a distribution of the Certificates under the Securities Act of 1933, as amended (the "1933 Act"), or would render the disposition of any Certificate a violation of Section 5 of the 1933 Act or any state securities law or would require registration or qualification pursuant thereto. The Transferor will not act, nor has it authorized or will it authorize any person to act, in any manner set forth in the foregoing sentence with respect to any Certificate. The Transferor will not sell or otherwise transfer any of the Certificates, except in compliance with the provisions of that certain Pooling and Servicing Agreement dated as of March 1, 2007, among Citigroup Mortgage Loan Trust Inc., as Depositor, Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP as Servicers, Wells Fargo Bank, N.A. as Master Servicer and Trust Administrator and U.S. Bank National Association as Trustee (the "Pooling and Servicing Agreement"), pursuant to which Pooling and Servicing Agreement the Certificates were issued.

293

Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Pooling and Servicing Agreement.

Very truly yours,

[Transferor]

By: _____
    Name:
    Title:

294

FORM OF TRANSFEREE REPRESENTATION LETTER

[Date]

Well Fargo Bank, N.A.
Sixth Street and Marquette Avenue
Minneapolis, Minnesota 55479
Attn: Transfer Unit: CMLTI 2007-AMC2

Citibank N.A.
Collateral Management Group
333 West 34th Street, 2nd FL
New York, NY 10001

　　　　　　　　　　　　Re:　Citigroup Mortgage Loan Trust Inc., Asset-Backed
　　　　　　　　　　　　　　　Pass-Through Certificates, Class, Series 2007-AMC2,
　　　　　　　　　　　　　　　representing a % Percentage Interest

Ladies and Gentlemen:

　　　　　In connection with the purchase from _____ (the "Transferor") on the date hereof of the captioned trust certificates (the "Certificates"), _____ (the "Transferee") hereby certifies as follows:

　　　　　1. The Transferee is a "qualified institutional buyer" as that term is defined in Rule 144A ("Rule 144A") under the Securities Act of 1933 (the "1933 Act") and has completed either of the forms of certification to that effect attached hereto as Annex 1 or Annex 2. The Transferee is aware that the sale to it is being made in reliance on Rule 144A. The Transferee is acquiring the Certificates for its own account or for the account of a qualified institutional buyer, and understands that such Certificate may be resold, pledged or transferred only (i) to a person reasonably believed to be a qualified institutional buyer that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, or (ii) pursuant to another exemption from registration under the 1933 Act.

　　　　　2. The Transferee has been furnished with all information regarding (a) the Certificates and distributions thereon, (b) the nature, performance and servicing of the Mortgage Loans, (c) the Pooling and Servicing Agreement referred to below, and (d) any credit enhancement mechanism associated with the Certificates, that it has requested.

　　　　　3. With respect to a transfer of the Class CE Certificates, the Transferee agrees to provide to the Trust Administrator and the Interest Risk Cap Provider the appropriate tax certification form (i.e. IRS Form W-9 or IRS Form W-8BEN, W-8IMY or W-8ECI, as applicable (or any successor form thereto)), and agrees to update such forms (i) upon expiration of any such form, (ii) as required under then applicable U.S. Treasury regulations and (iii) promptly upon learning that any IRS Form W-9 or IRS Form W-8BEN, W-8IMY or W-8ECI, as applicable (or any successor form thereto), has become obsolete or incorrect. In addition, if the transfer contemplated hereby causes the Net WAC Rate Carryover Reserve Account or the Cap Account to be beneficially owned by two or more persons for federal income tax purposes, or continue to be so treated, (a) each Transferee shall comply with the foregoing conditions, (b) the proposed majority Holder of the Class CE Certificates (or each Holder, if there is or would be no majority Holder) (A) shall provide, or cause to be provided, on behalf of the Net WAC Rate Carryover Reserve Account or the Cap Account the appropriate tax certification form that would be required from the Net WAC Rate Carryover Reserve Account or the Cap Account to eliminate any withholding or deduction for taxes from amounts payable by the Interest Risk Cap Provider, pursuant to the Interest Rate Cap Agreement, to the Trust Administrator and the Interest Risk Cap Provider on behalf of the Net WAC Rate Carryover Reserve Account or the Cap Account (i.e. IRS Form W-9 or IRS Form W-8BEN, W-8IMY or W-8ECI, as applicable (or any successor form thereto) as a condition to transfer, together with any applicable attachments) and (B) each Transferee agrees to update such form (x) upon expiration of any such form, (y) as required under then applicable U.S. Treasury regulations and (z) promptly upon learning that such form has become obsolete or incorrect.

　　　　　The Transferee hereby authorizes the Trust Administrator to provide any such tax certification form to the Interest Risk Cap Provider, upon its request, solely to the extent the Interest Risk Cap Provider has not received such IRS Form directly from the Holder of the Class CE Certificates. Each Holder of a Class CE Certificate by its purchase of such Certificate is deemed to consent to any such IRS

295

Form being so forwarded. Upon the request of the Interest Risk Cap Provider, the Trust Administrator shall be required to forward any tax certification received by it to the Interest Risk Cap Provider at the last known address provided to it, and, subject to Section 8.01 of the Pooling and Servicing Agreement, shall not be liable for the receipt of such tax certification by the Interest Risk Cap Provider nor any action taken or not taken by the Interest Risk Cap Provider with respect to such tax certification. Any purported sales or transfers of the Class CE Certificate to a Transferee which does not comply with the requirements of the preceding paragraph shall be deemed null and void under the Pooling and Servicing Agreement. The Trust Administrator shall have no duty to take any action to correct any misstatement or omission in any tax certification provided to it by the Holder of the Class CE Certificates and forwarded to the Interest Risk Cap Provider.

All capitalized terms used but not otherwise defined herein have the respective meanings assigned thereto in the Pooling and Servicing Agreement dated as of March 1, 2007, among Citigroup Mortgage Loan Trust Inc., as Depositor, Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP as Servicers, Wells Fargo Bank, N.A. as Master Servicer and as Trust Administrator and U.S. Bank National Association as Trustee, pursuant to which the Certificates were issued.

[Transferee]

By: _____

Name:

Title:

296

ANNEX 1 TO EXHIBIT F
QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Transferees Other Than Registered Investment Companies]

The undersigned hereby certifies as follows to [name of Transferor] (the "Transferor") and Wells Fargo Bank, N.A., as Trust Administrator, with respect to the mortgage pass-through certificates (the "Certificates") described in the Transferee Certificate to which this certification relates and to which this certification is an Annex:

1.      As indicated below, the undersigned is the President, Chief Financial Officer, Senior Vice President or other executive officer of the entity purchasing the Certificates (the "Transferee").

2.      In connection with purchases by the Transferee, the Transferee is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because (i) the Transferee owned and/or invested on a discretionary basis $_____[1] in securities (except for the excluded securities referred to below) as of the end of the Transferee's most recent fiscal year (such amount being calculated in accordance with Rule 144A) and (ii) the Transferee satisfies the criteria in the category marked below.

___     CORPORATION, ETC. The Transferee is a corporation (other than a bank, savings and loan association or similar institution), Massachusetts or similar business trust, partnership, or any organization described in Section 501(c)(3) of the Internal Revenue Code of 1986.

___     BANK. The Transferee (a) is a national bank or banking institution organized under the laws of any State, territory or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official or is a foreign bank or equivalent institution, and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

___     SAVINGS AND LOAN. The Transferee (a) is a savings and loan association, building and loan association, cooperative bank, homestead association or similar institution, which is supervised and examined by a State or Federal authority having supervision over any such institutions or is a foreign savings and loan association or equivalent institution and (b) has an audited net worth of at least

___     BROKER-DEALER. The Transferee is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

___     INSURANCE COMPANY. The Transferee is an insurance company whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies and which is subject to supervision by the insurance commissioner or a similar official or agency of a State, territory or the District of Columbia.

___     STATE OR LOCAL PLAN. The Transferee is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

___     ERISA PLAN. The Transferee is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, as amended.

___     INVESTMENT ADVISOR. The Transferee is an investment advisor registered under the Investment Advisers Act of 1940.

3.      The term "SECURITIES" as used herein DOES NOT INCLUDE (i) securities of issuers that are affiliated with the Transferee, (ii) securities that are part of an unsold allotment to or subscription by the Transferee, if the Transferee is a dealer, (iii) securities issued or guaranteed by the U.S. or any instrumentality thereof, (iv) bank deposit notes and certificates of deposit, (v) loan participations, (vi) repurchase agreements, (vii) securities owned but subject to a repurchase agreement and (viii) currency, interest rate and commodity swaps.

297

4.      For purposes of determining the aggregate amount of securities owned and/or invested on a discretionary basis by the Transferee, the Transferee used the cost of such securities to the Transferee and did not include any of the securities referred to in the preceding paragraph. Further, in determining such aggregate amount, the Transferee may have included securities owned by subsidiaries of the Transferee, but only if such subsidiaries are consolidated with the Transferee in its financial statements prepared in accordance with generally accepted accounting principles and if the investments of such subsidiaries are managed under the Transferee's direction. However, such securities were not included if the Transferee is a majority-owned, consolidated subsidiary of another enterprise and the Transferee is not itself a reporting company under the Securities Exchange Act of 1934.

5.      The Transferee acknowledges that it is familiar with Rule 144A and understands that the Transferor and other parties related to the Certificates are relying and will continue to rely on the statements made herein because one or more sales to the Transferee may be in reliance on Rule 144A.

___    ___    Will the Transferee be purchasing the Certificates only for the Transferee's own account?

Yes    No

6.      If the answer to the foregoing question is "no", the Transferee agrees that, in connection with any purchase of securities sold to the Transferee for the account of a third party (including any separate account) in reliance on Rule 144A, the Transferee will only purchase for the account of a third party that at the time is a "qualified institutional buyer" within the meaning of Rule 144A. In addition, the Transferee agrees that the Transferee will not purchase securities for a third party unless the Transferee has obtained a current representation letter from such third party or taken other appropriate steps contemplated by Rule 144A to conclude that such third party independently meets the definition of "qualified institutional buyer" set forth in Rule 144A.

7.      The Transferee will notify each of the parties to which this certification is made of any changes in the information and conclusions herein. Until such notice is given, the Transferee's purchase of the Certificates will constitute a reaffirmation of this certification as of the date of such purchase. In addition, if the Transferee is a bank or savings and loan as provided above, the Transferee agrees that it will furnish to such parties updated annual financial statements promptly after they become available.

Dated:

_____

Print Name of Transferee


By: _____

        Name:
        Title:

_____

[1] Transferee must own and/or invest on a discretionary basis at least $100,000,000 in securities unless Transferee is a dealer, and, in that case, Transferee must own and/or invest on a discretionary basis at least $10,000,000 in securities. $25,000,000 as demonstrated in its latest annual financial statements, A COPY OF WHICH IS ATTACHED HERETO.

298

<u>ANNEX 2 TO EXHIBIT F</u>

QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Transferees That Are Registered Investment Companies]

The undersigned hereby certifies as follows to [name of Transferor] (the "Transferor") and Wells Fargo Bank, N.A., as Trust Administrator, with respect to the mortgage pass- through certificates (the "Certificates") described in the Transferee Certificate to which this certification relates and to which this certification is an Annex:

1.     As indicated below, the undersigned is the President, Chief Financial Officer or Senior Vice President of the entity purchasing the Certificates (the "Transferee") or, if the Transferee is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because the Transferee is part of a Family of Investment Companies (as defined below), is such an officer of the investment adviser (the "Adviser").

2.     In connection with purchases by the Transferee, the Transferee is a "qualified institutional buyer" as defined in Rule 144A because (i) the Transferee is an investment company registered under the Investment Company Act of 1940, and (ii) as marked below, the Transferee alone, or the Transferee's Family of Investment Companies, owned at least $100,000,000 in securities (other than the excluded securities referred to below) as of the end of the Transferee's most recent fiscal year. For purposes of determining the amount of securities owned by the Transferee or the Transferee's Family of Investment Companies, the cost of such securities was used.

_____ The Transferee owned $_____ in securities (other than the excluded securities referred to below) as of the end of the Transferee's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

_____ The Transferee is part of a Family of Investment Companies which owned in the aggregate $_____ in securities (other than the excluded securities referred to below) as of the end of the Transferee's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

3.     The term "FAMILY OF INVESTMENT COMPANIES" as used herein means two or more registered investment companies (or series thereof) that have the same investment adviser or investment advisers that are affiliated (by virtue of being majority owned subsidiaries of the same parent or because one investment adviser is a majority owned subsidiary of the other).

4.     The term "SECURITIES" as used herein does not include (i) securities of issuers that are affiliated with the Transferee or are part of the Transferee's Family of Investment Companies, (ii) securities issued or guaranteed by the U.S. or any instrumentality thereof, (iii) bank deposit notes and certificates of deposit, (iv) loan participations, (v) repurchase agreements, (vi) securities owned but subject to a repurchase agreement and (vii) currency, interest rate and commodity swaps.

5.     The Transferee is familiar with Rule 144A and understands that the parties to which this certification is being made are relying and will continue to rely on the statements made herein because one or more sales to the Transferee will be in reliance on Rule 144A. In addition, the Transferee will only purchase for the Transferee's own account.

6.     The undersigned will notify the parties to which this certification is made of any changes in the information and conclusions herein. Until such notice, the Transferee's purchase of the Certificates will constitute a reaffirmation of this certification by the undersigned as of the date of such purchase.

Dated:

_____
Print Name of Transferee or Advisor

By:  _____
          Name:
          Title:

IF AN ADVISER:

_____

Print Name of Transferee

300

<u>FORM OF TRANSFEREE REPRESENTATION LETTER</u>

The undersigned hereby certifies on behalf of the purchaser named below (the "Purchaser") as follows:

1.      I am an executive officer of the Purchaser.

2.      The Purchaser is a "qualified institutional buyer", as defined in Rule 144A, ("Rule 144A") under the Securities Act of 1933, as amended.

3.      As of the date specified below (which is not earlier than the last day of the Purchaser's most recent fiscal year), the amount of "securities", computed for purposes of Rule 144A, owned and invested on a discretionary basis by the Purchaser was in excess of $100,000,000.

Name of Purchaser

_____

By:     _____
        Name:
        Title:

Date of this certificate:
Date of information provided in paragraph 3

<u>EXHIBIT F-2</u>

FORM OF RESIDUAL CERTIFICATE TRANSFER AFFIDAVIT

STATE OF              )
                      )  ss.:
COUNTY OF             )

The undersigned, being first duly sworn, deposes and says as follows:

1.      The undersigned is an officer of the proposed Transferee of an Ownership Interest in a Residual Certificate (the "<u>Certificate</u>") issued pursuant to the Pooling and Servicing Agreement dated as of March 1, 2007 (the "<u>Agreement</u>"), among Citigroup Mortgage Loan Trust Inc., as depositor (the "<u>Depositor</u>"), Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP as Servicers, (the "Servicers"), Wells Fargo Bank, N.A. as master servicer (the "<u>Master Servicer</u>") and as trust administrator (the "<u>Trust Administrator</u>") and U.S. Bank National Association, as trustee (the "<u>Trustee</u>"). Capitalized terms used, but not defined herein or in Exhibit 1 hereto, shall have the meanings ascribed to such terms in the Agreement. The Transferee has authorized the undersigned to make this affidavit on behalf of the Transferee for the benefit of the Depositor and the Trustee.

2.      The Transferee is, as of the date hereof, and will be, as of the date of the Transfer, a Permitted Transferee. The Transferee is acquiring its Ownership Interest in the Certificate for its own account. The Transferee has no knowledge that any such

affidavit is false.

3.     The Transferee has been advised of, and understands that (i) a tax will be imposed on Transfers of the Certificate to Persons that are not Permitted Transferees; (ii) such tax will be imposed on the transferor, or, if such Transfer is through an agent (which includes a broker, nominee or middleman) for a Person that is not a Permitted Transferee, on the agent; and (iii) the Person otherwise liable for the tax shall be relieved of liability for the tax if the subsequent Transferee furnished to such Person an affidavit that such subsequent Transferee is a Permitted Transferee and, at the time of Transfer, such Person does not have actual knowledge that the affidavit is false.

4.     The Transferee has been advised of, and understands that a tax will be imposed on a "pass-through entity" holding the Certificate if at any time during the taxable year of the pass-through entity a Person that is not a Permitted Transferee is the record holder of an interest in such entity. The Transferee understands that such tax will not be imposed for any period with respect to which the record holder furnishes to the pass-through entity an affidavit that such record holder is a Permitted Transferee and the pass-through entity does not have actual knowledge that such affidavit is false. (For this purpose, a "pass-through entity" includes a regulated investment company, a real estate investment trust or common trust fund, a partnership, trust or estate, and certain cooperatives and, except as may be provided in Treasury Regulations, persons holding interests in pass-through entities as a nominee for another Person.)

5.     The Transferee has reviewed the provisions of Section 5.02(d) of the Agreement and understands the legal consequences of the acquisition of an Ownership Interest in the Certificate including, without limitation, the restrictions on subsequent Transfers and the provisions regarding voiding the Transfer and mandatory sales. The Transferee expressly agrees to be bound by and to abide by the provisions of Section 5.02(d) of the Agreement and the restrictions noted on the face of the Certificate. The Transferee understands and agrees that any breach of any of the representations included herein shall render the Transfer to the Transferee contemplated hereby null and void.

6.     The Transferee agrees to require a Transfer Affidavit from any Person to whom the Transferee attempts to Transfer its Ownership Interest in the Certificate, and in connection with any Transfer by a Person for whom the Transferee is acting as nominee, trustee or agent, and the Transferee will not Transfer its Ownership Interest or cause any Ownership Interest to be Transferred to any Person that the Transferee knows is not a Permitted Transferee. In connection with any such Transfer by the Transferee, the Transferee agrees to deliver to the Trust Administrator a certificate substantially in the form set forth as Exhibit L to the Agreement (a "Transferor Certificate") to the effect that such Transferee has no actual knowledge that the Person to which the Transfer is to be made is not a Permitted Transferee.

7.     The Transferee has historically paid its debts as they have come due, intends to pay its debts as they come due in the future, and understands that the taxes payable with respect to the Certificate may exceed the cash flow with respect thereto in some or all periods and intends to pay such taxes as they become due. The Transferee does not have the intention to impede the assessment or collection of any tax legally required to be paid with respect to the Certificate.

8.     The Transferee's taxpayer identification number is _____.

9.     The Transferee is a U.S. Person as defined in Code Section 7701(a)(30).

10.     The Transferee is aware that the Certificate may be a "noneconomic residual interest" within the meaning of proposed Treasury regulations promulgated pursuant to the Code and that the transferor of a noneconomic residual interest will remain liable for any taxes due with respect to the income on such residual interest, unless no significant purpose of the transfer was to impede the assessment or collection of tax.

11.     The Transferee will not cause income from the Certificate to be attributable to a foreign permanent establishment or fixed base, within the meaning of an applicable income tax treaty, of the Transferee or any other U.S. person.

12.     Check one of the following:

[_] The present value of the anticipated tax liabilities associated with holding the Certificate, as applicable, does not exceed the sum of:

(i)        the present value of any consideration given to the Transferee to acquire such Certificate;

(ii)       the present value of the expected future distributions on such Certificate; and

302

Unassociated Document              Page 293 of 377

Case 3:13-cv-01983-WHO  Document 32-4  Filed 09/27/13  Page 94 of 178

(iii)  the present value of the anticipated tax savings associated with holding such Certificate as the related REMIC generates losses.

For purposes of this calculation, (i) the Transferee is assumed to pay tax at the highest rate currently specified in Section 11(b) of the Code (but the tax rate in Section 55(b)(1)(B) of the Code may be used in lieu of the highest rate specified in Section 11(b) of the Code if the Transferee has been subject to the alternative minimum tax under Section 55 of the Code in the preceding two years and will compute its taxable income in the current taxable year using the alternative minimum tax rate) and (ii) present values are computed using a discount rate equal to the short-term Federal rate prescribed by Section 1274(d) of the Code for the month of the transfer and the compounding period used by the Transferee.

[__] The transfer of the Certificate complies with U.S. Treasury Regulations Sections 1.860E-1(c)(5) and (6) and, accordingly,

(i)  the Transferee is an "eligible corporation," as defined in U.S. Treasury Regulations Section 1.860E-1(c)(6)(i), as to which income from the Certificate will only be taxed in the United States;

(ii)  at the time of the transfer, and at the close of the Transferee's two fiscal years preceding the year of the transfer, the Transferee had gross assets for financial reporting purposes (excluding any obligation of a person related to the Transferee within the meaning of U.S. Treasury Regulations Section 1.860E-1(c)(6)(ii)) in excess of $100 million and net assets in excess of $10 million;

(iii)  the Transferee will transfer the Certificate only to another "eligible corporation," as defined in U.S. Treasury Regulations Section 1.860E-1(c)(6)(i), in a transaction that satisfies the requirements of Sections 1.860E-1(c)(4)(i), (ii) and (iii) and Section 1.860E-1(c)(5) of the U.S. Treasury Regulations; and

(iv)  the Transferee determined the consideration paid to it to acquire the Certificate based on reasonable market assumptions (including, but not limited to, borrowing and investment rates, prepayment and loss assumptions, expense and reinvestment assumptions, tax rates and other factors specific to the Transferee) that it has determined in good faith.

[__] None of the above.

13.  The Transferee is not an employee benefit plan that is subject to Title I of ERISA or a plan that is subject to Section 4975 of the Code or a plan subject to any Federal, state or local law that is substantially similar to Title I of ERISA or Section 4975 of the Code, and the Transferee is not acting on behalf of or investing plan assets of such a plan.

303

IN WITNESS WHEREOF, the Transferee has caused this instrument to be executed on its behalf, pursuant to authority of its Board of Directors, by its duly authorized officer and its corporate seal to be hereunto affixed, duly attested, this ___ day of _____, 20_.

[NAME OF TRANSFEREE]

By: _____
    Name:
    Title:

[Corporate Seal]

ATTEST:

_____
[Assistant] Secretary

Personally appeared before me the above-named _____, known or proved to me to be the same person who executed the foregoing instrument and to be the _____ of the Transferee, and acknowledged that he executed the same as his free act and deed and the free act and deed of the Transferee.

Subscribed and sworn before me this ___ day of _____, 20_.

_____
                    NOTARY PUBLIC

My Commission expires the __ day of _____, 20__

304

FORM OF TRANSFEROR AFFIDAVIT

STATE OF NEW)
YORK
                   )
COUNTY     OF)
NEW YORK

_____, being duly sworn, deposes, represents and warrants as follows:

1.    I am a _____ of _____ (the "Owner"), a corporation duly organized and existing under the laws of _____, on behalf of whom I make this affidavit.

2.    The Owner is not transferring the Class R Certificates or Class R-X Certificates (the "Residual Certificates") to impede the assessment or collection of any tax.

3.    The Owner has no actual knowledge that the Person that is the proposed transferee (the "Purchaser") of the Residual Certificates: (i) has insufficient assets to pay any taxes owed by such proposed transferee as holder of the Residual Certificates; (ii) may become insolvent or subject to a bankruptcy proceeding for so long as the Residual Certificates remain outstanding and (iii) is not a Permitted Transferee.

4.    The Owner understands that the Purchaser has delivered to the Trust Administrator a transfer affidavit and agreement in the form attached to the Pooling and Servicing Agreement as Exhibit F-2. The Owner does not know or believe that any representation contained therein is false.

5.    At the time of transfer, the Owner has conducted a reasonable investigation of the financial condition of the Purchaser as contemplated by Treasury Regulations Section 1.860E-1(c)(4)(i) and, as a result of that investigation, the Owner has determined that the Purchaser has historically paid its debts as they became due and has found no significant evidence to indicate that the Purchaser will not continue to pay its debts as they become due in the future. The Owner understands that the transfer of a Residual Certificate may not be respected for United States income tax purposes (and the Owner may continue to be liable for United States income taxes associated therewith) unless the Owner has conducted such an investigation.

6.    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Pooling and Servicing Agreement.

305

IN WITNESS WHEREOF, the Owner has caused this instrument to be executed on its behalf, pursuant to the authority of its Board of Directors, by its [Vice] President, attested by its [Assistant] Secretary, this _____ day of _____, 20___.

[OWNER]

By: _____
Name:
Title:  [Vice] President

ATTEST

By: _____
Name:
Title:  [Assistant] Secretary

Personally appeared before me the above-named , known or proved to me to be the same person who executed the foregoing instrument and to be a [Vice] President of the Owner, and acknowledged to me that [he/she] executed the same as [his/her] free act and deed and the free act and deed of the Owner.

Subscribed and sworn before me this _____ day of _____, 20___.

_____
Notary Public

County of _____
State of _____

My Commission expires:

306

EXHIBIT G

FORM OF CERTIFICATION WITH RESPECT TO ERISA AND THE CODE

[Date]

Well Fargo Bank, N.A.
Sixth Street and Marquette Avenue
Minneapolis, Minnesota 55479
Attn: Transfer Unit: CMLTI 2007-AMC2

Re: Citigroup Mortgage Loan Trust Inc.
    Asset-Backed Pass-Through Certificates, Series 2007-
    AMC2, Mortgage Class

Dear Sirs:

_____ (the "Transferee") intends to acquire from _____ (the "Transferor") $_____ Initial Certificate Principal Balance of Citigroup Mortgage Loan Trust Inc., Series 2007-AMC2, Asset-Backed Pass-Through Certificates, Class [CE] [P] [R] (the "Certificates"), issued pursuant to a Pooling and Servicing Agreement dated as of March 1, 2007 (the "Agreement"), among Citigroup Mortgage Loan Trust Inc., as depositor (the "Depositor"), Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP as Servicers, (the "Servicers"), Wells Fargo Bank, N.A. as master servicer and trust administrator (the "Master Servicer" and the "Trust Administrator") and U.S. Bank National Association as trustee (the "Trustee"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned thereto in the Pooling and Servicing Agreement. The Transferee hereby certifies, represents and warrants to, and covenants with the Depositor, the Trust Administrator, the Trustee, the Master Servicer and the Servicer that:

The Certificates (i) are not being acquired by, and will not be transferred to, any employee benefit plan within the meaning of section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or other retirement arrangement, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and insurance company general or separate accounts in which such plans, accounts or arrangements are invested, that is subject to Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986 (the "Code") (any of the foregoing, a "Plan"), (ii) are not being acquired with "plan assets," of a Plan within the meaning of the Department of Labor ("DOL") regulation, 29 C.F.R. § 2510.3-101, as modified by Section 3(42) of ERISA, of a Plan, and (iii) will not be transferred to any entity that is deemed to be investing in plan assets of a Plan.

307

Very truly yours,

_____

By: _____

Name:
Title:


EXHIBIT H-1

FORM CERTIFICATION TO BE PROVIDED BY THE MASTER SERVICER WITH FORM 10-K

Re: Citigroup Mortgage Loan Trust Inc., Series 2007-AMC2
Asset-Backed Pass-Through Certificates, Series 2007-AMC2

I, [_____], certify that:

1. I have reviewed this annual report on Form 10-K, and all reports on Form 10-D required to be filed in respect of the period covered by this report on Form 10-K of Citigroup Mortgage Loan Trust Inc., Asset-Backed Pass-Through Certificates, Series 2007-AMC2 (the "Exchange Act periodic reports");

2. Based on my knowledge, the Exchange Act periodic reports, taken as a whole, do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, all of the distribution, servicing and other information required to be provided under Form 10-D for the period covered by this report is included in the Exchange Act periodic reports;

4. Based on my knowledge and upon the annual compliance statement required in this report under Item 1123 of Regulation AB, and except as disclosed in the Exchange Act periodic reports, the Servicer has fulfilled each of its obligations under the servicing agreement; and

5. All of the reports on assessment of compliance with servicing criteria for asset-backed securities and their related attestation reports on assessment of compliance with servicing criteria for asset-backed securities required to be included in this report in accordance with Item 1122 of Regulation AB and Exchange Act Rules 13a-18 and 15d-18 have been included as an exhibit to this report, except as otherwise disclosed in this report. Any material instances of noncompliance described in such reports have been disclosed in this report on Form 10-K.

In giving the certifications above, I have reasonably relied on information provided to me by the following unaffiliated parties: Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP.

Date: [___], 2007


WELLS FARGO BANK, N.A.

By: _____
Name:
Title:
Date:


EXHIBIT H-2

FORM CERTIFICATION TO BE PROVIDED TO MASTER SERVICER BY THE SERVICERS (OTHER THAN COUNTRYWIDE)

Re: Citigroup Mortgage Loan Trust Inc., Series 2007-AMC2
Asset-Backed Pass-Through Certificates, Series 2007-
AMC2 _____

[Ocwen Loan Servicing, LLC][GMAC Mortgage, LLC] as a Servicer (the "Company") hereby certifies to the Master Servicer that:

1. I have reviewed the servicer compliance statement of the Company provided in accordance with Item 1123 of Regulation AB (the "Compliance Statement"), the report on assessment of any Subservicer's compliance with the servicing criteria set forth in Item 1122 (d) of Regulation AB (the "Servicing Criteria"), provided in accordance with Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as amended (the "Exchange Act") and Item 1122 of Regulation AB (the "Servicing Assessment"), the registered public accounting firm's attestation report provided in accordance with Rules 13a-18 and 15d-18 under the Exchange Act and Section 1122(b) of Regulation AB (the "Attestation Report"), and all servicing reports, officer's certificates and other information relating to the servicing of the Mortgage Loans by the Company during 200[ ] that were delivered by the Company to the Depositor, the Master Servicer and/or the Trust Administrator pursuant to the Agreement (collectively, the "Company Servicing Information");

2. Based on my knowledge, the Company Servicing Information, taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which such statements were made, not misleading with respect to the period of time covered by the Company Servicing Information;

3. Based on my knowledge, all of the Company Servicing Information required to be provided by the Company under the Agreement has been provided to the Depositor, the Master Servicer and/or the Trust Administrator;

4. I am responsible for reviewing the activities performed by the Company as servicer under the Agreement, and based on my knowledge and the compliance review conducted in preparing the Compliance Statement and except as disclosed in the Compliance Statement, the Company has fulfilled its obligations under the Agreement in all material respects; and

5. The Compliance Statement required to be delivered by the Company pursuant to this Agreement, and the Servicing Assessment and Attestation Report required to be provided by any Subservicer and Subcontractor pursuant to the Agreement, have been provided to the Depositor, the Master Servicer and/or the Trust Administrator. Any material instances of noncompliance described in such reports have been disclosed to the Depositor, the Master Servicer and/or the Trust Administrator. Any material instance of noncompliance with the Servicing Criteria has been disclosed in such reports.

Capitalized terms used but not defined herein have the meanings ascribed to them in the Pooling and Servicing Agreement, dated March 1, 2007 (the "Pooling and Servicing Agreement"), among the Depositor as depositor, Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP as Servicers, Wells Fargo Bank, N.A. as master servicer and as trust administrator and U.S. Bank National Association as trustee.


[OCWEN LOAN SERVICING, LLC]


[GMAC MORTGAGE, LLC]


309

By: _____

Name:

Title:

Date:

310

EXHIBIT I

FORM OF INTEREST RATE CAP AGREEMENT


**DATE:**     March 30, 2007

**TO:**      Wells Fargo Bank, N.A., not in its individual capacity, but solely as Cap Trustee on behalf of the trust created pursuant to the Cap Administration Agreement (the "Cap Trust") with respect to Citigroup Mortgage Loan Trust Inc., Asset-Backed Pass-Through Certificates, Series 2007-AMC2 ("Party B")

**ATTENTION:**  Client Manager - CMLTI 2007-AMC2
**TELEPHONE:**  (410) 884-2000
**FACSIMILE:**  (410) 715-2380

**FROM:**    CITIBANK, N.A., a national banking association organized under the laws of the United States ("Party A")
**TELEPHONE:**  (212) 615-8398
**FACSIMILE:**  (212) 615-8985

**SUBJECT:**   Rate Cap Transaction

**REFERENCE**   CPC4628
**NUMBER:**

The purpose of this long-form confirmation ("Confirmation") is to confirm the terms and conditions of the current Transaction entered into on the Trade Date specified below (the "Transaction") between CITIBANK, N.A., a national banking association organized under the laws of the United States ("Party A") and Wells Fargo Bank, N.A., not in its individual capacity, but solely as Cap Trustee on behalf of the trust created pursuant to the Cap Administration Agreement (the "Cap Trust") with respect to Citigroup Mortgage Loan Trust Inc., Asset-Backed Pass-Through Certificates, Series 2007-AMC2 ("Party B"). Reference is hereby made to the Pooling and Servicing Agreement, dated as of March 1, 2007, among CITIGROUP MORTGAGE LOAN TRUST INC., as Depositor, OCWEN LOAN SERVICING, LLC, GMAC MORTGAGE, LLC and COUNTRYWIDE HOME LOANS SERVICING LP, as Servicers, WELLS FARGO BANK, N.A., as Master Servicer and as Trust Administrator, and U.S. BANK NATIONAL ASSOCIATION, as Trustee (the "Pooling and Servicing Agreement"). This Confirmation evidences a complete and binding agreement between you and us to enter into the Transaction on the terms set forth below and replaces any previous agreement between us with respect to the subject matter hereof. This Confirmation constitutes a "Confirmation" and also constitutes a "Schedule" as referred to in the ISDA Master Agreement, and Paragraph 13 of a Credit Support Annex to the Schedule.

1.  This Confirmation shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Master Agreement (Multicurrency - Cross Border) as published and copyrighted in 1992 by the International Swaps and Derivatives Association, Inc. (the "ISDA Master Agreement"), as if Party A and Party B had executed an agreement in such form on the date hereof, with a Schedule as set forth in Item 3 of this Confirmation, and an ISDA Credit Support Annex (Bilateral Form - ISDA Agreements Subject to New York Law Only version) as published and copyrighted in 1994 by the International Swaps and Derivatives Association, Inc., with Paragraph 13 thereof as set forth in Annex A hereto (the "Credit Support Annex"). For the avoidance of doubt, the Transaction described herein shall be the sole Transaction governed by such ISDA Master Agreement. In the event of any inconsistency among any of the following documents, the relevant document first listed shall govern: (i) this Confirmation, exclusive of the provisions set forth in Item 3 hereof and Annex A hereto; (ii) the provisions set forth in Item 3 hereof, which are incorporated by reference into the Schedule; (iii) the Credit Support Annex; (iv) the Definitions; and (v) the ISDA Master Agreement.

  Each reference herein to a "Section" (unless specifically referencing the Pooling and Servicing Agreement) or to a "Section" "of this Agreement" will be construed as a reference to a Section of the ISDA Master Agreement; each reference herein to a "Part" will be construed as a reference to the provisions herein deemed incorporated in the Schedule to the ISDA Master Agreement; each reference herein to a "Paragraph" will be construed as a reference to a Paragraph of the Credit Support Annex.

2.  The terms of the particular Transaction to which this Confirmation relates are as follows:

311

| | |
|---|---|
| Type of Transaction: | Interest Rate Cap |
| Notional Amount: | With respect to each Calculation Period, the amount set forth for such period on Schedule I attached hereto. |
| Trade Date: | February 14, 2007 |
| Effective Date: | March 30, 2007 |
| Termination Date: | May 25, 2012, subject to adjustment in accordance with the Business Day Convention |
| Fixed Amount: | USD 6,589,000.00 |
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Date: | March 30, 2007 |
| Floating Amounts: | |
| Floating Rate Payer: | Party A |
| Floating Rate Payer Period End Dates: | The 25th calendar day of each month during the Term of this Transaction, commencing April 25, 2007, and ending on the Termination Date, subject to adjustment in accordance with the Business Day Convention. |
| Floating Rate Payer Payment Dates: | Early Payment shall apply. Each Floating Rate Payer Payment Date shall be 2 Business Day prior to the 25th calendar day of each month during the Term of this Transaction, commencing April 23, 2007, and ending on the Termination Date. |
| Cap Rate: | With respect to any Calculation Period, the Strike Rate set forth for such period on Schedule I attached hereto |
| Floating Rate Option: | USD-LIBOR-BBA; provided that the Floating Rate Option shall be determined two (2) London and New York Business Days prior to the Reset Date. |
| Floating Amount: | To be determined in accordance with the following formula: |
| | Greater of (i) Scale Factor * (Floating Rate Option - Cap Rate) * Notional Amount * Floating Rate Day Count Fraction; and (ii) zero |
| Scale Factor: | 250 |
| Designated Maturity: | One month |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period. |
| Compounding: | Inapplicable |
| Business Days: | New York |

312

| Business Day Convention: | Following |
|---|---|
| Calculation Agent: | Party A |

3.        Provisions Deemed Incorporated in a Schedule to the ISDA Master Agreement:

Part 1.        Termination Provisions

For the purposes of this Agreement:-

(a)        "**Specified Entity**" means:

(i) in relation to Party A:  not applicable; and

(ii) in relation to Party B: not applicable.

(b)        "**Specified Transaction**" shall have the meaning specified in Section 14 of this Agreement.

(c) The **"Failure to Pay or Deliver"** provisions of Section 5(a)(i) will apply to Party A and will apply to Party B; provided, however, that Section 5(a)(i) is hereby amended by replacing the word "third" with the word "first"; provided, further, that notwithstanding anything to the contrary in Section 5(a)(i), any failure by Party A to comply with or perform any obligation to be complied with or performed by Party A under the Credit Support Annex shall not constitute an Event of Default under Section 5(a)(i) unless (A) a Required Ratings Downgrade Event has occurred and been continuing for 30 or more Local Business Days and (B) such failure is not remedied on or before the third Local Business Day after notice of such failure is given to Party A.

(d) The **"Breach of Agreement"** provisions of Section 5(a)(ii) will apply to Party A and will not apply to Party B.

(e) The **"Credit Support Default"** provisions of Section 5(a)(iii) will apply to Party A and will not apply to Party B except that Section 5 (a)(iii)(1) will apply to Party B solely in respect of Party B's obligations under Paragraph 3(b) of the Credit Support Annex; provided, however, that notwithstanding anything to the contrary in Section 5(a)(iii)(1), any failure by Party A to comply with or perform any obligation to be complied with or performed by Party A under the Credit Support Annex shall not constitute an Event of Default under Section 5(a)(iii) unless (A) a Required Ratings Downgrade Event has occurred and been continuing for 30 or more Local Business Days and (B) such failure is not remedied on or before the third Local Business Day after notice of such failure is given to Party A.

(f) The **"Misrepresentation"** provisions of Section 5(a)(iv) will apply to Party A and will not apply to Party B..

(g) The **"Default under Specified Transaction"** provisions of Section 5(a)(v) will apply to Party A and will not apply to Party B.

(h) The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and will not apply to Party B.

For purposes of Section 5(a)(vi), the following provisions apply:

"**Specified Indebtedness**" will have the meaning specified in Section 14 of this Agreement except that such term shall not include obligations in respect of deposits received in the ordinary course of Party A's banking business.

"**Threshold Amount**" means with respect to Party A an amount equal to three percent (3%) of the Shareholders' Equity of Party A or, if applicable, the Eligible Guarantor.

"**Shareholders' Equity**" means with respect to an entity, at any time, the sum (as shown in the most recent annual audited financial statements of such entity) of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

313

(i) The **"Bankruptcy"** provisions of Section 5(a)(vii) will apply to Party A and will apply to Party B except that the provisions of Section 5(a)(vii)(2), (6) (to the extent that such provisions refer to any appointment contemplated or effected by the Pooling and Servicing Agreement or any appointment to which Party B has not become subject), (7) and (9) will not apply to Party B; provided that, with respect to Party B only, Section 5(a)(vii)(4) is hereby amended by adding after the words "against it" the words "(excluding any proceeding or petition instituted or presented by Party A or its Affiliates)", and Section 5(a)(vii)(8) is hereby amended by deleting the words "to (7) inclusive" and inserting in lieu thereof ", (3), (4) as amended, (5), (6) as amended, or (7)".

(j) The **"Merger without Assumption"** provisions of Section 5(a)(viii) will apply to Party A and will not apply to Party B.

(k) The **"Illegality"** provisions of Section 5(b)(i) will apply to Party A and will apply to Party B.

(l) The **"Tax Event"** provisions of Section 5(b)(ii) will apply to Party A and will apply to Party B, provided that the words "(x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y)" are hereby deleted.

(m) The **"Tax Event Upon Merger"** provisions of Section 5(b)(iii) will apply to Party A and will apply to Party B, provided that Party A shall not be entitled to designate an Early Termination Date by reason of a Tax Event upon Merger in respect of which it is the Affected Party.

(n) The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) of this Agreement will not apply to Party A and will not apply to Party B.

(o) The **"Automatic Early Termination"** provisions of Section 6(a) will not apply to Party A and will not apply to Party B;

(p) For the purpose of the **"Payments on Early Termination"** provisions of Section 6(e): Market Quotation and Second Method will apply; provided, however, that, in the event of a Derivative Provider Trigger Event, the following provisions will apply:

(A)     The definition of Market Quotation in Section 14 shall be deleted in its entirety and replaced with the following:

*"Market Quotation"* means, with respect to one or more Terminated Transactions, a Firm Offer which is (1) made by a Reference Market-maker that is an Eligible Replacement, (2) for an amount that would be paid to Party B (expressed as a negative number) or by Party B (expressed as a positive number) in consideration of an agreement between Party B and such Reference Market-maker to enter into a Replacement Transaction, and (3) made on the basis that Unpaid Amounts in respect of the Terminated Transaction or group of Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included.

(B)     The definition of "Settlement Amount" shall be deleted in its entirety and replaced with the following:

""**Settlement Amount**" means, with respect to any Early Termination Date, an amount (as determined by Party B) equal to the Termination Currency Equivalent of the amount (whether positive or negative) of any Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions that is accepted by Party B so as to become legally binding, Provided that:

(1) If, on the Early Termination Date, no Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions has been accepted by Party B so as to become legally binding and one or more Market Quotations have been made and remain capable of becoming legally binding upon acceptance, the Settlement Amount shall equal the Termination Currency Equivalent of the amount (whether positive or negative) of the lowest of such Market Quotations (for the avoidance of doubt, the lowest of such Market Quotations shall be the lowest Market Quotation of such Market Quotations expressed as a positive number or, if any of such Market Quotations is expressed as a negative number, the Market Quotation expressed as a negative number with the largest absolute value); and

(2) If, on the Early Termination Date, no Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions is accepted by Party B so as to become legally binding and no Market Quotations have been made and remain capable of becoming legally binding upon acceptance, the Settlement Amount shall equal Party B's

Loss (whether positive or negative and without reference to any Unpaid amounts) for the relevant Terminated Transaction or group of Terminated Transactions.

(C)    If Party B requests Party A in writing to obtain Market Quotations, Party A shall use its reasonable efforts to do so before the Latest Settlement Amount Determination Day.

(D)    Without prejudice to Party B's discretion as to the time of obtaining and accepting quotations, Party B shall consult with Party A as to the day and time of obtaining any quotations.

(E)    At any time on or before the Latest Settlement Amount Determination Day at which two or more Market Quotations remain capable of becoming legally binding upon acceptance, Party B shall be entitled to accept only the lowest of such Market Quotations (for the avoidance of doubt, the lowest of such Market Quotations shall be the lowest Market Quotation of such Market Quotations expressed as a positive number or, if any of such Market Quotations is expressed as a negative number, the Market Quotation expressed as a negative number with the largest absolute value).

(F)    If the Settlement Amount is a negative number, Section 6(e)(i)(3) shall be deleted in its entirety and replaced with the following:

"(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, (I) Party B shall pay to Party A an amount equal to the absolute value of the Settlement Amount in respect of the Terminated Transactions, (II) Party B shall pay to Party A the Termination Currency Equivalent of the Unpaid Amounts owing to Party A and (III) Party A shall pay to Party B the Termination Currency Equivalent of the Unpaid Amounts owing to Party B; provided, however, that (x) the amounts payable under the immediately preceding clauses (II) and (III) shall be subject to netting in accordance with Section 2(c) of this Agreement and (y) notwithstanding any other provision of this Agreement, any amount payable by Party A under the immediately preceding clause (III) shall not be netted-off against any amount payable by Party B under the immediately preceding clause (I)."

(q)       **"Termination Currency"** means United States Dollars.

(r)       **"Additional Termination Event"** will apply as provided in Part 5(b)

315

Part 2.          Tax Matters

(a)      Tax Representations.

      (i)          **Payer Representations.** For the purpose of Section 3(e) of this Agreement,

      (A)          Party A makes the following representation:

          None.

      (B)          Party B makes the following representation:

          None.

      (ii)          **Payee Representations.**  For the purpose of Section 3(f) of the Agreement, Party A and Party B make the representations specified below, if any:

          None.

(b)      **Tax Provisions.**

      (i)          **Gross Up.** Section 2(d)(i)(4) shall not apply to Party B as X, and Section 2(d)(ii) shall not apply to Party B as Y, in each case such that Party B shall not be required to pay any additional amounts referred to therein.

      (ii)          **Indemnifiable Tax.** The definition of "Indemnifiable Tax" in Section 14 is deleted in its entirety and replaced with the following:

          ***"Indemnifiable Tax"*** means, in relation to payments by Party A, any Tax and, in relation to payments by Party B, no Tax.

---

Part 3.        Agreement to Deliver Documents

For the purpose of Section 4(a) of this Agreement:

I. Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party A | A correct, complete and duly executed U.S. IRS Form W-9. | Promptly upon execution of this Agreement; |
| Party B | Tax forms relating to the beneficial owner of payments to Party B under this Agreement from time to time. | Promptly upon execution of this Agreement any such forms will be applied for and delivered promptly upon receipt, but in any event prior to the first Payment Date, and thereafter, upon previously delivered forms becoming obsolete; |

II. Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Any documents required by the receiving party to evidence the authority of the delivering party or its Credit Support Provider, if any, for it to execute and deliver, and to perform its obligations under the Agreement, this Confirmation, and any Credit Support Documents to which it is a party. | Upon the execution and delivery of this Agreement, or in the case of Party B, promptly upon receipt | Yes |
| Party A and Party B | Incumbency and authority certificate authorizing the officers of the party signing the Agreement, this Confirmation, and any relevant Credit Support Document, as the case may be | Upon the execution and delivery of this Agreement | Yes |
| Party A | An opinion of counsel to Party A | Upon the execution and delivery of this Agreement | No |

317

Part 4.          Miscellaneous

(a) **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

**Address for notices or communications to Party A:**

Address:          3888 Greenwich Street
                  17th Floor
                  New York, New York 10013

Attention:        Director Derivatives Operations

Facsimile No.:    212 801 4109

(For all purposes)

In addition, in the case of notices or communications relating to Section 5, 6, 11 or 13 of this Agreement, a second copy of any such notice or communication shall be addressed to the attention of Party A's legal department as follows:

Address:          Legal Department
                  77 Water Street
                  9th Floor
                  New York, New York 10004

Attention:                 Department Head

Facsimile No.:             212 657 1452

**Address for notices or communications to Party B:**

Address:          Wells Fargo Bank, N.A.
                  9062 Old Annapolis Road
                  Columbia, Maryland 21045

Attention:        Client Manager - CMLTI 2007-AMC2

Facsimile No:     (410) 715-2380

Telephone No:     (410) 884-2000

(b) **Effectiveness of Notice.** Section 12(a) is hereby amended by deleting the words "facsimile transmission or" in line 3 thereof.

(c) **Process Agent.** For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: Not applicable.

Party B appoints as its Process Agent: Not applicable.

(d) **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(e) **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:

318

Party A not a Multibranch Party.

Party B is not a Multibranch Party.

(f) **Calculation Agent.** The Calculation Agent will be Party A; provided, however, that if an Event of Default shall have occurred with respect to Party A, Party B shall have the right to appoint as Calculation Agent a third party, reasonably acceptable to Party A, the cost for which shall be borne by Party A.

(g) **Credit Support Document.** Credit Support Document means any credit support annex from time to time entered into between Party A and Party B in relation to this Master Agreement with respect to which a Rating Agency Confirmation has been received prior to or at the time of entry into such credit support annex, and, with respect to Party A, any guarantee that is provided to Party B pursuant to Part 5(b) below.

(h) **Credit Support Provider.** Means (i) in relation to Party A, if a guarantee is provided to Party B pursuant to Part 5 (b) below, the guarantor providing such guarantee and (ii) in relation to Party B, not applicable.

(i) **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York without regard to the conflict of law provisions thereof other than the New York General Obligations Law Sections 5-1401 and 5-1402.

(j) **Jurisdiction.** Section 13(b)(i) of the Agreement is hereby amended by (i) deleting in line 2 the word "non-" and (ii) deleting the final paragraph thereof. The following shall be added at the end of Section 13(b): "Nothing in this provision shall prohibit a party from bringing an action to enforce a money judgment in any other jurisdiction."

(k) "**Affiliate**" will have the meaning specified in Section 14 of this Agreement except, for purposes of Section 3(c) of this Agreement, Party A and Party B shall be considered to have no Affiliates.

(l) **Netting of Payments.** The parties agree that subparagraph (ii) of Section 2(c) will apply to each Transaction hereunder.

(m) **Single Agreement.** Section 1(c) shall be amended by the addition of the words ",any credit support annex from time to time entered into between Party A and Party B in relation to this Master Agreement" after the words "Master Agreement".

(n) **Local Business Day**. The definition of Local Business Day in Section 14 of this Agreement shall be amended by the addition of the words "or any Credit Support Document" after "Section 2(a)(i)" and the addition of the words "or Credit Support Document" after "Confirmation".

---

319

Part 5.Other Provisions

(a)        **No Set-Off**

(i)        All payments under this Agreement shall be made without set-off or counterclaim, except as expressly provided for in Section 2(c), Section 6 or Part 1(p)(F).

(ii)       Section 6(e) shall be amended by the deletion of the following sentence; "The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off."

(b)        **Additional Termination Events**. The following Additional Termination Events will apply:

(i)        *S&P First Rating Trigger Collateral*. If a Relevant Entity no longer meets the S&P Approved Ratings Threshold, and Party A has failed within thirty (30) calendar days of the date on which the Relevant Entity no longer met the S&P Approved Ratings Threshold to either (A) complied with its obligations to be complied with or performed in accordance with the Credit Support Annex, (B) furnish an Eligible Guarantee, subject to satisfaction of the Rating Agency Condition with respect to S&P, from an Eligible Guarantor, or (C) obtain an Eligible Replacement, subject to satisfaction of the Rating Agency Condition with respect to S&P, then an Additional Termination Event shall have occurred with respect to Party A, and Party A shall be the sole Affected Party with respect to such Additional Termination Event.

(ii)       *Moody's First Rating Trigger Collateral*. If (A) a Moody's First Trigger Ratings Event has occurred and been continuing for at least 30 Local Business Days and (B) Party A has neither (i) complied with its obligations to be complied with or performed in accordance with the Credit Support Annex nor (ii) furnished an Eligible Guarantee or obtained an Eligible Replacement to cause such Moody's First Trigger Ratings Event to cease and either (A) no Moody's Second Trigger Ratings Event has occurred or (B) less than 30 Local Business Days have elapsed since the last time that no Moody's Second Trigger Ratings Event had occurred and was continuing, then an Additional Termination Event shall have occurred with respect to Party A and Party A shall be the sole Affected Party with respect to such Additional Termination Event.

(iii)      *Second Rating Trigger Replacement*. If :

(A) an S&P Required Ratings Downgrade Event has occurred and been continuing for 30 Local Business Days and Party A has failed to procure an Eligible Replacement subject to satisfaction of the Rating Agency Condition with respect to S&P; underline provided that Party A shall, while it searches for an Eligible Replacement, post and maintain, or continue to maintain, as the case may be, collateral in accordance with the terms of the ISDA Credit Support Annex; or

(B) (i) At least 30 days have elapsed since the last time that no Moody's Second Trigger Ratings Event had occurred and was continuing, (ii) Party A has not furnished an Eligible Guarantee or obtained an Eligible Replacement to cause such Moody's Second Trigger Ratings Event to cease and (i) at least one Eligible Replacement has made a firm offer to be the transferee of all of Party A's rights and obligations under this Agreement (and such offer remains an offer that will become legally binding upon such Eligible Replacement upon acceptance by the offeree) and/or (ii) an Eligible Guarantor has made a Firm Offer to provide an Eligible Guarantee (and such Firm Offer remains an offer that will become legally binding upon such Eligible Guarantor immediately upon acceptance by the offeree),

then an Additional Termination Event shall have occurred with respect to Party A and Party A shall be the sole Affected Party with respect to such Additional Termination Event.

(iv)       *Optional Termination of Securitization.* An Additional Termination Event shall occur upon the notice to Certificateholders of an Optional Termination becoming unrescindable in accordance with Article IX of the Pooling and Servicing Agreement. Party B shall be the sole Affected Party with respect to such Additional Termination Event; provided, however, that notwithstanding anything to the contrary in Section 6(b)(iv), only Party B may designate an Early Termination Date in respect of this Additional Termination Event.

(v)        *Swap Disclosure Event.* If, upon the occurrence of a Swap Disclosure Event (as defined in Part 5(q) below) Party A has not, within 10 Business Days after such Swap Disclosure Event complied with any of the provisions set forth in clause

320

(iii) of Party 5(q) below, then an Additional Termination Event shall have occurred with respect to Party A and Party A shall be the sole Affected Party with respect to such Additional Termination Event.

(c) **Required Ratings Downgrade Event**. So long as a Required Ratings Downgrade Event has occurred and is continuing, then Party A shall, as soon as reasonably practicable and so long as a Required Ratings Downgrade Event is in effect, at its own expense, use commercially reasonable efforts to attempt to procure either (A) a Permitted Transfer or (B) an Eligible Guarantee from an Eligible Guarantor.

(d) **Timing of Payments by Party B upon Early Termination**. Notwithstanding anything to the contrary in Section 6(d)(ii), to the extent that all or a portion (in either case, the "Unfunded Amount") of any amount that is calculated as being due in respect of any Early Termination Date under Section 6(e) from Party B to Party A will be paid by Party B from amounts other than any upfront payment paid to Party B by an Eligible Replacement that has entered a Replacement Transaction with Party B, then such Unfunded Amount shall be due on the next subsequent Distribution Date following the date on which the payment would have been payable as determined in accordance with Section 6(d)(ii), and on any subsequent Distribution Dates until paid in full (or if such Early Termination Date is the final Distribution Date, on such final Distribution Date); provided, however, that if the date on which the payment would have been payable as determined in accordance with Section 6(d)(ii) is a Distribution Date, such payment will be payable on such Distribution Date.

(e) **Rating Agency Notifications**. Notwithstanding any other provision of this Agreement, no Early Termination Date shall be effectively designated hereunder by Party B and no transfer of any rights or obligations under this Agreement shall be made by either party unless each Swap Rating Agency has been given prior written notice of such designation or transfer.

(f) **Limitation on Events of Default**. Notwithstanding the provisions of Sections 5 and 6, with respect to any Transaction, if at any time and so long as Party B has satisfied in full all its payment obligations under Section 2(a)(i) in respect of each Transaction executed pursuant hereto (each, a "Cap Transaction") and has at the time no future payment obligations, whether absolute or contingent, under such Section in respect of such Cap Transaction, then unless Party A is required pursuant to appropriate proceedings to return to Party B or otherwise returns to Party B upon demand of Party B any portion of any such payment in respect of such Cap Transaction, (a) the occurrence of an event described in Section 5(a) with respect to Party B shall not constitute an Event of Default or Potential Event of Default with respect to Party B as Defaulting Party in respect of such Cap Transaction and (b) Party A shall be entitled to designate an Early Termination Date pursuant to Section 6 in respect of such Cap Transaction only as a result of the occurrence of a Termination Event set forth in either Section 5(b)(i) or 5(b)(ii) with respect to Party A as the Affected Party, or Section 5(b)(iii) with respect to Party A as the Burdened Party. For purposes of the Transactions executed pursuant hereto, Party A acknowledges and agrees that Party B's only payment obligation under Section 2(a)(i) in respect of each Cap Transaction is to pay the related Fixed Amount on the related Fixed Amount Payer Payment Date.

(g) Reserved.

(h) **Limited Recourse**. Notwithstanding any other provision of this Agreement to the contrary, Party A hereby acknowledges and agrees that all of Party B's obligations hereunder or in connection herewith will be solely the corporate obligations of Party B, and Party A will not have any recourse to any of the directors, officers, incorporators, shareholders, partners, agents or Affiliates of Party B or any of their successors or assigns with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby. The provisions of this paragraph will survive the designation of any Early Termination Date and any termination of this Agreement.

(i) **Non-petition**. Party A agrees not to institute against or join any person in instituting against Party B any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding or other similar proceeding against Party B for any reason whatsoever, until the payment in full of all Certificates issued under the Pooling and Servicing Agreement and the expiration of a period equal to one year and one day (or, if longer, the then applicable preference period) following all such payments; underlined provided that nothing in this clause shall preclude, or be deemed to estop, Party A (i) from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the then applicable preference period) in (x) any case or proceeding voluntarily filed or commenced by Party B or (y) any involuntary insolvency proceeding filed or commenced against Party B by a person other than Party A or its Affiliates, or (ii) from commencing against Party B or any properties of Party B any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding. The provisions of this paragraph will survive the designation of any Early Termination Date and any termination of this Agreement.

(j) **Transfers**.

(i)     Section 7 of this Agreement shall not apply to Party A and, subject to Section 6(b)(ii) and Part 5(j)(ii) below, Party A may not transfer (whether by way of security or otherwise) any interest or obligation in or under this Agreement without

321

(i) the prior written consent of Party B and (ii) satisfaction of the Rating Agency Condition with respect to S&P.

(ii)   Party A may (at its own cost) transfer, by a Permitted Transfer at any time after 90 days of the Closing Date, all or substantially all of its rights and obligations with respect to this Agreement to any other entity (a "Transferee") that is an Eligible Replacement, Provided that Party B shall determine in its sole discretion, acting in a commercially reasonable manner, whether or not a transfer relates to all or substantially all of Party A's rights and obligations under this Agreement. Following such transfer, all references to Party A shall be deemed to be references to the Transferee.

(iii)   If an entity has made a Firm Offer to be the transferee of a transfer to be made in accordance with (ii) above, Party B shall (at Party A's cost) at Party A's written request, take any reasonable steps required to be taken by it to effect such transfer.

(k)   **Waiver of Right to Trial by Jury**. Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement.

(l)   **Severability**. In the event that any one or more of the provisions contained in this Agreement should be held invalid, illegal, or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The parties shall endeavor, in good faith negotiations, to replace the invalid, illegal or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(m)   **Additional Representations**. For purposes of Section 3 of this Agreement, the following shall be added, immediately following paragraph (f) thereof:

"(g)   *No Reliance*. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(h)   *Evaluation and Understanding*. It is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the financial and other risks of that Transaction.

(i)   *Status of Parties*. The other party is not acting as a fiduciary or an advisor for it in respect of that Transaction.

(j)   *No Agency*. It is entering into this Agreement and each Transaction as principal and not as agent.

(k)   *Risk Management*. Each of Party A and Party B represents that this Agreement has been, and each Transaction hereunder has been or will be, as the case may be, entered into for the purpose of managing its borrowings or investments, hedging its underlying assets or liabilities or in connection with its line of business (including financial intermediation services) and not for the purpose of speculation.

(l)   *Eligible Contract Participant*. Each of Party A and Party B (a) represents that it is an "eligible contract participant" within the meaning of Section 1(a)(12) of the Commodity Exchange Act, as amended (the "CEA"), (b) this Agreement and each Transaction is subject to individual negotiation by each party, and (c) neither this Agreement nor any Transaction will be executed or traded on a "trading facility" within the meaning of Section 1a(33) of the CEA.

(m)   *Financial Institution*. Party A represents that it is a "financial institution" as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991 or Regulation EE promulgated by the Federal Reserve Board thereunder.

(n)   *FDIC Representation*. Party A represents to Party B on the date on which Party A enters into each Transaction that Party A is a depository institution subject to the requirements of the Federal Deposit Insurance Act. This Agreement (including the Credit Support Annex and each Confirmation) has been authorized by all necessary corporate action of Party A, the person executing this Agreement on behalf of Party A is an officer of Party A of the level of vice president

or higher, and this Agreement (including the Credit Support Annex and each Confirmation) will be maintained by Party A in its official books and records.

(o)   **Capacity.** Party A represents to Party B on the date on which Party A enters into each Transaction that it is entering into the Agreement and the Transaction as principal and not as agent of any person. The Cap Trustee represents to Party A on the date on which the Cap Trustee executes this Agreement that it is executing the Agreement solely in its capacity as the Cap Trustee on behalf of the Cap Trust and not in its individual capacity.

(n) **Recording of Conversations**. Each party hereto consents to the recording of its telephone conversations pursuant to this Agreement. To the extent that one party records telephone conversations (the "Recording Party") and the other party does not (the "Non-Recording Party"), the Recording Party shall, in the event of any dispute, make a complete and unedited copy of such party's tape of the entire day's conversations with the Non-Recording Party's personnel available to the Non-Recording Party. The Recording Party's tapes may be used by either party in any forum in which a dispute is sought to be resolved and the Recording Party will retain tapes for a consistent period of time in accordance with the Recording Party's policy unless one party notifies the other that a particular transaction is under review and warrants further retention.

(o) **Limitation of Liability**. No party shall be required to pay or be liable to the other party for any consequential, indirect or punitive damages, opportunity costs or lost profits. It is expressly understood and agreed by the parties hereto that insofar as this Agreement is executed by Wells Fargo Bank, National Association ("Wells Fargo") not in its individual capacity, but solely as Cap Trustee of the Cap Trust under the Pooling and Servicing Agreement in the exercise of the powers and authority conferred and invested in it thereunder; (i) Wells Fargo has been directed pursuant to the Pooling and Servicing Agreement to enter into this Agreement and to perform its obligations hereunder; (ii) each of the representations, undertakings and agreements herein made on behalf of Party B is made and intended not as personal representations of Wells Fargo but is made and intended for the purpose of binding only the Cap Trust; and (iii) nothing herein shall be construed as imposing any liability on Wells Fargo, individually or personally, to perform any covenant either express or implied contained herein, all such liability, being expressly waived by the parties hereto and by any person claiming by, through or under the parties hereto and under no circumstances shall Wells Fargo in its individual capacity be personally liable for any payment of any indebtedness or expenses or be personally liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken under this Agreement.

(p)   **Transfer to Avoid Termination Event.** Section 6(b)(ii) is hereby amended by (i) deleting the words "or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party," and (ii) by deleting the words "to transfer" and inserting the words "to effect a Permitted Transfer" in lieu thereof.

(q) **Compliance with Regulation AB.**

(i)      Party A agrees and acknowledges that Citigroup Mortgage Loan Trust Inc. (the "Depositor") may be required under Regulation AB, as defined in the Pooling and Servicing Agreement, to disclose certain financial information regarding Party A or its group of affiliated entities, if applicable, depending on the aggregate "significance percentage" of this Agreement and any other derivative contracts between Party A or its group of affiliated entities, if applicable, and Party B, as calculated from time to time in accordance with Item 1115 of Regulation AB.

(ii)     It shall be a swap disclosure event ("Swap Disclosure Event") if, on any Business Day after the date hereof for so long as the Issuing Entity is required to file periodic reports under the Exchange Act with respect to the Certificates, Party B or the Depositor requests from Party A the applicable financial information described in Item 1115(b) of Regulation AB (such request to be based on a reasonable determination by the Depositor, based on "significance estimates" made in substantially the same manner as that used in the Sponsor's internal risk management process in respect of similar instruments and furnished by the Sponsor to the Depositor, or if the Sponsor does not furnish such significance estimates to the Depositor, based on a determination of such significance estimates by the Depositor in a commercially reasonable manner) (the "Swap Financial Disclosure").

(iii)    Upon the occurrence of a Swap Disclosure Event, Party A, at its own expense, shall either (1)(a) either (i) provide to the Depositor the current Swap Financial Disclosure in an EDGAR-compatible format (for example, such information may be provided in Microsoft Word® or Microsoft Excel® format but not in .pdf format) or (ii) provide written consent to the Depositor to incorporation by reference of such current Swap Financial Disclosure that are filed with the Securities and Exchange Commission in the Exchange Act Reports of the Depositor, (b) if applicable, cause its outside accounting firm to provide its consent to filing or incorporation by reference in the Exchange Act Reports of the Depositor of such accounting firm's report relating to their audits of such current Swap Financial Disclosure, and (c) provide to the Depositor any updated Swap Financial Disclosure with respect to Party A or any entity that consolidates Party A within

five days of the release of any such updated Swap Financial Disclosure; (2) secure another entity through a Permitted Transfer to replace Party A as party to this Agreement on terms substantially similar to this Agreement, which entity (or a guarantor thereto) meets or exceeds the Approved Rating Thresholds and which entity complies with the requirements of Item 1115 of Regulation AB and clause (1) above, or (3) obtain a guaranty of Party A's obligations under this Agreement from an affiliate of Party A that complies with the financial information disclosure requirements of Item 1115 of Regulation AB, and cause such affiliate to provide Swap Financial Disclosure and any future Swap Financial Disclosure and other information pursuant to clause (1), such that disclosure provided in respect of such affiliate will satisfy any disclosure requirements applicable to the Swap Provider.

(iv)     Party A agrees that, in the event that Party A provides Swap Financial Disclosure to the Depositor in accordance with clause (iii)(1) above or causes its affiliate to provide Swap Financial Disclosure to the Depositor in accordance with clause (iii)(3) above, it will indemnify and hold harmless the Depositor, its respective directors or officers and any person controlling the Depositor, from and against any and all losses, claims, damages and liabilities caused by any untrue statement or alleged untrue statement of a material fact contained in such Swap Financial Disclosure or caused by any omission or alleged omission to state in such Swap Financial Disclosure a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(v)      Third Party Beneficiary. Depositor shall be an express third party beneficiary of this Agreement as if a party hereto to the extent of Depositor's rights explicitly specified herein.

(r) **Amendment.** Notwithstanding any provision to the contrary in this Agreement, no amendment of either this Agreement or any Transaction under this Agreement shall be permitted by either party unless each of the Swap Rating Agencies has been provided prior written notice of the same and such amendment satisfies the Rating Agency Condition with respect to S&P.

(s) **Definitions.** Unless otherwise specified in a Confirmation, this Agreement and each Transaction under this Agreement are subject to the 2000 ISDA Definitions as published and copyrighted in 2000 by the International Swaps and Derivatives Association, Inc. (the "Definitions"), and will be governed in all relevant respects by the provisions set forth in the Definitions, without regard to any amendment to the Definitions subsequent to the date hereof. The provisions of the Definitions are hereby incorporated by reference in and shall be deemed a part of this Agreement, except that (i) references in the Definitions to a "Swap Transaction" shall be deemed references to a "Transaction" for purposes of this Agreement, and (ii) references to a "Transaction" in this Agreement shall be deemed references to a "Swap Transaction" for purposes of the Definitions. Each term capitalized but not defined in this Agreement shall have the meaning assigned thereto in the Pooling and Servicing Agreement.

(t) **Additional Definitions**.

As used in this Agreement, the following terms shall have the meanings set forth below, unless the context clearly requires otherwise:

"*Approved Ratings Threshold*" means each of the S&P Approved Ratings Threshold and the Moody's Second Trigger Ratings Threshold.

"*Derivative Provider Trigger Event*" means (i) an Event of Default with respect to which Party A is a Defaulting Party, (ii) a Termination Event with respect to which Party A is the sole Affected Party other than a Termination Event occurring under Section 5(b)(i) or Section 5 (b)(ii), or (iii) an Additional Termination Event with respect to which Party A is the sole Affected Party.

"*Eligible Guarantee*" means an unconditional and irrevocable guarantee of all present and future obligations of Party A or an Eligible Replacement of Party A to Party B under this Agreement that is provided by an Eligible Guarantor as principal debtor rather than surety and that is directly enforceable by Party B, the form and substance of which guarantee are subject to the Rating Agency Condition with respect to S&P, and either (A) a law firm has given a legal opinion confirming that none of the guarantor's payments to Party B under such guarantee will be subject to Tax collected by withholding or (B) such guarantee provides that, in the event that any of such guarantor's payments to Party B are subject to Tax collected by withholding, such guarantor is required to pay such additional amount as is necessary to ensure that the net amount actually received by Party B (free and clear of any Tax collected by withholding) will equal the full amount Party B would have received had no such withholding been required.

"*Eligible Guarantor*" means an entity that (A) has credit ratings at least equal to the Approved Ratings Threshold and (B) satisfies the Rating Agency Condition with respect to S&P.

"*Eligible Replacement*" means an entity that has credit ratings at least equal to the Approved Ratings Threshold or the present and future obligations (for the avoidance of doubt, not limited to payment obligations) of such entity to Party B under this Agreement are guaranteed pursuant to an Eligible Guarantee provided by an Eligible Guarantor.

324

*"Firm Offer"* means an offer that will become legally binding upon acceptance.

*"Latest Settlement Amount Determination Day"* means the day falling ten Local Business Days after the day on which the Early Termination Date is designated or such later day as Party B may specify in writing to Party A (but in either case no later than the Early Termination Date).

*"Moody's"* means Moody's Investors Service, Inc., or any successor thereto.

*"Moody's First Trigger Ratings Event"* means that no Relevant Entity has credit ratings from Moody's at least equal to the Moody's First Trigger Rating Threshold.

*"Moody's First Trigger Ratings Threshold"* means, with respect to Party A, the guarantor under an Eligible Guarantee or an Eligible Replacement, (i) if such entity has both a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's and a short-term unsecured and unsubordinated debt rating from Moody's, a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's of "A2"and a short-term unsecured and unsubordinated debt rating from Moody's of "Prime-1", or (ii) if such entity has only a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's, a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's of "A1".

*"Moody's Second Trigger Ratings Event"* means that no Relevant Entity has credit ratings from Moody's at least equal to the Moody's Second Trigger Ratings Threshold.

*"Moody's Second Trigger Ratings Threshold"* means, with respect to Party A, the guarantor under an Eligible Guarantee or an Eligible Replacement, (i) if such entity has both a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's and a short-term unsecured and unsubordinated debt rating from Moody's, a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's of "A3" and a short-term unsecured and unsubordinated debt rating from Moody's of "P-2", or (ii) if such entity has only a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's, a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's of "A3.

*"Permitted Transfer"* means a transfer by novation by Party A to a transferee (the "Transferee") of all, but not less than all, of Party A's rights, liabilities, duties and obligations under this Agreement, with respect to which transfer each of the following conditions is satisfied: (a) the Transferee is an Eligible Replacement (b) Party A and the Transferee are both "dealers in notional principal contracts" within the meaning of Treasury regulations section 1.1001-4 (c) as of the date of such transfer the Transferee would not be required to withhold or deduct on account of Tax from any payments under this Agreement or would be required to gross up for such Tax under Section 2(d)(i)(4), (d) an Event of Default or Termination Event would not occur as a result of such transfer, (e) the transfer would not give rise to a taxable event or any other adverse Tax consequences to Party B or its interest holders, as determined by Party B in its sole discretion, (f) pursuant to a written instrument (the "Transfer Agreement"), the Transferee acquires and assumes all rights and obligations of Party A under the Agreement and the relevant Transaction, (g) Party B shall have determined, in its sole discretion, acting in a commercially reasonable manner, that such Transfer Agreement is effective to transfer to the Transferee all, but not less than all, of Party A's rights and obligations under the Agreement and all relevant Transactions, (h) Party A will be responsible for any costs or expenses incurred in connection with such transfer (including any replacement cost of entering into a replacement transaction); (i) either (A) Moody's has been given prior written notice of such transfer and the Rating Agency Condition is satisfied with respect to S&P or (B) each Swap Rating Agency has been given prior written notice of such transfer and such transfer is in connection with the assignment and assumption of this Agreement without modification of its terms, other than party names, dates relevant to the effective date of such transfer, tax representations (provided that the representations in Part 2(a)(i) are not modified) and any other representations regarding the status of the substitute counterparty, notice information and account details; and (j) such transfer otherwise complies with the terms of the Pooling and Servicing Agreement.

*"Rating Agency Condition"* means, with respect to any particular proposed act or omission to act hereunder and each Swap Rating Agency specified in connection with such proposed act or omission, that the party acting or failing to act must consult with each of the specified Swap Rating Agencies and receive from each such Swap Rating Agency a prior written confirmation that the proposed action or inaction would not cause a downgrade or withdrawal of the then-current rating of any Certificates or Notes.

*"Relevant Entity"* means Party A and, to the extent applicable, a guarantor under an Eligible Guarantee or an Eligible Replacement.

*"Replacement Transaction"* means, with respect to any Terminated Transaction or group of Terminated Transactions, a transaction or group of transactions that (i) would have the effect of preserving for Party B the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of

325

the relevant Early Termination Date, have been required after that Date, and (ii) has terms which are substantially the same as this Agreement, including, without limitation, rating triggers, Regulation AB compliance, and credit support documentation, save for the exclusion of provisions relating to Transactions that are not Terminated Transaction, as determined by Party B in its sole discretion, acting in a commercially reasonable manner.

"*Required Ratings Downgrade Event*" means either a Moody's Second Trigger Ratings Event or an S&P Required Ratings Downgrade Event.

"*Required Ratings Threshold*" means each of the S&P Required Ratings Threshold and the Moody's Second Trigger Ratings Threshold.

"*S&P*" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

"*S&P Approved Ratings Downgrade Event*" means no Relevant Entity meets the S&P Approved Ratings Threshold.

"*S&P Approved Ratings Threshold*" means, with respect to a Relevant Entity a short-term unsecured and unsubordinated debt rating from S&P of "A-1", or, if such entity does not have a short-term unsecured and unsubordinated debt rating from S&P, a long-term unsecured and unsubordinated debt rating from S&P of "A+".

"*S&P Required Ratings Downgrade Event*" means no Relevant Entity meets the S&P Required Ratings Threshold.

"*S&P Required Ratings Threshold*" means, with respect to Party A, the guarantor under an Eligible Guarantee or an Eligible Replacement, a long-term unsecured and unsubordinated debt rating from S&P of "BBB+".

"*Swap Rating Agencies*" means, with respect to any date of determination, each of S&P or Moody's, to the extent that each such rating agency is then providing a rating for any of the Citigroup Mortgage Loan Trust Inc., Asset-Backed Pass-Through Certificates, Series 2007-AMC2 (the "Certificates") or any notes backed by the Certificates (the "Notes").

326

4. Account Details and Settlement Information:

Payments to Party A:    Citibank, N.A. New York
                        ABA # 021000089
                        Account # 00167679
                        Swift: CITIUS33
                        Transaction Ref# CPC4628


Payments to Party B:    Wells Fargo Bank, N.A.
                        ABA # 121-000-248
                        For Credit To: SAS Clearing
                        Acct #: 3970771416
                        Re: 50995001 - CMLTI 2007-AMC2


This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

327

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

CITIBANK, N.A.                                          Wells Fargo Bank, N.A., not in its individual capacity, but
                                                       solely as Cap Trustee on behalf of the trust created pursuant to
                                                       the Cap Administration Agreement with respect to Citigroup
                                                       Mortgage Loan Trust Inc., Asset-Backed Pass-Through
                                                       Certificates, Series 2007-AMC2

By: _____                    By: _____
(Signing with respect to the terms of the ISDA Master
Agreement)


By: _____
(Signing with respect to the terms of this document, with the
exception of the terms of the ISDA Master Agreement)

328

**SCHEDULE I**

(All such dates subject to adjustment in accordance with the Following Business Day Convention with respect to Floating Rate Payer Period End Dates)

| From and including | To but excluding | Notional Amount | Strike Rate |
|---|---|---|---|
| Effective Date | 4/25/2007 | 7,948,756.40 | 6.000 |
| 4/25/2007 | 5/25/2007 | 7,840,594.54 | 6.000 |
| 5/25/2007 | 6/25/2007 | 7,710,987.42 | 6.000 |
| 6/25/2007 | 7/25/2007 | 7,564,313.27 | 6.000 |
| 7/25/2007 | 8/25/2007 | 7,402,877.66 | 6.000 |
| 8/25/2007 | 9/25/2007 | 7,221,931.66 | 6.000 |
| 9/25/2007 | 10/25/2007 | 7,025,345.50 | 5.400 |
| 10/25/2007 | 11/25/2007 | 6,802,528.81 | 5.400 |
| 11/25/2007 | 12/25/2007 | 6,563,640.71 | 5.400 |
| 12/25/2007 | 1/25/2008 | 6,323,632.51 | 5.400 |
| 1/25/2008 | 2/25/2008 | 6,088,354.54 | 5.400 |
| 2/25/2008 | 3/25/2008 | 5,858,230.94 | 5.400 |
| 3/25/2008 | 4/25/2008 | 5,634,635.97 | 5.400 |
| 4/25/2008 | 5/25/2008 | 5,420,319.35 | 5.400 |
| 5/25/2008 | 6/25/2008 | 5,203,463.88 | 5.400 |
| 6/25/2008 | 7/25/2008 | 4,981,469.14 | 5.400 |
| 7/25/2008 | 8/25/2008 | 4,718,971.98 | 5.400 |
| 8/25/2008 | 9/25/2008 | 4,455,297.77 | 5.400 |
| 9/25/2008 | 10/25/2008 | 4,207,334.50 | 5.400 |
| 10/25/2008 | 11/25/2008 | 3,972,926.20 | 5.400 |
| 11/25/2008 | 12/25/2008 | 3,749,813.35 | 5.400 |
| 12/25/2008 | 1/25/2009 | 3,532,147.35 | 5.400 |
| 1/25/2009 | 2/25/2009 | 3,324,905.34 | 5.400 |
| 2/25/2009 | 3/25/2009 | 3,129,938.10 | 5.400 |
| 3/25/2009 | 4/25/2009 | 2,946,022.76 | 5.250 |
| 4/25/2009 | 5/25/2009 | 2,794,477.90 | 5.250 |
| 5/25/2009 | 6/25/2009 | 2,639,375.43 | 5.250 |
| 6/25/2009 | 7/25/2009 | 2,510,082.24 | 5.250 |
| 7/25/2009 | 8/25/2009 | 2,394,537.90 | 5.250 |
| 8/25/2009 | 9/25/2009 | 2,284,177.01 | 5.250 |
| 9/25/2009 | 10/25/2009 | 2,178,737.51 | 5.250 |
| 10/25/2009 | 11/25/2009 | 2,077,973.34 | 5.250 |
| 11/25/2009 | 12/25/2009 | 1,981,659.13 | 5.250 |
| 12/25/2009 | 1/25/2010 | 1,889,630.57 | 5.250 |
| 1/25/2010 | 2/25/2010 | 1,801,647.84 | 5.250 |
| 2/25/2010 | 3/25/2010 | 1,717,722.09 | 5.250 |
| 3/25/2010 | 4/25/2010 | 1,637,645.54 | 5.250 |
| 4/25/2010 | 5/25/2010 | 1,637,645.54 | 5.250 |
| 5/25/2010 | 6/25/2010 | 1,637,645.54 | 5.250 |
| 6/25/2010 | 7/25/2010 | 1,637,645.54 | 5.250 |
| 7/25/2010 | 8/25/2010 | 1,608,277.50 | 5.250 |
| 8/25/2010 | 9/25/2010 | 1,555,914.30 | 5.250 |
| 9/25/2010 | 10/25/2010 | 1,505,266.80 | 5.250 |
| 10/25/2010 | 11/25/2010 | 1,456,278.39 | 5.250 |
| 11/25/2010 | 12/25/2010 | 1,408,894.36 | 5.250 |

329

| 12/25/2010 | 1/25/2011 | 1,363,063.60 | 5.250 |
| 1/25/2011 | 2/25/2011 | 1,318,733.58 | 5.250 |
| 2/25/2011 | 3/25/2011 | 1,275,854.10 | 5.250 |
| 3/25/2011 | 4/25/2011 | 1,234,377.35 | 5.450 |
| 4/25/2011 | 5/25/2011 | 1,189,393.14 | 5.450 |
| 5/25/2011 | 6/25/2011 | 1,146,060.82 | 5.450 |
| 6/25/2011 | 7/25/2011 | 1,104,319.99 | 5.450 |
| 7/25/2011 | 8/25/2011 | 1,064,109.16 | 5.450 |
| 8/25/2011 | 9/25/2011 | 1,025,371.63 | 5.450 |
| 9/25/2011 | 10/25/2011 | 988,053.91 | 5.450 |
| 10/25/2011 | 11/25/2011 | 952,103.38 | 5.450 |
| 11/25/2011 | 12/25/2011 | 917,467.85 | 5.450 |
| 12/25/2011 | 1/25/2012 | 884,015.67 | 5.450 |
| 1/25/2012 | 2/25/2012 | 851,761.48 | 5.450 |
| 2/25/2012 | 3/25/2012 | 820,691.81 | 5.450 |
| 3/25/2012 | 4/25/2012 | 790,762.79 | 5.450 |
| 4/25/2012 | Termination Date | 761,932.26 | 5.450 |

330

Annex A

Paragraph 13 of the Credit Support Annex

331

ANNEX A

# ISDA®
## CREDIT SUPPORT ANNEX

to the Schedule to the
ISDA Master Agreement
dated as of March 30, 2007 between

CITIBANK, N.A., a national banking association organized under the laws of the United States (hereinafter referred to as *"Party A"* or
*"Pledgor"*)
and

Wells Fargo Bank, N.A., not in its individual capacity, but solely as Cap Trustee on behalf of the trust created pursuant to the Cap
Administration Agreement (the "Cap Trust") with respect to Citigroup Mortgage Loan Trust Inc., Asset-Backed Pass-Through Certificates,
Series 2007-AMC2 (hereinafter referred to as *"Party B"* or *"Secured Party"*).

For the avoidance of doubt, and notwithstanding anything to the contrary that may be contained in the Agreement, this Credit Support
Annex shall relate solely to the Transaction documented in the Confirmation dated March 30, 2007, between Party A and Party B,
Reference Number CPC4628.

**Paragraph 13. Elections and Variables**

(a)      **Security Interest for "Obligations".** The term "Obligations" shall have the meaning set forth in Paragraph 12.

(b)       **Credit Support Obligations.**

(i) **Delivery Amount, Return Amount and Credit Support Amount; Addition to Paragraph 3.**

(A) **"Delivery Amount"** has the meaning set forth in Paragraph 3(a), as amended by deleting the words "upon a demand
made by the Secured Party on or promptly following a Valuation Date" and inserting in lieu thereof the words "not later
than the close of business on each Valuation Date".

(B) **"Return Amount"** has the meaning set forth in Paragraph 3(b).

(C) **"Credit Support Amount"** for a Valuation Date shall mean zero; **provided** that, if the Threshold in respect of Party
A is zero on such Valuation Date, **"*Credit Support Amount*"** shall mean one of the following if one of the following
specified events have occurred on such Valuation Date:

(i)       if (a) no Moody's Second Trigger Ratings Event has occurred and is continuing or (b) less than 30
Local Business Day have elapsed since the last time that no Moody's Second Trigger Rating Event had
occurred and was continuing, **"*Credit Support Amount*"** shall mean an amount in USD equal to the
greater of (1) the sum of (a) the Secured Party's Exposure and (b) the First Trigger Collateral Amount
(as defined below) for each Transaction hereunder and (2) zero;

(ii)      so long as a Moody's Second Trigger Ratings Event has occurred and is continuing and 30 or more
Local Business Days have elapsed since the last time that no Moody's Second Trigger Rating Event had
occurred and was continuing, **"*Credit Support Amount*"** shall mean an amount in USD equal to the
greatest of (1) the sum of (a) the Secured Party's Exposure and (b) the Second Trigger Collateral
Amount (as defined below) for each Transaction hereunder, (2) the aggregate amount of the Next
Payments (as defined below) for all Next Payment Dates (as defined below) and (3) zero; and

(iii)     if a Relevant Entity's rating falls below either the S&P Approved Ratings Threshold or the S&P
Required Ratings Threshold and continues to remain below either the S&P Approved Ratings

Threshold or the S&P Required Ratings Threshold, "**Credit Support Amount**" shall mean an amount in USD equal to the greater of (1) the sum of (a) the Secured Party's Exposure and (b) the Notional Volatility Buffer and (2) zero. "**Notional Volatility Buffer**", as determined by the Valuation Agent for any date, means the product of (i) the Scale Factor, if any, for such Transaction, or, if no Scale Factor is applicable for such Transaction, one, (ii) the Notional Amount of the Transaction on such date, and (iii) the Volatility Buffer Percentage for such date as set out in the table below on such date,

| Party A S&P Rating on such date | Remaining Weighted Average Life Maturity up to 3 years | Remaining Weighted Average Life Maturity up to 5 years | Remaining Weighted Average Life Maturity up to 10 years | Remaining Weighted Average Life Maturity up to 30 years |
|---|---|---|---|---|
| S&P S-T Rating of "A-1" or above | 0.00% | 0.00% | 0.00% | 0.00% |
| S&P S-T Rating of "A-2" | 2.75% | 3.25% | 4.0% | 4.75% |
| S&P S-T Rating of "A-3" | 3.25% | 4.00% | 5.0% | 6.25% |
| S&P L-T Rating of "BB+" or lower | 3.50% | 4.50% | 6.75% | 7.50% |

*L-T Rating* means with respect to any Person, the unsecured, unguaranteed and otherwise unsupported long-term senior debt obligations of such Person.

*S-T Rating* means with respect to any Person, the unsecured, unguaranteed and otherwise unsupported short-term debt obligations of such Person.

In circumstances where more than one of Paragraph 13(b)(i)(C)(i), (ii) and (iii) apply, the Credit Support Amount shall be calculated by reference to the paragraph which would result in Party A Transferring the greatest amount of Eligible Credit Support. Under no circumstances will Party A be required to Transfer more Eligible Credit Support than the greatest amount calculated in accordance with one of Paragraph 13(b)(i)(C)(i), (ii) or (iii).

**First Trigger Collateral Amount** means, in respect of each Transaction hereunder on any date, an amount in USD equal to the product of (i) the Scale Factor, if any, for such Transaction, or, if no Scale Factor is applicable for such Transaction, one, (ii) Notional Amount of such Transaction on such date and (iii) the Applicable Percentage set forth in the table in Exhibit A hereto.

"**Next Payment**" means, in respect of each Next Payment Date, the greater of (i) the amount of any payments due to be made by Party A under Section 2(a) on such Next Payment Date less any payments due to be made by Party B under Section 2(a) on such Next Payment Date (in each case, after giving effect to any applicable netting under Section 2(c)) and (ii) zero.

"**Next Payment Date**" means each date on which the next scheduled payment under any Transaction is due to be paid.

**Second Trigger Collateral Amount** means, in respect of each Transaction hereunder on any date, an amount in USD equal to the product of (i) the Scale Factor, if any, for such Transaction, or, if no Scale Factor is applicable for such Transaction, one, (ii) Notional Amount of such Transaction on such date and (iii) the Applicable Percentage set forth in the applicable table in Exhibit B hereto.

(ii) **Eligible Collateral.** On any date, the following items will qualify as "**Eligible Collateral**" for Party A:

333

**(A)** Valuation Percentage S&P

| Collateral | S&P Valuation Percentage |
|---|---|
| (A)    U.S. Dollar Cash | 100% |
| (B)    Fixed-rate negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity on such date of not more than one year | 98.5% |
| (C)    Fixed-rate negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity on such date of more than one year but not more than ten years | 89.9% |
| (D)    Fixed-rate negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity on such date of more than ten years | 83.9% |

*/ The Valuation Percentage shall be determined by the Valuation Agent from time to time and in its sole discretion.

**(B)** Valuation Percentage Moody's

| INTRUMENT | If Paragraph 13(b)(i)(C)(i) applies | If Paragraph 13(b)(i)(C)(ii) applies |
|---|---|---|
| U.S. Dollar Cash | 100% | 100% |
| Fixed-Rate Negotiable treasury Debt Issued by the U.S. Treasury Department with Remaining Maturity | | |
| <1 Year | 100% | 100% |
| 1 to 2 years | 100% | 99% |
| 2 to 3 years | 100% | 98% |
| 3 to 5 years | 100% | 97% |
| 5 to 7 years | 100% | 96% |
| 7 to 10 years | 100% | 94% |
| Floating-Rate Negotiable treasury Debt Issued by the U.S. Treasury Department | | |
| All Maturities | 100% | 99% |

Paragraph 13(b)(ii)(A) shall apply if Paragraph 13(b)(i)(C)(iii) applies and Paragraph 13 (b)(ii)(B) shall apply if either Paragraph 13(b)(i)(C)(i) or 13(b)(i)(C)(ii) applies.

If both Paragraph 13(b)(ii)(A) and 13(b)(ii)B) apply: (i) no item shall qualify as "Eligible Collateral" for Party A unless it is specified in both such paragraphs and (ii) the Valuation Percentage for an item of Eligible Collateral shall be calculated by reference to the paragraph which would result in the lower Valuation Percentage for such item of Eligible Collateral.

(iii) **Other Eligible Support.** There shall be no "Other Eligible Support" for either party for purposes of this Annex.

(iv) **Thresholds.**

(A) **"Threshold"** means with respect to Party A and Party B: infinity, provided that the Threshold with respect to Party A shall be zero so long as (1) a Moody's First Trigger Ratings Event has occurred and is continuing and either (i) at least 30 Local Business Days have elapsed since the last time that no Moody's First Trigger Ratings Event has occurred and was continuing or (ii) such Moody's First Trigger Ratings Event has been continuing since this Annex was executed, or (2) (i) an S&P Approved Ratings Downgrade Event has occurred and is continuing and either (a) at least 30 calendar days have elapsed since the last time that S&P Approved Ratings Downgrade Event has occurred or (b) such S&P

Approved Ratings Downgrade Event has been continuing since this Annex was executed or (ii) an S&P Required Ratings Downgrade Event has occurred and is continuing.

(B) **"Minimum Transfer Amount"** means USD 100,000 with respect to Party A and Party B; provided, however, that if the aggregate Certificate Principal Balance and note principal balance of Certificates and Notes rated by S&P ceases to be more than USD 50,000,000, the *"Minimum Transfer Amount"* shall be USD 50,0000.

(C) **Rounding.** The Delivery Amount will be rounded up to the nearest integral multiple of USD 10,000. The Return Amount will be rounded down to the nearest integral multiple of USD 10,000.

(c)      **Valuation and Timing.**

(i) **"Valuation Agent"** means Party A. Calculations by Party A will be made by reference to         commonly accepted market sources.

(ii) **"Valuation Date"** means, means each Local Business Day which, if treated as a Valuation Date, would result in a Delivery Amount or a Return Amount.

(iii) **"Valuation Time"** means, with respect to the determination of Exposure, Value of Eligible Credit Support and Posted Credit Support, the close of business on the Local Business Day immediately before the Valuation Date or date of calculation, as applicable; provided, that the calculations of of Value and Exposure will be made as of approximately the same time on the same date.

(iv) **"Notification Time"** means 10:00 a.m., New York time on a Valuation Date.

(d)      **Conditions Precedent and Secured Party's Rights and Remedies.** There shall be no "Specified Condition" with respect to Party A or Party B.

(e)      **Substitution.**

(i) **"Substitution Date"** has the meaning specified in Paragraph 4(d)(ii).

(f)      **Dispute Resolution.**

(i) **"Resolution Time"** means 1:00 p.m., New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute under Paragraph 5.

(ii) **Value**. For the purpose of Paragraphs 5(i)(C) and 5(ii), Party A will determine the Value of Eligible Credit Support or Posted Credit Support consisting of securities based upon the bid price quotations of any generally recognized dealer (which may include an affiliate of Party A), and adding thereto any interest accrued but not paid to any person with respect to such securities through the day on which the determination is made and multiplying the sum by the applicable Valuation Percentage, if any.

(iii) **Alternative**. The provisions of Paragraph 5 will apply, provided, however, that in the event of a dispute regarding the Value of securities which constitute Eligible Credit Support or Posted Credit Support, Party B may submit mid market quotations from two other recognized dealers in which case the Value of such securities shall be the mean of the two quotations submitted by Party B.

(g)      **Holding and Using Posted Collateral**.

(i) **Eligibility to Hold Posted Collateral; Custodians**. The Cap Trustee will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); provided, that Posted Collateral shall be held in a segregated Eligible Account or a segregated trust account.

(ii) **Use of Posted Collateral**. The provisions of Paragraph 6(c) will not apply to Party B. Therefore, Party B will not have any of the rights specified in Paragraph 6(c)(i) or 6(c)(ii), provided, however, that Party B or its Custodian shall have the right to register any Posted Collateral that constitutes a book entry security in the name of its custodian.

335

(h)        **Distributions and Interest Amount.**

(i) **Interest Rate**. The "Interest Rate" will be the actual rate earned on Posted Collateral in the form of Cash that is held by Party B or its Custodian. Posted Collateral in the form of Cash shall be invested in such overnight (or redeemable within two Local Business Days of demand) Permitted Investments rated at least (x) AAAm or AAAm-G by S&P and (y) Prime-1 by Moody's or Aaa by Moody's, as directed by Party A unless (x) an Event of Default or an Additional Termination Event has occurred with respect to which Party A is the defaulting or sole Affected Party or (y) an Early Termination Date has been designated, in which case such investment shall be uninvested). Gains and losses incurred in respect of any investment of Posted Collateral in the form of Cash in Permitted Investments as directed by Party A shall be for the account of Party A.

(ii) **Transfer of Interest Amount.** Transfers of the Interest Amount will be made in arrears on the last Local Business Day of each calendar month, *provided* that Party B shall not be obliged to so transfer any Interest Amount unless and until it has earned and received such interest

(iii) **Alternative to Interest Amount.** The provisions of Paragraph 6(d)(ii) will apply, provided, however, that the Interest Amount will compound daily.

(i)        **Additional Representations.**

Party A represents to Party B (which representation will be deemed to be repeated as of each date on which Party A, as the Pledgor, Transfers Eligible Collateral) that:

(i) no consent, approval or other authorization of any governmental authority is required in connection with the Transfer of Eligible Collateral hereunder.

(ii) Its assets exceed its liabilities.

(j)        **Other Eligible Support and Other Posted Support.**

(i) **"Value"** with respect to Other Eligible Support and Other Posted Support shall not be applicable.

(ii) **"Transfer"** with respect to Other Eligible Support and Other Posted Support shall not be applicable.

(k)        **Demands and Notices.**

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Annex, provided, that the address for Party A for such purposes shall be:

Citibank N.A.
Collateral Management Group
333 West 34th Street, 2nd FL
New York, NY 10001
Telephone no. (212) 615-8406
Facsimile no. (212) 994-0727;

and the address for Party B for such purposes shall be:

Address:        Wells Fargo Bank, N.A.
                9062 Old Annapolis Road
                Columbia, Maryland 21045
Attention: Client Manager - CMLTI 2007-AMC2
Facsimile No: (410) 715-2380
Telephone No: (410) 884-2000

336

(l)        **External Verification.**

Notwithstanding anything to the contrary in the definitions of Valuation Agent or Valuation Date, at any time at which Party A (or, to the extent applicable, its Credit Support Provider) does not have a long-term unsubordinated and unsecured debt rating of at least "BBB+" from S&P, the Valuation Agent shall (A) calculate the Secured Party's Exposure and the S&P Value of Posted Credit Support on each Valuation Date based on internal marks and (B) verify such calculations with external marks monthly by obtaining on the last Local Business Day of each calendar month two external marks for each Transaction to which this Annex relates and for all Posted Credit Support; such verification of the Secured Party's Exposure shall be based on the higher of the two external marks. Each external mark in respect of a Transaction shall be obtained from an independent Reference Market-maker that would be eligible and willing to enter into such Transaction in the absence of the current derivative provider, provided that an external mark may not be obtained from the same Reference Market-maker more than four times in any 12-month period. The Valuation Agent shall obtain these external marks directly or through an independent third party, in either case at no cost to Party B. The Valuation Agent shall calculate on each Valuation Date (for purposes of this paragraph, the last Local Business Day in each calendar month referred to above shall be considered a Valuation Date) the Secured Party's Exposure based on the greater of the Valuation Agent's internal marks and the external marks received. If the S&P Value on any such Valuation Date of all Posted Credit Support then held by the Secured Party is less than the S&P Credit Support Amount on such Valuation Date (in each case as determined pursuant to this paragraph), Party A shall, within three Local Business Days of such Valuation Date, Transfer to the Secured Party Eligible Credit Support having an S&P Value as of the date of Transfer at least equal to such deficiency.

(m)        **Agreement as to Single Secured Party and Single Pledgor.** Party A and Party B hereby agree that, notwithstanding anything to the contrary in this Annex, (a) the term "Secured Party" as used in this Annex means only Party B, and (b) the term "Pledgor" as used in this Annex means only Party A.

(n)        **Expenses.** Notwithstanding anything to the contrary in Paragraph 10, the Pledgor will be responsible for, and will reimburse the Secured Party for, all transfer and other taxes and other costs involved in any Transfer of Eligible Collateral.

(o)        **Other Provisions.**

(i) **Custodian.** A party shall be eligible to serve as Custodian if and for so long as it (i) is a trust company or commercial bank with trust powers, organized under the laws of the United States of America or any state thereof and subject to supervision or examination by federal or state authority, having a combined capital and surplus of at least $500,000,000 and (ii) shall have general unsecured short-term obligations rated at least "P-1" by Moody's and "A-1" by S&P.

(ii) **Actions Hereunder**. Either party may take any actions hereunder, including liquidation rights, through its Custodian, and, in the case of Party A, through Salomon Smith Barney Inc. or any successor, as agent for Party A.

(iii) **Events of Default.** Paragraph 7 shall be deleted and replaced in its entirety by the following paragraph:

"For the purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Elligibile Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for one Local Business Day after the notice of that failure is given to that party, except that (A) if such failure would constitute an Additional Termination Event under another provision of this Agreement and (B) no more than 30 Local Business Days have elapsed since the last time that Party A satisfied the Moody's Second Trigger Ratings Threshold, then such failure shall be an Additional Termination Event and not an Event of Default".

(iv) *Address for Transfers*. Each Transfer hereunder shall be made to the address specified below or to an address specified in writing from time to time by the party to which such Transfer will be made.

Party A account details for holding collateral: To be provided

Party B's Custodian account details for holding collateral:

ABA #: 121-000-248
For Credit To: SAS Clearing
Acct #: 3970771416

337

Re: 50995002 - CMLTI 2007-AMC2

IN WITNESS WHEREOF, the parties hereto have executed this Annex as of the date first above written.

CITIBANK, N.A.                          Wells Fargo Bank, N.A., not in its individual capacity, but solely as
                                        Cap Trustee on behalf of the trust created pursuant to the Cap
                                        Administration Agreement with respect to Citigroup Mortgage Loan
                                        Trust Inc., Asset-Backed Pass-Through Certificates, Series 2007-
                                        AMC2

By:                                     By:
_____     _____

339

**EXHIBIT A**

**FIRST TRIGGER COLLATERAL AMOUNT APPLICABLE PERCENTAGES**

Note: Please delete weekly columns

| Weighted Average Life of Hedge in Years | Interest Rate Hedges | | Currency Hedges | |
|---|---|---|---|---|
| | Valuation Dates: | | | |
| | Daily | Weekly | Daily | Weekly |
| Less than 1 year | 0.15% | 0.25% | 1.10% | 2.20% |
| Equal to or greater than 1 year but less than 2 years | 0.30% | 0.50% | 1.20% | 2.40% |
| Equal to or greater than 2 years but less than 3 years | 0.40% | 0.70% | 1.30% | 2.60% |
| Equal to or greater than 3 years but less than 4 years | 0.60% | 1.00% | 1.40% | 2.80% |
| Equal to or greater than 4 years but less than 5 years | 0.70% | 1.20% | 1.50% | 2.90% |
| Equal to or greater than 5 years but less than 6 years | 0.80% | 1.40% | 1.60% | 3.10% |
| Equal to or greater than 6 years but less than 7 years | 1.00% | 1.60% | 1.60% | 3.30% |
| Equal to or greater than 7 years but less than 8 years | 1.10% | 1.80% | 1.70% | 3.40% |
| Equal to or greater than 8 years but less than 9 years | 1.20% | 2.00% | 1.80% | 3.60% |
| Equal to or greater than 9 years but less than 10 years | 1.30% | 2.20% | 1.90% | 3.80% |
| Equal to or greater than 10 years but less than 11 years | 1.40% | 2.30% | 1.90% | 3.90% |
| Equal to or greater than 11 years but less than 12 years | 1.50% | 2.50% | 2.00% | 4.00% |
| Equal to or greater than 12 years but less than 13 years | 1.60% | 2.70% | 2.10% | 4.10% |
| Equal to or greater than 13 years but less than 14 years | 1.70% | 2.80% | 2.10% | 4.30% |
| Equal to or greater than 14 years but less than 15 years | 1.80% | 3.00% | 2.20% | 4.40% |
| Equal to or greater than 15 years but less than 16 years | 1.90% | 3.20% | 2.30% | 4.50% |

340

| | | | | |
|---|---|---|---|---|
| Equal to or greater than 16 years but less than 17 years | 2.00% | 3.30% | 2.30% | 4.60% |
| Equal to or greater than 17 years but less than 18 years | 2.00% | 3.50% | 2.40% | 4.80% |
| Equal to or greater than 18 years but less than 19 years | 2.00% | 3.60% | 2.40% | 4.90% |
| Equal to or greater than 19 years but less than 20 years | 2.00% | 3.70% | 2.50% | 5.00% |
| Equal to or greater than 20 years but less than 21 years | 2.00% | 3.90% | 2.50% | 5.00% |
| Equal to or greater than 21 years but less than 22 years | 2.00% | 4.00% | 2.50% | 5.00% |
| Equal to or greater than 22 years but less than 23 years | 2.00% | 4.00% | 2.50% | 5.00% |
| Equal to or greater than 23 years but less than 24 years | 2.00% | 4.00% | 2.50% | 5.00% |
| Equal to or greater than 24 years but less than 25 years | 2.00% | 4.00% | 2.50% | 5.00% |
| Equal to or greater than 25 years but less than 26 years | 2.00% | 4.00% | 2.50% | 5.00% |
| Equal to or greater than 26 years but less than 27 years | 2.00% | 4.00% | 2.50% | 5.00% |
| Equal to or greater than 27 years but less than 28 years | 2.00% | 4.00% | 2.50% | 5.00% |
| Equal to or greater than 28 years but less than 29 years | 2.00% | 4.00% | 2.50% | 5.00% |
| Equal to or greater than 29 years but less than 30 years | 2.00% | 4.00% | 2.50% | 5.00% |
| Equal to 30 years | 2.00% | 4.00% | 2.50% | 5.00% |

341

EXHIBIT B

**SECOND TRIGGER COLLATERAL AMOUNT APPLICABLE PERCENTAGES**
Note - delete all weekly columns

For Transactions that are not Transaction-Specific Hedges.

*"Transaction-Specific Hedge"* means any Transaction that is a cap, floor or swaption, or a Transaction in respect of which (x) the notional amount of the swap is "balance guaranteed" or (y) the notional amount of the swap for any Calculation Period otherwise is not a specific dollar amount that is fixed at the inception of the Transaction.

| Weighted Average Life of Hedge in Years | Interest Rate Swaps | | Currency Swaps | |
|---|---|---|---|---|
| | Valuation Dates: | | | |
| | Daily | Weekly | Daily | Weekly |
| Less than 1 year | 0.50% | 0.60% | 6.10% | 7.25% |
| Equal to or greater than 1 year but less than 2 years | 1.00% | 1.20% | 6.30% | 7.50% |
| Equal to or greater than 2 years but less than 3 years | 1.50% | 1.70% | 6.40% | 7.70% |
| Equal to or greater than 3 years but less than 4 years | 1.90% | 2.30% | 6.60% | 8.00% |
| Equal to or greater than 4 years but less than 5 years | 2.40% | 2.80% | 6.70% | 8.20% |
| Equal to or greater than 5 years but less than 6 years | 2.80% | 3.30% | 6.80% | 8.40% |
| Equal to or greater than 6 years but less than 7 years | 3.20% | 3.80% | 7.00% | 8.60% |
| Equal to or greater than 7 years but less than 8 years | 3.60% | 4.30% | 7.10% | 8.80% |
| Equal to or greater than 8 years but less than 9 years | 4.00% | 4.80% | 7.20% | 9.00% |
| Equal to or greater than 9 years but less than 10 years | 4.40% | 5.30% | 7.30% | 9.20% |
| Equal to or greater than 10 years but less than 11 years | 4.70% | 5.60% | 7.40% | 9.30% |
| Equal to or greater than 11 years but less than 12 years | 5.00% | 6.00% | 7.50% | 9.50% |
| Equal to or greater than 12 years but less than 13 years | 5.40% | 6.40% | 7.60% | 9.70% |
| Equal to or greater than 13 years but less than 14 years | 5.70% | 6.80% | 7.70% | 9.80% |

342

| | | | | |
|---|---|---|---|---|
| Equal to or greater than 14 years but less than 15 years | 6.00% | 7.20% | 7.80% | 10.00% |
| Equal to or greater than 15 years but less than 16 years | 6.30% | 7.60% | 7.90% | 10.00% |
| Equal to or greater than 16 years but less than 17 years | 6.60% | 7.90% | 8.00% | 10.00% |
| Equal to or greater than 17 years but less than 18 years | 6.90% | 8.30% | 8.10% | 10.00% |
| Equal to or greater than 18 years but less than 19 years | 7.20% | 8.60% | 8.20% | 10.00% |
| Equal to or greater than 19 years but less than 20 years | 7.50% | 9.00% | 8.20% | 10.00% |
| Equal to or greater than 20 years but less than 21 years | 7.80% | 9.00% | 8.30% | 10.00% |
| Equal to or greater than 21 years but less than 22 years | 8.00% | 9.00% | 8.40% | 10.00% |
| Equal to or greater than 22 years but less than 23 years | 8.00% | 9.00% | 8.50% | 10.00% |
| Equal to or greater than 23 years but less than 24 years | 8.00% | 9.00% | 8.60% | 10.00% |
| Equal to or greater than 24 years but less than 25 years | 8.00% | 9.00% | 8.60% | 10.00% |
| Equal to or greater than 25 years but less than 26 years | 8.00% | 9.00% | 8.70% | 10.00% |
| Equal to or greater than 26 years but less than 27 years | 8.00% | 9.00% | 8.80% | 10.00% |
| Equal to or greater than 27 years but less than 28 years | 8.00% | 9.00% | 8.80% | 10.00% |
| Equal to or greater than 28 years but less than 29 years | 8.00% | 9.00% | 8.90% | 10.00% |
| Equal to or greater than 29 years but less than 30 years | 8.00% | 9.00% | 8.90% | 10.00% |
| Equal to 30 years | 8.00% | 9.00% | 9.00% | 10.00% |

343

For Transactions that are Transaction-Specific Hedges.

| Weighted Average Life of Hedge in Years | Interest Rate Hedges | | Currency Hedges | |
|---|---|---|---|---|
| | Valuation Dates: | | | |
| | Daily | Weekly | Daily | Weekly |
| Less than 1 year | 0.65% | 0.75% | 6.30% | 7.40% |
| Equal to or greater than 1 year but less than 2 years | 1.30% | 1.50% | 6.60% | 7.80% |
| Equal to or greater than 2 years but less than 3 years | 1.90% | 2.20% | 6.90% | 8.20% |
| Equal to or greater than 3 years but less than 4 years | 2.50% | 2.90% | 7.10% | 8.50% |
| Equal to or greater than 4 years but less than 5 years | 3.10% | 3.60% | 7.40% | 8.90% |
| Equal to or greater than 5 years but less than 6 years | 3.60% | 4.20% | 7.70% | 9.20% |
| Equal to or greater than 6 years but less than 7 years | 4.20% | 4.80% | 7.90% | 9.60% |
| Equal to or greater than 7 years but less than 8 years | 4.70% | 5.40% | 8.20% | 9.90% |
| Equal to or greater than 8 years but less than 9 years | 5.20% | 6.00% | 8.40% | 10.20% |
| Equal to or greater than 9 years but less than 10 years | 5.70% | 6.60% | 8.60% | 10.50% |
| Equal to or greater than 10 years but less than 11 years | 6.10% | 7.00% | 8.80% | 10.70% |
| Equal to or greater than 11 years but less than 12 years | 6.50% | 7.50% | 9.00% | 11.00% |
| Equal to or greater than 12 years but less than 13 years | 7.00% | 8.00% | 9.20% | 11.30% |
| Equal to or greater than 13 years but less than 14 years | 7.40% | 8.50% | 9.40% | 11.50% |
| Equal to or greater than 14 years but less than 15 years | 7.80% | 9.00% | 9.60% | 11.80% |
| Equal to or greater than 15 years but less than 16 years | 8.20% | 9.50% | 9.80% | 11.80% |
| Equal to or greater than 16 years but less than 17 years | 8.60% | 9.90% | 10.00% | 12.00% |
| Equal to or greater than | 9.00% | 10.40% | 10.10% | 12.00% |

344

| | | | | |
|---|---|---|---|---|
| 17 years but less than 18 years | | | | |
| Equal to or greater than 18 years but less than 19 years | 9.40% | 10.80% | 10.30% | 12.00% |
| Equal to or greater than 19 years but less than 20 years | 9.70% | 11.00% | 10.50% | 12.00% |
| Equal to or greater than 20 years but less than 21 years | 10.00% | 11.00% | 10.70% | 12.00% |
| Equal to or greater than 21 years but less than 22 years | 10.00% | 11.00% | 10.80% | 12.00% |
| Equal to or greater than 22 years but less than 23 years | 10.00% | 11.00% | 11.00% | 12.00% |
| Equal to or greater than 23 years but less than 24 years | 10.00% | 11.00% | 11.00% | 12.00% |
| Equal to or greater than 24 years but less than 25 years | 10.00% | 11.00% | 11.00% | 12.00% |
| Equal to or greater than 25 years but less than 26 years | 10.00% | 11.00% | 11.00% | 12.00% |
| Equal to or greater than 26 years but less than 27 years | 10.00% | 11.00% | 11.00% | 12.00% |
| Equal to or greater than 27 years but less than 28 years | 10.00% | 11.00% | 11.00% | 12.00% |
| Equal to or greater than 28 years but less than 29 years | 10.00% | 11.00% | 11.00% | 12.00% |
| Equal to or greater than 29 years but less than 30 years | 10.00% | 11.00% | 11.00% | 12.00% |
| Equal to 30 years | 10.00% | 11.00% | 11.00% | 12.00% |

EXHIBIT J

[RESERVED]

346

EXHIBIT K

ADDITIONAL DISCLOSURE NOTIFICATION

**\*\*SEND VIA FAX TO 410-715-2380 AND VIA EMAIL TO cts.sec.notifications@wellsfargo.com AND VIA OVERNIGHT MAIL TO THE ADDRESS IMMEDIATELY BELOW\*\***

Wells Fargo Bank, N.A., as Trust Administrator
9062 Old Annapolis Road
Columbia, Maryland 21045
Attn: Corporate Trust Services- CMLTI 2007-AMC2—SEC REPORT PROCESSING

Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
New York, New York 10013

RE: \*\*Additional Form [10-D][10-K][8-K] Disclosure\*\* Required

Ladies and Gentlemen:

In accordance with Section 4.07 of the Pooling and Servicing Agreement, dated as of March 1, 2007, among Citigroup Mortgage Loan Trust Inc. as Depositor, Wells Fargo Bank, N.A. as Master Servicer and Trust Administrator, Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP as Servicers and U.S. Bank National Association as Trustee, the undersigned, as [ ], hereby notifies you that certain events have come to our attention that [will] [may] need to be disclosed on Form [10-D][10-K][8-K].

Description of Additional Form [10-D][10-K][8-K] Disclosure:

List of any Attachments hereto to be included in the Additional Form [10-D][10-K][8-K] Disclosure:

Any inquiries related to this notification should be directed to [                    ], phone number: [                    ]; email address: [                    ].

[NAME OF PARTY],
as [role]

By:  _____
Name:
Title:

EXHIBIT L


ANNUAL STATEMENT OF COMPLIANCE


CITIGROUP MORTGAGE LOAN TRUST 2007-AMC2,


ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-AMC2

I, _____, hereby certify that I am a duly appointed _____ of [Wells Fargo Bank, N.A.] [Ocwen Loan Servicing, LLC], [GMAC Mortgage, LLC], and further certify as follows:


1. This certification is being made pursuant to the terms of the Pooling and Servicing Agreement, dated as of March 1, 2007 (the "Agreement"), among Citigroup Mortgage Loan Trust Inc., as depositor, Wells Fargo Bank, N.A. as master servicer and trust administrator (the "Master Servicer" and the "Trust Administrator"), Ocwen Loan Servicing, LLC, GMAC Mortgage, LLC and Countrywide Home Loans Servicing LP as Servicers (the "Servicers") and U.S. Bank National Association, as trustee.


2. The undersigned officer of the [Servicer] [Master Servicer] [Trust Administrator] hereby certifies that (i) a review of the activities of the [Servicer] [Master Servicer] [Trust Administrator] during the preceding calendar year and of performance under the Agreement has been made under such officers' supervision and (ii) to the best of such officers' knowledge, based on such review, the [Servicer] [Master Servicer] [Trust Administrator] has fulfilled all of its obligations under the Agreement in all material respects throughout such year.


Capitalized terms not otherwise defined herein have the meanings set forth in the Agreements.

Dated: _____, 2008

348

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of _____.

By: _____

Name:

Title:

I, _____, a (an) _____ of the [Servicer] [Master Servicer] [Trust Administrator], hereby certify that _____ is a duly elected, qualified, and acting _____ of the [Servicer] [Master Servicer] [Trust Administrator]and that the signature appearing above is his/her genuine signature.

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of _____.

By: _____

Name:

**EXHIBIT M-1**

**FORM OF DELINQUENCY REPORT**

**Exhibit : Standard File Layout - Delinquency Reporting**

*The column/header names in **bold** are the minimum fields Wells Fargo must receive from every Servicer*

| Column/Header Name | Description | Decimal | Format Comment |
|---|---|---|---|
| **SERVICER_LOAN_NBR** | A unique number assigned to a loan by the Servicer. This may be different than the LOAN_NBR | | |
| **LOAN_NBR** | A unique identifier assigned to each loan by the originator. | | |
| CLIENT_NBR | Servicer Client Number | | |
| **SERV_INVESTOR_NBR** | Contains a unique number as assigned by an external servicer to identify a group of loans in their system. | | |
| BORROWER_FIRST_NAME | First Name of the Borrower. | | |
| **BORROWER_LAST_NAME** | Last name of the borrower. | | |
| PROP_ADDRESS | Street Name and Number of Property | | |
| **PROP_STATE** | The state where the property located. | | |
| **PROP_ZIP** | Zip code where the property is located. | | |
| BORR_NEXT_PAY_DUE_DATE | The date that the borrower's next payment is due to the servicer at the end of processing cycle, as reported by Servicer. | | MM/DD/YYYY |
| LOAN_TYPE | Loan Type (i.e. FHA, VA, Conv) | | |
| **BANKRUPTCY_FILED_DATE** | The date a particular bankruptcy claim was filed. | | MM/DD/YYYY |
| **BANKRUPTCY_CHAPTER_CODE** | The chapter under which the bankruptcy was filed. | | |
| **BANKRUPTCY_CASE_NBR** | The case number assigned by the court to the bankruptcy filing. | | |
| **POST_PETITION_DUE_DATE** | The payment due date once the bankruptcy has been approved by the courts | | MM/DD/YYYY |

| | | | |
|---|---|---|---|
| **BANKRUPTCY_DCHRG_DISM_DATE** | The Date The Loan Is Removed From Bankruptcy. Either by Dismissal, Discharged and/or a Motion For Relief Was Granted. | | MM/DD/YYYY |
| **LOSS_MIT_APPR_DATE** | The Date The Loss Mitigation Was Approved By The Servicer | | MM/DD/YYYY |
| **LOSS_MIT_TYPE** | The Type Of Loss Mitigation Approved For A Loan Such As; | | |
| **LOSS_MIT_EST_COMP_DATE** | The Date The Loss Mitigation /Plan Is Scheduled To End/Close | | MM/DD/YYYY |
| **LOSS_MIT_ACT_COMP_DATE** | The Date The Loss Mitigation Is Actually Completed | | MM/DD/YYYY |
| **FRCLSR_APPROVED_DATE** | The date DA Admin sends a letter to the servicer with instructions to begin foreclosure proceedings. | | MM/DD/YYYY |
| **ATTORNEY_REFERRAL_DATE** | Date File Was Referred To Attorney to Pursue Foreclosure | | MM/DD/YYYY |
| FIRST_LEGAL_DATE | Notice of 1st legal filed by an Attorney in a Foreclosure Action | | MM/DD/YYYY |
| **FRCLSR_SALE_EXPECTED_DATE** | The date by which a foreclosure sale is expected to occur. | | MM/DD/YYYY |
| **FRCLSR_SALE_DATE** | The actual date of the foreclosure sale. | | MM/DD/YYYY |
| FRCLSR_SALE_AMT | The amount a property sold for at the foreclosure sale. | 2 | No commas(,) or dollar signs ($) |
| **EVICTION_START_DATE** | The date the servicer initiates eviction of the borrower. | | MM/DD/YYYY |
| **EVICTION_COMPLETED_DATE** | The date the court revokes legal possession of the property from the borrower. | | MM/DD/YYYY |
| **LIST_PRICE** | The price at which an REO property is marketed. | 2 | No commas(,) or dollar signs ($) |
| **LIST_DATE** | The date an REO property is listed at a particular price. | | MM/DD/YYYY |
| **OFFER_AMT** | The dollar value of an offer for an REO property. | 2 | No commas(,) or dollar signs ($) |
| OFFER_DATE_TIME | The date an offer is received by DA Admin or by the Servicer. | | MM/DD/YYYY |
| **REO_CLOSING_DATE** | The date the REO sale of the property is scheduled to close. | | MM/DD/YYYY |
| **REO_ACTUAL_CLOSING_DATE** | Actual Date Of REO Sale | | MM/DD/YYYY |
| **OCCUPANT_CODE** | Classification of how the property is occupied. | | |
| **PROP_CONDITION_CODE** | A code that indicates the condition of the property. | | |
| PROP_INSPECTION_DATE | The date a property inspection is performed. | | MM/DD/YYYY |
| **APPRAISAL_DATE** | The date the appraisal was done. | | MM/DD/YYYY |
| **CURR_PROP_VAL** | The current "as is" value of the property based on brokers price opinion or appraisal. | 2 | |
| REPAIRED_PROP_VAL | The amount the property would be worth if repairs are completed pursuant to a broker's price opinion or appraisal. | 2 | |
| **If applicable:** | | | |
| **DELINQ_STATUS_CODE** | FNMA Code Describing Status of Loan | | |
| **DELINQ_REASON_CODE** | The circumstances which caused a borrower to stop | | |

350

| | | | |
|---|---|---|---|
| | paying on a loan. Code indicates the reason why the loan is in default for this cycle. | | |
| MI_CLAIM_FILED_DATE | Date Mortgage Insurance Claim Was Filed With Mortgage Insurance Company. | | MM/DD/YYYY |
| MI_CLAIM_AMT | Amount of Mortgage Insurance Claim Filed | | No commas(,) or dollar signs ($) |
| MI_CLAIM_PAID_DATE | Date Mortgage Insurance Company Disbursed Claim Payment | | MM/DD/YYYY |
| MI_CLAIM_AMT_PAID | Amount Mortgage Insurance Company Paid On Claim | 2 | No commas(,) or dollar signs ($) |
| POOL_CLAIM_FILED_DATE | Date Claim Was Filed With Pool Insurance Company | | MM/DD/YYYY |
| POOL_CLAIM_AMT | Amount of Claim Filed With Pool Insurance Company | 2 | No commas(,) or dollar signs ($) |
| POOL_CLAIM_PAID_DATE | Date Claim Was Settled and The Check Was Issued By The Pool Insurer | | MM/DD/YYYY |
| POOL_CLAIM_AMT_PAID | Amount Paid On Claim By Pool Insurance Company | 2 | No commas(,) or dollar signs ($) |
| FHA_PART_A_CLAIM_FILED_DATE | Date FHA Part A Claim Was Filed With HUD | | MM/DD/YYYY |
| FHA_PART_A_CLAIM_AMT | Amount of FHA Part A Claim Filed | 2 | No commas(,) or dollar signs ($) |
| FHA_PART_A_CLAIM_PAID_DATE | Date HUD Disbursed Part A Claim Payment | | MM/DD/YYYY |
| FHA_PART_A_CLAIM_PAID_AMT | Amount HUD Paid on Part A Claim | 2 | No commas(,) or dollar signs ($) |
| FHA_PART_B_CLAIM_FILED_DATE | Date FHA Part B Claim Was Filed With HUD | | MM/DD/YYYY |
| FHA_PART_B_CLAIM_AMT | Amount of FHA Part B Claim Filed | 2 | No commas(,) or dollar signs ($) |
| FHA_PART_B_CLAIM_PAID_DATE | Date HUD Disbursed Part B Claim Payment | | MM/DD/YYYY |
| FHA_PART_B_CLAIM_PAID_AMT | Amount HUD Paid on Part B Claim | 2 | No commas(,) or dollar signs ($) |
| VA_CLAIM_FILED_DATE | Date VA Claim Was Filed With the Veterans Admin | | MM/DD/YYYY |
| VA_CLAIM_PAID_DATE | Date Veterans Admin. Disbursed VA Claim Payment | | MM/DD/YYYY |
| VA_CLAIM_PAID_AMT | Amount Veterans Admin. Paid on VA Claim | 2 | No commas(,) or dollar signs ($) |

| | | | |
|---|---|---|---|
| MOTION_FOR_RELIEF_DATE | The date the Motion for Relief was filed | 10 | MM/DD/YYYY |
| FRCLSR_BID_AMT | The foreclosure sale bid amount | 11 | No commas(,) or dollar signs ($) |
| FRCLSR_SALE_TYPE | The foreclosure sales results: REO, Third Party, Conveyance to HUD/VA | | |
| REO_PROCEEDS | The net proceeds from the sale of the REO property. | | No commas(,) or dollar signs ($) |
| BPO_DATE | The date the BPO was done. | | |
| CURRENT_FICO | The current FICO score | | |
| HAZARD_CLAIM_FILED_DATE | The date the Hazard Claim was filed with the Hazard Insurance Company. | 10 | MM/DD/YYYY |
| HAZARD_CLAIM_AMT | The amount of the Hazard Insurance Claim filed. | | No commas(,) or |

351

| | | 11 | dollar signs ($) |
|---|---|---|---|
| HAZARD_CLAIM_PAID_DATE | The date the Hazard Insurance Company disbursed the claim payment. | 10 | MM/DD/YYYY |
| HAZARD_CLAIM_PAID_AMT | The amount the Hazard Insurance Company paid on the claim. | 11 | No commas(,) or dollar signs ($) |
| ACTION_CODE | Indicates loan status | | Number |
| NOD_DATE | | | MM/DD/YYYY |
| NOI_DATE | | | MM/DD/YYYY |
| ACTUAL_PAYMENT_PLAN_START_DATE | | | MM/DD/YYYY |
| ACTUAL_PAYMENT_ PLAN_END_DATE | | | |
| ACTUAL_REO_START_DATE | | | MM/DD/YYYY |
| REO_SALES_PRICE | | | Number |
| REALIZED_LOSS/GAIN | As defined in the Servicing Agreement | | Number |

**Exhibit 2: Standard File Codes - Delinquency Reporting**

The **Loss Mit Type** field should show the approved Loss Mitigation Code as follows:

- ASUM-    Approved Assumption
- BAP-    Borrower Assistance Program
- CO-    Charge Off
- DIL-    Deed-in-Lieu
- FFA-    Formal Forbearance Agreement
- MOD-    Loan Modification
- PRE-    Pre-Sale
- SS-    Short Sale
- MISC-    Anything else approved by the PMI or Pool Insurer

**NOTE:** Wells Fargo Bank will accept alternative Loss Mitigation Types to those above, provided that they are consistent with industry standards. If Loss Mitigation Types other than those above are used, the Servicer must supply Wells Fargo Bank with a description of each of the Loss Mitigation Types prior to sending the file.

The **Occupant Code** field should show the current status of the property code as follows:

- Mortgagor
- Tenant
- Unknown
- Vacant

The **Property Condition** field should show the last reported condition of the property as follows:

- Damaged
- Excellent
- Fair
- Gone
- Good
- Poor
- Special Hazard
- Unknown

352

**Exhibit 2: Standard File Codes - Delinquency Reporting,** *Continued*

The **FNMA Delinquent Reason Code** field should show the Reason for Delinquency as follows:

| Delinquency Code | Delinquency Description |
|---|---|
| 001 | FNMA-Death of principal mortgagor |
| 002 | FNMA-Illness of principal mortgagor |
| 003 | FNMA-Illness of mortgagor's family member |
| 004 | FNMA-Death of mortgagor's family member |
| 005 | FNMA-Marital difficulties |
| 006 | FNMA-Curtailment of income |
| 007 | FNMA-Excessive Obligation |
| 008 | FNMA-Abandonment of property |
| 009 | FNMA-Distant employee transfer |
| 011 | FNMA-Property problem |
| 012 | FNMA-Inability to sell property |
| 013 | FNMA-Inability to rent property |
| 014 | FNMA-Military Service |
| 015 | FNMA-Other |
| 016 | FNMA-Unemployment |
| 017 | FNMA-Business failure |
| 019 | FNMA-Casualty loss |
| 022 | FNMA-Energy environment costs |
| 023 | FNMA-Servicing problems |
| 026 | FNMA-Payment adjustment |
| 027 | FNMA-Payment dispute |
| 029 | FNMA-Transfer of ownership pending |
| 030 | FNMA-Fraud |
| 031 | FNMA-Unable to contact borrower |
| INC | FNMA-Incarceration |

353

**Exhibit 2: Standard File Codes - Delinquency Reporting,** *Continued*

The **FNMA Delinquent Status Code** field should show the Status of Default as follows:

| Status Code | Status Description |
|---|---|
| 09 | Forbearance |
| 17 | Pre-foreclosure Sale Closing Plan Accepted |
| 24 | Government Seizure |
| 26 | Refinance |
| 27 | Assumption |
| 28 | Modification |
| 29 | Charge-Off |
| 30 | Third Party Sale |
| 31 | Probate |
| 32 | Military Indulgence |
| 43 | Foreclosure Started |
| 44 | Deed-in-Lieu Started |
| 49 | Assignment Completed |
| 61 | Second Lien Considerations |
| 62 | Veteran's Affairs-No Bid |
| 63 | Veteran's Affairs-Refund |
| 64 | Veteran's Affairs-Buydown |
| 65 | Chapter 7 Bankruptcy |
| 66 | Chapter 11 Bankruptcy |
| 67 | Chapter 13 Bankruptcy |

**EXHIBIT M-2
MONTHLY REMITTANCE ADVICE**

354

| | Standard Loan Level File Layout - Master Servicing | | | |
|---|---|---|---|---|
| | | | | |
| **Exhibit 1:** Layout | | | | |
| **Column Name** | **Description** | **Decimal** | **Format Comment** | **Max Size** |
| **Each file requires the following fields:** | | | | |
| SER_INVESTOR_NBR | A value assigned by the Servicer to define a group of loans. | | Text up to 20 digits | 20 |
| LOAN_NBR | A unique identifier assigned to each loan by the investor. | | Text up to 10 digits | 10 |
| SERVICER_LOAN_NBR | A unique number assigned to a loan by the Servicer. This may be different than the LOAN_NBR. | | Text up to 10 digits | 10 |
| SCHED_PAY_AMT | Scheduled monthly principal and scheduled interest payment that a borrower is expected to pay, P&I constant. | 2 | No commas(,) or dollar signs ($) | 11 |
| NOTE_INT_RATE | The loan interest rate as reported by the Servicer. | 4 | Max length of 6 | 6 |
| NET_INT_RATE | The loan gross interest rate less the service fee rate as reported by the Servicer. | 4 | Max length of 6 | 6 |
| SERV_FEE_RATE | The servicer's fee rate for a loan as reported by the Servicer. | 4 | Max length of 6 | 6 |
| SERV_FEE_AMT | The servicer's fee amount for a loan as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| NEW_PAY_AMT | The new loan payment amount as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| NEW_LOAN_RATE | The new loan rate as reported by the Servicer. | 4 | Max length of 6 | 6 |
| ARM_INDEX_RATE | The index the Servicer is using to calculate a forecasted rate. | 4 | Max length of 6 | 6 |
| ACTL_BEG_PRIN_BAL | The borrower's actual principal balance at the beginning of the processing cycle. | 2 | No commas(,) or dollar signs ($) | 11 |
| ACTL_END_PRIN_BAL | The borrower's actual principal balance at the end of the processing cycle. | 2 | No commas(,) or dollar signs ($) | 11 |
| BORR_NEXT_PAY_DUE_DATE | The date at the end of processing cycle that the borrower's next payment is due to the Servicer, as reported by Servicer. | | MM/DD/YYYY | 10 |
| SERV_CURT_AMT_1 | The first curtailment amount to be applied. | 2 | No commas(,) or dollar signs ($) | 11 |
| SERV_CURT_DATE_1 | The curtailment date associated with the first curtailment amount. | | MM/DD/YYYY | 10 |
| CURT_ADJ_AMT_1 | The curtailment interest on the first curtailment amount, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |
| SERV_CURT_AMT_2 | The second curtailment amount to be applied. | 2 | No commas(,) or dollar signs ($) | 11 |
| SERV_CURT_DATE_2 | The curtailment date associated with the second curtailment amount. | | MM/DD/YYYY | 10 |

| CURT_ADJ_ AMT_2 | The curtailment interest on the second curtailment amount, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |

356

| Exhibit 1: Continued | Standard Loan Level File Layout | | | |
|---|---|---|---|---|
| Column Name | Description | Decimal | Format Comment | Max Size |
| SERV_CURT_AMT_3 | The third curtailment amount to be applied. | 2 | No commas(,) or dollar signs ($) | 11 |
| SERV_CURT_DATE_3 | The curtailment date associated with the third curtailment amount. | | MM/DD/YYYY | 10 |
| CURT_ADJ_AMT_3 | The curtailment interest on the third curtailment amount, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |
| PIF_AMT | The loan "paid in full" amount as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| PIF_DATE | The paid in full date as reported by the Servicer. | | MM/DD/YYYY | 10 |
| ACTION_CODE | The standard FNMA numeric code used to indicate the default/delinquent status of a particular loan. | | Action Code Key: 15=Bankruptcy, 30=Foreclosure, , 60=PIF, 63=Substitution, 65=Repurchase,70=REO | 2 |
| INT_ADJ_AMT | The amount of the interest adjustment as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| SOLDIER_SAILOR_ADJ_AMT | The Soldier and Sailor Adjustment amount, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |
| NON_ADV_LOAN_AMT | The Non Recoverable Loan Amount, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |
| LOAN_LOSS_AMT | The amount the Servicer is passing as a loss, if applicable. | 2 | No commas(,) or dollar signs ($) | 11 |
| Plus the following applicable fields: | | | | |
| SCHED_BEG_PRIN_BAL | The scheduled outstanding principal amount due at the beginning of the cycle date to be passed through to investors. | 2 | No commas(,) or dollar signs ($) | 11 |
| SCHED_END_PRIN_BAL | The scheduled principal balance due to investors at the end of a processing cycle. | 2 | No commas(,) or dollar signs ($) | 11 |
| SCHED_PRIN_AMT | The scheduled principal amount as reported by the Servicer for the current cycle -- only applicable for Scheduled/Scheduled Loans. | 2 | No commas(,) or dollar signs ($) | 11 |
| SCHED_NET_INT | The scheduled gross interest amount less the service fee amount for the current cycle as reported by the Servicer -- only applicable for Scheduled/Scheduled Loans. | 2 | No commas(,) or dollar signs ($) | 11 |
| ACTL_PRIN_AMT | The actual principal amount collected by the Servicer for the current reporting cycle -- only applicable for Actual/Actual Loans. | 2 | No commas(,) or dollar signs ($) | 11 |

| ACTL_NET_INT | The actual gross interest amount less the service fee amount for the current reporting cycle as reported by the Servicer -- only applicable for Actual/Actual Loans. | 2 | No commas(,) or dollar signs ($) | 11 |
|---|---|---|---|---|
| PREPAY_PENALTY_ AMT | The penalty amount received when a borrower prepays on his loan as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| PREPAY_PENALTY_ WAIVED | The prepayment penalty amount for the loan waived by the servicer. | 2 | No commas(,) or dollar signs ($) | 11 |

358

| | | | | |
|---|---|---|---|---|
| **Exhibit 1: Continued** | **Standard Loan Level File Layout** | | | |
| **Column Name** | **Description** | **Decimal** | **Format Comment** | **Max Size** |
| MOD_DATE | The Effective Payment Date of the Modification for the loan. | | MM/DD/YYYY | 10 |
| MOD_TYPE | The Modification Type. | | Varchar - value can be alpha or numeric | 30 |
| DELINQ_P&I_ADVANCE_AMT | The current outstanding principal and interest advances made by Servicer. | 2 | No commas(,) or dollar signs ($) | 11 |
| BREACH_FLAG | Flag to indicate if the repurchase of a loan is due to a breach of Representations and Warranties | | Y=Breach N=NO Breach Let blank if N/A | 1 |

359

**Exhibit 2: Monthly Summary Report by Single Investor**
## MONTHLY SUMMARY REPORT

For Month Ended: __mm/dd/yyyy__         Servicer Name _____

Prepared by: _____ Investor Nbr _____

| Section 1. Remittances and Ending Balances - Required Data | | | | |
|---|---|---|---|---|
| Beginning Loan Count | Ending Loan Count | Total Monthly Remittance Amo | Total Ending Unpaid Principal Balance | Total Monthly Principal Balance |
| 0 | 0 | $0.00 | $0.00 | $0.00 |

**Principal Calculation**

| | | |
|---|---|---|
| 1.  Monthly Principal Due | + | $0.00 |
| 2.  Current Curtailments | + | $0.00 |
| 3.  Liquidations | + | $0.00 |
| 4.  Other (attach explanation) | + | $0.00 |
| 5.  Principal Due | | $0.00 |
| 6.  Interest *(reported "gross")* | + | $0.00 |
| 7.  Interest Adjustments on Curtailments | + | $0.00 |
| 8.  Servicing Fees | - | $0.00 |
| 9.  Other Interest (attach explanation) | + | $0.00 |
| 10. Interest Due          *(need to subtract ser fee)* | | $0.00 |

**Remittance Calculation**

| | | |
|---|---|---|
| 11. Total Principal and Interest Due (lines 5+10) | + | $0.00 |
| 12. Reimbursement of Non-Recoverable Advances | - | $0.00 |
| 13. Total Realized gains | + | $0.00 |
| 14. Total Realized Losses | - | $0.00 |
| 15. Total Prepayment Penalties | + | $0.00 |
| 16. Total Non-Supported Compensating Interest | - | $0.00 |
| 17. Other (attach explanation) | | $0.00 |
| 18. Net Funds Due on or before Remittance Date | $ | $0.00 |

| Section 2. Delinquency Report - Optional Data for Loan Accounting | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Installments Delinquent** | | | | | | | |
| Total No. of Loans | Total No. of Delinquencies | 30- Days | 60- Days | 90 or more Days | In Foreclosure (Optional) | Real Estate Owned (Optional) | Total Dollar Amount of Delinquencies |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | $0.00 |

| Section 3.  REG AB Summary Reporting - REPORT ALL APPLICABLE FIELDS | | |
|---|---|---|
| **REG AB FIELDS** | **LOAN COUNT** | **BALANCE** |
| PREPAYMENT PENALTY AMT | 0 | $0.00 |
| PREPAYMENT PENALTY AMT WAIVED | 0 | $0.00 |
| DELINQUENCY P&I AMOUNT | 0 | $0.00 |

361

**EXHIBIT M-3**

**FORM OF REALIZED LOSS REPORT**

**Exhibit : Calculation of Realized Loss/Gain Form 332- Instruction Sheet**

**NOTE: Do not net or combine items. Show all expenses individually and all credits as separate line items. Claim packages are due on the remittance report date. Late submissions may result in claims not being passed until the following month. The Servicer, with respect to GMAC only, is responsible to remit all funds pending loss approval and /or resolution of any disputed items.**

1.

2.    The numbers on the 332 form correspond with the numbers listed below.

**Liquidation and Acquisition Expenses:**

1.    The Actual Unpaid Principal Balance of the Mortgage Loan. For documentation, an Amortization Schedule from date of default through liquidation breaking out the net interest and servicing fees advanced is required.

2.    The Total Interest Due less the aggregate amount of servicing fee that would have been earned if all delinquent payments had been made as agreed. For documentation, an Amortization Schedule from date of default through liquidation breaking out the net interest and servicing fees advanced is required.

3.    Accrued Servicing Fees based upon the Scheduled Principal Balance of the Mortgage Loan as calculated on a monthly basis. For documentation, an Amortization Schedule from date of default through liquidation breaking out the net interest and servicing fees advanced is required.

4-12.    Complete as applicable. Required documentation:

    * For taxes and insurance advances - see page 2 of 332 form - breakdown required showing period

    of coverage, base tax, interest, penalty. Advances prior to default require evidence of servicer efforts to recover advances.

    * For escrow advances - complete payment history

    (to calculate advances from last positive escrow balance forward)

    * Other expenses -  copies of corporate advance history showing all payments

    * REO repairs > $1500 require explanation

    * REO repairs >$3000 require evidence of at least 2 bids.

    * Short Sale or Charge Off require P&L supporting the decision and WFB's approved Officer Certificate

    * Unusual or extraordinary items may require further documentation.

13.    The total of lines 1 through 12.

**3.    Credits:**

14-21.    Complete as applicable. Required documentation:

362

* Copy of the HUD 1 from the REO sale. If a 3rd Party Sale, bid instructions and Escrow Agent / Attorney

Letter of Proceeds Breakdown.

* Copy of EOB for any MI or gov't guarantee

* All other credits need to be clearly defined on the 332 form

22.      The total of lines 14 through 21.

<u>Please Note:</u> For HUD/VA loans, use line (18a) for Part A/Initial proceeds and line (18b) for Part B/Supplemental proceeds.

**<u>Total Realized Loss (or Amount of Any Gain)</u>**

23.       The total derived from subtracting line 22 from 13. If the amount represents a realized gain, show the amount in parenthesis ( ).

---

363

**Exhibit 3A: Calculation of Realized Loss/Gain Form 332**

Prepared by: _____          Date: _____
Phone: _____          Email Address:_____

Servicer Loan No.                    Servicer Name                    Servicer Address

**WELLS FARGO BANK, N.A. Loan No.**_____

Borrower's Name: _____
Property Address: _____

**Liquidation Type:**     **REO Sale**     **3rd Party Sale**     **Short Sale**     **Charge Off**

**Was this loan granted a Bankruptcy deficiency or cramdown**     **Yes**     **No**
If "Yes", provide deficiency or cramdown amount _____

**Liquidation and Acquisition Expenses:**

| | | | |
|---|---|---|---|
| (1) | Actual Unpaid Principal Balance of Mortgage Loan | $ _____ | (1) |
| (2) | Interest accrued at Net Rate | _____ | (2) |
| (3) | Accrued Servicing Fees | _____ | (3) |
| (4) | Attorney's Fees | _____ | (4) |
| (5) | Taxes (see page 2) | _____ | (5) |
| (6) | Property Maintenance | _____ | (6) |
| (7) | MI/Hazard Insurance Premiums (see page 2) | _____ | (7) |
| (8) | Utility Expenses | _____ | (8) |
| (9) | Appraisal/BPO | _____ | (9) |
| (10) | Property Inspections | _____ | (10) |
| (11) | FC Costs/Other Legal Expenses | _____ | (11) |
| (12) | Other (itemize) | _____ | (12) |
| | Cash for Keys _____ | _____ | (12) |
| | HOA/Condo Fees _____ | | (12) |
| | | _____ | (12) |
| | **Total Expenses** | $ _____ | (13) |

**Credits**:

| | | | |
|---|---|---|---|
| (14) | Escrow Balance | $ _____ | (14) |
| (15) | HIP Refund | _____ | (15) |
| (16) | Rental Receipts | _____ | (16) |
| (17) | Hazard Loss Proceeds | _____ | (17) |
| (18) | Primary Mortgage Insurance / Gov't Insurance | _____ | (18a) |
| | HUD Part A | | |

364

HUD Part B                                                            (18b)

(19)      Pool Insurance Proceeds                                     (19)

(20)      Proceeds from Sale of Acquired Property                     (20)

(21)      Other (itemize)                                             (21)

                                                                     (21)

          **Total Credits**                              $           (22)
**Total Realized Loss (or Amount of Gain)**              $           (23)

365

**Escrow Disbursement Detail**

| Type (Tax /Ins.) | Date Paid | Period of Coverage | Total Paid | Base Amount | Penalties | Interest |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

366

Case 3:13-cv-01983-WHO   Document 32-4   Filed 09/27/13   Page 158 of 178

EXHIBIT N

COUNTRYWIDE ADDENDUM REGULATION AB

1.        Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Pooling and Servicing Agreement.

Countrywide Information: As defined in Section 2(g)(i)(A)(1).

Securitization Transaction: Citigroup Mortgage Loan Trust 2007-AMC2, Asset-Backed Pass-Through Certificates, Series 2007-AMC2.

Servicer: As defined in Section 2(c)(iii).

Subcontractor: Any vendor, subcontractor or other Person that is not responsible for the overall servicing (as "servicing" is commonly understood by participants in the mortgage-backed securities market) of Mortgage Loans but performs one or more discrete functions identified in Item 1122(d) of Regulation AB with respect to Mortgage Loans under the direction or authority of Countrywide or a Subservicer.

Subservicer: Any Person that services Mortgage Loans on behalf of Countrywide or any Subservicer and is responsible for the performance (whether directly or through Subservicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed by Countrywide under the Pooling and Servicing Agreement that are identified in Item 1122(d) of Regulation AB; provided, however, that the term "Subservicer" shall not include any master servicer, or any special servicer engaged at the request of the Depositor, the Master Servicer or investor in the Securitization Transaction, nor any "back-up servicer" or trustee performing servicing functions on behalf of the Securitization Transaction.

2.      The Master Servicer, the Depositor and Countrywide agree that the Pooling and Servicing Agreement is hereby supplemented by adding the following provisions:

(a)        Intent of the Parties; Reasonableness.

The Depositor, the Master Servicer and Countrywide acknowledge and agree that the purpose of Article 2 of this Addendum is to facilitate compliance by the Master Servicer and the Depositor with the provisions of Regulation AB and related rules and regulations of the Commission. Neither the Master Servicer nor the Depositor shall exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission thereunder. Countrywide acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, and agrees to negotiate in good faith with the Master Servicer and the Depositor with regard to any reasonable requests for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB. In connection with the Securitization Transaction, Countrywide shall cooperate fully with the Master Servicer and the Depositor to deliver to the Master Servicer (including any of its assignees or designees) and the Depositor, any and all statements, reports, certifications, records and any other information necessary to permit the Master Servicer or the Depositor to comply with the provisions of Regulation AB, together with such disclosures relating to Countrywide, and any parties or items identified in writing by the Master Servicer or the Depositor, including, any Subservicer or the servicing of the Mortgage Loans necessary in order to effect such compliance.

The Depositor and the Master Servicer agree that they will cooperate with Countrywide and provide sufficient and timely notice of any information requirements pertaining to the Securitization Transaction. The Depositor and the Master Servicer will make all reasonable efforts to contain requests for information, reports or any other materials to items required for compliance with Regulation AB, and shall not request information which is not required for such compliance.

(b) [Reserved].

(c) Information to Be Provided by Countrywide.

In connection with the Securitization Transaction Countrywide shall (1) within ten Business Days following request by the Master Servicer or the Depositor, provide to the Master Servicer and the Depositor (or cause each Subservicer to provide), in writing reasonably required for compliance with Regulation AB, the information and materials specified in paragraph (iii) of this Section 2(c), (2) within the time frame set forth therein, the information and materials specified in paragraph (vi) of this Section 2(c), and (3) as promptly as practicable following notice to or discovery by Countrywide, provide to the Master Servicer and the Depositor (as required by Regulation AB) the information specified in paragraph (iv) of this Section.

(i) Reserved.

(ii) Reserved.

(iii) Reserved.

(iv) For the purpose of satisfying the reporting obligations of the Issuing Entity under the Exchange Act, Countrywide shall (and shall cause each Subservicer to) (a) provide prompt notice to the Master Servicer and the Depositor in writing of (1) any merger, consolidation or sale of substantially all of the assets of Countrywide, (2) Countrywide's entry into an agreement with a Subservicer to perform or assist in the performance of any of Countrywide's obligations under the Pooling and Servicing Agreement that qualifies as an "entry into a material definitive agreement" under Item 1.01 of the Form 8-K, (3) any Servicer Event of Default under the terms of the Pooling and Servicing Agreement to the extent not known by the Master Servicer or the Depositor, and (4) a brief description of any material litigation or governmental proceedings involving Countrywide or any Subservicer.

(v) As a condition to the succession to Countrywide or any Subservicer as servicer or subservicer under the Pooling and Servicing Agreement by any Person (i) into which Countrywide or such Subservicer may be merged or consolidated, or (ii) which may be appointed as a successor to Countrywide or any Subservicer, Countrywide shall provide to the Master Servicer and the Depositor, at least 15 calendar days prior to the effective date of such succession or appointment, (x) written notice to the Master Servicer and the Depositor of such succession or appointment and (y) in writing, all information reasonably requested by the Master Servicer or the Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K with respect to the Certificates.

(vi) Countrywide shall provide to the Master Servicer and the Depositor a description of any affiliation or relationship required to be disclosed under Item 1119 between Countrywide and any of the parties listed in Items 1119 (a)(1)-(6) of Regulation AB that develops following the Closing Date (other than an affiliation or relationship that the Master Servicer, the Depositor or the issuing entity is required to disclose under Item 1119 of Regulation AB) no later than 15 calendar days prior to the date the Depositor is required to file its Form 10-K disclosing such affiliation or relationship. For purposes of the foregoing, Countrywide (1) shall be entitled to assume that the parties to the Securitization Transaction with whom affiliations or relations must be disclosed are the same as on the closing date if it provides a written request (which may be by e-mail) to the Depositor or the Master Servicer, as applicable, requesting such confirmation and either obtains such confirmation or receives no response within three (3) Business Days, (2) shall not be obligated to disclose any affiliations or relationships that may develop after the closing date for the Securitization Transaction with any parties not identified to Countrywide in writing within ten days in advance of the Securitization Transaction, and (3) shall be entitled to rely upon any written identification of parties provided by the Depositor or the Master Servicer.

(vii) Not later than ten days prior to the deadline for the filing of the Monthly Statement on Form 10-D in respect of the Securitization Transaction that includes any of the Mortgage Loans serviced by Countrywide or any Subservicer, Countrywide or such Subservicer, as applicable, shall, to the extent Countrywide or such Subservicer has knowledge, provide to the party responsible for filing such report (including, if applicable, the Master Servicer) notice of the occurrence of any of the following events, along with all information, data, and materials related thereto as may be required to be included in the related distribution report on Form 10-D:

(a) any material modifications, extensions or waivers of Mortgage Loan terms, fees, penalties or payments during the distribution period; or

368

(b) material breaches of transaction covenants under the Pooling and Servicing Agreement, as supplemented herein.

(d)        Servicer Compliance Statement.

On or before March 5 of each calendar year, commencing in 2008, Countrywide shall deliver to the Master Servicer and the Depositor a statement of compliance addressed to the Master Servicer and the Depositor and signed by an authorized officer of Countrywide, to the effect that (i) a review of Countrywide's servicing activities during the immediately preceding calendar year (or applicable portion thereof) and of its performance under the servicing provisions of the Pooling and Servicing Agreement during such period has been made under such officer's supervision, and (ii) to the best of such officers' knowledge, based on such review, Countrywide has fulfilled all of its servicing obligations under the Pooling and Servicing Agreement in all material respects throughout such calendar year (or applicable portion thereof) or, if there has been a failure to fulfill any such obligation in any material respect, specifically identifying each such failure known to such officer and the nature and the status thereof.

(e)        Report on Assessment of Compliance and Attestation.

(i)        On or before March 5 of each calendar year, commencing in 2008, Countrywide shall:

(A) deliver to the Master Servicer and the Depositor a report regarding Countrywide's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB. Such report shall be addressed to the Master Servicer and the Depositor and signed by an authorized officer of Countrywide, and shall address each of the applicable Servicing Criteria specified on Exhibit A hereto (wherein "Investor" shall mean the Master Servicer);

(B) deliver to the Master Servicer and the Depositor a report of a registered public accounting firm that attests to, and reports on, the assessment of compliance made by Countrywide and delivered pursuant to the preceding paragraph. Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act;

(C) if required by Regulation AB, cause each Subservicer and each Subcontractor determined by Countrywide pursuant to Section 2(f)(ii) to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB (each, a "Participating Entity"), to deliver to the Master Servicer and the Depositor an assessment of compliance and accountants' attestation as and when provided in paragraphs (i) and (ii) of this Section 2(e); and

(D) deliver, or, if required by Regulation AB, cause each Subservicer and Participating Entity to deliver to the Master Servicer, the Depositor or any other Person that will be responsible for signing the certification (a "Sarbanes Certification") required by Rules 13a-14(d) and 15d-14(d) under the Exchange Act (pursuant to Section 302 of the Sarbanes-Oxley Act of 2002) on behalf of the Issuing Entity a certification, signed by the appropriate officer of Countrywide, in the form attached hereto as Exhibit B; provided that such certification delivered by Countrywide may not be filed as an exhibit to, or included in, any filing with the Commission.

Countrywide acknowledges that the party identified in clause (i)(D) above may rely on the certification provided by Countrywide pursuant to such clause in signing a Sarbanes Certification and filing such with the Commission.

(ii) Each assessment of compliance provided by a Subservicer pursuant to Section 2(e)(i)(A) shall address each of the applicable Servicing Criteria specified on Exhibit A hereto (wherein "investor" shall mean the Master Servicer) delivered to the Master Servicer and the Depositor concurrently with the execution of the Pooling and Servicing Agreement or, in the case of a Subservicer subsequently appointed as such, on or prior to the date of such appointment. An assessment of compliance provided by a Participating Entity pursuant to Section 2(e)(i)(C) need not address any elements of the Servicing Criteria other than those specified by Countrywide pursuant to Section 2(f).

If reasonably requested by the Master Servicer or the Depositor, Countrywide shall provide to the Master Servicer or the Depositor, evidence of the authorization of the person signing the certificate or statement provided pursuant to Section 2(d) and 2(e) of this Addendum.

(f)        Use of Subservicers and Subcontractors.

Countrywide shall not hire or otherwise utilize the services of any Subservicer to fulfill any of the obligations of Countrywide as

369

servicer under the Pooling and Servicing Agreement unless Countrywide complies with the provisions of paragraph (i) of this Subsection (f). Countrywide shall not hire or otherwise utilize the services of any Subcontractor, and shall not permit any Subservicer to hire or otherwise utilize the services of any Subcontractor, to fulfill any of the obligations of Countrywide as servicer under the Pooling and Servicing Agreement unless Countrywide complies with the provisions of paragraph (ii) of this Subsection (f).

(i)       It shall not be necessary for Countrywide to seek the consent of the Master Servicer or the Depositor to the utilization of any Subservicer. If required by Regulation AB, Countrywide shall cause any Subservicer used by Countrywide (or by any Subservicer) for the benefit of the Master Servicer and the Depositor to comply with the provisions of this Section and with Sections 2(b), 2(c)(iii), 2(c)(v), 2(d), and 2(e) of this Addendum, and to provide the information required with respect to such Subservicer under Section 2(c)(iv) of this Addendum. Countrywide shall be responsible for obtaining from each Subservicer and delivering to the Master Servicer and the Depositor any servicer compliance statement required to be delivered by such Subservicer under Section 2(d), any assessment of compliance and attestation required to be delivered by such Subservicer under Section 2(e) and any certification required to be delivered to the Person that will be responsible for signing the Sarbanes Certification under Section 2(e) as and when required to be delivered.

(ii)      It shall not be necessary for Countrywide to seek the consent of the Master Servicer or the Depositor to the utilization of any Subcontractor. If required by Regulation AB, after reasonable notice from the Master Servicer or the Depositor of the parties involved in the Securitization Transaction, Countrywide shall promptly upon request provide to the Master Servicer and the Depositor a written description of the role and function of each Subcontractor utilized by Countrywide or any Subservicer, specifying (A) the identity of each such Subcontractor, (B) which (if any) of such Subcontractors are Participating Entities, and (C) which elements of the Servicing Criteria will be addressed in assessments of compliance provided by each Participating Entity identified pursuant to clause (B) of this paragraph.

Countrywide shall cause any such Participating Entity used by Countrywide (or by any Subservicer) for the benefit of the Master Servicer and the Depositor to comply with the provisions of Section 2(e) of this Addendum. Countrywide shall be responsible for obtaining from each Participating Entity and delivering to the Master Servicer and the Depositor any assessment of compliance and attestation and certificate required to be delivered by such Participating Entity under Section 2(e), in each case as and when required to be delivered.

(g)       Indemnification; Remedies.

(i) Countrywide shall indemnify the Master Servicer and each of the following parties participating in the Securitization Transaction: the Sponsor, the Depositor and the Issuing Entity; each Person responsible for the execution or filing of any report required to be filed with the Commission with respect to the Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to the Securitization Transaction; each broker dealer acting as underwriter, acting as placement agent or acting as initial purchaser; each Person who controls any of such parties (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers and employees of each of the foregoing and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(A)(1) any untrue statement of a material fact contained or alleged to be contained in any written information, written report, certification or other material provided under this Addendum by or on behalf of Countrywide, or provided under this Addendum by or on behalf of any Subservicer or Participating Entity (collectively, the "Countrywide Information"), or (2) the omission or alleged omission to state in Countrywide Information a material fact required to be stated in Countrywide Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, by way of clarification,* that clause (2) of this paragraph shall be construed solely by reference to Countrywide Information and not to any other information communicated in connection with the sale or purchase of the Certificates, without regard to whether Countrywide Information or any portion thereof is presented together with or separately from such other information;

(B) any failure by Countrywide, any Subservicer, any Participating Entity to deliver any information, report, certification, accountants' letter or other material when and as required under this Addendum, including any failure by Countrywide to identify pursuant to Section 2(f)(ii) any Participating Entity; or

(C) any breach by Countrywide of a representation or warranty set forth in Section 2(b)(i) or in a writing furnished pursuant to Section 2(b)(ii) and made as of a date prior to the Closing Date, to the extent that such breach is not cured by such closing date, or any breach by Countrywide of a representation or warranty in a writing furnished pursuant to Section 2(b)(ii) to the extent made as of a date subsequent to such closing date.

370

If the indemnification provided for herein is unavailable or insufficient to hold harmless the parties set forth in Section 2(g)(i), then Countrywide agrees that it shall contribute to the amount paid or payable by such indemnified party as a result of any claims, losses, damages or liabilities incurred by such indemnified party in such proportion as is appropriate to reflect the relative fault of such indemnified party on the one hand and Countrywide on the other.

In the case of any failure of performance described in clause (i)(B) of this Section, Countrywide shall promptly reimburse the Master Servicer or the Depositor, as applicable, and each Person responsible for the execution or filing of any report required to be filed with the Commission with respect to the Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to the Securitization Transaction, for all costs reasonably incurred by each such party in order to obtain the information, report, certification, accountants' letter or other material not delivered as required by Countrywide, any Subservicer or any Participating Entity.

(ii)    (A) Any failure by Countrywide, any Subservicer or any Participating Entity to deliver any information, report, certification, accountants' letter or other material when and as required under this Addendum, which continues unremedied for three Business Days after receipt by Countrywide and the applicable Subservicer or Subcontractor of written notice of such failure from the Master Servicer or the Depositor shall, except as provided in clause (B) of this paragraph, constitute a Servicer Event of Default with respect to Countrywide under the Pooling and Servicing Agreement, and shall entitle the Master Servicer or the Depositor, as applicable, in its sole discretion to terminate the rights and obligations of Countrywide as servicer under the Pooling and Servicing Agreement without payment (notwithstanding anything in the Pooling and Servicing Agreement to the contrary) of any compensation to Countrywide (and appoint a successor servicer reasonably acceptable to the Master Servicer); *provided, however* it is understood that Countrywide shall remain entitled to receive reimbursement for all unreimbursed P&I Advances and Servicing Advances made by Countrywide under the Pooling and Servicing Agreement in accordance with and pursuant to the terms of the Pooling and Servicing Agreement as if Countrywide had not been terminated as servicer. Notwithstanding anything to the contrary set forth herein, to the extent that any provision of the Pooling and Servicing Agreement expressly provides for the survival of certain rights or obligations following termination of Countrywide as servicer, such provision shall be given effect.

(B)    Any failure by Countrywide, any Subservicer or any Participating Entity to deliver any information, report, certification or accountants' letter required under Regulation AB when and as required under Section 2(d) or 2(e), including any failure by Countrywide to identify a Participating Entity, which continues unremedied for ten calendar days after the date on which such information, report, certification or accountants' letter was required to be delivered shall constitute a Servicer Event of Default with respect to Countrywide under the Pooling and Servicing Agreement, and shall entitle the Master Servicer or the Depositor, as applicable, in its sole discretion to terminate the rights and obligations of Countrywide as servicer under the Pooling and Servicing Agreement without payment (notwithstanding anything in the Pooling and Servicing Agreement to the contrary) of any compensation to Countrywide; *provided, however* it is understood that Countrywide shall remain entitled to receive reimbursement for all unreimbursed P&I Advances and Servicing Advances made by Countrywide under the Pooling and Servicing Agreement in accordance with and pursuant to the terms of the Pooling and Servicing Agreement as if Countrywide had not been terminated as servicer. Notwithstanding anything to the contrary set forth herein, to the extent that any provision of the Pooling and Servicing Agreement expressly provides for the survival of certain rights or obligations following termination of Countrywide as servicer, such provision shall be given effect.

(C)    Countrywide shall promptly reimburse the Master Servicer (or any affected designee of the Master Servicer) and the Depositor, as applicable, for all reasonable expenses incurred by the Master Servicer (or such designee) or the Depositor as such are incurred, in connection with the termination of Countrywide as servicer and the transfer of servicing of the Mortgage Loans to a successor servicer. The provisions of this paragraph shall not limit whatever rights Countrywide, the Master Servicer or the Depositor may have under other provisions of the Pooling and Servicing Agreement or otherwise, whether in equity or at law, such as an action for damages, specific performance or injunctive relief.

(iii)    The Master Servicer agrees to indemnify and hold harmless Countrywide, any Subservicer, any Participating Entity, each Person who controls any of such parties (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the respective present and former directors, officers and employees of each of the foregoing from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon any untrue statement or alleged untrue statement of any material fact contained in any filing with the Commission or the omission or alleged omission to state in any filing with the Commission a material fact required to be stated or necessary to be stated in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case to the extent, but only to the extent, that such untrue statement, alleged untrue statement, omission, or alleged omission relates to any filing with the Commission other than

371

Countrywide Information.

(iv)      If the indemnification provided for herein is unavailable or insufficient to hold harmless the indemnified party, then the indemnifying party agrees that it shall contribute to the amount paid or payable by such indemnified party as a result of any claims, losses, damages or liabilities incurred by such indemnified party in such proportion as is appropriate to reflect the relative fault of such indemnified party on the one hand and the indemnifying party on the other.

(v)      The indemnifications provided for in Section 2(g) shall survive the termination of the Pooling and Servicing Agreement or the termination of any party to the Pooling and Servicing Agreement.

3.      The Pooling and Servicing Agreement is hereby supplemented as follows:

(A)      Subservicing Agreements Between Countrywide and Subservicers.

Countrywide, as servicer, may arrange for the subservicing of any Mortgage Loan by a Subservicer pursuant to a subservicing agreement. Each Subservicer shall be (i) authorized to transact business in the state or states where the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law to enable the Subservicer to perform its obligations hereunder and under the subservicing agreement and (ii) a Freddie Mac or Fannie Mae approved mortgage servicer. Notwithstanding the provisions of any subservicing agreement, any of the provisions of the Pooling and Servicing Agreement relating to agreements or arrangements between Countrywide or a Subservicer or reference to actions taken through Countrywide or otherwise, Countrywide shall remain obligated and liable to the Master Servicer and its successors and assigns for the servicing and administration of the Mortgage Loans in accordance with the provisions of the Pooling and Servicing Agreement without diminution of such obligation or liability by virtue of such subservicing agreements or arrangements or by virtue of indemnification from the Subservicer and to the same extent and under the same terms and conditions as if Countrywide alone were servicing and administering the Mortgage Loans. In the event Countrywide is terminated as servicer pursuant to Section 7.01 of the Pooling and Servicing Agreement or Section 2(g)(ii)(A) or (B) of this Addendum, the Subservicer, if any, shall no longer have the right to service the related Mortgage Loans.

(B)      No Contractual Relationship Between Subservicer and the Master Servicer or the Depositor

Any subservicing agreement and any other transactions or services relating to the Mortgage Loans involving a Subservicer shall be deemed to be between the Subservicer and Countrywide alone and the Master Servicer and the Depositor shall not be deemed a party thereto and shall have no claims, rights, obligations, duties or liabilities with respect to any Subservicer except as set forth in Section (A) above.

4.      Notwithstanding any other provision of this Addendum, Countrywide shall seek the consent of the Master Servicer and the Depositor for the utilization of all Subservicers and Participating Entities, when required by and in accordance with the terms of the Pooling and Servicing Agreement.

5.      The Pooling and Servicing Agreement is hereby supplemented with the Exhibit attached hereto as Exhibit A to the end thereto. References in this Addendum to the "Pooling and Servicing Agreement" or words of similar import (including indirect references to the Pooling and Servicing Agreement) shall be deemed to be references to the Pooling and Servicing Agreement as supplemented by this Addendum. In the event of a conflict between this Addendum and any other document or agreement, including without limitation the Pooling and Servicing Agreement, this Addendum shall control.

EXHIBIT A

SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

The assessment of compliance to be delivered by [Countrywide] [Name of Subservicer] shall address, at a minimum, the applicable criteria identified below as "Applicable Servicing Criteria":

| Servicing Criteria | Applicable Servicing Criteria |
|---|---|
|  |  |

| Reference | Criteria | |
|---|---|---|
| | **General Servicing Considerations** | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | X |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | X |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the mortgage loans are maintained. | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | X |
| | **Cash Collection and Administration** | |
| 1122(d)(2)(i) | Payments on mortgage loans are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | X |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | X |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | X |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | X |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | X |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | X |
| | **Investor Remittances and Reporting** | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of mortgage loans serviced by the Servicer. | X |

373

| | | |
|---|---|---|
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | X |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the Servicer's investor records, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | X |
| | **Pool Asset Administration** | |
| 1122(d)(4)(i) | Collateral or security on mortgage loans is maintained as required by the transaction agreements or related mortgage loan documents. | X |
| 1122(d)(4)(ii) | Mortgage loan and related documents are safeguarded as required by the transaction agreements | X |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | X |
| 1122(d)(4)(iv) | Payments on mortgage loans, including any payoffs, made in accordance with the related mortgage loan documents are posted to the Servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related mortgage loan documents. | X |
| 1122(d)(4)(v) | The Servicer's records regarding the mortgage loans agree with the Servicer's records with respect to an obligor's unpaid principal balance. | X |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's mortgage loans (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | X |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | X |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a mortgage loan is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent mortgage loans including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | X |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for mortgage loans with variable rates are computed based on the related mortgage loan documents. | X |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's mortgage loan documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable mortgage loan documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related mortgage loans, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | X |

| | | |
|---|---|---|
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | **X** |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | **X** |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | **X** |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | |

[NAME OF COMPANY] [NAME OF SUBSERVICER]

Date: _____

By: _____
Name: _____
Title: _____

EXHIBIT B

FORM OF ANNUAL CERTIFICATION

Re:      The [              ] agreement dated as of [        ], 200[  ] (the "Agreement"), among [IDENTIFY PARTIES]

I, _____, the _____ of Countrywide Home Loans, Inc., certify to [the Master Servicer], [the Depositor], [Master Servicer], [Securities Administrator] or [Trustee], and its officers, with the knowledge and intent that they will rely upon this certification, that:

(1) I have reviewed the servicer compliance statement of Countrywide provided in accordance with Item 1123 of Regulation AB (the "Compliance Statement"), the report on assessment of Countrywide's compliance with the servicing criteria set forth in Item 1122(d) of Regulation AB (the "Servicing Criteria"), provided in accordance with Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as amended (the "Exchange Act") and Item 1122 of Regulation AB (the "Servicing Assessment"), the registered public accounting firm's attestation report provided in accordance with Rules 13a-18 and 15d-18 under the Exchange Act and Section 1122(b) of Regulation AB (the "Attestation Report"), and all servicing reports, officer's certificates and other information relating to the servicing of the Mortgage Loans by Countrywide during 200[  ] that were delivered by Countrywide to the [Depositor] [Master Servicer] [Securities Administrator] or [Trustee] pursuant to the Pooling and Servicing Agreement (collectively, the "Company Servicing Information");

(2) Based on my knowledge, Countrywide Servicing Information, taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which such statements were made, not misleading with respect to the period of time covered by Countrywide Servicing Information;

(3) Based on my knowledge, all of Countrywide Servicing Information required to be provided by Countrywide under the Pooling and Servicing Agreement has been provided to the [Depositor] [Master Servicer] [Securities Administrator] or [Trustee];

375

(4) I am responsible for reviewing the activities performed by Countrywide as servicer under the Pooling and Servicing Agreement, and based on my knowledge and the compliance review conducted in preparing the Compliance Statement and except as disclosed in the Compliance Statement, the Servicing Assessment or the Attestation Report, Countrywide has fulfilled its obligations under the Pooling and Servicing Agreement; and

[Intentionally Left Blank]

(5) The Compliance Statement required to be delivered by Countrywide pursuant to the Pooling and Servicing Agreement, and the Servicing Assessment and Attestation Report required to be provided by Countrywide and by each Subservicer and Participating Entity pursuant to the Pooling and Servicing Agreement, have been provided to the [Depositor] [Master Servicer]. Any material instances of noncompliance described in such reports have been disclosed to the [Depositor] [Master Servicer]. Any material instance of noncompliance with the Servicing Criteria has been disclosed in such reports.

Date:_____

By:_____
Name:_____
Title:_____

376

EXHIBIT O-1

FORM OF COUNTRYWIDE DELINQUENCY REPORT

**Standard File Layout - Delinquency Reporting**

REPORTING DATA FOR DEFAULTED LOANS

Data must be submitted to Wells Fargo Bank in an **Excel** spreadsheet format with fixed field names and data type. The **Excel** spreadsheet should be used as a template consistently every month when submitting data.

**Table: Delinquency**

| Name | Type | Size |
|------|------|------|
| **Servicer Loan #** | **Number (Double)** | **8** |
| **Investor Loan #** | **Number (Double)** | **8** |
| **Borrower Name** | **Text** | **20** |
| **Address** | **Text** | **30** |
| **State** | **Text** | **2** |
| Due Date | Date/Time | 8 |
| **Action Code** | **Text** | **2** |
| FC Received | Date/Time | 8 |
| File Referred to Atty | Date/Time | 8 |
| NOD | Date/Time | 8 |
| Complaint Filed | Date/Time | 8 |
| Sale Published | Date/Time | 8 |
| Target Sale Date | Date/Time | 8 |
| Actual Sale Date | Date/Time | 8 |
| Loss Mit Approval Date | Date/Time | 8 |
| Loss Mit Type | Text | 5 |
| Loss Mit Estimated Completion Date | Date/Time | 8 |
| Loss Mit Actual Completion Date | Date/Time | 8 |
| Loss Mit Broken Plan Date | Date/Time | 8 |
| BK Chapter | Text | 6 |
| BK Filed Date | Date/Time | 8 |
| Post Petition Due | Date/Time | 8 |
| Motion for Relief | Date/Time | 8 |
| Lift of Stay | Date/Time | 8 |
| RFD | Text | 10 |
| Occupant Code | Text | 10 |
| Eviction Start Date | Date/Time | 8 |
| Eviction Completed Date | Date/Time | 8 |
| List Price | Currency | 8 |
| List Date | Date/Time | 8 |
| Accepted Offer Price | Currency | 8 |
| Accepted Offer Date | Date/Time | 8 |
| Estimated REO Closing Date | Date/Time | 8 |
| Actual REO Sale Date | Date/Time | 8 |

• **Items in bold are MANDATORY FIELDS. We must receive information in those fields every month in order for your file to be**

**accepted**.

The Action Code Field should show the applicable numeric code to indicate that a special action is being taken. The Action Codes are the following:

> **12-Relief Provisions**
> **15-Bankruptcy/Litigation**
> **20-Referred for Deed-in-Lieu**
> **30-Referred fore Foreclosure**
> **60-Payoff**
> **65-Repurchase**
> **70-REO-Held for Sale**
> **71-Third Party Sale/Condemnation**
> **72-REO-Pending Conveyance-Pool Insurance claim filed**

Wells Fargo Bank will accept alternative Action Codes to those above, provided that the Codes are consistent with industry standards. If Action Codes other than those above are used, the Servicer must supply Wells Fargo Bank with a description of each of the Action Codes prior to sending the file.

Description of Action Codes:

**Action Code 12** - To report a Mortgage Loan for which the Borrower has been granted relief for curing a delinquency. The Action Date is the date the relief is expected to end. For military indulgence, it will be three months after the Borrower's discharge from military service.

**Action Code 15** - To report the Borrower's filing for bankruptcy or instituting some other type of litigation that will prevent or delay liquidation of the Mortgage Loan. The Action Date will be either the date that any repayment plan (or forbearance) instituted by the bankruptcy court will expire or an additional date by which the litigation should be resolved.

**Action Code 20** - To report that the Borrower has agreed to a deed-in-lieu or an assignment of the property. The Action Date is the date the Servicer decided to pursue a deed-in-lieu or the assignment.

**Action Code 30** - To report that the decision has been made to foreclose the Mortgage Loan. The Action Date is the date the Servicer referred the case to the foreclosure attorney.

**Action Code 60** - To report that a Mortgage Loan has been paid in full either at, or prior to, maturity. The Action Date is the date the pay-off funds were remitted to the Master Servicer.

**Action Code 65** - To report that the Servicer is repurchasing the Mortgage Loan. The Action Date is the date the repurchase proceeds were remitted to the Master Servicer.

**Action Code 70** - To report that a Mortgage Loan has been foreclosed or a deed-in-lieu of foreclosure has been accepted, and the Servicer, on behalf of the owner of the Mortgage Loan, has acquired the property and may dispose of it. The Action Date is the date of the foreclosure sale or, for deeds-in-lieu, the date the deed is recorded on behalf of the owner of the Mortgage Loan.

**Action Code 71** - To report that a Mortgage Loan has been foreclosed and a third party acquired the property, or a total condemnation of the property has occurred. The Action Date is the date of the foreclosure sale or the date the condemnation award was received.

**Action Code 72** - To report that a Mortgage Loan has been foreclosed, or a deed-in-lieu has been accepted, and the property may be conveyed to the mortgage insurer and the pool insurance claim has been filed. The Action Date is the date of the foreclosure sale, or, for deeds-in-lieu, the date of the deed for conventional mortgages.

The Loss Mit Type field should show the approved Loss Mitigation arrangement. The following are acceptable:

> **ASUM-Approved Assumption**
> **BAP-Borrower Assistance Program**
> **CO-Charge Off**
> **DIL-Deed-in-Lieu**

**FFA-Formal Forbearance Agreement**
**MOD-Loan Modification**
**PRE-Pre-Sale**
**SS-Short Sale**
**MISC-Anything else approved by the PMI or Pool Insurer**

Wells Fargo Bank will accept alternative Loss Mitigation Types to those above, provided that they are consistent with industry standards. If Loss Mitigation Types other than those above are used, the Servicer must supply Wells Fargo Bank with a description of each of the Loss Mitigation Types prior to sending the file.

The Occupant Code field should show the current status of the property. The acceptable codes are:

**MORTGAGOR**
**TENANT**
**UNKNOWN**
**VACANT**

379

EXHIBIT O-2

COUNTRYWIDE MONTHLY REMITTANCE ADVICE

**Standard File Layout - Scheduled/Scheduled**

| Column Name | Description | Decimal | Format Comment |
|---|---|---|---|
| SER_INVESTOR_NBR | A value assigned by the Servicer to define a group of loans. | | Text up to 10 digits |
| LOAN_NBR | A unique identifier assigned to each loan by the investor. | | Text up to 10 digits |
| SERVICER_LOAN_NBR | A unique number assigned to a loan by the Servicer. This may be different than the LOAN_NBR. | | Text up to 10 digits |
| BORROWER_NAME | The borrower name as received in the file. It is not separated by first and last name. | | Maximum length of 30 (Last, First) |
| SCHED_PAY_AMT | Scheduled monthly principal and scheduled interest payment that a borrower is expected to pay, P&I constant. | 2 | No commas(,) or dollar signs ($) |
| NOTE_INT_RATE | The loan interest rate as reported by the Servicer. | 4 | Max length of 6 |
| NET_INT_RATE | The loan gross interest rate less the service fee rate as reported by the Servicer. | 4 | Max length of 6 |
| SERV_FEE_RATE | The servicer's fee rate for a loan as reported by the Servicer. | 4 | Max length of 6 |
| SERV_FEE_AMT | The servicer's fee amount for a loan as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) |
| NEW_PAY_AMT | The new loan payment amount as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) |
| NEW_LOAN_RATE | The new loan rate as reported by the Servicer. | 4 | Max length of 6 |
| ARM_INDEX_RATE | The index the Servicer is using to calculate a forecasted rate. | 4 | Max length of 6 |
| ACTL_BEG_PRIN_BAL | The borrower's actual principal balance at the beginning of the processing cycle. | 2 | No commas(,) or dollar signs ($) |
| ACTL_END_PRIN_BAL | The borrower's actual principal balance at the end of the processing cycle. | 2 | No commas(,) or dollar signs ($) |
| BORR_NEXT_PAY_DUE_DATE | The date at the end of processing cycle that the borrower's next payment is due to the Servicer, as reported by Servicer. | | MM/DD/YYYY |
| SERV_CURT_AMT_1 | The first curtailment amount to be applied. | 2 | No commas(,) or dollar signs ($) |
| SERV_CURT_DATE_1 | The curtailment date associated with the first curtailment amount. | | MM/DD/YYYY |
| CURT_ADJ_AMT_1 | The curtailment interest on the first curtailment amount, if applicable. | 2 | No commas(,) or dollar signs ($) |
| SERV_CURT_AMT_2 | The second curtailment amount to be applied. | 2 | No commas(,) or dollar signs ($) |

380

| | | | |
|---|---|---|---|
| SERV_CURT_DATE_2 | The curtailment date associated with the second curtailment amount. | | MM/DD/YYYY |
| CURT_ADJ_AMT_2 | The curtailment interest on the second curtailment amount, if applicable. | 2 | No commas(,) or dollar signs ($) |
| SERV_CURT_AMT_3 | The third curtailment amount to be applied. | 2 | No commas(,) or dollar signs ($) |
| SERV_CURT_DATE_3 | The curtailment date associated with the third curtailment amount. | | MM/DD/YYYY |
| CURT_ADJ_AMT_3 | The curtailment interest on the third curtailment amount, if applicable. | 2 | No commas(,) or dollar signs ($) |
| PIF_AMT | The loan "paid in full" amount as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) |
| PIF_DATE | The paid in full date as reported by the Servicer. | | MM/DD/YYYY |
| ACTION_CODE | The standard FNMA numeric code used to indicate the default/delinquent status of a particular loan. | | Action Code Key: 15=Bankruptcy, 30=Foreclosure,     ,   60=PIF, 63=Substitution, 65=Repurchase,70=REO |
| INT_ADJ_AMT | The amount of the interest adjustment as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) |
| SOLDIER_SAILOR_ADJ_AMT | The Soldier and Sailor Adjustment amount, if applicable. | 2 | No commas(,) or dollar signs ($) |
| NON_ADV_LOAN_AMT | The Non Recoverable Loan Amount, if applicable. | 2 | No commas(,) or dollar signs ($) |
| LOAN_LOSS_AMT | The amount the Servicer is passing as a loss, if applicable. | 2 | No commas(,) or dollar signs ($) |
| SCHED_BEG_PRIN_BAL | The scheduled outstanding principal amount due at the beginning of the cycle date to be passed through to investors. | 2 | No commas(,) or dollar signs ($) |
| SCHED_END_PRIN_BAL | The scheduled principal balance due to investors at the end of a processing cycle. | 2 | No commas(,) or dollar signs ($) |
| SCHED_PRIN_AMT | The scheduled principal amount as reported by the Servicer for the current cycle -- only applicable for Scheduled/Scheduled Loans. | 2 | No commas(,) or dollar signs ($) |
| SCHED_NET_INT | The scheduled gross interest amount less the service fee amount for the current cycle as reported by the Servicer -- only applicable for Scheduled/Scheduled Loans. | 2 | No commas(,) or dollar signs ($) |
| ACTL_PRIN_AMT | The actual principal amount collected by the Servicer for the current reporting cycle -- only applicable for Actual/Actual Loans. | 2 | No commas(,) or dollar signs ($) |
| ACTL_NET_INT | The actual gross interest amount less the service fee amount for the current reporting cycle as reported by the Servicer -- only applicable for Actual/Actual Loans. | 2 | No commas(,) or dollar signs ($) |
| PREPAY_PENALTY_AMT | The penalty amount received when a borrower prepays on his loan as reported by the Servicer. | 2 | No commas(,) or dollar signs ($) |
| PREPAY_PENALTY_WAIVED | The prepayment penalty amount for the loan waived by the servicer. | 2 | No commas(,) or dollar signs ($) |
| | | | |

381

| MOD_DATE | The Effective Payment Date of the Modification for the loan. | | MM/DD/YYYY |
|---|---|---|---|
| MOD_TYPE | The Modification Type. | | Varchar - value can be alpha or numeric |
| DELINQ_P&I_ADVANCE_AMT | The current outstanding principal and interest advances made by Servicer. | 2 | No commas(,) or dollar signs ($) |

382

EXHIBIT O-3

FORM OF COUNTRYWIDE REALIZED LOSS REPORT

WELLS FARGO BANK, N.A. Form 332

<u>Calculation of Realized Loss</u>

<u>Purpose</u>

To provide the Servicer with a form for the calculation of any Realized Loss (or gain) as a result of a Mortgage Loan having been foreclosed and Liquidated.

<u>Distribution</u>

The Servicer will prepare the form in duplicate and send the original together with evidence of conveyance of title and appropriate supporting documentation to the Master Servicer with the Monthly Accounting Reports which supports the Mortgage Loan's removal from the Mortgage Loan Activity Report. The Servicer will retain the duplicate for its own records.

<u>Due Date</u>

With respect to any liquidated Mortgage Loan, the form will be submitted to the Master Servicer no later than the date on which statements are due to the Master Servicer under Section 4.02 of this Agreement (the "Statement Date") in the month following receipt of final liquidation proceeds and supporting documentation relating to such liquidated Mortgage Loan; provided, that if such Statement Date is not at least 30 days after receipt of final liquidation proceeds and supporting documentation relating to such liquidated Mortgage Loan, then the form will be submitted on the first Statement Date occurring after the 30th day following receipt of final liquidation proceeds and supporting documentation.

<u>Preparation Instructions</u>

The numbers on the form correspond with the numbers listed below.

1.        The actual Unpaid Principal Balance of the Mortgage Loan.
2.        The Total Interest Due less the aggregate amount of servicing fee that would have been earned if all delinquent payments had been made as agreed.

3-7.      Complete as necessary. All line entries must be supported by copies of appropriate statements, vouchers, receipts, canceled checks, etc., to document the expense. Entries not properly documented will not be reimbursed to the Servicer.

8.        Accrued Servicing Fees based upon the Scheduled Principal Balance of the Mortgage Loan as calculated on a monthly basis.
10.       The total of lines 1 through 9.

<u>Credits</u>

11-17.    Complete as necessary. All line entries must be supported by copies of the appropriate claims forms, statements, payment checks, etc. to document the credit. If the Mortgage Loan is subject to a Bankruptcy Deficiency, the difference between the Unpaid Principal Balance of the Note prior to the Bankruptcy Deficiency and the Unpaid Principal Balance as reduced by the Bankruptcy Deficiency should be input on line 16.

18.       The total of lines 11 through 17.

Total Realized Loss (or Amount of Any Gain)

19.      The total derived from subtracting line 18 from 10. If the amount represents a realized gain, show the amount in parenthesis ( ).


# WELLS FARGO BANK, N.A.
# CALCULATION OF REALIZED LOSS


WELLS FARGO BANK, N.A. Trust: _____

Prepared by: _____  Date: _____

Phone: _____

Servicer Loan No.        Servicer Name        Servicer Address

WELLS FARGO BANK, N.A.
Loan No._____
Borrower's Name:_____
Property
Address:_____

**Liquidation and Acquisition Expenses:**

| | | |
|---|---|---|
| Actual Unpaid Principal Balance of Mortgage Loan | $ _____ | (1) |
| Interest accrued at Net Rate | _____ | (2) |
| Attorney's Fees | _____ | (3) |
| Taxes | _____ | (4) |
| Property Maintenance | _____ | (5) |
| MI/Hazard Insurance Premiums | _____ | (6) |
| Hazard Loss Expenses | _____ | (7) |
| Accrued Servicing Fees | _____ | (8) |
| Other (itemize) | _____ | (9) |
| | $ _____ | |

| | | |
|---|---|---|
| **Total Expenses** | $ _____ | (10) |
| **Credits**: | | |
| Escrow Balance | $ _____ | (11) |
| HIP Refund | _____ | (12) |
| Rental Receipts | _____ | (13) |
| Hazard Loss Proceeds | _____ | (14) |
| Primary Mortgage Insurance Proceeds | _____ | (15) |
| Proceeds from Sale of Acquired Property | _____ | (16) |
| Other (itemize) | _____ | (17) |
| | _____ | |
| | _____ | |
| **Total Credits** | $_____ | (18) |

**Total Realized Loss (or Amount of Gain)** $_____

384

Case 3:13-cv-01983-WHO   Document 32-4   Filed 09/27/13   Page 176 of 178

Case 3:13-cv-01983-WHO   Document 32-4   Filed 09/27/13   Page 177 of 178

SCHEDULE 1

MORTGAGE LOAN SCHEDULE

AS PREVIOUSLY FILED WITH THE COMMISSION ON MARCH 30, 2007

---

386

SCHEDULE 2

PREPAYMENT CHARGE SCHEDULE

AVAILABLE UPON REQUEST

387