# Rich Decl.

# Exhibit 4

1   Kristin L. Crone (SBN #269679)
    UFAN Legal Group, PC
2   1490 Stone Point Dr., Suite 100
    Roseville, CA 95661
3   Tel: (877) 791-2247
    Fax: (916) 669-9698
4   kristin@theufan.com

5   Attorney for Plaintiffs

6

7              UNITED STATES DISTRICT COURT
       CALIFORNIA CENTRAL DISTRICT – WESTERN DIVISION
8

9   OBED APOSTOL JR., an individual;          ) Case No.: 2:12-cv-04395-PSG-SH
10  JEANNE AMORATI, an individual;            )
    THEODORE AUFORT, an individual;           )
11  KAREN AUFORT, an individual;              ) **FIRST AMENDED COMPLAINT FOR**
    EDWARD FERGUSON, an individual;           ) **DAMAGES, INJUNCTIVE AND**
12  ANA OLIVARES, an individual;              ) **DECLARATORY RELIEF**
13  EFRAIN OLIVARES, an individual;           )
    NATHANIEL SANTAMARIA, an individual; )
14  DOROTEA SANTAMARIA, an individual;        )    1.  Invalid Assignment;
    TRACY SMITH, an individual;               )    2.  Mistake;
15  ANDREW TANDOC, an individual;             )    3.  Negligence (origination);
                                              )    4.  Negligence (servicing);
16           Plaintiffs,                       )
17       vs.                                   )
    CITIBANK, N.A.;                           )
18  CITIMORTGAGE, INC.;                       )
    ARGENT MORTGAGE COMPANY, LLC;             )
19  FLAGSTAR BANK, INC.;                      )
    ABN AMRO MORTGAGE GROUP, INC.;            )
20  WELLS FARGO, N.A. fka WACHOVIA, as        )
    successor in interest to WORLD SAVINGS    )
21  BABK, FSB;                                )
    UNITED CAPITAL SERVICES, INC.;            )
22  AMERIQUEST MORTGAGE COMPANY;              )
23  MORTGAGEIT, INC.; and                     )
    DOES I – XX, inclusive,                   )
24                                            )
25           Defendant.                        )
    _____       )
26

27  ///

28

FILED
2012 JUL 13 PM 3:37
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

411

Plaintiffs, and each of them, hereby demand a jury trial and allege as follows:

**PRELIMINARY STATEMENT**

1.     In recent history, subprime mortgage lending reached epic proportions. Historically, banks loaned money to borrowers that they would not recoup until the stream of payments had been made.  For the loss of the use of this money, interest was added to the total amount owed by the borrower.   The bank took the sole risk of loss of this investment.  To hedge the bet, the bank was allowed to take as security for funds loaned, the property of the borrower.  Traditionally, prior to issuing a loan the bank would have the property appraised to determine the amount it would lend.  Because the bank bore the risk of loss, the bank had motivation to seek reasonable and conservative appraisals of the property and was motivated to use conservative underwriting guidelines.

2.     In the early 1980's, two very important laws were passed that changed the nature of mortgage litigation.  The Depository Institutions Deregulation and Monetary Control Act of 1980 essentially barred states from limiting mortgage interest rates.  Then in 1982, the Alternative Mortgage Transaction Parity Act passed which made it possible for lenders to offer exotic mortgages.

3.     As a result of the above legislation, this country saw the birth of adjustable-rate mortgages, mortgages with balloon payments, interest-only mortgages, and so-called option-ARM loans.

4.     Unlike traditional mortgage lenders who made their money as borrowers repay the loan, subprime lenders made their money upfront first by charging outrageous closing costs and brokers fees that could total over $10,000.  Then the lenders pooled the loans into Residential Mortgage Backed Securities (RMBS) and sold the RMBS to investors recouping monies lent almost immediately.  By doing so, lenders could make bad loans and just pass the loans and the risk along to investors.

5.     Because the lenders could now recoup monies lent almost immediately, the lenders began issuing loans in utter disregard for all underwriting standards.  The lenders offered high fees at loan origination to motivate brokers to write subprime loans for anyone who would put up their property as security – no matter what the value of the property, or the income, the credit or the ability to pay of the client.

6.     These practices encouraged and incentivized brokers to deceive borrowers into believing they could afford loans they could not and to promise borrowers refinances they would never receive.  In fact, brokers would say and do just about anything to get the borrowers to agree to their financing because of the outrageous incentives offered by the lenders.

7.     In furtherance of this scheme of deception, the banks encouraged appraisers to over-assess property values in order to determine loan amounts.  Unlike the traditional bank that had an interest in a conservative appraisal, these new banking standards gave the bank an incentive to appraise properties far higher than their true values.  By lending larger sums of money to borrowers, the bank could package up mortgages with larger streams of income.  Larger streams of income appeared more valuable to investors and could bring higher sums for the lender with the sale of the RMBS.  For these reasons, the lenders chose appraisers who cooperated with their scheme and incentivized them to appraise homes at far greater than market value.

8.     Borrowers unwittingly lost the investments and equity in their properties due to these appraisals.  Many borrowers are now under severe emotional distress facing the loss of their homes and the uprooting of their families.

9.     Furthermore, property owners nationwide were damaged similarly by the negligence of the banks.  Because homes appraised by these deceptive lenders were appraised for higher than true market rate values, the comparables were skewed for ALL properties.

413

10.   In addition to skewing property values for all of America in epic proportion, "Lenders" have further bilked borrowers and investors by unreasonably servicing these loans after securitization.  Citi, as servicer, collects high fees for foreclosure and has an incentive to foreclose even when loan modification would be of greater value to the investors.  Citi has shown repeatedly that, although it purports to work with borrowers on loan modifications, it is really only causing borrowers to send in the same prolific paperwork over and over again only to deny the modification and move forward with foreclosure despite borrower qualifications.

11.   Borrowers are advised that their chances of loan modification are higher once they are 90 days late on payment.  This induces borrowers to stop mortgage payments during the loan modification process.  When denied months and sometimes years later, not only does the borrower owe all of the back payments, but also a fortune in accrued fees.

12.   A borrower's ability to pay a mortgage in the short term is not a reflection of his/her ability to pay long term.  Seemingly, if a borrower has the requisite circumstances and income to qualify for a loan modification, his/her current loan status should have no bearing.

13.   Even Plaintiffs who are current on payments are harassed by out-sourced collection employees.

14.   Most Plaintiffs are faced with frequently changing payments they do not understand.  When they call for an accounting, they are given the run-around.  Some are given complex math equations they do not understand and are given a list of fees they do not believe to be accurate.  Yet, the bank will not justify the fees it is charging or the amount it says is due.

15.   Because of these willful and negligent behaviors, Plaintiffs have been injured. Plaintiffs have suffered severe emotional distress, loss of investments and equity in their homes, loss of credit, public embarrassment with the publishing of foreclosure notices, and the dispossession of their family homes and properties.

16.     Everyone has a duty to act as a reasonably prudent person – or in this case, a reasonably prudent corporation.  The bank certainly did not act reasonably prudent in its interactions with Plaintiffs and because of these acts, millions have been injured.

17.     Before Congress last year, former Federal Reserve Chairman Alan Greenspan admitted he was in "a state of shocked disbelief" that lenders had failed to regulate themselves.

## PARTIES

### Plaintiffs

18.     Plaintiffs **OBED APOSTOL JR.** is an individual residing in the State of California, with rental property located at 1330 Cedar Court, Gilroy, CA 95020. Mr. Apostol refinanced his mortgage with Argent Mortgage Company, LLC in 2006, as evidenced by the Deed of Trust recorded in Santa Clara County on October 6, 2006. Mr. Apostol receives all communications regarding his mortgage, including his monthly statements, from CitiMortgage, Inc. When Mr. Apostol acquired his loan in 2006, he worked with a broker named Azucena (Sandy) Zipagan. The broker did not explain anything about the terms of the loan, and rushed him into signing.

19.     Later, Mr. Apostol had another broker review the documents and he was informed that Sandy took advantage of him. Despite his good credit and steady income, Mr. Apostol was put into a negative amortization ARM loan with the initial interest rate of 6.675%.

20.     At the time of origination, Mr. Apostol was still operating under the false belief that he was entering into a traditional mortgage agreement with a traditional lender. This belief as to the nature of the transaction and as to the nature of the lender included the misconception that the traditional lender motivations applied.

21.     Mr. Apostol also had a traditional understanding of the ability for his "lender" to assign or transfer the mortgage to another "lender." He did not know that the mortgage could be transferred to groups of investors with varying interests in the performance of the loan. Further, he did not know that such a transfer could increase risk under the contract.

22.     When the economic crisis severely and unforeseeably altered his financial circumstances, Plaintiff Obed Apostol Jr. sought a loan modification. He has applied for a modification several times to no avail. Mr. Apostol has repeatedly tried to contact Citi. When Mr. Apostol calls Citi, he is transferred from person to person and department to department. Each time, Mr. Apostol speaks to a different person and has to explain his situation all over again because there is no record in their system of previous conversations.  Mr. Apostol is repeatedly told to resubmit the same paperwork time and time again.

23.     Citi's mishandling of Mr. Apostol's loan has caused severe anxiety and emotional distress. He now lost his rental property to foreclosure, which was a business for him.  He has lost significant income from the time he has spent trying to work with Citi, and now from the loss of his income property.  His credit has been severely damaged, which has affected his ability to get other lines of credit.  He also now has an unlawful detainer judgment on his record, even though he was never in physical possession of his property, which will impede his ability to rent property in the future.  He has been publicly embarrassed with the publication of foreclosure notices.

24.     Plaintiff **JEANNE AMORATI** purchased property located at 804 East Windward Way in April 2006 which is her primary residence.  Ms. Amorati borrowed $273,600 through Flagstar Bank according to a Mortgage recorded on April 20, 2006.  When Ms. Amorati took out her loan, she did so with The Mortgagezone, Inc., and worked with a mortgage broker named Mr. Evans.  She was placed in fixed rate mortgage at 6 1/8% interest.

25.     At the time of origination, Ms. Amorati was still operating under the false belief that she was entering into a traditional mortgage agreement with a traditional lender. This belief as to the nature of the transaction and as to the nature of the lender included the misconception that the traditional lender motivations applied.

26.     Ms. Amorati also had a traditional understanding of the ability for her "lender" to assign or transfer her mortgage to another "lender." She did not know that her mortgage could be transferred to groups of investors with varying interests in the performance of her loan. Further, she did not know that such a transfer could increase her risk under the contract.

27.     Ms. Amorati understood that traditional lenders used conservative appraisals and underwriting standards to protect themselves from losses associated with default.

28.     Mr. Evans was dishonest and misleading with the Ms. Amorati. Mr. Evans had discussed the loan terms with Ms. Amorati prior to her signing and he had quoted her a 6% interest rate. But, when presented with the final loan contract, Ms. Amorati noticed that the interest had changed to 6 1/8%. Despite the changed term on the contract, Ms. Amorati felt as though she had no choice but to accept the higher interest rate.

29.     Additionally, Ms. Amorati was required to pay over $20,000 in closing costs, yet was told by Mr. Evans that such fees were required. This was clear on the face of the loan documents.

30.     Ms. Amorati had requested to use her own appraiser, yet she was refused by Mr. Evans and told that only a lender approved appraiser would be allowed. Yet, Ms. Amorati had to pay for the appraisal. The appraisal was prepared by Facendo Associates, Inc., of 6950 Cypress Road, Suite 206, Plantation, FL 33317. The appraisal came in at exactly the asking price of the property.

31.     Ms. Amorati made a 20% down payment on the property, about $60,000, which has now been lost in its entirety with the decline in home values. The property that she paid over $300,000 for in 2006 is now worth about 1/3rd of that price. Ms. Amorati continues to suffer from higher monthly mortgage premiums due to the misleading and predatory circumstances surrounding her loan origination. She is current on payments but struggles to pay the amount Citi demands.

417

32.     Further, at the time of origination, Ms. Amorati was unaware that she might be working with a servicer of the loan rather than a lender.  Approximately five months after the originatioin of the loan, Citi began to send Ms. Amorati's monthly statements and to collect payment. Active MERS records list Citibank as the servicer of the loan and Fannie Mae as the investor.  Although Ms. Amorati recognized the transfer of the loan, she did not know that Citi was not her new "lender" in the traditional sense.

33.     It was not until sometime in 2010 that Ms. Amorati began to understand that Citi was not her "lender" but a loan servicer and that her loan had been sold into an RMBS. She began to understand what had happened through media reports.

34.     Ms. Amorati first attempted to modify her mortgage in 2011 with Citi. However, despite numerous attempts at contacting the bank to begin the modification process, Ms. Amorati was unsuccessful at reaching anyone who could help.

35.     CitiMortgage, Inc. participates in the HAMP program as evidenced by the Making Home Affordable website (http://www.makinghomeaffordable.gov/get-assistance/contact-mortgage/Pages/default.aspx).

36.     Citi represents that it works with homeowners for modification. (https://www.citimortgage.com/Mortgage/Home.do?page=homeowner_assistance)

37.     Yet, despite calling multiple numbers Citi lists on its various websites and following online instructions, Ms. Amorati was unable to even start the application process for modification.

38.     When speaking with Citi representatives on the phone regarding a modification, Ms. Amorati faced a frustrating lack of help.  The people she spoke with were rude and simply passed her around among operators without attempting to help with the process. Notes were not made in the system of what transpired during the call, and Ms. Amorati was made to start the whole maddening process over again upon the next phone call.

39.     The people that Ms. Amorati with whom Ms. Amorati spoke were not helpful and told her simply that she needed to talk to someone else, placed her on hold for a long time,

1    and often hung up on her.  One of the people that Ms. Amorati was put in contact with

2    was Todd Martrez, who, like the other Citi employees, was extremely unhelpful.

3    40.      Despite having been told that she would receive a call back from Citi to discuss a

4    loan modification, Ms. Amorati never received any call. Ms. Amorati attempted for

5    months to get in contact with the bank to begin the modification process, but was

6    eventually forced to give up in frustration.

7    41.      Ms. Amorati has faced severe depression as a result of the loan terms with which

8    she must comply and Citi's refusal to allow her to begin the modification process.  She

9    remains hopeless at the prospect of ever getting relief.  She has lost wages from the time

10   spent away from work trying to communicate with Citi.  She suffers lower credit from her

11   significantly high debt to income ratio from the overvalued property.

12   42.      Ms. Amorati likewise has suffered from loss of sleep and physical manifestations

13   of anxiety, such as digestive issues, related to the prospect of losing her home should she

14   default on her mortgage.

15   43.      Plaintiffs **THEODORE & KAREN AUFORT** are a married couple residing in

16   the State of California with property located at 8662 Winter Gardens Blvd, Lakeside, CA

17   92040.  The Auforts entered into a mortgage agreement with ABN Amro Mortgage

18   Group, Inc in 2006.  Current MERS records indicate that the Auforts' current loan

19   servicer and loan investor is CitiMortgage, Inc.

20   44.      When the economic crisis severely and unforeseeably altered the Auforts'

21   financial circumstances, they sought a loan modification with Citi.  When the Auforts first

22   applied for a loan modification, they were current on their payments but struggling to keep

23   up with those payments.  The Auforts have applied for a loan modification on three

24   separate occasions.  During each loan modification application, the Auforts have been

25   required to repeatedly send into the bank the same prolific documentation.

26   45.      The first time CitiMortgage denied the Auforts loan modification, the Auforts

27   were told that they did not qualify for a loan modification because of inadequate income.

28

The Auforts strongly deny that they do not have enough income to support a modified mortgage agreement.

46.     The second time Citi denied the Auforts for a loan modification, Citi informed the Auforts that the investor of their note would not accept a modification of their loan. This is the first time the Auforts had any reason to know that their loan was not held by a traditional "lender."

47.     The Auforts asked Citi who the owner of their loan was and the bank informed the Auforts that Bank of the West owned their loan. The Auforts then drove to the El Cahon branch of Bank of the West to discuss modifying their loan. When the Auforts got to the Bank of the West branch office, they were told that Bank of the West did not have any record of owning their mortgage.

48.     Through the Auforts' persistence, they were able to get the Bank of the West representative to research whether their loan was owned by Bank of the West. The representative then discovered that Bank of the West did own the loan.

49.     When the Auforts questioned the Bank of the West representative, Dotty, about the possibility of a loan modification, the Auforts were told that they would not be considered for a loan modification with Bank of the West unless they were behind on their mortgage payments. But, they were also told that they would qualify if they defaulted on payments. The Auforts detrimentally relied on this statement and ceased to make payments on their mortgage so that they could receive a loan modification. The Auforts then applied a third time for loan modification.

50.     The Auforts are now facing an unlawful detainer action which attempts to permanently dispossess the Auforts of their primary residence. They ceased making payments on their mortgage in accordance with the statements of the Bank of the West representative. The Auforts have since applied for a loan modification a third time through Citi, and the loan modification has been denied. The loan modification process has caused the Auforts to suffer undue stress and familial problems.

420

51.    Throughout all three modification attempts, the Auforts enlisted the services of Save Your Home California, Save Your Home San Diego, and all of Citi's modification programs.    According to Save Your Home California, the Auforts qualify for a modification of their mortgage.

52.    The Auforts were regularly required to submit the same documentation.  Citi often said the numbers did not match up on the originally submitted documentation, but the Auforts resubmitted the same documentation with an addendum and the same numbers were purportedly processed.

53.    Because of the inconsistency in the results of their modification attempts and because of the information provided to them by Save Your Home California, the Auforts believe their loan was improperly processed and denied by Citi.

54.    Plaintiffs **EDWARD FERGUSON** is an individual residing in the State of Michigan, with property located at 535 Woodbridge Circle, South Haven, MI 49090. Mr. Ferguson refinanced his mortgage with Citi Financial Mortgage, Co. in 2005, as evidenced by the Deed of Trust recorded in Van Buren County on October 19, 2005.  Mr. Ferguson receives all communications regarding his mortgage from CitiMortgage, Inc., including his monthly statements.

55.    Broker Kathy Green and a broker named Shirley structured the loan for Mr. Ferguson. Despite Mr. Ferguson's great credit and steady income, Mr. Ferguson was sold an ARM loan, with the current interest rate of 9.125%. Ms. Green assured Mr. Ferguson that this loan was a prime loan and the best loan available to him.

56.    In October or November of 2005, Mr. Ferguson was notified that his loan was in default.  Mr. Ferguson had submitted all of his monthly payments timely as demanded on his monthly mortgage statements. When he called Citi to investigate, he was told that his last payment was applied to taxes and insurance even though such were not due until February of 2006. Mr. Ferguson was not able to make another monthly payment in the amount Citi demanded (essentially doubling the amount due) and now faces foreclosure.

57.     Still behind from the mistake of Citi, the economic crisis severely and unforeseeably altered Mr. Ferguson's financial circumstances, and his adjustable rate payments increased to an amount he could not afford. Mr. Ferguson sought a loan modification. Mr. Ferguson has applied for modification on at least four separate occasions.

58.     Citi representatives informed Mr. Ferguson that he should not make mortgage payments while the modification was being processed.  He has been asked to send in the same documents over six times, of which Mr. Ferguson sent in by UPS at his own expense. It took several hours to compile the prolific documentation that caused Mr. Ferguson to miss work and lose wages.

59.     Despite his efforts to mail the application in the most reliable fashion possible and according to Citi's instructions, Citi still claims to have never received any application or they tell Mr. Ferguson that the documents need to be updated.  These representations are inconsistent.  Furthermore, Mr. Ferguson sends in the most up-to-date information by UPS every time he is asked.  The information could not get more up-to-date.

60.     Upon information and belief, Mr. Ferguson believes that the information may not be "up-to-date" by the time Citi gets around to reviewing it.

61.     When Mr. Ferguson calls Citi to check on the status of his application, he is put on hold for hours at a time and is then disconnected before reaching a representative. Mr. Ferguson has called Citi several times a week for assistance, but when Citi returns his calls it is not to offer assistance, but rather to collect money, even though Citi instructed Mr. Ferguson not to make payments while his modification was processed.

62.     Mr. Ferguson is a disabled veteran suffering from Post-Traumatic Stress Syndrome, which has only been exacerbated by the dysfunctional modification process that Mr. Ferguson has been actively involved in for years. Citi's inability and unwillingness to assist Mr. Ferguson has caused him severe anxiety and emotional distress, resulting in declining health and an overall feeling of hopelessness.   Mr.

422

Ferguson has also suffered loss of credit, public embarrassment with the publication of foreclosure notices, the imminent possibility of losing his home and the real possibility of homelessness.

63.     Plaintiffs **ANA and EFRAIN OLIVARES** are a married couple residing in the State of California, with property located at 403 W. Kenneth Road, Glendale, CA 91202. The Olivares refinanced their mortgage with World Savings Bank FSB  in 2005, as evidenced by the Deed of Trust recorded in Los Angeles County on June 16, 2005.  Ms. Olivares receives all communications regarding her loan from CitiMortgage, including her monthly statements.

64.     Despite her good credit and steady income, the broker that structured the loan placed Ms. Olivares in a negative amortization ARM loan.

65.     When the economic crisis severely and unforeseeably altered her financial circumstances and when her payments substantially increased after the initial teaser period of her loan, Ms. Olivares unsuccessfully sought a loan modification.

66.     When Ms. Olivares contacted Citi for assistance, she was often transferred from person to person and department to department. Each time she spoke to a new representative, she was forced to explain her situation all over again because there was never a record of prior conversations.

67.     Citi's inability and unwillingness to assist Ms. Olivares has caused severe anxiety and emotional distress for the entire family. The Olivareses feel as if they lost the opportunity for modification.  Citi did not handle or process their modification request properly and would not communicate with the Olivareses about the status of their application.

68.     The Olivareses now face losing their home in a Trustee Sale.  They have suffered damaged credit and public embarrassment with the publication of foreclosure notices.

69.     Plaintiffs **NATHANIEL and DOROTEA SANTAMARIA** are a married couple residing in the State of California, with property located at 15383 Braun Court, Moorpark,

423

CA 93021. Mr. Santamaria and his wife, Dorotea Santamaria, obtained their mortgage loan with United Capital Services, Inc. in 2006, as evidenced by the Deed of Trust recorded in Ventura County on July 11, 2006. The Santamarias receive all correspondence, including their monthly statements, from CitiMortgage, Inc. and an inactive MERS report shows CitiMortgage, Inc. as the loan servicer.

70.     A United Capital Services, Inc. loan officer brokered the loan for the Santamarias. Despite their good credit and steady income, the Santamarias were placed in an ARM loan with the interest rate starting at 6.25% interest and capping at 12.25% interest.   The Santamarias were prime borrowers and reasonably relied on the broker's statements that they were being sold a favorable loan.  They were unsophisticated borrowers and did not understand the complex terms of the loan.

71.     After the economic crisis severely and unforeseeably altered their financial situation, the Santamarias sought a loan modification. The Santamarias were told that they lied about their employment history, which was incorrect.

72.     At the time of origination, the Santamaria's were never asked to provide their employment history.   They were willing to provide that information, but were never asked.  Upon information and belief, the broker submitted false information about the Santamaria's income and employment history without the Santamaria's knowledge or consent.

73.     The Santamarias were also asked to send in the same documentation time and time again. When they attempted to get assistance with their loan and the modification process, they were often transferred from department to department and person to person.   On information and belief, Citi either repeatedly lost the Santamaria's modification submissions or did not timely process the information necessitating the Santamaria's repeated submissions.

74.     Providing the prolific paperwork demanded was time consuming and required lost work and lost wages.

75.     Citi's inability and unwillingness to communicate the Santamarias has caused severe anxiety and emotional distress, resulting in anxiety attacks and sleep deprivation for the entire family.

76.     Furthermore, Citi's mishandling of the documents and refusal to process the application has cost the Santamaria's the opportunity to obtain a modification. All of the above has caused the Santamaria's severe damage to their credit and severe emotional distress with the imminent possibility of homelessness.

77.     Plaintiff **TRACY SMITH** is an individual residing in the State of Texas, with property located at 11743 Gatesden Drive, Tomball, TX 77377. Tracy Smith and her husband, Keith Smith, refinanced their mortgage with Ameriquest Mortgage Company in 2004, as evidenced by the Deed of Trust recorded in Harris County. The Smiths received all communications regarding their loan from Citi Financial, including their monthly statements.

78.     A mortgage broker from Netco, Inc. on Richmond Avenue in Houston, Texas brokered the loan for the Smiths.  Despite their great credit and steady income, the broker placed the Smiths in a negative amortization ARM loan, which at the time this case was filed was at the interest rate of 8.25%. The broker assured the Smiths that this was the best loan possible for their circumstances.

79.     The Smiths were prime borrowers and were unsophisticated borrowers.  The terms of the loan were complex.  The reasonably relied on the representations of the broker that the loan was favorable as they were prime borrowers and expected a prime loan.

80.     The Smiths have been confused about the terms of their loan since origination. They first received statements from Town and Country Credit Corporation in 2002. The Smiths would send in their payment and then receive a notice that they had not made the payment. This went on for about a year when they received a notice that Ameriquest now owned the mortgage. According to public records, the Smiths refinanced with Ameriquest in 2004, but this is contrary to the memory of the Smiths.

425

81.     Ameriquest would send the Smiths statements which were conflicting from month to month. The Smiths were asked to pay a certain amount, which they did. Shortly after sending the payment, the Smiths would receive either a credit for being overcharged, or a bill because they were undercharged. When the Smiths would call Ameriquest for assistance, they often had no record of the loan.

82.     The Smiths would receive letters stating the rate had changed and the letter would give them a new payment amount. The Smiths would then pay the amount requested and would again receive either a small credit or a bill for deficiency a couple of weeks later. This continued for approximately two years until Citi took over the servicing of their loan.

83.     The Smiths continued diligently making payments to Citi, but would begin receiving calls from debt collectors informing them they were behind on their payments. When the Smiths would call to investigate, they would learn that the rate had changed without notice and their payments had not covered the payment increase. The Smiths would then cure the default, but a couple of months later they would receive calls from debt collectors and have to cure a default again due to another unexpected and unnoticed rate change. This continued for years.

84.     Due to the significant changes in payment amounts and due to the economic downturn, the Smiths sought a modification. Citi representatives told the Smiths, several times, that they could not qualify for a modification unless they were behind on payments. Citi representatives informed the Smiths that once they were behind, the modification would be easy. The Smiths purposely fell behind on payments in order to qualify for a modification based on the representations of Citi modification employees.

85.     The Smiths were asked to send in the same documents in excess of fifteen times. Preparing these prolific document submissions took significant time and energy.  The Smiths even lost wages because of missed work ours used to prepare these submissions.

86.     Modification representatives continually informed them that the documents were never received, despite the fact that the Smiths kept detailed records of what was sent and

1    where it was sent.  The Smiths followed every instruction they were given and submitted

2    the paperwork according to the direction of Citi employees.

3    87.    Seeking assistance, the Smiths have called Citi countless times. The Smiths were

4    transferred from person to person and department to department. Each time they called or

5    were transferred to another department, the Smiths would have to explain their situation

6    all over again because there was never a record of prior conversations.

7    88.    It wasn't until almost two years into the modification application process that a

8    Citi representative informed the Smiths that they were unable to get a modification

9    because it was not available to residents in Texas.  It was clear from the beginning that the

10   Smiths lived in Texas.

11   89.    The Smiths have now been permanently dispossessed of their family home through

12   foreclosure on December 6, 2011. They suffered severe emotional distress trying to work

13   with Citi and comply with its demands. Citi's inability and unwillingness to assist the

14   Smiths has caused the entire family severe anxiety and emotional distress. The Smiths

15   have suffered severe damage to their credit and were publicly embarrassed with the

16   publication of foreclosure notices.  The Smiths lost all equity and investments in their

17   home when it was lost in foreclosure.

18   90.    Plaintiffs **ANDREW TANDOC** is an individual residing in the State of

19   California, with property located at 12528 Evaro Drive, Whittier, CA 90606. Mr. Tandoc

20   obtained his mortgage with Mortgageit, Inc. in 2006, as evidenced by the Deed of Trust

21   recorded in Los Angeles County on August 23,  2006.

22   91.    Mortgage IT agent, Cindy Tran, brokered the loan for Mr. Tandoc. Ms. Tran

23   assured Mr. Tandoc that he would be placed in the best loan possible.  Mr. Tandoc was

24   placed into an ARM loan with the initial interest rate of 6.75%, adjusting to a maximum

25   of 12.75% interest rate. Mr. Tandoc receives all communication regarding his loan,

26   including his monthly statements, from CitiMortgage, Inc.

27

28

92.   When the economic crisis severely and unforeseeably altered his financial circumstances, Mr. Tandoc sought a loan modification. Mr. Tandoc was placed into a trial modification period for about a year.   He continued to make his trial modification payment for the entire year when a Citi representative called him and informed him that the modification was denied because he did not qualify.

93.   None of the money he paid under the trial modification was applied to the amount due on his mortgage, but instead went into a suspended account.   This money was not returned to Mr. Tandoc.

94.   Mr. Tandoc applied two additional times for a modification, only to be denied both times.   Mr. Tandoc was asked to send in the same documentation several times. Complying with the documentation demands required significant time and effort.   Mr. Tandoc lost wages from missed work attempting to comply with the documentation requests.   Yet, his documentation was lost or not timely processed which required additional submissions.

95.   Despite his repeated attempts to send in the requested documentation, Mr. Tandoc was denied for a modification. The reason stated was that he had not sent in all of the proper documentation.   Mr. Tandoc very carefully prepared the documentation submissions according to the instructions he received from Citi.

96.   He has left several messages that have never been returned. Citi's inability and unwillingness to assist Mr. Tandoc has caused severe anxiety, humiliation, and damage to his credit. Mr. Tandoc now faces foreclosure.  He has suffered public embarrassment from the publication of foreclosure notices.  He stands to lose all equity and investment in his property.

**Defendant**

97.   On information and belief, CitiMortgage, Inc. is a wholly owned subsidiary of CitiBank, N.A.

98.   On information and belief, Citi Financial Mortgage, Co. is a wholly owned

428

1    subsidiary of CitiBank, N.A.   Citi Financial Mortgage, Co. originated the loan on the
2    property of Plaintiff Edward Ferguson.

3    99.    CitiBank, N.A. ("Citi") is a national banking association with its principal place of
4    business in New York, New York and its headquarters in Sioux Falls, South Dakota.

5    100.   For all Plaintiff's herein, some division of CitiBank is acting as the loan servicer
6    and/or the current note holder.  All entities wholly owned by CitiBank will be collectively
7    referred to as "Citi" herein.

8    101.   On information and belief, Argent Mortgage Company, LLC ("Argent") is a
9    limited liability company incorporated in Delaware and its principal place of business in
10   Orange, CA.  Argent originated the loan for the property of Plaintiff Obed Apostol, Jr.

11   102.   On information and belief, Flagstar Bank, Inc. ("Flagstar") is a wholly owned
12   subsidiary of Flagstar Bancorp, Inc. which is incorporated in the State of Michigan, which
13   is also its principal place of business.   Flagstar originated the loan on the property of
14   Plaintiff Jeanne Amorati.

15   103.   On information and belief, ABN Amro Mortgage Group, Inc. ("Amro") is a
16   subsidiary of LaSalle Bank Corporation, incorporated under the laws of Delaware with its
17   principal place of business in Ann Arbor, Michigan.   Amro originated the loan on the
18   property of the Auforts.

19   104.   On information and belief, WELLS FARGO, N.A. fka WACHOVIA, as successor
20   in interest to WORLD SAVINGS BABK, FSB ("Wells Fargo") is the successor in interest
21   to World Savings Bank, FSB.   World Savings Bank, FSB originated the loan on the
22   property of Plaintiffs Ana and Efrain Olivares.   Wells Fargo is a national banking
23   association and is a resident of the State of California.

24   105.   On information and belief, United Capital Services, Inc. ("United") is now a
25   dissolved business.  United was incorporated under the laws of California and its principal
26   place of business was in California.   United originated the loan on the property of
27   Plaintiffs Nathaniel and Dorotea Santamaria.

28

429

106.    On information and belief, Ameriquest Mortgage Company ("Ameriquest") is incorporated under the laws of Delaware with its principal place of business in Orange, CA. Ameriquest originated the loan related to the property of Plaintiff Tracy Smith.

107.    On information and belief, Mortgageit, Inc. ("Mortgageit") is incorporated under the laws of New York with its principal place of business in New York.  Mortgageit originated the loan related to the property of Plaintiff Andrew Tandoc.

108.    Together, all lenders that originated loans of Plaintiffs herein as described above are referred to as "Originating Lenders."

## JURISDICTION AND VENUE

**Jurisdiction**

109.    Defendant has such "substantial, continuous, or systematic" contacts with California as to have general personal jurisdiction.

110.    When a Defendant is subject to general personal jurisdiction, he may even be sued on causes of action unrelated to his activities within the state.  *Perkins v. Benguet Consolidated Mining Co.*, 342 US 437 (1952).

111.    Furthermore, three of the four Notes subject to this litigation were executed in California and the associated Deeds of Trust secure real property located in California.

112.    Not all Plaintiffs herein are California residents and some Plaintiffs request action in regard to property located outside of California.  If all the property owners are before the court, California courts may affect rights in property outside the state if the state finds personal jurisdiction over the Defendant. *Fall v. Eastin,* 215 US 1, 7 (1909).

113.    In the mortgage crisis, California was one of the hardest hit states in the nation. California has an interest in protecting its citizens from the poor business practices of these major lenders leading to the subprime mortgage crisis.

///

///

**Venue**

114.   The California County with a substantial number of Plaintiffs and properties included in this suit is Los Angeles.   Therefore, venue is proper in Los Angeles County Superior Court.

**GENERAL FACTS**

115.   Paragraphs 1 through 114 and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

116.   As discussed more thoroughly in the Preliminary Statement, the lending arena was materially changed by the passage of acts allowing riskier and hybrid loans.

117.   Citi, including its subsidiaries and predecessors in interest were regularly engaged in the issuance of predatory loans targeted to unqualified borrowers for the purpose of securitization and sale of Residential Mortgage Backed Securities (RMBS). Many of these predatory loans were negative amortization loans that allowed borrowers to make minimum payments that did not cover even the interest owed.   The interest not paid was added to the principal owed on the loans.   As such, it is argued that negative amortization loans are not negotiable instruments since they are not for a fixed amount.   Fraudulent document signing (so called "robo-signing) has been found against Citi.

118.   According to the April 13, 2011 Comptroller of the Currency Consent Order findings (attached hereto as Exhibit A), Citi "(a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records; (b) filed or caused to be

431

filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; (c) litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time; (d) failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes; (e) failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and (f) failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

119.    The report further goes on to say, "By reason of the conduct set forth above, the Bank engaged in unsafe or unsound banking practices."

120.    Because of repeated instances of fraudulent documentation, the use of MERS to transfer loan documents without recording the transfers, improper or no notice of the transfers to the Plaintiffs, Plaintiffs do not know who legally has the right to enforce their Notes and has the concern for the potential of multiple claims.

121.    Not only are loan transfers hidden from the public, but the Notes are not properly transferred between parties with proper endorsement.

122.    Citi had notice, when it purchased the failing banking entities and/or acquired these loans or RMBS holding these loans, that these loans were bad.

123.    At origination, Plaintiffs believed that they were entering into a traditional lender/borrower relationship.

124.    Plaintiffs further believed that they were dealing with a traditional "Lender" who was using the property appraisal and underwriting guidelines to ensure it was making a safe investment.

125.    Plaintiffs did not know that the "Lender" no longer had an interest in ensuring the stability of loans made and really intended to induce anyone willing to sign into loans it could package up into already existing RMBS.

126.    In most instances, Pooling and Servicing Agreements (PSAs) were written and then loan officers and brokers were sent out to write the loans to fill them.

127.    At origination, Defendant intended that Plaintiffs' loans would be packaged up into RMBS and sold to investors.  Defendant knew that it would recoup monies lent immediately.  Defendant knew that Plaintiffs would be subject to a servicer instead of a lender and that the servicer was limited as to its power to assist Plaintiffs when issues not foreseeable to Plaintiffs arose.

128.    Citi indicated an intent to work with Plaintiffs through loan modification.  Instead, the loan modification process was intended to stall Plaintiffs from taking available legal action against Defendant and to unjustly gain additional payment to which Citi was not entitled.

129.    Plaintiffs who have entered the loan modification process have encountered huge obstacles placed by Defendant's employees on a systematic basis.  The behavior of the loan modification employees has been and continues to be regular and systematic.  It is not the action of one employee, but the regular actions of all employees.  Citi not only knew of this conduct, but encouraged and ratified it.

130.    Plaintiffs are first asked to submit a plethora of paperwork.  A month or two later, the Plaintiffs are told they must resubmit the same, plethora of paperwork.

131.    Defendant's loss mitigation employees state that they did not receive the paperwork or that it was lost.

132.    Many Plaintiffs have been required to submit updated paperwork every month for years only to be denied the loan modification.

133.    Instead of the traditional lender/borrower arms-length transaction, "lenders" turned into loan processors for Residential Mortgage Backed Securities (RMBS).  As such, the

1   lenders had an incentive, not to protect themselves from default, but to write as many high

2   dollar loans as possible.

3   134.    The Defendant touted high underwriting standards while encouraging its

4   employees and brokers to cheat to overcome these standards.

5   135.    Defendant encouraged brokers to tell potential borrowers anything to get them into

6   the subprime loans.  Defendant even encouraged brokers to adjust loan applications to fit

7   underwriting standards.    Brokers were given higher incentives at loan closing for

8   subprime loans than for traditional loans.

9   136.    Many borrowers who qualified for prime loans were told they were being placed in

10   prime loans when really they were placed in subprime loans.

11   137.    Plaintiffs relied on the representations of the Defendant that their loans were of

12   good quality.  Loan approvals were used to convince Plaintiffs they were in loans they

13   could afford.

14   138.    Inflated loan appraisals were also used to convince Plaintiffs into high dollar loans.

15   Plaintiffs were told, "look how much your house is worth and the value just keeps rising.

16   It will never depreciate."

17   139.    Inflated loan appraisals resulting in a wide-spread skew of property values across

18   the nation.

19   140.    The appraisers were chosen by the Defendant, but often paid for by the borrowers.

20   141.    Defendant is responsible for the injury to Plaintiffs.

21   142.    All of this resulting in Plaintiffs' loss of equity and investments in their properties.

22   Plaintiffs have suffered public embarrassment with the publication of foreclosure notices.

23   Plaintiffs have, in some cases, been dispossessed of their family homes or face the

24   imminent threat of such.  Plaintiffs have suffered severe emotional distress.  Many

25   Plaintiffs have had physical manifestations of the emotional stress they have suffered.

26   ///

27   ///

28

434

**FIRST CAUSE OF ACTION**

Invalid Assignment

(By All Plaintiffs Against the Originating Lenders, their successors and assigns)

143.    Paragraphs 1 through 142 and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

144.    There are both procedural and substantive elements to proper assignment of rights and duties under a contract.  Without the proper procedures, an assignee's right to enforce the contract may be inhibited.   If the substance of the assignment is not valid under principals of contract law, the assignment may be invalid and unenforceable by the assignee.

145.    In this case, there are both substantive and procedural defects in relation to the purported assignment of ownership of the loan from the originating lenders to the residential mortgage backed securities trusts ("the trusts").

146.    The other parties involved have not been revealed to Plaintiffs.  The identity of the trusts and related parties is secreted within the knowledge of Citi.

**Substantive Issues**

147.    In the dissent in *Trubowitch v. Riverbank Canning Co.,* 30 Cal. 2d 335, 350 (1947), Justice Edmonds noted the language of the Restatement (Second) of Contracts:

"§ 317. Assignment of a Right

(1) An assignment of a right is a manifestation of the assignor's intention to

transfer it by virtue of which the assignor's right to performance by the obligor is

extinguished in whole or in part and the assignee acquires a right to such

performance.

(2) A contractual right can be assigned ***unless***

(a) the substitution of a right of the assignee for the right of the assignor

would materially change the duty of the obligor, or ***materially increase the***

***burden or risk imposed on him by his contract, or materially impair his chance***

***of obtaining return performance, or materially reduce its value to him***, or

(b) the assignment is forbidden by statute or is otherwise inoperative on

grounds of public policy, or

(c) assignment is validly precluded by contract.

Rest. Contracts, sec. § 317 (emphasis added).

148.    In this case, the assignment of the notes to the trusts from the originating lenders materially increased the risk imposed on Plaintiffs, materially impaired Plaintiffs' chance of obtaining return performance, and materially reduced the value of Plaintiffs' contract.

Increased Risk

149.    Under a traditional mortgage contract, the lender makes the loan and generally has no further duty save for re-conveying clear title after the borrower has made all of the payments as agreed. The borrower's duty is to repay principal and pay an agreed rate of interest within the specified repayment period.

150.    The first risk involved in a residential mortgage transaction is the risk of borrower default called "default risk" or "credit risk." A traditional lender protected against such risk by investigating the creditworthiness of the borrower, charging a higher interest rate, requiring sufficient collateral (the house), or requiring a higher down payment.

151.    Under the securitization scheme, lenders no longer continue to carry the default risk. By assignment to the Trust, they pass this risk on to the Trust which is owned by investors.    The entity originating the loan no longer has the incentive to check creditworthiness of the borrower or ensure that sufficient collateral is put up as security.

152.    The entity that acquires the loan believes it is protected by holder in due course doctrine and has no incentive to check that proper origination procedures were used.

153.    This scheme further increased risks associated with the transaction by fostering fraudulent conduct both in regard to the borrowers induced into predatory mortgages and in regard to the assignees (investors) of these contracts.

154.    The second risk involved in residential mortgage transactions is the interest rate risk. In a fixed rate mortgage, the lender traditionally bears this risk whether interest rates rise or fall. If interest rates rise, the lender loses because it would have been more profitable if the lender would have loaned the money later at the higher rate of interest. If

1   interest rates fall, the lender still loses because the borrower will refinance the loan at the

2   lower rate.

3   155.   With the changes in regulation in the 1980's, lenders have been able to mitigate

4   this risk by offering adjustable rate mortgages that shift in step with interest rate changes.

5   156.   But, with the securitization scheme, originating lenders who no longer carry any

6   risks do not check the value of the collateral or the creditworthiness of the borrower.

7   Instead, originating lenders issue loans that fit the open RMBS to be filled and sold to

8   investors.

9   157.   A third risk is that the value of the collateral securing the loan will fluctuate.  This

10  is called the "equity risk" or "collateral risk."  Residential mortgages in California are

11  essentially non-recourse.  Even in circumstances when the loan is recourse, lenders often

12  do not pursue the deficiency because of the costs involved and the potential to actually

    collect from the debtor.

13  158.   Under normal economic circumstances, the lender only bears the collateral or

14  equity risk when the value of the collateral drops below the amount owed AND the lender

15  cannot collect the deficiency.  Usually, it is the borrower that carries this risk since the

16  amount owed does not decrease even when the value of the collateral drops.

17  159.   But, the securitization scheme caused the artificial inflation of home values and

18  blew air into the housing bubble.  When the bubble burst, it left many homeowners

19  "underwater" with loans far in excess of the value of their homes.  The homeowners

20  thereby lost all equity and investments in their properties.  This increased risk to both

21  homeowners and investors, but not to originating lenders.

22  160.   Borrowers were put into loans far in excess of their ability to pay and far in excess

23  of the value of their collateral.  Subprime lenders issued loans with an initial low "teaser"

24  rate that jumped to a higher adjustable rate after a few years. Subprime lenders and

25  borrowers came to depend on refinancing as the only way subprime borrowers had to pay

26  back the loan.  The drastic drop in home values with the depression made it impossible for

27  borrowers to refinance shifting the risk associated with these loans away from "lenders."

28

161.    In fact, the whole securitization scheme increased the risk to borrowers that even prime borrowers would be sold subprime loans.

162.    Again, the assignment of the loan from the originating lenders to the trusts increased risk to Plaintiffs.

163.    A fourth form of risk could be described as modification risk. Traditionally, this risk is on borrowers. Under changed circumstances, the parties to a contract can agree to modify the terms of the mortgage. Borrowers always bear the risk that a lender will decline to modify a mortgage.

164.    But, this risk is increased when the mortgage is assigned to a group of investors in a securitized mortgage scheme as opposed to an assignment to a unified entity, the lender, that bears the various risks.

165.    In a securitized mortgage scheme, the mortgage is transferred to a trust owned by several groups of investors with varied interests in various aspects of mortgage performance. One group of investors will benefit from any loan related fees that are paid. One group of investors benefit from payments to interest. One group of investors will benefit from payments to principal, and so on.

166.    To further exacerbate the situation, the investors are represented by a poorly structured trust and are generally represented by a servicer with varied power to make decisions on behalf of the trust.

167.    Different servicers are governed by different servicing contracts. Some servicers are given broad powers to modify loans and others are more restricted.

168.    The modification risk of a borrower is increased by the limitations of modification placed on servicers by the servicing contracts.

169.    The modification risk to borrowers is further increased by diverse interests of investor groups. Where a traditional lender holding all the cards might have benefited from modification of the loan that would also be beneficial to the borrower, the same modification in a securitization scheme might be denied because of the diverse interests of the various investor groups.

170.    Therefore, assignment of the loan to the Trust increased the modification risk to Plaintiffs.

171.    A final form of risk could be described as legal risk.  There are very few excuses for non-payment of a residential mortgage and, therefore, there is a kind of strict liability of contractual liability.  As such, the borrower bears the risk of economic downturn and lost wages that will result in default.

172.    This legal risk to borrowers was increased by the securitization scheme.  Because originating lenders issued riskier loans far in excess of the value of collateral and passed the default risk to investors by assignment, the US economy suffered a recession more severe than the great depression of the 1930's.

173.    The truth is that innovations in residential mortgage lending actually served to increase risk for both lenders and borrowers, including Plaintiffs, hide the true cost of credit, facilitate a bubble in housing prices, and create a novel way to short the housing market that may have exacerbated the harmful effects of the bubble's bursting.

174.    Thus the assignments of Plaintiffs' loans increased their risk under the contracts without their knowledge or permission and the assignment was substantively invalid.

175.    Although assignment is allowed by the plain terms of Plaintiffs' contracts, Plaintiffs interpreted the assignment language in the traditional sense.

176.    Based on traditional usage, Plaintiffs believed that any assignments that could be permitted would be from a "lender" to another "lender" or unified banking entity.

177.    Based on the above, Plaintiffs had no reason to know that the loans could be transferred to a diverse group of investors in a way that would materially increase the risks associated with the loans.


Impaired Chance of Return Performance

178.    The assignment of Plaintiffs' loans from the originating lenders to the trusts materially impaired Plaintiffs' chances of receiving return performance under the contracts.

179.   While most understand a lender's duty under a residential mortgage contract fully performed upon making the loan, the lender has a subsequent duty at the end of the loan to re-convey clear title to the borrower.  To understand more fully how the assignment of the loans to the trusts increased the risk that lender cannot complete its performance, it is first important to understand the procedural issues that may impede proper assignment.

180.   Plaintiffs' notes are negotiable instruments.  Negotiable instruments are subject to formalities required for proper transfer.  Without the proper formalities of transfer of negotiable instruments, the transferee may not be able to enforce the instrument.

181.   Specifically, negotiable instruments require both proper indorsement of the note and actual physical transfer of the document to the transferee.

182.   These formalities are requisite with the transfer of negotiable instruments to protect the obligor from competing claims.  Plaintiffs are reasonably concerned that the payments they make will not be applied to the loan balance owed.

183.   Take for example Mr. Tandoc.  Mr. Tandoc made trial modification payments for a year.  These payments were neither applied to the balance of his loan, nor were they refunded to him.

184.   Also, take the issues faced by Mr. and Mrs. Aufort.  The Auforts spent significant time tracking down the "owner" of their loan.  When they finally contacted the "owner," Bank of the West, directly, they were told that Bank of the West did not own their loan.  It was only by the diligent efforts of the Auforts that Bank of the West did "find" their note.

185.   Upon information and belief, Bank of the West is not the "owner" of the Auforts' loan, but the trustee for the trust which is holding the Auforts' loan.

186.   Finally, consider the Smiths.   Throughout their loan history, there has been significant confusion related to who they are to pay and what amount they are to pay.  Their loan has been transferred from servicer-to-servicer and, ultimately, they lost their property to foreclosure because Citi told them they would qualify for modification if they defaulted on their payments.  Because of the confusion related to the payment amounts demanded and not knowing to whom to make the payments, the Smiths relied on these

1  representations and stopped payments – an action that ended in the permanent

2  dispossession of their family home.

3  187.    More importantly hereto are the familiar media reports of fraudulent document

4  preparation and other issues involved with the mass transfer of documents into RMBS.

5  Many documents related to residential mortgages have been lost with the various transfers

6  of interests in these notes.

7  188.    Plaintiffs are reasonably concerned that the entities now purporting to hold the

8  interests in their loans do not have the proper documentation to convey clear title at the

9  end of the loan periods.    Therefore, the assignments of Plaintiffs' loans, under the

10  circumstances, impairs or puts them at greater risk that they will not be able to obtain

11  return performance, namely re-conveyance of clear title.

12  Material Reduction in Value of Contract

13  189.    Because of all of the above, the value of the contract to borrowers, including

14  Plaintiffs, subject to assignments of the loans to the trusts is materially reduced.   Plaintiffs

15  suffered increased risks associated with the contract.    Further, incidents of fraud were

16  significantly increased and Plaintiffs' chances of return performance are impaired.

17  190.    Plaintiffs had no knowledge of the originating lender's intent or ability to assign

18  the loans to trust.   Traditional notions of lending do not lead to an understanding of the

19  assignability clause in the contract that would allow for an assignment that would impair

20  Plaintiffs' contract in this way.

21  191.    Therefore, Plaintiffs pray for damages according to proof at trial, for equitable

22  modification of the contract, and for any other relief the Court deems appropriate.

23  ///

24  ///

25  ///

26  ///

27  ///

28

## SECOND CAUSE OF ACTION

Mistake

(By All Plaintiffs, Against the Originating Lenders, their successors and assigns)

192.    Paragraphs 1 through 191 and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

193.    The Restatement (Second) of Contract, § 17 states that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent. . ." American Law Institute, Restatement (Second) of Contracts, § 17(1).

194.    The bargain between the parties is often referred to as the "meeting of the minds." See, e.g., American Law Institute, Restatement (Second) of Contracts, § 17, comment 2.

195.    The California Forth District Appellate Court has held that a lack of meeting of the minds, a mistake as to fact, can justify a rescission of the contract. "A mutual mistake, whether of fact or law, which affects an essential element of the contract and is harmful to one of the parties, is subject to rescission by the party harmed." *Guthrie v. Times-Mirror Co., 51 Cal.App.3d 879 (1975).*

196.    The mistake or missing of the minds does not have to be mutual.  A single party mistaken justifies the voiding or rescinding of the contract when the mistake is known to the non-mistaken party. *Donovan v. RRL Corp,* 109 Cal. Rptr. 2d 807, 823 (2001).

197.    The Restatement (Second) of Contracts, § 153 states:

"Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154 , and

    a.  The effect of the mistake is such that enforcement of the contract would be unconscionable, or

    b.  The other party had reason to know of the mistake or his fault caused the mistake.

198.    Furthermore, the Ninth Circuit Federal Court determined in *Nankuli Paving and Rock Co. v. Shell Oil Co., Inc.,* 664 F.2d 772 (1981) that when a contract does not comply

1    with a mistaken parties reasonably reliance on traditional trade usage of a term therein, the

2    contract is subject to equitable modification.

3    199.    In this case, the Plaintiffs were mistaken as to several aspects of the loan

4    transaction.

5    200.    First, the Plaintiffs were mistaken as to the nature of the party with whom they

6    were entering the transaction.  Traditionally, borrowers entered into mortgage agreements

7    with a lender.  The lender bore the cost of default and so used conservative underwriting

8    principals and chose appraisers who conservatively appraised property values.  At the time

9    of the loan transaction, Plaintiffs herein still reasonably expected to enter into a mortgage

10   transaction with a traditional lender as described above.

11   201.    Instead, in modern mortgage transactions, there is no longer a traditional lender.

12   In fact, the parties now involved in mortgage transactions are various and the motivations

13   of the parties have changed as more fully set forth above in the First Cause of Action.

14   There is a lender who originates the loan, but this lender is usually writing the loan to fill a

15   trust already created.  After opening a Residential Mortgage Backed Securities (RMBS)

16   Trust, the lender will then instruct brokers and loan officers to get the mortgages to fill the

17   trust.  The trust has certain parameters for the mortgages such as loan amount, duration,

     and interest rate.

18   202.    Many RMBS were created to hold subprime loans.    The idea behind the

19   securitization of subprime mortgage was to diversify risk.   In fact, the securitization

20   scheme significantly increased risk.

21   203.    Under this new structure, loan officers and brokers are no longer trying to fit the

22   client to the mortgage, but trying to fit the mortgage to the RMBS.

23   204.    The lenders, including Defendants herein, incentivized this behavior by giving

24   higher than normal fees to the brokers and loan officers for getting the subprime

25   mortgages they needed to fill the RMBS.  Prior to securitization, prime loans were more

26   desirable for lenders.  Securitization so changed the motivation of originating lenders that

27   it caused lenders to seek out highly risky subprime loans.

28

443

205.   Defendants knew at the time of origination that the Plaintiffs still understood a traditional lending scheme.  They not only allowed Plaintiffs to remain mistaken, but encouraged loan officers and brokers to use the mistake against Plaintiffs to lure them, prime borrowers, into subprime loans.

206.   Plaintiffs were mistaken about maintaining a traditional borrower/lender relationship throughout the term of the loan.  Although Plaintiffs understood in the traditional sense that the loans could be transferred between lenders, they did not know that ownership of the mortgage and decision making for the mortgage would be separated, among other things as fully set forth above in the First Cause of Action.

Modern parties to a loan transaction are as follows:

207.   There is an originating lender that purportedly underwrites and originates the loan.  There is also a "beneficiary" under the Deed of Trust, in this case MERS.  It is unclear what the "beneficiary" does other than hide transfers of the Deed of Trust from Plaintiffs and the public.

208.   The loan is often transferred to RMBS immediately after the loan funds.  At this point, the originating lender attempts to assign all of its interests and duties under the loan to the RMBS.  The RMBS is owned by diverse groups of investors with varying interests in loan performance.

209.   There is a trustee for the RMBS trust.  This trustee is supposed to act for the benefit of the trust as a whole but mostly does very little.

210.   In this case, Plaintiffs do not know the identity of the trusts or the trustees.  Plaintiffs only know that Citi is acting as the servicer for all loans herein.

211.   The Servicer is paid under terms of a servicing contract to collect payment for the RMBS and otherwise enforce the note.

212.   The problem arises when the motivations of the Servicer and various groups of investors are not the same as those of a traditional unified lender.

213.   The Servicers, here Citi, receive fees for the acts that they perform.  When a homeowner is facing foreclosure, the Servicer collects fees for foreclosing.  The

foreclosure process for the servicer is automated and the Servicer is paid to foreclose. Additionally, the servicer bares no risk of loss with foreclosure. Any deficiency is borne by the RMBS and some groups of its investors.

214.   On the other hand, modification is not automated and requires an increase in personnel. Efficient modifications that benefit borrowers and investors alike are not profitable for Servicers and require increased costs related to employment and training of modification personnel.

215.   Additionally, the varying interests of the investor groups sometimes make it impossible for the investors to agree to a modification that would benefit the RMBS as a whole.

216.   Therefore, even when the trust and investors would benefit from granting a loan modification, it is more profitable to the Servicer to deny the modification and foreclose on the loan, or the Servicer may be prevented from modifying based on a third party servicer contract that requires investor approval.

217.   When originating the loans, the Originating Lenders knew that Plaintiffs were mistaken as to the relationship into which they were entering.

218.   Plaintiffs believed that the party responsible for making determinations as to modification in the event of unexpected financial trouble, would be the same entity carrying the risk of default on the loans and, therefore, would be motivated to work out an agreement with Plaintiffs.

219.   Because of this mistake, Plaintiffs have now been damaged.

220.   The mistake was not a future contingency, but a reality present at the contract formation: the Defendants knew the securitization of the conduit Loan would occur with certainty and they knew no borrower/lender relationship was contemplated or planned as a result of the Loan.

221.   As illustrated by the Wells Fargo publication attached herein as Exhibit B the major lenders knew borrowers did not understand that the securitization of the Loans would destroy the lender/borrower relationship.

222.    Plaintiffs had no reason to know of the mistake until recent years when media reports began to uncover and explain the acts of lenders that led to the financial crisis.

223.    Furthermore, Plaintiffs were not notified of the transfers of their loans into trusts. Through the use of MERS, these transfers were hidden from Plaintiffs and the public. Additionally, state recording statutes did not require these transfers to be recorded in public records.

224.    Plaintiffs had no knowledge of the transfers of their mortgages into trusts until they entered into the modification process and were told the "investor" would not approve their modification.

225.    Based on the material mistake in the formation of the contract, Plaintiffs who still possess their real properties and continue under the original terms of their loans are entitled to an order of this Court rescinding the Loan and/or declaring the Loan void, invalid, and unenforceable.

226.    These Plaintiffs are willing to tender, but because of the damage to Plaintiffs' credit due to these loans, Plaintiffs are unable to obtain financing to effect tender.   It would be inequitable under the circumstances to require Plaintiffs to tender.

227.    If Plaintiffs succeed on this cause of action and their credit is restored, Plaintiffs believe they can obtain financing to restore Defendants if Defendants do the same.

228.    In the alternative, Plaintiffs requests that the Court modify the agreement to match the intent of the parties.

229.    In addition, all Plaintiffs request restitution and damages, the specific amount to be determined at trial as well as such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

///

///

///

///

///

### THIRD CAUSE OF ACTION

Negligence (origination)

(By Plaintiffs in footnote[1] Against the Originating Lenders, their successors and assigns)

230.    Paragraphs 1 through 229 and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

231.    The elements of negligence are duty, breach, causation, and damages.  The first and most important element of negligence is duty.    According to 46 California Jurisprudence 3d Negligence § 9, "The concept of duty is only an expression of the sum total of those considerations of policy that lead the law to say that the particular Plaintiffs is entitled to protection." John A. Gebauer, J.D. et al, 46 Cal. Jur. 3d Negligence § 9 (2011).  § 8 says a duty of care has three origins.  The origin relevant to this action is "the duty of a person to use ordinary care in activities from which harm might reasonably be anticipated . . . .  A person is not liable unless he or she is actively careless." *Id.* at §8 "Moreover, one's general duty of care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct, including the reasonably foreseeable negligent conduct of a third person." *Id.*

232.    Although, "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money," *Nymark v. Heart Fed. Savings & Loan Assn.,* 231 Cal. App. 3d 1089 (1991), several courts have agreed that this is a "general rule" and there are occasions when a lender owes a duty of care to borrowers. *Champlaie v. BAC Home Loans Servicing, LP,* 706 F. Supp. 2d 1029, 1059-60 (2009); *Taheny v. Wells Fargo Bank, N.A.,* No. CIV. S-10-2123 LICK/EFB, 2010 WL 5394315; *Miller v. Citi Mortgage, LLC,* NO. 2:11-CV-00257-MCR-DAD, 2011 WL 1549290.

---

[1] Obed Apostol Jr., Jeanne Amorati, Edward Ferguson, Ana Olivares, Efrain Olivares, Nathaniel Santamaria, Dorotea Santamaria, Tracy Smith, and Andrew Tandoc

233.   It is first arguable that the Defendant's involvement in these loan transactions did "exceed the scope of its conventional role as a mere lender of money." *Nymark* at 1096. A conventional lender of money issued loans with the incentive to underwrite the loans conservatively as the lender bore the risk of loss.   In the Plaintiffs' loan transactions, Defendants did not bear the risk of loss.   Instead, the Defendants packaged up the loans and sold them off to investors.

234.   In *Connor v. Great Western Savings and Loan* (1968) 69 Cal. 2d 850 the Court held that the bank (Great Western) abandoned its traditional role as a mere lender of money when it became intimately involved not only the financing of home purchasers, but also in the financing of the construction of the housing development.   The court held that because the bank undertook to develop the market for its home lending it took on a role beyond that of a traditional lender of money. *Id.* at 864. It thus assumed a duty to protect buyers against the defective construction of the homes. The bank was held to know that the construction company was dangerously underfinanced and operating on thin profit margins, and therefore, it should have reasonably foreseen a cutting of corners by the developer. *Id.* The bank was thus held to owe a duty to purchasers of the houses based not on its privity of contract with them, but based on its creation of an unreasonable risk of harm to them. *Id.*   Under these circumstance, the Court found that the bank owed a duty to purchasers of houses. *Id.* at 866.

235.   As a subsequent case put it, the lender in *Connor* "wore two hats: one as a developer of a subdivision under construction and the second as the financing entity for it. Liability followed that broad relationship to the construction." *Hoida, Inc. v. M & I Midstate Bank* (2006) 291 Wis. 2d 283 fn 20. Defendants were similarly wearing two hats – one as a developer of the mortgage backed securities market and one as the originating lender of the loans filling it. Defendants profited not only from high fees from the origination of mortgages but also from the sale of those mortgages on the secondary market. Defendants, in many instances, remained in the picture as the servicer, collecting

monthly payments and fees related to the servicing (and in many instances, the foreclosure) of the loan. This broad relationship that Defendants have to every facet of the mortgage process takes them beyond the role of a mere lender of funds and their role is directly analogous to the role that Great Western took in *Connor*.

236.    Just as the bank in *Connor* was held to owe a duty to its borrowers for creating an unreasonable risk of harm to them, Defendants should be found to owe a duty to its borrowers for all of the bad acts described above.

237.    Defendants were in a unique position to foresee the damage that was likely to result from its business practices, such as broker fraud and predatory lending. Being that Defendants were acting more as a middleman in the sale of mortgages, they had no incentive to originate mortgages with the care and prudence that a traditional lender would exercise. Rather, the more mortgages that Defendants originated, the more product the bank had for sale on the secondary market. Defendants were not concerned about the quality of the mortgages that they were originating.

238.    Incentivizing loan officers and brokers to get well qualified prime borrowers into subprime loans at prices far higher than the borrower can afford foreseeably leads to borrowers, including Plaintiffs herein, losing the downpayment and other equity invested in their properties.

239.    In addition to Defendants direct actions leading to harm to Plaintiffs, Defendants created the circumstances where harm to Plaintiffs resulting from the actions of others will forseeably result. Even where Defendants themselves may not have engaged in improper underwriting, the ability of mortgage brokers to originate loans on Defendants' behalf for immediate securitization and sale ensured that bad loans would be created. Because Defendants created the circumstances which encouraged mortgage brokers to commit fraud originate highly predatory loans, Defendants cannot argue that actions by mortgage brokers are a superseding causes of harm for which they are not liable. The bank in *Connor* was held to a duty to protect home buyers from the foreseeably defective

1    construction instigated by the bank's lending practices. So too in the present case should
2    Defendants owe a duty to borrowers for the defective loans given to them as a result of
3    Defendants' lending practices.

4    240.    Plaintiffs were unaware that their loans were intended be packaged up and sold to
5    groups of investors and expected a traditional lending relationship (as more fully set out in
6    the Second Cause of Action).

7    241.    In so treating the loans issued, Defendants were not acting as traditional lenders of
8    money, but more as loan processors.  Furthermore, in processing these loans, Defendants
9    acted negligently and fraudulently.  Defendants regularly made no documentation loans,
10   which allowed the broker fraud to continue unchecked.

11   242.    Furthermore, the courts have noted that "even when a lender's acts are confined to
12   their traditional scope, *Nymark* announced only a 'general' rule." *Champlaie* at 1060.
13   Rather than conclude that no duty existed per se, the *Nymark* court determined whether a
14   duty existed on the facts of that case by applying the six-factor test established by the
15   California Supreme Court in *Biakanja v. Irving*, 320 P.2d 16 (1958).  *Nymark* at 1098; *see
16   also Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1197 (9th Cir. 2001).  This test balances
17   six non-exhaustive factors:

18           [1] the extent to which the transaction was intended to affect the Plaintiffs, [2] the
19           foreseeability of harm to him, [3] the degree of certainty that the Plaintiffs suffered
20           injury, [4] the closeness of the connection between the defendant's conduct and the
21           injury suffered, [5] the moral blame attached to the defendant's conduct, and [6]
22           the policy of preventing future harm.

23   *Biakanja* at 19

24   243.    The *Champlaie* court noted that *Nymark* held that this test also determines
25   'whether a financial institution owes a duty of care to a borrower-client," *Champlaie* at
26   1061; *Nymark* at 1098.

27

28

244.   In *Roe*, the Ninth Circuit noted that the California Supreme Court 'arguably limited' *Biakanja* in *Bily v. Arthur Young & Co.*, 834 P.2d 745 (1992), which held a court must consider three additional factors before imposing a duty of care.  *Roe* at 1198.  *Roe* summarized these factors as "(1) liability may in particular cases be out of proportion to fault; (2) parties should be encouraged to rely on their own ability to protect themselves through their own prudence, diligence and contracting power; and (3) the potential adverse impact on the class of Defendant upon whom the duty is imposed."  *Id.* (citing *Bily*, at 68-73).  *Bily* was decided before *Nymark*, but not discussed therein.

245.   Applying the facts as fully set forth in the Parties section and General Facts, Plaintiffs as borrowers were directly related to the loans issued.  Some Plaintiffs borrowed money from Defendant to purchase the home.  Monies were invested for down payment and/or improvements to the home during ownership.  Plaintiffs paid unreasonably high monthly payments as the purchase price was based on inflated appraisal values and because of the highly predatory terms of their loans.  Other Plaintiffs borrowed money against the grossly inflated equity value of the property for various reasons.  All Plaintiffs lost all investments and existing equity in their properties due to the negligence of Defendants.

246.   Plaintiffs further suffered public embarrassment from the publishing of foreclosure notices and suffer severe emotional distress from the threat of being disposed from their family homes.   Some Plaintiffs (Tracy Smith and Obed Apostol Jr.) have been permanently dispossessed of their properties.

247.   Among other reasons, property appraisals were grossly inflated in order to induce Plaintiffs into unaffordable loans.  Falsification of loan applications was encouraged by Defendants in order to, among other outcomes, convince Plaintiffs they were being placed into loans they could afford.  These negligent and fraudulent acts were intended to defraud borrowers and investors alike, thereby stripping equity from the Plaintiffs.  Therefore, these transactions were intended to directly affect Plaintiffs.

248.    It is a reasonable inference that creating highly inflated appraisals in the real estate market, issuing those inflated appraisals to induce Plaintiffs into unaffordable loans, changing loan applications to show more favorable income for Plaintiffs as induced by Defendants and using the loan approval as proof to Plaintiffs that they could afford their loans (among other things), would all lead to defaulting borrowers, many of whom lost all of the equity and investment in their properties.

249.    Furthermore, borrowers face dispossession of their family homes, accrued expenses of relocation and attorneys fees trying to fight for better loan terms or to remain in their properties, and suffer severe emotional distress.

250.    As some evidence of the foreseeability of harm to Plaintiffs, Plaintiffs point to the existence of credit default swaps created by Wall Street to bet against the housing bubble. Had there been no reason to believe that the issuance of these highly predatory and fraudulently induced loan transactions would lead to defaulting borrowers on a scale not seen since the Great Depression, why would Wall Street investment banks create stock instruments designed to bet against the Residential Mortgage Backed Securities market?

251.    Plaintiffs are all in loans far higher than the value of their properties.  Plaintiffs are expected to pay these loans when the over-valued appraisals used to set the loan amounts were incentivized by Defendants.  Plaintiffs have been injured by the loss of equity and investment in their properties.  Therefore, it is certain that Plaintiffs have been injured by the acts of the Defendant.

252.    Furthermore, based on the above analysis, the injuries suffered by Plaintiffs is a direct result of the conduct of Defendant.

253.    There is moral blame associated with lying, deceit, and fraud encouraged by these Defendants.  The Defendant's conduct is clearly reprehensible.

254.    Banks should not be allowed to treat borrowers with such reckless disregard for their welfare.  Before Congress last year, former Federal Reserve Chairman, Alan

452

1    Greenspan, admitted he was in "a state of shocked disbelief" that Defendant had failed to

2    regulate themselves.

3    255.    The result of allowing banks free reign over dealings with borrowers and loan

4    approvals has been an invitation for fraud and deceit, not to mention an economic disaster.

5    256.    Therefore as a matter of public policy, a duty should be found between Defendants

6    and Plaintiffs to sustain a reasonable level of care in handling the loan transactions in a

7    securitized lending scheme.

8    257.    Stated income loans have often been referred to as "liars loans." The implication

9    of this secondary title is that those seeking the loans are the "liars." With an internal

10   memo from JP Morgan Chase as a prime example (attached hereto as ExhibitC), it is not

11   the loan applicants who were the liars in these transactions, but the lenders. Everyone is

12   trying to place blame on Plaintiffs for entering into unaffordable loans which lead to

13   default and their dispossession of their properties, when the Plaintiffs were deceived and

14   their loan applications were altered. Why should Plaintiffs bear the weight of the housing

15   disaster?

16   258.    While parties should be encouraged to rely on their own ability to protect

17   themselves through their own prudence, diligence and contracting power, the same should

18   not be said when the party is dealing with unethical and deceitful behavior. Plaintiffs

19   aren't arguing that Defendants should ensure that Plaintiffs can afford their mortgages.

20   Plaintiffs are arguing that, as a minimum, a bank should not encourage the alteration of

21   the income provided by Plaintiffs, approve a loan they should not so that they can sell it to

22   investors, and then use a non-existent underwriting approval to persuade Plaintiffs they

23   can afford the loan in which they are sold.

24   259.    Asking Defendants to follow their own underwriting guidelines would not in any

25   way adversely impact Defendants. Defendants set the guidelines. If Defendants want

26   riskier loans approved, they should set lower underwriting standards instead of holding

27   out to the public that they have impeccable underwriting standards and then encouraging

28

fraudulent adjustment of loan applications to approve loans not within their own standards.

260.    In this case, a duty should be found between Defendants and Plaintiffs.  After weighing all of the *Nymark* and *Roe* factors, public policy is best served by a finding of duty.

261.    Defendants did not act as reasonably prudent corporations or federal savings banks and, as a result, Plaintiffs were damaged by the Defendants' negligence.  Just as a duty was found in *Connor* due to the expanded role the bank took on in the financing of the construction of homes, a duty was created here when Defendants took on roles beyond that of a mere lender and became involved in all aspects of the RMBS industry.  Defendants should be held liable for the damages their negligence caused.

262.    Defendants encouraged brokers and employees to adjust and fraudulently submit loan applications.   In essence, Defendants encouraged fraud on themselves and purposefully hid their heads in the sand so as to ignore the fraud they knew existed.  Although Defendants encouraged fraudulent loan submissions, this fraud damaged Plaintiffs and indicates a breach of reasonable care.

263.    But for these behaviors of Defendants, Plaintiffs would not have been injured.  Had Defendants not encouraged the fraud, Plaintiffs would not have been lured into over-valued loans with terms they could not afford.  Plaintiffs would not have been approved for the loans and would have remained where they were.  Now, Plaintiffs are facing homelessness, and have lost the equity and investments in their properties.  None of this would have occurred but for the encouragement of loan application adjustment for approval of loans.

264.    It is foreseeable that encouraging the adjustment of loan applications in order to qualify otherwise unqualified borrowers would lead to borrowers being placed in loans they could not afford.  Furthermore, it is foreseeable that borrowers placed in loans they cannot afford will, at some point, default.

454

265.   Because of the above, Defendants' acts were the actual and proximate cause of Plaintiffs' injuries.

266.   Plaintiffs have suffered multiple damages as more fully set forth above.   In general, Plaintiffs have suffered severe emotional distress, severe financial difficulty, the loss of equity and investment in their properties, and, in some cases, face dispossession from their properties.

267.   Defendant acted outrageously and persistently in performing the acts alleged herein and continues to do so.   Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

The following facts are specific to each Plaintiff and support this cause of action:

268.   When **Plaintiff Obed Apostol Jr.** acquired his loan in 2006, he worked with a broker named Azucena (Sandy) Zipagan. The broker did not explain anything  about the terms of the loan, and rushed him into signing.

269.   Later, Mr. Apostol had another broker review the documents and he was informed that Sandy took advantage of him. Despite his good credit and steady income, Mr. Apostol was put into a negative amortization ARM loan with the initial interest rate of 6.675%.

270.   At the time of origination, Mr. Apostol was still operating under the false belief that he was entering into a traditional mortgage agreement with a traditional lender. This belief as to the nature of the transaction and as to the nature of the lender included the misconception that the traditional lender motivations applied.

271.   Mr. Apostol also had a traditional understanding of the ability for his "lender" to assign or transfer the mortgage to another "lender."  He did not know that the mortgage could be transferred to groups of investors with varying interests in the performance of the loan. Further, he did not know that such a transfer could increase risk under the contract.

272.   When **Plaintiff Jeanne Amorati** took out her loan, she did so with The Mortgagezone, Inc., and worked with a mortgage broker named Mr. Evans.  She was placed in fixed rate mortgage at 6 1/8% interest.

273.   At the time of origination, Ms. Amorati was still operating under the false belief that she was entering into a traditional mortgage agreement with a traditional lender. This belief as to the nature of the transaction and as to the nature of the lender included the misconception that the traditional lender motivations applied.

274.   Ms. Amorati also had a traditional understanding of the ability for her "lender" to assign or transfer her mortgage to another "lender." She did not know that her mortgage could be transferred to groups of investors with varying interests in the performance of her loan.  Further, she did not know that such a transfer could increase her risk under the contract.

275.   Ms. Amorati understood that traditional lenders used conservative appraisals and underwriting standards to protect themselves from losses associated with default.

276.   Mr. Evans was dishonest and misleading with the Ms. Amorati.  Mr. Evans had discussed the loan terms with Ms. Amorati prior to her signing and he had quoted her a 6% interest rate. But, when presented with the final loan contract, Ms. Amorati noticed that the interest had changed to 6 1/8%. Despite the changed term on the contract, Ms. Amorati felt as though she had no choice but to accept the higher interest rate.

277.   Additionally, Ms. Amorati was required to pay over $20,000 in closing costs, yet was told by Mr. Evans that such fees were required.  This was clear on the face of the loan documents.

278.   Ms. Amorati had requested to use her own appraiser, yet she was refused by Mr. Evans and told that only a lender approved appraiser would be allowed.  Yet, Ms. Amorati had to pay for the appraisal. The appraisal was prepared by Facendo Associates, Inc., of 6950 Cypress Road, Suite 206, Plantation, FL 33317. The appraisal came in at exactly the asking price of the property.

279.    Ms. Amorati made a 20% down payment on the property, about $60,000, which has now been lost in its entirety with the decline in home values. The property that she paid over $300,000 for in 2006 is now worth about 1/3rd of that price. Ms. Amorati continues to suffer from higher monthly mortgage premiums due to the misleading and predatory circumstances surrounding her loan origination.  She is current on payments but struggles to pay the amount Citi demands.

280.    Further, at the time of origination, Ms. Amorati was unaware that she might be working with a servicer of the loan rather than a lender.  Approximately five months after the originatioin of the loan, Citi began to send Ms. Amorati's monthly statements and to collect payment. Active MERS records list Citibank as the servicer of the loan and Fannie Mae as the investor.  Although Ms. Amorati recognized the transfer of the loan, she did not know that Citi was not her new "lender" in the traditional sense.

281.    It was not until sometime in 2010 that Ms. Amorati began to understand that Citi was not her "lender" but a loan servicer and that her loan had been sold into an RMBS. She began to understand what had happened through media reports.

282.    Broker Kathy Green and a broker named Shirley structured the loan for **Plaintiff Edward Ferguson**. Despite Mr. Ferguson's great credit and steady income, Mr. Ferguson was sold an ARM loan, with the current interest rate of 9.125%. Ms. Green assured Mr. Ferguson that this loan was a prime loan and the best loan available to him.

283.    In October or November of 2005, Mr. Ferguson was notified that his loan was in default.  Mr. Ferguson had submitted all of his monthly payments timely as demanded on his monthly mortgage statements. When he called Citi to investigate, he was told that his last payment was applied to taxes and insurance even though such were not due until February of 2006. Mr. Ferguson was not able to make another monthly payment in the amount Citi demanded (essentially doubling the amount due) and now faces foreclosure.

284.    Despite their good credit and steady income, the broker that structured the loan placed **Plaintiffs Ana and Efrain Olivares** in a negative amortization ARM loan.

285.   A United Capital Services, Inc. loan officer brokered the loan for **Plaintiffs Nathaniel and Dorotea Santamaria**.  Despite their good credit and steady income, the Santamarias were placed in an ARM loan with the interest rate starting at 6.25% interest and capping at 12.25% interest.  The Santamarias were prime borrowers and reasonably relied on the broker's statements that they were being sold a favorable loan.  They were unsophisticated borrowers and did not understand the complex terms of the loan.

286.   Mortgage IT agent, Cindy Tran, brokered the loan for **Plaintiff Andrew Tandoc**. Ms. Tran assured Mr. Tandoc that he would be placed in the best loan possible.  Mr. Tandoc was placed into an ARM loan with the initial interest rate of 6.75%, adjusting to a maximum of 12.75% interest rate. Mr. Tandoc receives all communication regarding his loan, including his monthly statements, from CitiMortgage, Inc.


### FOURTH CAUSE OF ACTION

Negligence (servicing)

(By all Plaintiffs Against Citi)

287.   Paragraphs 1 through 286 and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

288.   The elements of negligence are duty, breach, causation, and damages.  The first and most important element of negligence is duty.   According to 46 California Jurisprudence 3d Negligence § 9, "The concept of duty is only an expression of the sum total of those considerations of policy that lead the law to say that the particular plaintiff is entitled to protection." John A. Gebauer, J.D. et al, 46 Cal. Jur. 3d Negligence § 9 (2011). § 8 says a duty of care has three origins.  The origin relevant to this action is "the duty of a person to use ordinary care in activities from which harm might reasonably be anticipated . . . .  A person is not liable unless he or she is actively careless." *Id.* at §8 "Moreover, one's general duty of care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably

1    foreseeable conduct, including the reasonably foreseeable negligent conduct of a third

2    person." *Id.*

3    289.    Although, "as a general rule, a financial institution owes no duty of care to a

4    borrower when the institution's involvement in the loan transaction does not exceed the

5    scope of its conventional role as a mere lender of money," *Nymark v. Heart Fed. Savings*

6    *& Loan Assn.,* 231 Cal. App. 3d 1089 (1991), several courts have agreed that this is a

7    "general rule" and there are occasions when a lender owes a duty of care to borrowers.

8    *Champlaie v. BAC Home Loans Servicing, LP,* 706 F. Supp. 2d 1029, 1059-60 (2009);

9    *Taheny v. Wells Fargo Bank, N.A.,* No. CIV. S-10-2123 LICK/EFB, 2010 WL 5394315;

10   *Miller v. OCWEN Mortgage, LLC,* NO. 2:11-CV-00257-MCR-DAD, 2011 WL 1549290.

11   290.    When faced with the question of whether or not a loan servicer has a duty to a

12   borrower when it undertakes to process a loan application, the Court in *Garcia* stated:

13   "Moreover, '[t]he California legislature has determined that a person who

14   undertakes an activity owes a duty to others to exercise ordinary care or skill.'

15   *See, Mid-Cal Nat. Bank v. Federal Reserve Bank of San Francisco,* 590 F.2d 761,

16   (9th Cir. 1979), citing CAL. CIV. CODE § 1714.  Here, by asking Plaintiff to

17   submit supporting documentation, Defendant undertook the activity of processing

18   Plaintiff's loan modification request.  Having undertaken that task, it owed

19   Plaintiff a duty to exercise ordinary care in carrying out the task."

20   *Garcia v. Citi Loan Servicing, LLC,* 2010 WL 1881098.

21   291.    The *Garcia* Court went on to list the six factor test as set forth in *Nymark v. Heart*

     *Federal Savings & Loan Association,* 231 Cal. App. 3d 1089 (1991):

22   ". . . in California the test for determining whether a duty of care is owed involves:

23   'the balancing of various factors, among which are [1] the extent to which the

24   transaction was intended to affect the plaintiff, [2] the foreseeability of harm to

25   him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness

26   of the connection between the defendant's conduct and the unjury suffered, [5] the

27

28

1    moral blame attached to the defendant's conduct, and [6] the policy of preventing

2    future harm." *See Nymark,* 231 Cal. App. 3d at 1098.

3    *Garcia,* 2010 WL 1881098 at 3.

4    292.    The *Champlaie* Court also noted that *Nymark* held that this test also determines

5    'whether a financial institution owes a duty of care to a borrower-client," *Champlaie* at

6    1061; *Nymark* at 1098.

7    293.    In *Roe,* the Ninth Circuit noted that the California Supreme Court 'arguably

8    limited' *Biakanja* in *Bily v. Arthur Young & Co.,* 834 P.2d 745 (1992), which held a court

9    must consider three additional factors before imposing a duty of care. *Roe* at 1198. *Roe*

10    summarized these factors as "(1) liability may in particular cases be out of proportion to

11    fault; (2) parties should be encouraged to rely on their own ability to protect themselves

12    through their own prudence, diligence and contracting power; and (3) the potential

13    adverse impact on the class of Defendant upon whom the duty is imposed." *Id.* (citing

14    *Bily,* at 68-73). *Bily* was decided before *Nymark,* but not discussed therein.

15    294.    Applying these factors to the facts of Plaintiffs' case, it is clear that Citi had a duty

16    to act reasonably when undertaking to modify Plaintiffs' loans. This undertaking started

17    when Citi publicly announced through its website and other media that it would consider

18    borrowers for modification.

19    295.    Furthermore, Citi undertook loan modification by signing the HAMP contract to

20    become a participating servicer.

21    296.    Yet, in many cases, Plaintiffs were unable to even begin the modification process

22    with Citi because it refused to adequately correspond with Plaintiffs.

23    297.    Take for instance the facts of Plaintiff Jeanne Amorati. Ms. Amorati tried to

24    submit a loan modification for months. But, every time she called Citi for instructions and

25    assistance in beginning the process, she was put on hold for hours only for the connection

26    to be lost. When she was able to speak with a representative, no representative could

27    assist her and she was continually transferred between departments, put on hold, and

28    eventually lost connection.

298.    Several other Plaintiffs submitted repeated documentation according to the demands of Citi, but that documentation was lost or not timely processed requiring new submissions of prolific documentation.

299.    The transactions were unquestionably intended to affect Plaintiffs.  The decision on Plaintiffs' loan modifications would determine what they would pay in order to retain their home.

300.    The improper processing of Plaintiffs' applications led to Plaintiffs' loss of credit, severe emotional distress, public embarrassment with the publication of foreclosure notices, lost wages from time spent away from work preparing the documentation requests, and, for some Plaintiffs, the loss of their properties.  This illustrates the potential harm to Plaintiffs from mishandling the application and this harm was reasonably foreseeable.  "Although there was no guarantee the modification would be granted had the loan been properly processed, the mishandling of the documents deprived Plaintiff of the possibility of obtaining the requested relief."  *Garcia* at 3.

301.    Furthermore, Plaintiffs were foreseeably damaged first by requiring them to default on the loan to be considered for loan modification and then by not properly processing the loan to give them the opportunity of modification.  This foreseeably led to Plaintiffs' loss of credit, public embarrassment with the publication of foreclosure notices, and the eventual sale of some properties at foreclosure.

302.    The injury to Plaintiffs is certain, in that they lost the opportunity of obtaining a loan modification, suffered severe emotional distress, the loss of credit, and, for some, permanently lost their properties.

303.    There is a close connection between Defendant's conduct and any injury actually suffered, because, to the extent Plaintiffs otherwise qualified and would have been granted a modification, Defendant's conduct in misdirecting the submission of the applications or not properly processing the applications deprived Plaintiffs of the opportunity of modification.

304.    "The existence of a public policy of preventing future harm to home loan borrowers is shown by recent actions taken by both the state and federal government to

1    help homeowners caught in the home foreclosure crisis. *See, e.g.,* CAL. CIV. CODE §

2    2923.6 (encouraging lenders to offer loan modifications to borrowers in appropriate

3    circumstances); *see also,* Press Release at http://gov.ca.gov/press-release/14871 ("Gov.

4    Schwarzenegger Signs Legislation to Provide Greater Assistance to California

5    Homeowners"), and MakingHomeAffordable.gov (describing the federal "Making Home

6    Affordable Program")." *Garcia* at 3.

7    305.    It is not clear whether or not moral blame would attach to the conduct of Citi, but

8    five of the six balancing factors listed in *Nymark* clearly weigh in favor of finding a duty

9    of care.

10   306.    As for the remaining three factors, Plaintiffs hands are clean and it was by no fault

11   of their own that their loan application was not properly processed. In fact, in all cases

12   Plaintiffs diligently investigated the status of their application and continued to attempt to

13   communicate and cooperate with Citi. Therefore, liability is not out of proportion to fault.

14   307.    Plaintiffs acted prudently. They called and waited on hold multiple times to

15   negotiate amicably with Defendant. They followed the instructions given to them in

16   submitting their modification application. They diligently followed up with the lender

17   about the status of their application and took reasonable steps to correct the issue by

18   resubmitting the paperwork repeatedly.

19   308.    Under the Financial Stability Act of 2009, the Home Affordable Modification

20   Program (HAMP) was instituted. This program requires participating servicers to provide

21   modification to certain distressed homeowners. Participating servicers enter into HAMP

22   contracts which have certain requirements regarding the staffing and training of

23   employees to handle borrower modifications.

24   309.    The issue in front of the Court in *Sierra-Bay* was whether or not a breach of

25   federal law constituted negligence per se under California Evidence Code (Evid. Code) §

26   669. *Sierra-Bay Fed. Land Bank Asson. v. Superior Court,* 227 Cal. App. 3d 318 (1991).

27   The court determined that violation of a federal statute alone is not negligence per se

28   under California law. But, if a Plaintiff argues a breach of a legal duty that caused

462

1   Plaintiffs' injuries, federal statutes and acts enacted to protect the group of persons of

2   which Plaintiff is a member can be used to set the standard of care.

3   310.    Under the reasoning of *Sierra-Bay,* these standards set forth to protect distressed

4   borrowers such as Plaintiffs could be used to set the standard of care for participating loan

5   servicers, such as Citi.  Under the HAMP contract, servicers are required to provide

6   sufficient staffing and to adequately train the modification employees.  HAMP has many

7   other guidelines regarding the handling of distressed homeowners and processing of

8   modification applications.

9   311.    Citi, as a participator in HAMP, should at a minimum be required to follow the

10  guidelines of HAMP in order to fufill its duty of due care and would not be prejudiced by

11  such.

12  312.    Therefore, Citi had a duty of due care in instructing Plaintiffs on submission of the

13  modification applications and in processing Plaintiffs' applications.  Citi breached this

14  duty by refusing to communicate or incorrectly instructing Plaintiffs and by not

    processing Plaintiffs applications.

15  313.    Plaintiffs were damaged by these negligent acts because their credit was destroyed,

16  they were publicy embarrassed with the publication of foreclosure notices, they lost the

17  opportunity for consideration of modification, and they lost their primary residence to

18  foreclosure.

19  314.    Plaintiffs pray for damages in an amount to be determined at trial.  Plaintiffs also

20  pray that the Court restore the parties to the positions they were in prior to Plaintiffs

21  default and request any other relief the Court deems appropriate.

22

23  The following facts are specific to each Plaintiff and support this cause of action:

24  315.    When the economic crisis severely and unforeseeably altered his financial

25  circumstances, **Plaintiff Obed Apostol Jr.** sought a loan modification. He has applied for

26  a modification several times to no avail. Mr. Apostol has repeatedly tried to contact Citi.

27  When Mr. Apostol calls Citi, he is transferred from person to person and department to

28

department. Each time, Mr. Apostol speaks to a different person and has to explain his situation all over again because there is no record in their system of previous conversations. Mr. Apostol is repeatedly told to resubmit the same paperwork time and time again.

316. Citi's mishandling of Mr. Apostol's loan has caused severe anxiety and emotional distress. He now lost his rental property to foreclosure, which was a business for him. He has lost significant income from the time he has spent trying to work with Citi, and now from the loss of his income property. His credit has been severely damaged, which has affected his ability to get other lines of credit. He also now has an unlawful detainer judgment on his record, even though he was never in physical possession of his property, which will impede his ability to rent property in the future. He has been publicly embarrassed with the publication of foreclosure notices.

317. It was not until sometime in 2010 that **Plaintiff Jeanne Amorati** began to understand that Citi was not her "lender" but a loan servicer and that her loan had been sold into an RMBS. She began to understand what had happened through media reports.

318. Ms. Amorati first attempted to modify her mortgage in 2011 with Citi. However, despite numerous attempts at contacting the bank to begin the modification process, Ms. Amorati was unsuccessful at reaching anyone who could help.

319. CitiMortgage, Inc. participates in the HAMP program as evidenced by the Making Home Affordable website (http://www.makinghomeaffordable.gov/get-assistance/contact-mortgage/Pages/default.aspx).

320. Citi represents that it works with homeowners for modification. (https://www.citimortgage.com/Mortgage/Home.do?page=homeowner_assistance)

321. Yet, despite calling multiple numbers Citi lists on its various websites and following online instructions, Ms. Amorati was unable to even start the application process for modification.

322.    When speaking with Citi representatives on the phone regarding a modification, Ms. Amorati faced a frustrating lack of help.  The people she spoke with were rude and simply passed her around among operators without attempting to help with the process. Notes were not made in the system of what transpired during the call, and Ms. Amorati was made to start the whole maddening process over again upon the next phone call.

323.    The people that Ms. Amorati with whom Ms. Amorati spoke were not helpful and told her simply that she needed to talk to someone else, placed her on hold for a long time, and often hung up on her.  One of the people that Ms. Amorati was put in contact with was Todd Martrez, who, like the other Citi employees, was extremely unhelpful.

324.    Despite having been told that she would receive a call back from Citi to discuss a loan modification, Ms. Amorati never received any call. Ms. Amorati attempted for months to get in contact with the bank to begin the modification process, but was eventually forced to give up in frustration.

325.    Ms. Amorati has faced severe depression as a result of the loan terms with which she must comply and Citi's refusal to allow her to begin the modification process.  She remains hopeless at the prospect of ever getting relief.  She has lost wages from the time spent away from work trying to communicate with Citi.  She suffers lower credit from her significantly high debt to income ratio from the overvalued property.

326.    Ms. Amorati likewise has suffered from loss of sleep and physical manifestations of anxiety, such as digestive issues, related to the prospect of losing her home should she default on her mortgage.

327.    When the economic crisis severely and unforeseeably altered **Plaintiffs Theodore and Karen Aufort's** financial circumstances, they sought a loan modification with Citi. When the Auforts first applied for a loan modification, they were current on their payments but struggling to keep up with those payments.  The Auforts have applied for a loan modification on three separate occasions.  During each loan modification application,

the Auforts have been required to repeatedly send into the bank the same prolific documentation.

328.    The first time CitiMortgage denied the Auforts loan modification, the Auforts were told that they did not qualify for a loan modification because of inadequate income. The Auforts strongly deny that they do not have enough income to support a modified mortgage agreement.

329.    The second time Citi denied the Auforts for a loan modification, Citi informed the Auforts that the investor of their note would not accept a modification of their loan.  This is the first time the Auforts had any reason to know that their loan was not held by a traditional "lender."

330.    The Auforts asked Citi who the owner of their loan was and the bank informed the Auforts that Bank of the West owned their loan.  The Auforts then drove to the El Cahon branch of Bank of the West to discuss modifying their loan.  When the Auforts got to the Bank of the West branch office, they were told that Bank of the West did not have any record of owning their mortgage.

331.    Through the Auforts' persistence, they were able to get the Bank of the West representative to research whether their loan was owned by Bank of the West. The representative then discovered that Bank of the West did own the loan.

332.    When the Auforts questioned the Bank of the West representative, Dotty, about the possibility of a loan modification, the Auforts were told that they would not be considered for a loan modification with Bank of the West unless they were behind on their mortgage payments.  But, they were also told that they would qualify if they defaulted on payments. The Auforts detrimentally relied on this statement and ceased to make payments on their mortgage so that they could receive a loan modification.  The Auforts then applied a third time for loan modification.

333.    The Auforts are now facing an unlawful detainer action which attempts to permanently dispossess the Auforts of their primary residence.  They ceased making

1   payments on their mortgage in accordance with the statements of the Bank of the West

2   representative.   The Auforts have since applied for a loan modification a third time

3   through Citi, and the loan modification has been denied.   The loan modification process

4   has caused the Auforts to suffer undue stress and familial problems.

5   334.   Throughout all three modification attempts, the Auforts enlisted the services of

6   Save Your Home California, Save Your Home San Diego, and all of Citi's modification

7   programs.   According to Save Your Home California, the Auforts qualify for a

8   modification of their mortgage.

9   335.   The Auforts were regularly required to submit the same documentation.   Citi often

10   said the numbers did not match up on the originally submitted documentation, but the

11   Auforts resubmitted the same documentation with an addendum and the same numbers

12   were purportedly processed.

13   336.   Because of the inconsistency in the results of their modification attempts and

14   because of the information provided to them by Save Your Home California, the Auforts

15   believe their loan was improperly processed and denied by Citi.

16   337.   In October or November of 2005, **Plaintiff Edward Ferguson** was notified that

17   his loan was in default.   Mr. Ferguson had submitted all of his monthly payments timely

18   as demanded on his monthly mortgage statements. When he called Citi to investigate, he

19   was told that his last payment was applied to taxes and insurance even though such were

20   not due until February of 2006. Mr. Ferguson was not able to make another monthly

21   payment in the amount Citi demanded (essentially doubling the amount due) and now

22   faces foreclosure.

23   338.   Still behind from the mistake of Citi, the economic crisis severely and

24   unforeseeably altered Mr. Ferguson's financial circumstances, and his adjustable rate

25   payments increased to an amount he could not afford. Mr. Ferguson sought a loan

26   modification. Mr. Ferguson has applied for modification on at least four separate

27   occasions.

28

339.   Citi representatives informed Mr. Ferguson that he should not make mortgage payments while the modification was being processed.  He has been asked to send in the same documents over six times, of which Mr. Ferguson sent in by UPS at his own expense. It took several hours to compile the prolific documentation that caused Mr. Ferguson to miss work and lose wages.

340.   Despite his efforts to mail the application in the most reliable fashion possible and according to Citi's instructions, Citi still claims to have never received any application or they tell Mr. Ferguson that the documents need to be updated.  These representations are inconsistent.  Furthermore, Mr. Ferguson sends in the most up-to-date information by UPS every time he is asked.  The information could not get more up-to-date.

341.   Upon information and belief, Mr. Ferguson believes that the information may not be "up-to-date" by the time Citi gets around to reviewing it.

342.   When Mr. Ferguson calls Citi to check on the status of his application, he is put on hold for hours at a time and is then disconnected before reaching a representative. Mr. Ferguson has called Citi several times a week for assistance, but when Citi returns his calls it is not to offer assistance, but rather to collect money, even though Citi instructed Mr. Ferguson not to make payments while his modification was processed.

343.   Mr. Ferguson is a disabled veteran suffering from Post-Traumatic Stress Syndrome, which has only been exacerbated by the dysfunctional modification process that Mr. Ferguson has been actively involved in for years. Citi's inability and unwillingness to assist Mr. Ferguson has caused him severe anxiety and emotional distress, resulting in declining health and an overall feeling of hopelessness.  Mr. Ferguson has also suffered loss of credit, public embarrassment with the publication of foreclosure notices, the imminent possibility of losing his home and the real possibility of homelessness.

344.   When the economic crisis severely and unforeseeably altered their financial circumstances and when the payments substantially increased after the initial teaser period

468

1   of the loan, **Plaintiffs Ana and Efrain Olivares** unsuccessfully sought a loan
2   modification.

3   345.   When Ms. Olivares contacted Citi for assistance, she was often transferred from
4   person to person and department to department. Each time she spoke to a new
5   representative, she was forced to explain her situation all over again because there was
6   never a record of prior conversations.

7   346.   Citi's inability and unwillingness to assist Ms. Olivares has caused severe anxiety
8   and emotional distress for the entire family. The Olivareses feel as if they lost the
9   opportunity for modification.  Citi did not handle or process their modification request
10  properly and would not communicate with the Olivareses about the status of their
11  application.

12  347.   The Olivareses now face losing their home in a Trustee Sale.  They have suffered
13  damaged credit and public embarrassment with the publication of foreclosure notices.

14  348.   After the economic crisis severely and unforeseeably altered their financial
15  situation, **Plaintiffs Nathaniel and Dorotea Santamaria** sought a loan modification. The
16  Santamarias were told that they lied about their employment history, which was incorrect.

17  349.   At the time of origination, the Santamaria's were never asked to provide their
18  employment history.  They were willing to provide that information, but were never
19  asked.  Upon information and belief, the broker submitted false information about the
20  Santamaria's income and employment history without the Santamaria's knowledge or
21  consent.

22  350.   The Santamarias were also asked to send in the same documentation time and time
23  again. When they attempted to get assistance with their loan and the modification process,
24  they were often transferred from department to department and person to person.  On
25  information and belief, Citi either repeatedly lost the Santamaria's modification
26  submissions or did not timely process the information necessitating the Santamaria's
27  repeated submissions.

28

351.    Providing the prolific paperwork demanded was time consuming and required lost work and lost wages.

352.    Citi's inability and unwillingness to communicate the Santamarias has caused severe anxiety and emotional distress, resulting in anxiety attacks and sleep deprivation for the entire family.

353.    Furthermore, Citi's mishandling of the documents and refusal to process the application has cost the Santamaria's the opportunity to obtain a modification.  All of the above has caused the Santamaria's severe damage to their credit and severe emotional distress with the imminent possibility of homelessness.

354.    Ameriquest would send **Plaintiff Tracy Smith** and her husband statements which were conflicting from month to month. The Smiths were asked to pay a certain amount, which they did. Shortly after sending the payment, the Smiths would receive either a credit for being overcharged, or a bill because they were undercharged. When the Smiths would call Ameriquest for assistance, they often had no record of the loan.

355.    The Smiths would receive letters stating the rate had changed and the letter would give them a new payment amount. The Smiths would then pay the amount requested and would again receive either a small credit or a bill for deficiency a couple of weeks later. This continued for approximately two years until Citi took over the servicing of their loan.

356.    The Smiths continued diligently making payments to Citi, but would begin receiving calls from debt collectors informing them they were behind on their payments. When the Smiths would call to investigate, they would learn that the rate had changed without notice and their payments had not covered the payment increase. The Smiths would then cure the default, but a couple of months later they would receive calls from debt collectors and have to cure a default again due to another unexpected and unnoticed rate change. This continued for years.

357.    Due to the significant changes in payment amounts and due to the economic downturn, the Smiths sought a modification. Citi representatives told the Smiths, several

times, that they could not qualify for a modification unless they were behind on payments. Citi representatives informed the Smiths that once they were behind, the modification would be easy. The Smiths purposely fell behind on payments in order to qualify for a modification based on the representations of Citi modification employees.

358.    The Smiths were asked to send in the same documents in excess of fifteen times. Preparing these prolific document submissions took significant time and energy.  The Smiths even lost wages because of missed work ours used to prepare these submissions.

359.    Modification representatives continually informed them that the documents were never received, despite the fact that the Smiths kept detailed records of what was sent and where it was sent.  The Smiths followed every instruction they were given and submitted the paperwork according to the direction of Citi employees.

360.    Seeking assistance, the Smiths have called Citi countless times. The Smiths were transferred from person to person and department to department. Each time they called or were transferred to another department, the Smiths would have to explain their situation all over again because there was never a record of prior conversations.

361.    It wasn't until almost two years into the modification application process that a Citi representative informed the Smiths that they were unable to get a modification because it was not available to residents in Texas.  It was clear from the beginning that the Smiths lived in Texas.

362.    The Smiths have now been permanently dispossessed of their family home through foreclosure on December 6, 2011. They suffered severe emotional distress trying to work with Citi and comply with its demands. Citi's inability and unwillingness to assist the Smiths has caused the entire family severe anxiety and emotional distress. The Smiths have suffered severe damage to their credit and were publicly embarrassed with the publication of foreclosure notices.  The Smiths lost all equity and investments in their home when it was lost in foreclosure.

471

363.   When the economic crisis severely and unforeseeably altered his financial circumstances, **Plaintiff Andrew Tandoc** sought a loan modification. Mr. Tandoc was placed into a trial modification period for about a year.  He continued to make his trial modification payment for the entire year when a Citi representative called him and informed him that the modification was denied because he did not qualify.

364.   None of the money he paid under the trial modification was applied to the amount due on his mortgage, but instead went into a suspended account.  This money was not returned to Mr. Tandoc.

365.   Mr. Tandoc applied two additional times for a modification, only to be denied both times.    Mr. Tandoc was asked to send in the same documentation several times. Complying with the documentation demands required significant time and effort.  Mr. Tandoc lost wages from missed work attempting to comply with the documentation requests.   Yet, his documentation was lost or not timely processed which required additional submissions.

366.   Despite his repeated attempts to send in the requested documentation, Mr. Tandoc was denied for a modification. The reason stated was that he had not sent in all of the proper documentation.    Mr. Tandoc very carefully prepared the documentation submissions according to the instructions he received from Citi.

367.   He has left several messages that have never been returned. Citi's inability and unwillingness to assist Mr. Tandoc has caused severe anxiety, humiliation, and damage to his credit. Mr. Tandoc now faces foreclosure.  He has suffered public embarrassment from the publication of foreclosure notices.  He stands to lose all equity and investment in his property.

///

///

///

///

472

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendant and each of them as follows:

1. Declaratory relief and nominal and punitive damages according to proof under the First and Second Cause of Action;

2. Equitable relief according to proof under the Second Cause of action;

3. General, special and exemplary damages according to proof under the Third and Fourth Causes of Action;

4. On all causes of action, for costs of suit herein;

5. On all causes of action, for pre- and post-judgment interest;

6. On all causes of action for which attorney's fees may be awarded pursuant to the governing contract, by statute or otherwise, reasonable attorneys fees; and any other relief as the Court may deem appropriate.

PLAINTIFFS HEREIN DEMAND A JURY TRIAL.

Dated: July 13, 2012                                    Respectfully submitted by,


                                                        _Kristin Crone_
                                                        Kristin Crone, Esq.
                                                        UFAN Legal Group, PC
                                                        Attorney for Plaintiffs

473