# Rich Decl.

# Exhibit 5

# ORIGINAL

1  Kristin L. Crone (SBN #269679)
   UFAN Legal Group, PC
2  1490 Stone Point Dr., Suite 100
   Roseville, CA 95661
3  Tel: (877) 791-2247
   Fax: (916) 669-9698
4  kristin@theufan.com

5  Attorney for Plaintiffs

**FILED**
LOS ANGELES SUPERIOR COURT

FEB 1 6 2012

JOHN A. CLARKE, CLERK
BY C. LUNA, DEPUTY

6

7

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF LOS ANGELES

10                  (GLENDALE COURTHOUSE)

11                                    **EC 057639**

12  OBED APOSTEL JR., an individual;       )  Case No.:
13  THEODORE AUFORT, an individual;        )
    KAREN AUFORT, an individual;           )
14  DEBRA CARMAN, an individual;           )  **COMPLAINT FOR DAMAGES,**
    EDWARD FERGUSON, an individual;        )  **INJUNCTIVE AND DECLARATORY**
15  GINA MORRIS, an individual;            )  **RELIEF**
16  JAMES MORRIS, an individual;           )
    ANA OLIVARES, an individual;           )     1. **Privity of Contract;**
17  EFRAIN OLIVARES, an individual;        )     2. **Rescission – Mistake – Void**
    NATHANIEL SANTAMARIA, an individual;   )        **Agreement;**
18  DOROTEA SANTAMARIA, an individual;     )     3. **Negligence (origination);**
    TRACY SMITH, an individual;            )     4. **Negligence (servicing);**
19  ANDREW TANDOC, an individual;          )
20              Plaintiffs,                )
21       vs.                               )
22  CITIBANK, N.A. and                     )
    DOES I – XX, inclusive,                )
23                                         )
                Defendant.                 )
24

25  Plaintiffs, and each of them, hereby demand a jury trial and allege as follows:

26

27

28

COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF
Page 1

516

## PRELIMINARY STATEMENT

1.     In recent history, subprime mortgage lending reached epic proportions. Historically, banks loaned money to borrowers that they would not recoup until the stream of payments had been made.  For the loss of the use of this money, interest was added to the total amount owed by the borrower.  The bank took the sole risk of loss of this investment.  To hedge the bet, the bank was allowed to take as security for funds loaned, the property of the borrower.  Traditionally, prior to issuing a loan the bank would have the property appraised to determine the amount it would lend.  Because the bank bore the risk of loss, the bank had motivation to seek reasonable and conservative appraisals of the property and was motivated to use conservative underwriting guidelines.

2.     In the early 1980's, two very important laws were passed that changed the nature of mortgage litigation.  The Depository Institutions Deregulation and Monetary Control Act of 1980 essentially barred states from limiting mortgage interest rates.  Then in 1982, the Alternative Mortgage Transaction Parity Act passed which made it possible for lenders to offer exotic mortgages.

3.     As a result of the above legislation, this country saw the birth of adjustable-rate mortgages, mortgages with balloon payments, interest-only mortgages, and so-called option-ARM loans.

4.     Unlike traditional mortgage lenders who made their money as borrowers repay the loan, subprime lenders made their money upfront first by charging outrageous closing costs and brokers fees that could total over $10,000.  Then the lenders pooled the loans into Residential Mortgage Backed Securities (RMBS) and sold the RMBS to investors recouping monies lent almost immediately.  By doing so, lenders could make bad loans and just pass the loans and the risk along to investors.

5.     Because the lenders could now recoup monies lent almost immediately, the lenders began issuing loans in utter disregard for all underwriting standards.  The lenders offered high fees at loan origination to motivate brokers to write subprime loans for anyone who

1   would put up their property as security – no matter what the value of the property, or the

2   income, the credit or the ability to pay of the client.

3   6.      These practices encouraged and incentivized brokers to deceive borrowers into

4   believing they could afford loans they could not and to promise borrowers refinances they

5   would never receive.  In fact, brokers would say and do just about anything to get the

6   borrowers to agree to their financing because of the outrageous incentives offered by the

7   lenders.

8   7.      In furtherance of this scheme of deception, the banks encouraged appraisers to

9   over-assess property values in order to determine loan amounts.  Unlike the traditional

10  bank that had an interest in a conservative appraisal, these new banking standards gave the

11  bank an incentive to appraise properties far higher than their true values.  By lending

12  larger sums of money to borrowers, the bank could package up mortgages with larger

13  streams of income.  Larger streams of income appeared more valuable to investors and

14  could bring higher sums for the lender with the sale of the RMBS.  For these reasons, the

15  lenders chose appraisers who cooperated with their scheme and incentivized them to

16  appraise homes at far greater than market value.

17  8.      Borrowers unwittingly lost the investments and equity in their properties due to

18  these appraisals.  Many borrowers are now under severe emotional distress facing the loss

19  of their homes and the uprooting of their families.

20  9.      Furthermore, property owners nationwide were damaged similarly by the

21  negligence of the banks.  Because homes appraised by these deceptive lenders were

22  appraised for higher than true market rate values, the comparables were skewed for ALL

23  properties.

24  10.     In addition to skewing property values for all of America in epic proportion,

25  "Lenders" have further bilked borrowers and investors by unreasonably servicing these

26  loans after securitization. CITIBANK, as servicer, collects high fees for foreclosure and

27  has an incentive to foreclose even when loan modification would be of greater value to the

28

1  investors.   CITIBANK has shown repeatedly that, although it purports to work with

2  borrowers on loan modifications, it is really only causing borrowers to send in the same

3  prolific paperwork over and over again only to deny the modification and move forward

4  with foreclosure despite borrower qualifications.

5  11.     Borrowers are advised that their chances of loan modification are higher once they

6  are 90 days late on payment.  This induces borrowers to stop mortgage payments during

7  the loan modification process.  When denied months and sometimes years later, not only

8  does the borrower owe all of the back payments, but also a fortune in accrued fees.

9  12.     A borrower's ability to pay a mortgage in the short term is not a reflection of

10  his/her ability to pay long term.  Seemingly, if a borrower has the requisite circumstances

11  and income to qualify for a loan modification, his/her current loan status should have no

12  bearing.

13  13.     Even plaintiffs who are current on payments are harassed by out-sourced

14  collection employees.

15  14.     Most Plaintiffs are faced with frequently changing payments they do not

16  understand.  When they call for an accounting, they are given the run-around.  Some are

17  given complex math equations they do not understand and are given a list of fees they do

18  not believe to be accurate.  Yet, the bank will not justify the fees it is charging or the

19  amount it says is due.

20  15.     Because of these willful and negligent behaviors, Plaintiffs have been injured.

21  Plaintiffs have suffered severe emotional distress, loss of investments and equity in their

22  homes, loss of credit, public embarrassment with the publishing of foreclosure notices,

23  and the dispossession of their family homes and properties.

24  16.     Everyone has a duty to act as a reasonably prudent person – or in this case, a

25  reasonably prudent corporation.  The bank certainly did not act reasonably prudent in its

26  interactions with Plaintiffs and because of these acts, millions have been injured.

27

28

17.     Before Congress last year, former Federal Reserve Chairman Alan Greenspan admitted he was in "a state of shocked disbelief" that lenders had failed to regulate themselves.

### PARTIES

**Plaintiffs**

18.     Plaintiff OBED APOSTEL JR. is an individual residing in the State of California, with rental property located at 1330 Cedar Court, Gilroy, CA 95020. Mr. Apostel refinanced his mortgage with Argent Mortgage Company, LLC in 2006, as evidenced by the Deed of Trust recorded in Santa Clara County on October 6, 2006. Mr. Apostel receives all communications regarding his mortgage, including his monthly statements, from CitiMortgage, Inc. When Mr. Apostel acquired his loan in 2006, he worked with a broker named Azucena (Sandy) Zipagan. The broker did not explain anything with regards to the loan documents, and only told him where to sign.  Later, Mr. Apostel had another broker review the documents and he was informed that Sandy took advantage of him. Despite his good credit and steady income, Mr. Apostel was put into a negative amortization ARM loan with the initial interest rate of 6.675%. When the economic crisis severely and unforeseeably altered his financial circumstances, Mr. Apostel sought a loan modification. He has applied for a modification several times to no avail. Mr. Apostel has repeatedly tried to contact CitiMortgage. When Mr. Apostel calls Citi, he is transferred from person to person and department to department. Each time, Mr. Apostel speaks to a different person and has to explain his situation all over again because there is no record in their system of previous conversations.  Mr. Apostel is repeatedly told to resubmit the same paperwork time and time again. Citi's unwillingness and inability to assist Mr. Apostel has caused severe anxiety and emotional distress. He lives in constant fear of losing his rental property, which is a business for him.  His credit has been severely damaged, which has affected his ability to get other lines of credit.

19.     Plaintiff THEODORE & KAREN AUFORT are a married couple residing in the State of California with property located at 8662 Winter Gardens Blvd, Lakeside, CA 92040.   The Auforts entered into a mortgage agreement with ABN Amro Mortgage Group, Inc in 2006.   Current MERS records indicate that the Auforts' current loan servicer and loan investor is CitiMortgage, Inc.   When the economic crisis severely and unforeseeably altered the Auforts' financial circumstances, they sought a loan modification with CitiMortgage.   When the Auforts first applied for a loan modification, they were current on their payments but struggling to keep up with those payments.   The Auforts have applied for a loan modification on three separate occasions.   During each loan modification application, the Auforts have been required to repeatedly send into the bank the same prolific documentation.   The first time CitiMortgage denied the Auforts loan modification, the Auforts were told that they did not qualify for a loan modification because of inadequate income.   The Auforts strongly deny that they do not have enough income to support a modified mortgage agreement.   The second time CitiMortgage denied the Auforts for a loan modification, CitiMortgage informed the Auforts that the owner of their note would not accept a modification of their loan.'   The Auforts asked CitiMortgage who was the owner of their loan and the bank informed the Auforts that Bank of the West owned their loan.   The Auforts then drove to the El Cahon branch of Bank of the West to discuss modifying their loan.   When the Auforts got to the Bank of the West branch office, they were told that Bank of the West did not have any record of owning their mortgage.   Through the Auforts' persistence, they were able to get the Bank of the West representative to research whether their loan was owned by Bank of the West.   The representative then discovered that Bank of the West did own the loan.   When the Auforts questioned the Bank of the West representative about the possibility of a loan modification, the Auforts were told that they would not be considered for a loan modification with Bank of the West unless they were behind on their mortgage payments.   The Auforts detrimentally relied on this statement and ceased to make payments on their

1   mortgage so that they could receive a loan modification. The Auforts are now facing a

2   potential foreclosure of their property because they ceased making payments on their

3   mortgage in accordance with the statement of the Bank of the West representative. The

4   Auforts have since applied for a loan modification a third time through CitiMortgage, and

5   the loan modification is currently pending review. The loan modification process has

6   caused the Auforts to suffer undue stress and familial problems.

7   20.   Debra Carman refinanced her primary residence located at 22335 Caminito Arroyo

8   Seco 59, Laguna Hills, CA 92653 with Argent Mortgage Company on or around

9   December 15, 2006 for $393,000. At the time Ms. Carman went to refinance her property

10   she had excellent credit and steady income. She was a prime borrower. She used a broker

11   for the transaction. The broker assured her she was being placed into a prime loan. As an

12   unsophisticated borrower with prime credit and good income, Ms. Carman reasonably

13   relied on these representations. She was not placed in a prime loan, but an adjustable rate

14   loan. Ms. Carman was unclear about the terms of the loan and felt very uncomfortable,

15   but she trusted the broker and felt very pressured to sign. Ms. Carman has suffered

16   depression and has been put on anti-depressants because of the loss of the home and the

17   damage to her credit. She has lost all of the equity investments made in the property. At

18   the time of origination, Ms. Carman was still operating under the false belief that she was

19   entering into a traditional mortgage agreement with a traditional lender. This belief as to

20   the nature of the transaction and as to the nature of the "lender" included the

21   misconception that the traditional lender motivations applied. Ms. Carman understood

22   that traditional lenders used conservative appraisals and underwriting standards to protect

23   themselves from losses associated with default. Although Ms. Carman's Deed of Trust

24   states that Argent is the "lender" she has been receiving her mortgage statements from

25   CITI. Ms. Carman does not believe that she is in privity of contract with CITI. At the

26   time Ms. Carman went to refinance her property she had excellent credit and steady

27   income. She was a prime borrower. She used a broker for the transaction. The broker

28

1   assured her she was being placed into a prime loan.  As an unsophisticated borrower with

2   prime credit and good income, Ms. Carman reasonably relied on these representations.

3   She was not placed in a prime loan, but an adjustable rate loan.  Ms. Carman was unclear

4   about the terms of the loan and felt very uncomfortable, but she trusted the broker and felt

5   very pressured to sign.  Ms. Carman has suffered depression and has been put on anti-

6   depressants because of the loss of the home and the damage to her credit.  She has lost all

7   of the equity investments made in the property.  When Ms. Carman realized that the terms

8   of her loan are not what she thought, she tried to work things out with CITI by applying

9   for a modification.  She was told by a bank representative not to make any payments.  She

10   fell behind based on these statements.  She was placed in a temporary modification and

11   was promised a permanent modification if she made all of her trial payments and

12   submitted all of the requested paperwork.  Ms. Carman not only made the three trial

13   payments, but continued making trial payments for a total of six months before she was

14   denied the permanent modification.  After the trial modification, Ms. Carman tried to send

15   CITI a regular monthly payment and CITI refused to accept her payment.  The reason

16   CITI gave her for the denial is that the investor did not approve.  Ms. Carman has applied

17   for a modification four (4) times now.  The last modification was erroneously denied for

18   failure to provide documentation.  Ms. Carman has provided every document that CITI

19   has requested timely and repeatedly.  Fulfilling the document requests of CITI has cost Ms.

20   Carman a significant amount of time and energy.  Although Ms. Carman was told that the

21   foreclosure process would be stopped while she was being considered for a HAMP

22   modification, CITI has continued to publicly publish foreclosure notices while the

23   modification request was pending.  Ms. Carman is facing imminent dispossession from

24   her family home.  This is causing her severe stress.  The requirements of the modification

25   process have cost her significant time and energy that has taken away from her work and

26   her family.  She was never given the true consideration for modification that CITI

27   promised.  Although she has requested an explanation of the payment amount demanded

28

by CITI, CITI requires her to pay what they say she owes. According to Ms. Carman, the loan modification process "seems like a big façade – going through the motions for modification.  It's horrible to work with a powerful servicer with having no voice or say. [You're] at the mercy of an entity that wants something different than your best interest."

21.     Plaintiff EDWARD FERGUSON is an individual residing in the State of Michigan, with property located at 535 Woodbridge Circle, South Haven, MI 49090. Mr. Ferguson refinanced his mortgage with AFS in 2005, as evidenced by the Deed of Trust recorded in Van Buren County on October 19, 2005.   Mr. Ferguson receives all communications regarding his mortgage from CitiMortgage, Inc., including his monthly statements.  Broker Kathy Green and a broker named Shirley structured the loan for Mr. Ferguson. Despite Mr. Ferguson's great credit and steady income, Mr. Ferguson was in an ARM loan, with the current interest rate of 9.125%. Ms. Green assured Mr. Ferguson that this loan was the best loan available to him. When the economic crisis severely and unforeseeably altered his financial circumstances, Mr. Ferguson sought a loan modification. Mr. Ferguson has applied for a modification on at least four separate occasions. Citi representatives informed Mr. Ferguson that he should not make mortgage payments while the modification was being processed.  He has been asked to send in the same documents over six times, of which Mr. Ferguson sent in by UPS at his own expense. Despite his efforts to mail them in the most reliable fashion possible, Citi still claims to have never received them or they tell Mr. Ferguson that the documents need to be constantly updated. When Mr. Ferguson calls Citi to check on the status of his application, he is put on hold for hours at a time and is then disconnected before reaching a representative. Mr. Ferguson has called Citi several times a week for assistance, but when Citi returns his calls it is not to offer assistance, but rather to collect money. In October and November of 2005, Mr. Ferguson was notified that his loan was in default. When he called Citi to investigate, he was told that his payment was applied to taxes and insurance even though they were not due until February of 2006. Mr. Ferguson now faces

1   foreclosure. He is a disabled veteran suffering from Post-Traumatic Stress Syndrome,

2   which has only been exacerbated by the dysfunctional modification process that Mr.

3   Ferguson has been actively involved in for years. Citi's inability and unwillingness to

4   assist Mr. Ferguson has caused him severe anxiety and emotional distress, resulting in

5   declining health and an overall feeling of hopelessness.

6   22.      Plaintiffs JAMES and GINA MORRIS a married couple living in the State of

7   California. They refinanced their property located at 14974 Grays Peak Avenue, Fontana,

8   CA 92336 in December 2005.  The amount refinanced were $576,000 according to the

9   Deed of Trust recorded in San Bernardino on December 16, 2005.  Mr. Morris and Mrs.

10  Morris refinanced through Argent Mortgage Company, LLC, also evidenced by the Deed

11  of Trust. Citi is the purported successor in interest to Argent Mortgage Company.  When

12  Mr. Morris and Mrs. Morris refinanced their mortgage, they did so through an

13  independent broker. At the time of the refinance, Mr. Morris and Mrs. Morris were still

14  operating under the false belief that they were entering into a traditional mortgage

15  agreement with a traditional lender.  This belief as to the nature of the transaction and as

16  to the nature of the "lender" included the misconception that the traditional lender

17  motivations applied. Mr. Morris and Mrs. Morris understood that traditional lenders used

18  conservative appraisals and underwriting standards to protect themselves from losses

19  associated with default.  The broker was misleading and dishonest with Mr. Morris and

20  Mrs. Morris.  When Mr. Morris and Mrs. Morris were approved for the loan, they were

21  led to believe that the loan was reasonable and affordable based on the appraisal and the

22  use of quality underwriting standards. Mr. Morris and Mrs. Morris were led to believe

23  they could pay off the loan at any time or refinance at any time when the interest rates

24  lowered. The broker also assured them that refinancing would not be an issue because the

25  property was sure to increase in equity. Mr. Morris and Mrs. Morris had good credit and

26  steady income at the time the loan was originated.  Despite this, they were placed in an

27  ARM loan with the initial interest rate of 8.850% for five years. When it adjusted, per the

28

1    terms of their note, the interest rate was adjusted by adding six percentage points (6%) to

2    the Current Index.  When Mr. Morris and Mrs. Morris attempted to modify their loan,

3    their request was denied.  Mr. Morris and Mrs. Morris have suffered a loss of equity

4    investment due to the overinflated appraisal and the down turn in the economy.  Mr.

5    Morris and Mrs. Morris are imminently facing foreclosure as they have been placed in a

6    mortgage that is now far in excess of the value of their property and has terms that make

7    the payments unaffordable for them. Mr. and Mrs. Morris suffer from extreme anxiety and

8    emotional distress due to the looming foreclosure and the extremely high payments

9    required by the terms of their loan.

10

11   23.    Plaintiff ANA and EFRAIN OLIVARES a married couple residing in the State of

12   California, with property located at 403 W. Kenneth Road, Glendale, CA 91202. The

13   Olivares refinanced their mortgage with World Savings Bank FSB in 2005, as evidenced

14   by the Deed of Trust recorded in Los Angeles County on June 16, 2005.  Ms. Olivares

15   receives all communications regarding her loan from CitiMortgage, including her monthly

16   statements. Despite her good credit and steady income, the broker that structured the loan

17   placed Ms. Olivares in a negative amortization ARM loan. When the economic crisis

18   severely and unforeseeably altered her financial circumstances, Ms. Olivares

19   unsuccessfully sought a loan modification. When Ms. Olivares contacted Citi for

20   assistance, she was often transferred from person to person and department to department.

21   Each time she spoke to a new representative, she was forced to explain her situation all

22   over again because there was never a record of prior conversations. Citi's inability and

23   unwillingness to assist Ms. Olivares has caused severe anxiety and emotional distress for

24   the entire family. The Olivareses now face losing their home in a Trustee Sale.

25   24.    Plaintiff NATHANIEL and DOROTEA SANTAMARIA a married couple

26   residing in the State of California, with property located at 15383 Braun Court, Moorpark,

27   CA 93021. Mr. Santamaria and his wife, Dorotea Santamaria, obtained their mortgage

28   loan with United Capital Services, Inc. in 2006, as evidenced by the Deed of Trust

1  recorded in Ventura County on July 11, 2006. The Santamarias receive all
2  correspondence, including their monthly statements, from CitiMortgage, Inc. and an
3  inactive MERS report shows CitiMortgage, Inc. as the loan servicer. A United Capital
4  Services, Inc. loan officer brokered the loan for the Santamarias. Despite their good credit
5  and steady income, the Santamarias were placed in an ARM loan with the interest rate
6  starting at 6.25% interest and capping at 12.25% interest. After the economic crisis
7  severely and unforeseeably altered their financial situation, the Santamarias sought a loan
8  modification. The Santamarias were told that they lied about their employment history,
9  which was incorrect. The bank never verified their employment history, which they were
10 willing to do. The Santamarias were also asked to send in the same documentation time
11 and time again. When they attempted to get assistance with their loan and the modification
12 process, they were often transferred from department to department and person to person.
13 Citi's inability and unwillingness to assist the Santamarias has caused severe anxiety and
14 emotional distress, resulting in anxiety attacks and sleep deprivation for the entire family.
15 25.     Plaintiff TRACY SMITH is an individual residing in the State of Texas, with
16 property located at 11743 Gatesden Drive, Tomball, TX 77377. Tracy Smith and her
17 husband, Keith Smith, refinanced their mortgage with Town and Country Credit
18 Corporation in 2002, as evidenced by the Deed of Trust recorded in Harris County. The
19 Smiths receive all communications regarding their loan from Citi Financial, including
20 their monthly statements.  A mortgage broker from Netco, Inc. on Richmond Avenue in
21 Houston, Texas brokered the loan for the Smiths.  Despite their great credit and steady
22 income, the broker placed the Smiths in a negative amortization ARM loan, which is now
23 at the interest rate of 8.25%. The broker assured the Smiths that this was the best loan
24 possible for their circumstances. The Smiths have been confused about the terms of their
25 loan since origination. They first received statements from Town and Country Credit
26 Corporation. The Smiths would send in their payment and then receive a notice that they
27 had not made the payment. This went on for about a year when they received a notice that
28

1   Ameriquest now owned the mortgage. Ameriquest would send the Smiths statements

2   which were conflicting from month to month. The Smiths were asked to pay a certain

3   amount, which they did. Shortly after sending the payment, the Smiths would receive

4   either a credit for being overcharged, or a bill because they were undercharged. When the

5   Smiths would call Ameriquest for assistance, they often had no record of the loan. The

6   Smiths would receive letters stating the rate had changed and give them a new payment

7   amount. The Smiths would then pay the amount requested and would again receive either

8   a small credit or a bill a couple of weeks later. This continued for approximately two years

9   until Citi took over the servicing of their loan. The Smiths continued diligently making

10  payments to Citi, but would begin receiving calls from debt collectors informing them

11  they were behind on their payments. When the Smiths would call to investigate, they

12  would learn that the rate had changed without notice and their payments had not covered

13  the payment increase. The Smiths would then cure the default, but a couple of months

14  later they would receive calls from debt collectors and have to cure a default again due to

15  another unexpected rate change, of which they were never informed about. This continued

16  for years. When the economic crisis severely and unforeseeably altered their financial

17  circumstances, the Smiths sought a modification. Citi representatives told the Smiths,

18  several times, that they could not qualify for a modification unless they were behind on

19  payments. Citi representatives informed the Smiths that once they were behind, the

20  modification would come easy. The Smiths purposely fell behind on payments in order to

21  qualify for a modification. The Smiths were asked to send in the same documents in

22  excess of fifteen times. Representatives continually informed them that the documents

23  were never received, despite the fact that the Smiths kept detailed records of what was

24  sent and where it was sent. Seeking assistance, the Smiths have called Citi countless

25  times. The Smiths were transferred from person to person and department to department.

26  Each time they called or were transferred, the Smiths would have to explain their situation

27  all over again because there was never a record of prior conversations. It wasn't until

28

1   almost two years into the modification application process that a Citi representative

2   informed the Smiths that they were unable to get a modification because it was not

3   available to residents in Texas. The Smiths now face foreclosure. They have had trustee

4   sale dates set and rescheduled on a month to month basis for over two years. Citi's

5   inability and unwillingness to assist the Smiths has caused the entire family severe anxiety

6   and emotional distress. The Smiths lost their home in a Trustee Sale on December 6, 2011

7   and their credit has been destroyed.

8   26.    Plaintiff ANDREW TANDOC is an individual residing in the State of California,

9   with property located at 12528 Evaro Drive, Whittier, CA 90606. Mr. Tandoc obtained his

10   mortgage with Mortgageit, Inc. in 2006, as evidenced by the Deed of Trust recorded in

11   Los Angeles County on August 23, 2006. Mortgage IT agent, Cindy Tran, brokered the

12   loan for Mr. Tandoc. Ms. Tran assured Mr. Tandoc that he would be placed in the best

13   loan possible. Mr. Tandoc was placed into an ARM loan with the initial interest rate of

14   6.75%, adjusting to a maximum of 12.75% interest rate. Mr. Tandoc receives all

15   communication regarding his loan, including his monthly statements, from CitiMortgage,

16   Inc. When the economic crisis severely and unforeseeably altered his financial

17   circumstances, Mr. Tandoc sought a loan modification. Mr. Tandoc was placed into a trial

18   modification period for about a year. He continued to make his trial modification

19   payment for the entire year when a Citi representative called him and informed him that

20   the modification was denied because he did not qualify. All of the money he paid under

21   the trial modification was never deducted from his mortgage, but instead went into a

22   suspended account. Mr. Tandoc applied two additional times for a modification, only to

23   be denied both times. Mr. Tandoc was asked to send in the same documentation several

24   times. Despite his repeated attempts to send in the requested documentation, Mr. Tandoc

25   was denied for a modification. The reason stated was that he had not sent in all of the

26   proper documentation. He has left several messages that have never been returned. Citi's

27

28

529

1    inability and unwillingness to assist Mr. Tandoc has caused severe anxiety, humiliation,

2    and damage to his credit. Mr. Tandoc now faces foreclosure.

3

4

5    **Defendant**

6    27.    At all times mentioned and material hereto, Defendant Citibank, N.A. was and is

7    authorized to conduct business in California with corporate headquarters in Sioux Falls,

8    South Dakota and incorporated under the laws of the Federal Government. Hereinafter all

9    named and unnamed defendants shall be referred to as "CITIBANK," "CitiMortgage,"

10    "CITI" or "Defendant."

11

12    <u>**JURISDICTION AND VENUE**</u>

13    **Jurisdiction**

14    28.    Defendant has such "substantial, continuous, or systematic" contacts with

15    California as to have general personal jurisdiction.

16    29.    When a Defendant is subject to general personal jurisdiction, he may even be sued

17    on causes of action unrelated to his activities within the state. *Perkins v. Benguet*

18    *Consolidated Mining Co.*, 342 US 437 (1952).

19    30.    Furthermore, three of the four Notes subject to this litigation were executed in

20    California and the associated Deeds of Trust secure real property located in California.

21    31.    Not all Plaintiffs herein are California residents and some Plaintiffs request action

22    in regard to property located outside of California. If all the property owners are before

23    the court, California courts may affect rights in property outside the state if the state finds

24    personal jurisdiction over the Defendant. *Fall v. Eastin*, 215 US 1, 7 (1909).

25    32.    In the mortgage crisis, California was one of the hardest hit states in the nation.

26    California has an interest in protecting its citizens from the poor business practices of

27    these major lenders leading to the subprime mortgage crisis.

28

**Venue**

33.     The California County with a substantial number of Plaintiffs and properties included in this suit is Los Angeles.  Therefore, venue is proper in Los Angeles County Superior Court.

## GENERAL FACTS

34.     Paragraphs 1 through 33 and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

35.     As discussed more thoroughly in the Preliminary Statement, the lending arena was materially changed by the passage of acts allowing riskier and hybrid loans.

36.     CITIBANK, including its subsidiaries and predecessors in interest were regularly engaged in the issuance of predatory loans targeted to unqualified borrowers for the purpose of securitization and sale of Residential Mortgage Backed Securities (RMBS). Many of these predatory loans were negative amortization loans that allowed borrowers to make minimum payments that did not cover even the interest owed.  The interest not paid was added to the principal owed on the loans.  As such, it is argued that negative amortization loans are not negotiable instruments since they are not for a fixed amount. Fraudulent document signing (so called "robo-signing) has been found against CITIBANK.

37.     According to the April 13, 2011 Comptroller of the Currency Consent Order findings (attached hereto as Exhibit A), CITIBANK "(a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of

1    the relevant books and records, when, in many cases, they were not based on such

2    personal knowledge or review of the relevant books and records; (b) filed or caused to be

3    filed in state and federal courts, or in local land records offices, numerous affidavits or

4    other mortgage-related documents that were not properly notarized, including those not

5    signed or affirmed in the presence of a notary; (c) litigated foreclosure proceedings and

6    initiated non-judicial foreclosure proceedings without always ensuring that either the

7    promissory note or the mortgage document were properly endorsed or assigned and, if

8    necessary, in the possession of the appropriate party at the appropriate time; (d) failed to

9    devote sufficient financial, staffing and managerial resources to ensure proper

10   administration of its foreclosure processes; (e) failed to devote to its foreclosure processes

11   adequate oversight, internal controls, policies, and procedures, compliance risk

12   management, internal audit, third party management, and training; and (f) failed to

13   sufficiently oversee outside counsel and other third-party providers handling foreclosure-

14   related services.

15   38.    The report further goes on to say, "By reason of the conduct set forth above, the

16   Bank engaged in unsafe or unsound banking practices."

17   39.    Because of repeated instances of fraudulent documentation, the use of MERS to

18   transfer loan documents without recording the transfers, improper or no notice of the

19   transfers to the Plaintiffs, Plaintiffs do not know who legally has the right to enforce their

20   Notes and has the concern for the potential of multiple claims.

21   40.    Not only are loan transfers hidden from the public, but the Notes are not properly

22   transferred between parties with proper endorsement.

23   41.    CITIBANK had notice, when it purchased the failing banking entities and/or

24   acquired these loans or RMBS holding these loans, that these loans were bad.

25   42.    At origination, Plaintiffs believed that they were entering into a traditional

26   lender/borrower relationship.

27

28

43.     Plaintiffs further believed that they were dealing with a traditional "Lender" who was using the property appraisal and underwriting guidelines to ensure it was making a safe investment.

44.     Plaintiffs did not know that the "Lender" no longer had an interest in ensuring the stability of loans made and really intended to induce anyone willing to sign into loans it could package up into already existing RMBS.

45.     In most instances, Pooling and Servicing Agreements (PSAs) were written and then loan officers and brokers were sent out to write the loans to fill them.

46.     At origination, Defendant intended that Plaintiffs' loans would be packaged up into RMBS and sold to investors.  Defendant knew that it would recoup monies lent immediately.  Defendant knew that Plaintiffs would be subject to a servicer instead of a lender and that the servicer was limited as to its power to assist Plaintiffs when issues not foreseeable to Plaintiffs arose.

47.     CITIBANK indicated an intent to work with Plaintiffs through loan modification.  Instead, the loan modification process was intended to stall Plaintiffs from taking available legal action against Defendant and to unjustly gain additional payment to which CITIBANK was not entitled.

48.     Plaintiffs who have entered the loan modification process have encountered huge obstacles placed by Defendant's employees on a systematic basis.  The behavior of the loan modification employees has been and continues to be regular and systematic.  It is not the action of one employee, but the regular actions of all employees.  CITIBANK not only knew of this conduct, but encouraged and ratified it.

49.     Plaintiffs are first asked to submit a plethora of paperwork.  A month or two later, the Plaintiffs are told they must resubmit the same, plethora of paperwork.

50.     Defendant's loss mitigation employees state that they did not receive the paperwork or that it was lost.

51.     Many Plaintiffs have been required to submit updated paperwork every month for years only to be denied the loan modification.

52.     Instead of the traditional lender/borrower arms-length transaction, "lenders" turned into loan processors for Residential Mortgage Backed Securities (RMBS).  As such, the lenders had an incentive, not to protect themselves from default, but to write as many high dollar loans as possible.

53.     The Defendant touted high underwriting standards while encouraging its employees and brokers to cheat to overcome these standards.

54.     Defendant encouraged brokers to tell potential borrowers anything to get them into the subprime loans.  Defendant even encouraged brokers to adjust loan applications to fit underwriting standards.   Brokers were given higher incentives at loan closing for subprime loans than for traditional loans.

55.     Many borrowers who qualified for prime loans were told they were being placed in prime loans when really they were placed in subprime loans.

56.     Plaintiffs relied on the representations of the Defendant that their loans were of good quality.  Loan approvals were used to convince Plaintiffs they were in loans they could afford.

57.     Inflated loan appraisals were also used to convince Plaintiffs into high dollar loans.  Plaintiffs were told, "look how much your house is worth and the value just keeps rising.  It will never depreciate."

58.     Inflated loan appraisals resulting in a wide-spread skew of property values across the nation.

59.     The appraisers were chosen by the Defendant, but often paid for by the borrowers.

60.     Defendant is responsible for the injury to Plaintiffs.

61.     All of this resulting in Plaintiffs' loss of equity and investments in their properties.  Plaintiffs have suffered public embarrassment with the publication of foreclosure notices.  Plaintiffs have, in some cases, been dispossessed of their family homes or face the

1    imminent threat of such.   Plaintiffs have suffered severe emotional distress.   Many

2    Plaintiffs have had physical manifestations of the emotional stress they have suffered.

3

4

5                                    **FIRST CAUSE OF ACTION**

6                                       (Privity of Contract)

7                                (By All Plaintiffs Against CITIBANK)

8

9    62.    Paragraphs 1 through 61 and the paragraphs following this cause of action are

10   incorporated by reference as though fully set forth herein.

11   63.    It has been recognized that borrowers have the right to know that the party

12   foreclosing is entitled to enforce their note under Article 3 of the UCC. *Leyva v. National*

13   *Default Servicing Corp.* (Nev. 2011) 255 P.3d 1275 held that more than simple possession

14   of the original note is required to enforce a negotiable instrument. *Id.* at 1280. A party can

15   attain "holder" status through a transfer of a note so long as he can prove that it is a valid

16   transfer. Absent an endorsement to the party claiming enforcement right, a valid transfer

17   requires an account for possession of the unendorsed instrument by proving the

18   transaction through which the transferee acquired it. *Leyva* at 1281. Mere possession of

19   the unendorsed note, where no assignment was produced, was insufficient to establish the

20   right to enforce the note. *Id.*

21   64.    Plaintiffs argue that where a party attempting to enforce a note cannot demonstrate

22   a proper endorsement or show an assignment of the right to enforce, that party is not in

23   privity of contract and cannot proceed with enforcement.

24   65.    Parties disagree as to their rights and duties under the contract.  Plaintiffs believe

25   there is no privity of contract between CITIBANK and Plaintiffs.  Plaintiffs further

26   believe that CITIBANK has no right to enforce.  Therefore, plaintiffs seek declaratory

27   relief on disputed matters. Disputed matters, as more fully set forth, are as follows:

28

                                                                                    535

**NEGOTIABLE V. NON-NEGOTIABLE INSTRUMENTS**

66.     There are material differences between instruments classified as negotiable instruments and those that are not.  Material hereto are two distinct differences:  1) a negotiable instrument requires the physical delivery of the instrument for the transferee to enforce, and 2) Holder in Due Course Doctrine only applies to negotiable instruments.

67.     Under Cal. Com. Code § 3104, a negotiable instrument is defined as follows:

(a) Except as provided in subdivisions (c) and (d), "negotiable instrument" means an unconditional promise or order to pay a *fixed amount of money*, with or without interest or other charges described in the promise or order, if it is all of the following:

(1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder.

(2) Is payable on demand or at a definite time.

(3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to  the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.

Cal. Com. Code § 3104(a) (emphasis added)

68.     Plaintiffs request declaratory relief to determine the following:

a.   whether or not the notes in question are negotiable instruments or non-negotiable instruments;

b.   As to notes that are negotiable:

1        1)     whether or not the requisite formalities of transfer and

2    endorsement have been followed for enforcement of the note, and

3    therefore whether or not there was privity of contract between

4    Plaintiffs and CITIBANK;

5        2)     whether or not Holder in Due Course Doctrine applies to the

6    negotiable instruments given Defendant's notice of defects and

7    Defendant's non-compliance with requisite formalities of

8    endorsement and transfer;

9

10 **NEGOTIABLE INSTRUMENTS**

11 69.    All clients have notes that do not negatively amortize and are, therefore, negotiable

12 instruments:  Andrew Tandoc, Nathanial Santamaria, Dorotea Santamaria, Edward

13 Ferguson, Obed Apostel Jr., Debra Carman, and Betty Herman, Ana Olivares, Efrain

14 Olivares, Tracy Smith, James Morris, Gina Morris, Theodore Aufort, and Karen Aufort.

15 70.    Plaintiffs request that notes determined to be negotiable instruments follow the

16 formal requirements of such as laid out in California Commercial Code Division 3 –

17 Negotiable Instruments.

18

19 **RIGHT TO ENFORCE**

20 71.    Plaintiffs have loans that do not negatively amortize and therefore are negotiable

21 notes.  Negotiable notes are governed by California Commercial Code Division 3.

22 72.    California Commercial Code § 3203 states, "An instrument is transferred when it

23 is delivered by a person other than its issuer for the purpose of giving to the person

24 receiving delivery the right to enforce the instrument."

25 73.    Furthermore, a bill, note, check or draft indorsed in blank is transferable by

26 delivery only according to *Curtis v. Sprague*, 51 Cal. 239 (1876); *Bank of Lassen v.*

27

28

1   *Sherer*, 41 P. 415 (1895); *O'Conor v. Clarke*, 44 P. 482 (1896); *Meyer v. Foster*, 81 P.

2   402 (1905).

3   74.    Plaintiffs are aware of allegations of fraudulent documentation produced by the

4   purported note holders (e.g., robo-signing).  Furthermore, Plaintiffs have experienced

5   considerable confusion in the transfer and handling of their mortgages.  For these reasons,

6   Plaintiffs simply need a determination that the proper party seeks to enforce the Notes

7   since the parties now enforcing the notes are not the original parties to the contracts.

8   75.    As stated above in the General Facts Section of this Complaint, section 404 of

9   TILA, NOTIFICATION OF SALE OR TRANSFER OF MORTGAGE LOANS,

10  provides:

11          a.   IN GENERAL – Section 131 of the Truth in Lending Act (15 U.S.C. 1641)

12               is amended by adding at the end the following:

13               (g)  NOTICE OF NEW CREDITOR –

14               (1) IN GENERAL – In addition to other disclosures required by this title,

15               not later than 30 days after the date on which a mortgage loan is sold or

16               otherwise transferred or assigned to a third party, the creditor that is the

17               new owner or assignee of the debt shall notify the borrower in writing of

18               such transfer, including –

19               (A) the identity, address, telephone number of the new creditor;

20               (B) the date of transfer;

21               (C) how to reach an agent or party having authority to act on behalf of the

22               new creditor;

23               *(D) the location of the place where transfer of ownership of the debt is*

24               *recorded; and*

25               (E) any other relevant information regarding the new creditor.

26

27

28

1       (2) DEFINITION – As used in this subsection, the term 'mortgage loan'

2       means any consumer credit transaction that is secured by the principal

3       dwelling of a consumer."

4       b.  PRIVATE RIGHT OF ACTION – Section 130(a) of the Truth in Lending

5       Act (15 U.S.C. 1640(a)) is amended by inserting "subsection (f) or (g) of

6       section 131," after "section 125,"

7   15 USC 1640-41(emphasis added)

8   76.    Note that Plaintiffs are not arguing that production of the Note is a requirement of

9   non-judicial foreclosure in California under California Commercial Code §§ 2924-2924I.

10   Plaintiffs dispute that the party attempting to enforce the notes has a right to do so.

11

12   **HOLDER IN DUE COURSE DOCTRINE**

13   77.    Plaintiffs with negotiable notes also request a determination that Defendant are not

14   protected by Holder in Due Course Doctrine.

15   78.    Even if all loans of Plaintiffs herein are found to be negotiable, Plaintiffs argue

16   that the loans are not subject to Holder in Due Course Doctrine for the following two

17   reasons:

18   **Defendant had notice:**

19   79.    When mortgage backed securities were at their peak of popularity, a group of

20   investors realized that many consumers were being approved for loans they did not have a

21   dream of affording.  These investors noticed that underwriting standards were ignored in

22   order to package up and sell mortgage backed securities to unsuspecting investors.

23   Borrowers were misled and lied to in order to lure them into these highly predatory loans.

24   Because of these realizations, Wall Street created credit default swaps for investors to bet

25   against the mortgage backed securities market.  Credit default swaps are a kind of stock

26   insurance that was issued even to non-stockholders.

27

28

80.     These credit default swaps along with ample other press related evidence proves that Defendant knew of the issues inherent in its acquisitions.

**Improper Indorsement:**

81.     If, however, the Court disagrees with Plaintiffs and believes CITIBANK should continue to enjoy holder in due course status despite the notice of potential claims, Plaintiffs additionally request that the Court require Defendant to prove that the transfer and indorsement of the notes were proper before allowing them to enforce rights as the new holder of the notes.

82.     It hardly seems just to allow Defendant to take the benefits of both a negotiable and non-negotiable instrument.  To allow Defendant to circumvent the requirements of transfer and indorsement of negotiable instruments and enjoy holder in due course status would frustrate the laws of California.

83.     The legislature has made a distinction in the treatment of negotiable and non-negotiable instruments purposefully.  In order to protect makers of promissory notes from dual claims for payment, specific requirements are present for the transfer and indorsement of negotiable instruments that are not requirements of non-negotiable instruments.

84.     To properly transfer a negotiable instrument, the physical Note must be transferred from the seller to the buyer (*see supra*).  Furthermore, the Note must be indorsed to the transferee.  This indorsement must be made on the Note if there is room.  California Commercial Code § 3204 provides, "for the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument." Furthermore, the Court in *Pribus v. Bush*, 118 Cal. App. 3d 1003 decided that an allonge (an indorsement on a paper affixed to the instrument) is not an effective indorsement when there is ample room for an indorsement on the note itself. Plaintiffs allege that their notes neither have been properly indorsed nor physically transferred.

85.     Holder in Due Course protection requires a negotiable instrument, transfer of the actual note, and proper indorsement of the note.

86.     A judicial declaration is necessary and appropriate at this time and so that the Plaintiffs may ascertain their rights and duties and avoid any illegal collection activity which might occur.

87.     The formalities of transfer protect a borrower from dual claims to payment.

88.     Plaintiffs further request nominal and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## SECOND CAUSE OF ACTION

Rescission – Mistake – Void Agreement

(By All Plaintiffs, Against CITIBANK)

89.     Paragraphs 1 through 88 and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

90.     The Restatement (Second) of Contract, § 17 states that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent. . ." American Law Institute, Restatement (Second) of Contracts, § 17(1).

91.     The bargain between the parties is often referred to as the "meeting of the minds." See, e.g., American Law Institute, Restatement (Second) of Contracts, § 17, comment 2.

92.     The California Fourth District Appellate Court has held that a lack of meeting of the minds, a mistake as to fact, can justify a rescission of the contract. "A mutual mistake, whether of fact or law, which affects an essential element of the contract and is harmful to one of the parties, is subject to rescission by the party harmed." *Guthrie v. Times-Mirror Co.*, 51 Cal.App.3d 879 (1975).

93.     The mistake or missing of the minds does not have to be mutual.  A single party mistaken justifies the voiding or rescinding of the contract when the mistake is known to the non-mistaken party. *Donovan v. RRL Corp,* 109 Cal. Rptr. 2d 807, 823 (2001).

94.     The Restatement (Second) of Contracts, § 153 states:

"Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154 , and

a.  The effect of the mistake is such that enforcement of the contract would be unconscionable, or

b.  The other party had reason to know of the mistake or his fault caused the mistake.

95.     The Plaintiffs in this action executed their Loan documents based on the mistaken belief that they would remain in a borrower/lender relationship.

96.     Furthermore, Plaintiffs believed they were entering into negotiations and mortgages with a traditional lender who used conservative appraisals and strict underwriting guidelines to protect its interest in the real property and/or repayment of the amount owed.

97.     Instead, Plaintiffs were entering into highly predatory subprime loans, regardless of creditworthiness or financial stability, with middlemen.  Unbeknownst to Plaintiffs, lenders no longer kept the risk of the loans they made.  Instead, CITIBANK put on "two hats" and both induced borrowers into predatory loans to fill its RMBS to sell to investors.

98.     CITIBANK first set up the PSAs for the RMBS, then sent out loan officers and brokers to fill the RMBS with mortgages.  CITIBANK no longer had an interest in the viability of the loans, only the sellability of the RMBS.

99.     The CITIBANK knew there would be no borrower/lender relationship.

100.    Because of this mistake, the Plaintiffs' benefit from their Loan agreement is far less than they thought they would receive.  Instead of a lender who had full authority to deal with their contractual relationship and the economic value to the lender, the Plaintiffs received a relationship with a party who lacked the full authority of the lender and lacked the economic incentive to modify the loan rather than foreclose.

101.    The mistake was not a future contingency, but a reality present at the contract formation:  CITIBANK intended the securitization of the conduit Loans to occur with certainty and it knew no borrower/lender relationship was contemplated or planned as a result of the Loan.

102.    Furthermore, CITIBANK knew the borrowers believed they were entering into traditional mortgages with traditional lenders using traditional appraisals and underwriting standards.

103.    Based on the material mistake in the formation of their contracts, Plaintiffs are, therefore, entitled to an order of this Court rescinding the Loans and/or declaring the Loans void, invalid, and unenforceable.

104.    In addition, Plaintiffs request restitution and damages, the specific amount to be determined at trial as well as such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

105.    Although this cause of action is against CITIBANK, it goes to the enforceability of the contract by the present holder, if different.  If the underlying contract is void because of mistake during formation, it is not enforceable even by a protected successor in interest.

## THIRD CAUSE OF ACTION

### Negligence (origination)

### (By all Plaintiffs Against CITIBANK)

106.    Paragraphs 1 through 105 and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

107.   The elements of negligence are duty, breach, causation, and damages.   The first and most important element of negligence is duty.   According to 46 California Jurisprudence 3d Negligence § 9, "The concept of duty is only an expression of the sum total of those considerations of policy that lead the law to say that the particular plaintiff is entitled to protection." John A. Gebauer, J.D. et al, 46 Cal. Jur. 3d Negligence § 9 (2011). § 8 says a duty of care has three origins.   The origin relevant to this action is "the duty of a person to use ordinary care in activities from which harm might reasonably be anticipated . . . .   A person is not liable unless he or she is actively careless." *Id.* at §8 "Moreover, one's general duty of care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct, including the reasonably foreseeable negligent conduct of a third person." *Id.*

108.   Although, "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money," *Nymark v. Heart Fed. Savings & Loan Assn.,* 231 Cal. App. 3d 1089 (1991), several courts have agreed that this is a "general rule" and there are occasions when a lender owes a duty of care to borrowers. *Champlaie v. BAC Home Loans Servicing, LP,* 706 F. Supp. 2d 1029, 1059-60 (2009); *Taheny v. Wells Fargo Bank, N.A.,* No. CIV. S-10-2123 LICK/EFB, 2010 WL 5394315; *Miller v. CITIBANK Mortgage, LLC,* NO. 2:11-CV-00257-MCR-DAD, 2011 WL 1549290.

109.   It is first arguable that the CITIBANK's involvement in these loan transactions did "exceed the scope of its conventional role as a mere lender of money." *Nymark* at 1096. A conventional lender of money issued loans with the incentive to underwrite the loans conservatively as the lender bore the risk of loss.   In the Plaintiffs' loan transactions, Defendant did not bear the risk of loss.   Instead, the Defendant packaged up the loans and sold them off to investors.

110.    In *Connor v. Great Western Savings and Loan* (1968) 69 Cal. 2d 850 the Court held that the bank (Great Western) abandoned its traditional role as a mere lender of money when it became intimately involved not only the financing of home purchasers, but also in the financing of the construction of the development.   The court held that because the bank undertook to develop the market for its home lending it took on a role beyond that of a traditional lender of money. *Id.* at 864. It thus assumed a duty to protect buyers against the defective construction of the homes. The bank was held to know that the construction company was dangerously underfinanced and operating on thin profit margins, and therefore, it should have reasonably foreseen a cutting of corners by the developer. *Id.* The bank was thus held to owe a duty to purchasers of the houses based not on its privity of contract with them, but based on its creation of an unreasonable risk of harm to them. *Id.* Under these circumstance, the Court found that the bank owed a duty to purchasers of houses. *Id.* at 866.

111.    As a subsequent case put it, the lender in *Connor* "wore two hats: one as a developer of a subdivision under construction and the second as the financing entity for it. Liability followed that broad relationship to the construction." *Hoida, Inc. v. M & I Midstate Bank* (2006) 291 Wis. 2d 283 fn 20. CITIBANK was also, in effect, wearing two hats – one as a traditional mortgage lender and one as a major participant in the mortgage backed securities market. CITIBANK profited not only from the origination of mortgages but also from the sale of those mortgages on the secondary market. CITIBANK, in many instances, remained in the picture as the servicer, collecting monthly payments and fees relating to the servicing (and in many instances, the foreclosure) of the loan. This broad relationship that CITIBANK has to every facet of the mortgage process takes it beyond the role of mere lender of funds and it is directly analogous to the role that Great Western took in *Connor*.

112.   Just as the bank in *Connor* was held to owe a duty to its borrowers for creating an unreasonable risk of harm to them, CITIBANK should be found to owe a duty to its borrowers for all of the bad acts described herein.

113.   CITIBANK was in a unique position to foresee the damage that was likely to result from its business practices. Being that CITIBANK was acting more as a middleman in the sale of mortgages, it had no incentive to originate mortgages with the care and prudence that a traditional lender would exercise. Rather, the more mortgages that the bank originated, the more product the bank had for sale on the secondary market. CITIBANK was not concerned about the quality of the mortgages that it was originating.

114.   As servicer, if the loans went into foreclosure the bank not only suffered no consequences as it had already recouped lent funds from the sale of RMBS, but actually stood to profit from the fees it collected for foreclosing.

115.   Incentivizing loan officers and brokers to get well qualified prime borrowers into subprime loans at prices far higher than the borrower can afford foreseeably leads to borrowers, including Plaintiffs herein, losing the downpayment and other equity invested in their properties.

116.   In addition to the banks direct actions leading to harm to Plaintiffs, the bank created the circumstances where harm to plaintiffs resulting from the actions of others will forseeably result. Even where CITIBANK itself may not have engaged in improper underwriting, the ability of mortgage brokers to originate loans on CITIBANK's behalf for immediate securitization and sale ensured that bad loans would be created. Because CITIBANK created the circumstances which encouraged mortgage brokers to originate bad loans, Defendant cannot argue that actions by mortgage brokers are a superseding causes of harm for which it is not liable. The bank in *Connor* was held to a duty to protect home buyers from the foreseeably defective construction instigated by the bank's lending practices. So too in the present case should CITIBANK owe a duty to borrowers for the defective loans given to them as a result of CITIBANK's lending practices.

117.   Plaintiffs were unaware that their loans were intended be packaged up and sold to a group of investors and expected a traditional lending relationship (as more fully set out in the Second Cause of Action).

118.   In so treating the loans issued, the Defendant was not acting as a traditional lender of money, but more of a loan processor.   Furthermore, in processing these loans, the Defendant acted negligently and fraudulently.

119.   Furthermore, the courts have noted that "even when a lender's acts are confined to their traditional scope, *Nymark* announced only a 'general' rule." *Champlaie* at 1060. Rather than conclude that no duty existed per se, the *Nymark* court determined whether a duty existed on the facts of that case by applying the six-factor test established by the California Supreme Court in *Biakanja v. Irving*, 320 P.2d 16 (1958). *Nymark* at 1098; *see also Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1197 (9ᵗʰ Cir. 2001).   This test balances six non-exhaustive factors:

> [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.

*Biakanja* at 19

120.   The *Champlaie* court noted that *Nymark* held that this test also determines 'whether a financial institution owes a duty of care to a borrower-client," *Champlaie* at 1061; *Nymark* at 1098.

121.   In *Roe*, the Ninth Circuit noted that the California Supreme Court 'arguably limited' *Biakanja* in *Bily v. Arthur Young & Co.*, 834 P.2d 745 (1992), which held a court must consider three additional factors before imposing a duty of care. *Roe* at 1198.   *Roe* summarized these factors as "(1) liability may in particular cases be out of proportion to fault; (2) parties should be encouraged to rely on their own ability to protect themselves

1   through their own prudence, diligence and contracting power; and (3) the potential

2   adverse impact on the class of Defendant upon whom the duty is imposed." *Id.* (citing

3   *Bily*, at 68-73). *Bily* was decided before *Nymark*, but not discussed therein.

4   122.   Applying the facts as fully set forth in the Parties section and General Facts,

5   Plaintiffs as borrowers were directly related to the loans issued.  Some Plaintiffs borrowed

6   money from Defendant to purchase the home.  Monies were invested for down payment

7   and/or improvements to the home during ownership.  Plaintiffs paid unreasonably high

8   monthly payments as the purchase price was based on inflated appraisal values.  Other

9   Plaintiffs borrowed money against the grossly inflated equity value of the property for

10  various reasons.  All plaintiffs lost investments made in the property and existing equity

11  due to the negligence of Defendant.

12  123.   Plaintiffs further suffered public embarrassment from the publishing of foreclosure

13  notices and suffer severe emotional distress from the threat of being disposed from their

14  family homes.

15  124.   Among other reasons, property appraisals were grossly inflated in order to induce

16  plaintiffs into unaffordable loans.  Falsification of loan applications was encouraged by

17  CITIBANK in order to, among other outcomes, convince Plaintiffs they were being

18  placed into loans they could afford.  These negligent and fraudulent acts were intended to

19  defraud borrowers and investors alike, thereby stripping equity from the Plaintiffs and

20  thereby, these transactions were intended to directly affect Plaintiffs.

21  125.   It is a reasonable inference that creating highly inflated appraisals in the real estate

22  market, issuing those inflated appraisals to induce plaintiffs into unaffordable loans,

23  changing loan applications to show more favorable income for Plaintiffs as induced by

24  CITIBANK and using the loan approval as proof to Plaintiffs that they could afford their

25  loans (among other things), would all lead to defaulting borrowers, many of whom lost all

26  of the equity and investment in their properties.

27

28

126.   Furthermore, borrowers face dispossession of their family homes, accrued expenses of relocation and attorneys fees trying to fight for better loan terms or to remain in their properties, and suffer severe emotional distress.

127.   As some evidence of the foreseeability of harm to Plaintiffs, Plaintiffs point to the existence of credit default swaps created by Wall Street to bet against the housing bubble. Had there been no reason to believe that the issuance of these highly predatory and fraudulently induced loan transactions would lead to defaulting borrowers on a scale not seen since the savings and loan debacle, why would Wall Street investment banks create stock instruments designed to bet against the Residential Mortgage Backed Securities market?

128.   Plaintiffs are all in loans far higher than the value of their properties. Plaintiffs are expected to pay these loans when the over-valued appraisals used to set the loan amounts were incentivized by CITIBANK.  Plaintiffs have been injured by the loss of equity and investment in their properties.  Therefore, it is certain that Plaintiffs have been injured by the acts of the Defendant.

129.   Furthermore, based on the above analysis, the injuries suffered by Plaintiffs is a direct result of the conduct of Defendant.

130.   There is moral blame associated with lying, deceit, and fraud encouraged by these Defendants. The Defendant's conduct is clearly reprehensible.

131.   Banks should not be allowed to treat borrowers with such reckless disregard for their welfare.  Before Congress last year, former Federal Reserve Chairman, Alan Greenspan, admitted he was in "a state of shocked disbelief" that Defendant had failed to regulate themselves.

132.   The result of allowing banks free reign over dealings with borrowers and loan approvals has been an invitation for fraud and deceit.

133.   Therefore as a matter of public policy, a duty should be found between Defendant and borrowers to sustain a reasonable level of care in handling the loan transactions.

134.    Stated income loans have often been referred to as "liars loans." The implication of this secondary title is that those seeking the loans are the "liars." With an internal memo from JP Morgan Chase as a prime example (attached hereto as Exhibit B), it is not the loan applicants who were the liars in these transactions, but the lenders. Everyone is trying to place blame on borrowers for entering into unaffordable loans which lead to default and their dispossession of their properties, when the borrowers were deceived and their loan applications were altered. Why should borrowers bear the weight of the housing disaster?

135.    While parties should be encouraged to rely on their own ability to protect themselves through their own prudence, diligence and contracting power, the same should not be said when the party is dealing with unethical and deceitful behavior. Plaintiffs aren't arguing that the bank should ensure that Plaintiffs can afford their mortgages. Plaintiffs are arguing that, as a minimum, a bank should not encourage the alteration of the income provided by Plaintiffs, approve a loan they should not so that they can sell it to investors, and then use the approval to persuade Plaintiffs they can afford the loan in which they are being placed.

136.    Asking banks to follow their own underwriting guidelines would not in any way adversely impact the bank. The bank sets the guidelines. If the bank wants riskier loans approved, it should set lower underwriting standards instead of holding out to the public that it has impeccable underwriting standards and then encouraging fraudulent adjustment of loan applications to approve loans not within their own standards.

137.    In this case, a duty should be found between Defendant and Plaintiffs. After weighing all of the *Nymark* and *Roe* factors, public policy is best served by a finding of duty.

138.    The Defendant did not act as a reasonably prudent corporation or federal savings bank and, as a result, the plaintiffs were damaged by the Defendant' negligence. Just as a duty was found in *Connor* due to the expanded role the bank took on in the financing of

1   the construction of homes, a duty was created here when Defendant took on roles beyond

2   that of a mere lender and became involved in all aspects of the RMBS industry.   The

3   Defendant should be held liable for the damages its negligence caused.

4   139.   Defendant encouraged brokers and employees to adjust and fraudulently submit

5   loan applications.   In essence, the Defendant encouraged fraud on itself.   Although the

6   Defendant encouraged its employees and brokers to defraud themselves, this encouraged

7   fraud damaged Plaintiff and indicates a breach of reasonable care.

8   140.   But for these behaviors of the Defendant, Plaintiffs would not have been injured.

9   Had the Defendant not encouraged the fraud, Plaintiffs would not have been lured into

10   over-valued loans with terms they could not afford.   Plaintiffs would not have been

11   approved for the loans and would have remained where they were.   Now, Plaintiffs are

12   facing homelessness, and have lost the equity and investments in their properties.   None of

13   this would have occurred but for the encouragement of loan application adjustment for

14   approval of loans.

15   141.   It is foreseeable that encouraging the adjustment of loan applications in order to

16   qualify otherwise unqualified borrowers would lead to borrowers being placed in loans

17   they could not afford.   Furthermore, it is foreseeable that borrowers placed in loans they

18   cannot afford will, at some point, default.

19   142.   Because of the above, Defendant's acts were the actual and proximate cause of

20   Plaintiffs' injuries.

21   143.   Plaintiffs have suffered multiple damages as more fully set forth above.   In

22   general, plaintiffs have suffered severe emotional distress, severe financial difficulty, the

23   loss of equity and investment in their properties, and, in some cases, face dispossession

24   from their properties.

25   144.   Defendant acted outrageously and persistently in performing the acts alleged

26   herein and continues to do so.   Accordingly, Plaintiffs are entitled to exemplary and

27

28

1  punitive damages in a sum according to proof and to such other relief as is set forth below

2  in the section captioned Prayer for Relief which is by this reference incorporated herein.

3

4  **FOURTH CAUSE OF ACTION**

5  Negligence (servicing)

6  (By all Plaintiffs Against CITIBANK)

7  145.   Paragraphs 1 through 144 and the paragraphs following this cause of action are

8  incorporated by reference as though fully set forth herein.

9  146.   The complete analysis of the elements of negligence above are analogous to this

10  cause of action based on a different phase of the lending process – loan servicing.

11  147.   Again, as the loan servicer intimately involved in the RMBS market, CITIBANK

12  is not acting in a traditional role as a mere lender of money.

13  148.   Property owners have repeatedly attempted to work things out with CITIBANK

14  outside of court by working with the loan modification department.   CITIBANK loan

15  modification representatives, while first purporting to negotiate with borrowers, have

16  demonstrated by their actions an unwillingness to work with borrowers.

17  149.   Although clients are required to resubmit massive amounts of documentation

18  month after month, CITIBANK staff continues to "lose" this documentation month after

19  month.  In some instances, CITIBANK employees have told clients they did not receive

20  documents when the client received confirmation of receipt for such documents.

21  150.   These acts are purposeful and have a two-fold intent:  1) to convince Plaintiffs not

22  to pursue available legal action, and 2) to collect additional payments from Plaintiffs to

23  which CITIBANK is not entitled.

24  151.   These are not the acts of one or a few CITIBANK employees, but the regular and

25  systematic acts of all CITIBANK employees.   CITIBANK not only knows of the acts of

26  these employees, but encourages and ratifies these acts.

27

28

152.   Plaintiffs have suffered emotional distress related to the documentation demands of CITIBANK.   Furthermore, Plaintiffs have put forth significant effort and costs complying the repeated document requests.

153.   Plaintiffs have expended ample time on hold waiting to speak with a representative about the progress of their application only to be told their documentation was, once again, "lost" or not received.

154.   CITIBANK knew or should have known that these acts would cause damage to Plaintiffs and yet it acted in wanton disregard of Plaintiffs welfare.

155.   Defendant acted outrageously and persistently with actual malice in performing the acts alleged herein and continues to do so.   Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant and each of them as follows:

1. Declaratory relief and nominal and punitive damages according to proof under the First and Second Cause of Action;

2. Equitable relief according to proof under the Second Cause of action;

3. General, special and exemplary damages according to proof under the Third and Fourth Causes of Action;

4. On all causes of action, for costs of suit herein;

5. On all causes of action, for pre- and post-judgment interest;

6. On all causes of action for which attorney's fees may be awarded pursuant to the governing contract, by statute or otherwise, reasonable attorneys fees; and any other relief as the Court may deem appropriate.

PLAINTIFFS HEREIN DEMAND A JURY TRIAL.

Dated: February 15, 2012

Respectfully submitted by,

Kristin Crone, Esq.
UFAN Legal Group, PC
Attorney for Plaintiffs